**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
**www.flsb.uscourts.gov**

In re:

JOSEPH LOUIS FORD, III,

      Debtor.

_____/

Case No. 19-10309-EPK

Chapter 11

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTION**
**502(c)(1) TO ESTIMATE CLAIM OF DAVID AND DEBORAH CLARK**

Debtor-in-Possession, Joseph Louis Ford, III (the "Debtor"), by his undersigned counsel, respectfully move pursuant to 11 U.S.C. § 502(c)(1) to estimate at $0.00 for all purposes in this Chapter 11 Case the unsecured claim of David and Deborah Clark (the "Clarks") as set forth in Proof of Claim No. 2 in the amount of $2,500,000.00 (the "POC") filed in this case on April 5, 2019 and seeking: (i) "economic damages of at least $2.5 Million" for "breach of contract"; (ii) interference with an alleged "otherwise valid and enforceable Clark/Lawson contract"; (iii) disgorgement of the funds received by the Debtor in connection with the Ferrari; and (iv) economic damages/lost commission as a result of their alleged justifiable representations by the Debtor and/or concealment of material facts concerning that certain 1954 Ferrari 375 Plus Serial No. 0384AM (the "Ferrari"). In support of the Motion, the Debtor relies upon the following facts and substantial matters of law:

**Jurisdiction, Venue and Predicate for Relief**

1.     This Bankruptcy Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). The statutory predicate for the relief requested is 11 U.S.C. § 502(c)(1).

**Relevant Procedural Background**

2.        On January 9, 2019 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code.

3.        A hearing to consider approval of the Disclosure Statement [ECF No. 242] for Debtor's Plan of Reorganization [ECF No. 241] is scheduled for February 6, 2020 [ECF No. 244].

**Relevant Factual Background**

4.        This underlying dispute between the Debtor and David Clark ("David")[1] involves a rare Ferrari 375 Plus #0384AM racecar that had a portion stolen from it in 1989. (**Exhibit A**: *Affidavit of Ford RE: Settlement, Gardner Misrepresentations, and London Hi-Jacking*, dated July 15, 2013).  The owner of the vehicle at the time of the theft was Karl Kleve. (**Exhibit B**: Affidavit of Karl Kleve, dated August 11, 1999).

5.        After Karl Kleve's death, his three daughters, Lawson, Kleve, and English, inherited equal ownership interest.   (**Exhibit C**: *Amended and Restated Settlement Agreement*, dated July 15, 2016).  Years later in  London litigation, a UK court would find that Karl Kleve had sold his interests before his death. (**Exhibit S**: *Ruling in London Court*)

6.        On or about July 18, 2007, David contracted with the Kleve Heirs (Lawson, Kleve, and English) to recover and sell the Ferrari. (**Exhibit I**:  *Clarks' First Amended Complaint* at ¶13).

7.        The contract provided that Clark would be paid ten percent (10%) of the proceeds upon the recovery and sale of the Ferrari at his expense (**Exhibit J**: *Clark Contract*, dated July 16, 2007). After entering into the 2007 Contract and before February of 2010, Clark made a few, apparently unsuccessful phone calls to acquire the stolen portion from the Belgian possessor.

---

[1]        Deborah Clark is not a party to any of the alleged contracts and she therefore lacks standing to have ever filed the POC.

(*Deposition of Joseph Ford*, May 29, 2018).

8.      On or about February 12, 2010, Jacques Swaters, a Belgian car dealer, and his daughter, Florence Swaters, filed a Complaint, Case No. A1001370, against Defendants Lawson, Kleve, and English, in Hamilton County, Ohio, making claims that he owned the entire Ferrari including the Ohio parts. (**Exhibit D**: *Affidavit of Kristi Lawson* dated June 27, 2013).

9.      The Swaters claimed they were the lawful owners of the Ferrari although the Kleve Heirs were in possession of several original parts, including a gas tank, hood, rear deck lid, floor panels and other pieces, and held an Ohio Certificate of Title to the Ferrari. (**Exhibit I**: *Plaintiffs' First Amended Complaint* at ¶16-18).  The Swaters sought to recover the spare parts and to resolve the title issue. (Id. at ¶20).

10.      Lawson notified Clark of this lawsuit, and Clark responded, not by paying expenses to defend against the lawsuit or to retain his "exclusive right to recover and sell" but to instead tell Ms. Lawson that they should get Christopher Gardner involved, who in turn said he would not get involved, but they should contact the Debtor.   (*Id*. at ¶s 21, 22, 23)

11.      Debtor represented that he was an author of an Architectural Book, a retired Architect, a Louisiana licensed attorney with an inactive license, and a former international classic car dealer and exporter. (**Exhibit D**: *Affidavit of Kristi Lawson* dated June 27, 2013; and **Exhibit FF**: *Sworn Affidavit of David Clark*, #5, 7).

12.      Debtor's February 21, 2010 email to the Clarks, forwarded to Ms. Lawson the next day clearly stated "After receipt and review of the files, I can make my suggestions about whether and how I propose to be involved. Under no circumstance should Ms. Lawson not hire an Ohio attorney and answer on time, even if as a request for more time to answer."  (**Exhibit BB**:  Email from Debtor to the Clarks dated 2/20/2010; **Exhibit M**: *Affidavit of Joseph L. Ford, III* dated June

3

6, 2018).

13.    Debtor and Lawson entered into a Sales Agreement and Option Agreement on or about February 25, 2010 which gave the Debtor twenty percent (20%) ownership share with an option to acquire an additional fifty percent (50%) ownership share for $5,000.00 and a promissory note for an additional $95,000.00. (**Exhibit E**: *Sale Agreement and Option Agreement, with changes*, first dated February 25, 2010).

14.    On or about April 8, 2010, the Ohio Court in Case A1001370 acknowledged that the Debtor held seventy percent (70%) majority ownership interest in the Ferrari. (**Exhibit E**: *Sale Agreement and Option Agreement, with changes*, first dated February 25, 2010).

15.    Debtor then assembled a team of attorneys to represent Lawson and always had attorneys working on her case. (**Exhibit G**: *Kristine Lawson January 16, 2014 Deposition* at 19:10-19).

16.    Although the Debtor had a legal background in Louisiana, he also had extensive knowledge in classic car transactions. (**Exhibit D**: *Affidavit of Kristi Lawson* dated June 27, 2013).

17.    Case A1001370 filings show Lawson had Ohio attorneys representing her, and Ford had Ohio attorneys representing him, but for a brief period when he acted *pro se*.  The Debtor only assisted in the investigation and assisted in navigating through 1989 theft, international smuggling, and re-stamping with a phony serial number (**Exhibit G**: *Kristine Lawson January 16, 2014 Deposition* at 42:12-18, 45: 8-12, 118:9-12, and 118:25-119:1-10).

18.    Attorney Timothy Smith has known about the Ferrari since the 1970's. (**Exhibit H**: *Affidavit of Timothy Smith, Esq. in Support of Motion for Summary Judgment*).  Attorney Smith said that he met with the Debtor in 2010 and stated, "Ford, III informed me that he had purchased a portion of the Ferrari from Kristine. He never informed me at this meeting that he had a legal

4

background; rather, he was investigating the matter. He informed me that he had attorneys working on the matter from the Taft law firm." (*Id.* at ¶9)

19.     As background, in 1990 the FBI ultimately located the Ferrari in Belgium, even if done so indirectly by having the Ferrari listed as stolen internationally.  (**Exhibit L**: *Complaint in Swaters, et al. v. Lawson, et al., Hamilton County Case No. A1001370*).  The Swaters initiated the 2010 lawsuit in Ohio after being made aware that parts were still in Ohio and Lawson was still claiming ownership. (*Id.*).  The Swaters claimed they were the innocent purchases from Karl Kleve's agent in 1999 who therefore had good title, a claim later proven in the UK court. (*Id.*) The case in Ohio caused the Swaters to enter an agreement entitled the Heads of Agreement. (**Exhibit K**: *Heads of Agreement*).

20.     In March 2013, the Heads of Agreement was reached to settle the Swaters v. Lawson litigation. (**Exhibit K**: *Heads of Agreement*).  The Agreement was entered into between the Swaters (also referred to as the Belgian Contingency), Kristine Kleve (Lawson), Joseph Ford, III, and Christopher Gardner (also referred to as the Ohio Contingency) and Bonhams 1793 Limited (also referred to as Bonhams).  (*Id.*)  It provided that Bonhams 1793 Limited, an auction house, was the exclusive worldwide agent for selling the Ferrari. (*Id.*)  On June 27, 2014, Bonhams auctioned the Ferrari at the Goodwood Festival of Speed in Chichester, England, and Copley Motorcars, as agent for Les Wexner/L Brands, Ltd. purchased it for the hammer price of $16.32 Million based on the then-current conversion rate. (*Exhibit I*:  Clarks' First Amended Complaint at ¶46).  Lawson and the Debtor objected to the sale of the Ferrari by Bonhams because of issues with Bonhams and Christopher Gardner because the Auction House was misled by Gardner who led Bonhams to believe he had ownership interest and that all Ohio litigation had ended. (*Id.* at ¶47; *see also* **Exhibit A**: *Affidavit of Ford RE: Settlement, Gardner Misrepresentations, and*

*London Hi-Jacking*, dated July 15, 2013, at ¶6).

21.    The Ferrari's buyer at the Bonhams auction filed suit in the United Kingdom to rescind the sale because of pending litigation in Ohio. (**Exhibit I**: *Clarks' First Amended Complaint* at ¶¶ 48, 49).

22.    On or about April 17, 2016, Debtor and Lawson settled their claims regarding the Ferrari in exchange for payment of £2,349,646 ($3,330,858.17). (*Id*. at ¶50).  These settlement proceeds were divided as follows: Lawson received $300,000, English received $150,000, Kleve received $150,000, and Ford III received $1,112,049 after having to pay approximately $1,300,000 of attorney fee and litigation expenses. (*Id*. at ¶51; *see also* **Exhibit C**: *Amended and Restated Settlement Agreement*, dated July 15, 2016; and **Exhibit N**: *Settlement Agreement and Mutual Release*, dated May 25, 2016)

23.    David Clark has testified through deposition that he only ever had two potential buyers interested in the Ferrari, a mystery buyer in 2014 and Hugh Taylor in 2007 (**Exhibit O**: *Deposition of David Clark* at 71: 18-21, 97: 17-25).   Despite demand by Bonhams to produce his buyer, Clark never supplied a buyer for the Ferrari and it was sold through Bonhams (*Id*. at 106-108).

24.    David Clark admits he never recovered the Ferrari or provided a buyer (*Id*.).

25.    In fact, David Clark actually caused additional litigation between the Swaters and the Kleve Heirs when attempting to initiate negotiations. (**Exhibit I**: *Plaintiffs' First Amended Complaint* at ¶¶19, 20, 21). It was clear that Clark could not and did not recover the Ferrari as promised once the lawsuit was filed by the Swaters in 2010. (**Exhibit H**: *Affidavit of Timothy Smith, Esq. in Support of Motion for Summary Judgment* at ¶15).

26.    The chassis was in the possession of Florence Swaters, and in October of 2015, the

6

London court determined that the chassis, and the remainder of the Ferrari, including the part that had been in the possession of Kristine Lawson, belonged to Florence Swaters because Karl Kleve's agent had sold it in 1999. (*Id*. at ¶¶ 14, 16) But for Debtor's involvement because of his ownership interest that he purchased, there would not have been a favorable resolution for the Kleve sisters, because of this court determination.   (*Id*. at ¶15).

27.     Neither David Clark nor Deborah Clark ever paid any attorney fees to Timothy Smith (who represented Lawson in the London court and Ohio court Swaters case) to assist in the recovery of the Ferrari, nor did they assist in any productive way in the recovery or sale of the Ferrari.  (*Id*. at ¶¶ 12,17).

28.     Further, the 2007 Contract that Clark entered into with the Kleve sisters stated that David Clark was authorized to recover and sell the Kleve Ferrari and that he was providing a buyer, Hugh Taylor, for that sale, and that if the Kleve sisters decided to sell parts of the automobile, they agree to retain him as well.   (**Exhibit J**: *Clark Contract*, dated July 16, 2007).  David Clark did not recover the Ferrari, as stated above.

29.     The London Court determined that the Kleves were not the owners of the Ferrari chassis in the possession of the Swaters, or the Ferrari parts in their possession, and this is the only adjudication of the ownership in this matter.   (**Exhibit S**: *Ruling in London Court*; the grounds for the finding is that Karl Kleve had already settled the theft issue and been paid for clear title, per a 1999 settlement agreement negotiated by Karl Kleve's agent and thus no longer had ownership interest in any part of the Ferrari, regardless of whether or not he never turned over a title document or the remaining parts to the Ferrari).   Therefore, the Kleves could not legally and validly enter into a contract to sell something that they did not own, and thus the Clark contract is void *ab initio*.

## The Clarks' Claim

30.    The POC contains four (4) basis for alleged relief:

    i.    **Breach of Contract**.  The Clarks seek "economic damages of at least $2.5 Million" for "breach of contract".  A copy of this contact dated July 18, 2007 is attached as Exhibit 1 to the POC (the "Contract") and concerns the Ferrari.  Pursuant to the Contract, David Clark ("David") as "Agent" under the Contract, he was obligated to pay all expenses associated with the recovery and sale of the Ferrari.  David played absolutely no role in the sale and recovery of the Ferrari, nor did he pay any of the expenses associated with the sale and recovery of the Ferrari.

    ii.    **Interference with a Contract**.  The Clarks also seek $2.5 million for the alleged lost commission under the Contract based on the Debtor's alleged interference with an alleged "otherwise valid and enforceable Clark/Lawson contract by engaging in illegal acts, including, but not limited to, entering into contracts for champerty, maintenance, and/or the unlicensed practice of law".

    iii.    **Public Policy/Disgorgement/Constructive Trust**.   The Clarks allege in the POC that the "acts of [the Debtor] including, but not limited to, holding himself to be a licensed attorney (when he is not), holding himself out as qualified to handle complex, commercial international litigation (when he is not), unlawfully purchasing an interest in the subject matter of litigation, usurping control over the conduct of litigation by preying on the unsophisticated and uninformed parties (without the benefit of competent local counsel), and finally taking $3,412,049 of the settlement proceeds and leaving the Kleve Heirs to split $600k is outrageous, shocking to the conscience, an abomination, a travesty of justice and violates the public policies of the State of Florida including, but not limited to the prohibitions against payment for the unlicensed practice of law and contracts for champerty and/or maintenance."  The Clarks thereafter claim that they are entitled to "the proceeds from the sale of the Ferrari received by [the Debtor which] must be disgorged and held in trust for payment of creditors' claims or distributed to the Kleve Heirs."

    iv.    **Fraud**.  The Clarks' final grounds for their POC is that "[a]s a result of their justifiable reliance on the Debtor's representations and/or concealment of material facts, the Clarks have incurred economic damages including but not limited to, the lost commission of $2.5 Million."

**Requested Relief**

31.    The Debtor requests that the Court estimate the Clarks' Claim at $0.00 for all purposes in this Chapter 11 Case, including for allowance, distribution, and creation of a disputed claims reserve under the Debtor's Plan.

**Basis for Requested Relief**

**A.    Bankruptcy Code Section 502(c)**

32.    Section 502(c) of the Bankruptcy Code provides that "[t]here shall be estimated for purpose of allowance under this section any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case . . . ." 11 U.S.C. § 502(c) (emphasis added).

33.    The claims estimation process that is considered by section 502(c) "provides a means for a bankruptcy court to achieve reorganization, and/or distributions on claims, without awaiting the results of legal proceedings that could take a very long time to determine." *In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415, 422 (Bankr. S.D.N.Y. 2003). Section 502(c) therefore requires a bankruptcy court to estimate a claim where liquidation of that claim would otherwise unduly delay the reorganization process. *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1011–12 (4th Cir. 1986) (noting that the duty to estimate contingent or unliquidated claims is "a mandatory obligation of the bankruptcy court" where otherwise the claim would cause undue delay).

34.    In this case, the trial in the underlying Ohio State Court Action is currently scheduled for January 20, 2020 through January 24, 2020.

35.    Based on the long history of this case, the Debtor reasonable believes that if he wins at trial, it is a virtual certainty that the Clarks will appeal.

36.    An appeal could take many months if not years to be finalized.  There were six

9

consolidated appeals by the Debtor and Kristine Lawson in the prior Ohio litigation, all of which

the won.  The average time of those appeals exceeded 12 months.

37.    The Debtor therefore respectfully submits that the facts and circumstances

surrounding the Clarks Claim creates the exact type of situation that Congress envisioned in

enacting section 502(c) of the Bankruptcy Code.  Simply put, the Debtor will not be able to

implement his Plan and pay what he calculates to be a 58% distribution to his unsecured creditors

without estimating the Clarks' Claim.  For the reasons set forth below, the Court should estimate

the Clarks' Claim at $0.00.

**B.    The Clark's Claim is grounded solely on a contract that is void *ab initio*, and therefore the claim should be estimated at $0.00.**

38.    The Clarks' Claim is based entirely on the assumption that the Clark/Lawson

contract (**Exhibit J**: *Clark Contract*, dated July 16, 2007) is valid and enforceable. However, the

Clark/Lawson contract is actually void *ab initio*.

39.    Ab initio is a Latin word that means "from the beginning".   Merriam-Webster

Dictionary, https://www.merriam-webster.com/dictionary/ab%20initio,  June  2,  2018.  If  a

contract  is considered void ab initio by a court, it is considered invalid from the time it was written

and/or signed, as if the contract never existed.   The subject of the Clark/Lawson contract was a

particular Ferrari claimed to be owned by the Kleve Sisters.

40.    If David Clark recovered and subsequently sold to his buyer listed in the contract,

Mr. Clark would be paid a commission.

41.    However, one cannot enter into a contract to sell something they do not own.  The

most one party can transfer to another are the rights it actually and lawfully possesses.

42.    The London Court ruled that the Kleve sisters did not have any ownership interest

10

in the Ferrari. (**Exhibit S**: Ruling in London Court) The London Court is the only court in any jurisdiction that has ruled on the ownership of the Ferrari, and no appeal has been successful in overturning this ruling.   (**Exhibit M**: *Affidavit of Joseph L. Ford*, III dated June 6, 2018).

43.     Whether it is void because of impossibility of performance because the Kleve sisters could not enter into a contract for services to sell something that they did not own, or void because of fraud by the Kleve sisters in holding out that they owned something that they did not, and regardless of whether they did so in good faith or not, it still remains that the contract was never valid and was void ab initio.   As such, the Clark's Claim is based around an invalid contract, it should be estimated in the amount of $0.00.

44.     It is undisputed that the London court found that the Swaters had entire ownership, not the Kleve sisters.   It is undisputed that at the time the Kleve sisters entered into the contract with David Clark, the Kleve sisters would not have legally owned the Ferrari the subject of the contract.   Following, David Clark could not have been authorized to receive a commission on the sale of Ferrari and thus has no claim in this case.

**C.     Even if the Contract is Deemed Not To Be Void *Ab Initio*, the Clarks' Claim Should Still be Estimated at $0.00**

**i.     Breach of Contract**

45.     In order to substantiate a breach of contract claim, a party must establish four elements: (1) a binding contract or agreement was formed, (2) the nonbreaching party performed its contractual obligations, (3) the other party failed to fulfill its contractual obligations without legal excuse, and (4)  the nonbreaching party suffered damages as a result of the breach. *Carbone v. Nueva Construction Group, L.L.C.*, 2017-Ohio-392, 83 N.E. 3d 375. As stated above, there was no binding agreement between Kristine Lawson, Karyl Kleve, Katrina English, and

11

David Clark to recover and sell the Ferrari as the contract was void *ab initio*.  However, if it is ruled that the Clark/Lawson contract is valid, then ultimately the London Court's ruling that the Kleve sisters did not own the Ferrari a subject of the Clark/Lawson contract caused performance of the contract to be impossible.

46.    Assuming for argument's sake, however, that the contract was binding because it was a valid agreement containing written language that the sellers (Kleve sisters) "authorized the Agent to recover and sell the Kleve Ferrari.   In return, Sellers have agreed to pay Agent ten percent of the proceeds of the sale." (**Exhibit J**: *Clark Contract*, dated July 16, 2007).   Note that it does not say to "assist" or "help" in the recovery and sale of the Ferrari; it says to "recover and sell the Kleve Ferrari".  *Id*.  Clark stated in his deposition that he made three or four phone calls to Florence Swaters between 2007 and 2010.   (**Exhibit O**: *Deposition of David Clark* at 23:3-25:12).   He stated that he believed these phone calls caused the Swaters litigation in Ohio and that that helped in the recovery of the Ferrari.   (*Id.*)

47.    David Clark also stated that when Kristi Kleve (aka Kristine Lawson) was sued, she called him and he called Chris Gardner to get involved, and that it helped in the recovery of the Ferrari.   (*Id.* at 25:13-26:16).   In response to the question of what she personally did to help recover and sell the Ferrari, Deborah Clark replied, "Nothing." (**Exhibit EE**: *Deposition of Deborah Clark* at 70:6-10).

48.    In 2010, the Debtor agreed to work with David Clark to "reach a mutually acceptable agreement with Dave Clark to integrate" the 2007 Lawson, Kleve, English, Clark Agreement into his Sales Agreement with Lawson. (**Exhibit E**: *Sale Agreement and Option Agreement, with changes*, first dated February 25, 2010). However and assuming a successful integration of its terms as written, Clark never recovered the Ferrari nor produced a buyer for it

12

per his own deposition testimony; when asked "[d]id you ever provide a buyer to Bonhams," Clark replied "[n]ot at all." (**Exhibit O**: *Deposition of David Clark* at 108: 10-11). Therefore, by Clark's own admission, he never performed his contractual duties and a breach of contract claim cannot stand as a matter of law.

49.     Also, in his deposition, David Clark stated when asked if he recovered the Ferrari, "I don't think the Ferrari was ever recovered" and "Nobody recovered the Ferrari."   (*Id*. at p.26: 12-16)   The second element requiring that the nonbreaching party performed its contractual obligations is not met because Clark (who claims himself to be the nonbreaching party) never performed his contractual obligations.

50.     Further, the third element that the other party failed to fulfill its contractual obligations without legal excuse is not met.   If, for argument's sake, there was a valid contract and Clark performed his obligations, the other party did not fulfill its obligation to pay because of a legally valid excuse—an order of the court ruling that the Kleve sisters did not own the car, and therefore they could not sell it.

51.     The fourth element does not need discussion because none of the other three elements are met, therefore no damage exists because there was no breach of contract, for the foregoing reasons stated.

52.     Additionally, the Debtor was never a party to the Clark/Lawson contract, and therefore could not possibly breach it.   He was not privy to the contract, therefore, no breach of contract claim should be allowed against them.   Even if the Clarks contend that the Debtor had an obligation to work with Mr. Clark to integrate his 2007 agreement or to protect his commission, the Clarks were not privy, gave no consideration, and were not a party to any contract the Debtor had with Lawson or any of the Kleve sisters, and no legal obligation was owed or created by the

13

Debtor to Mr. Clark.  Therefore, this Clark's Claim for $2.5 Million for claim should estimated at $0.00.

    **ii.**      **Interference with a Contract**

53.    "To recover for a claim of intentional interference with a contract, one must prove (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St. 3d 415, 650 N.E.2d 863.  As set forth above, the contract is void *ab initio* and there is no contract to be interfered with.

54.    However, for argument's sake, assuming there was a contract, and that the Debtor knew about the contract, the Debtor did not intentionally procure the contract's breach.

55.    David Clark never recovered the Ferrari nor produced a buyer for it, as he admitted at his deposition.  It is arguable that Clark is the one who breached the contract by failing to recover the Ferrari and failing to produce the buyer of said Ferrari.

56.    Although the Debtor signed the Heads of Agreement, wherein Bonhams Limited was named the authorized seller, it was for informational purposes only, and the Debtor had no authority to authorize another seller because in 2015 the Swaters were the lawful owner of the vehicle.

57.    Furthermore, even if the Debtor had the authority to authorize a seller, David Clark had not fulfilled his portion of the contract because he had not recovered the Ferrari, bottom line, and therefore could not be authorized the seller under the Clark/Lawson contract.  This is a valid justification.  It is arguable as well that Mr. Clark did not incur any expenses for the recovery of the Ferrari, as he was not successful and not entitled to any commission or reimbursement of expenses if he was not successful, and therefore had no legitimate damages.

58.     On the contrary, the Debtor provided considerable time, effort and money for the recovery of the Ferrari, to which he had a good-faith and reasonable belief that he had ownership interest in, and had no intention to interfere with the Clark/Lawson Contract, as evidenced by his and Kristine Lawson's objections to Bonhams selling the Ferrari. (**Exhibit M**: *Affidavit of Joseph L. Ford, III* dated June 6, 2018).

59.     Although the elements of tortious interference as set forth above do not require interruption of a valid and enforceable contract by engaging in illegal acts, as the POC, we will assume for argument's sake that the Clarks are alleging that the Debtor's intentional procurement of the contract's breach was entering into a contract for champerty, maintenance, and/or the unlicensed practice of law.   This is a stretch, and makes many illogical jumps to reach this allegation, but the Debtor did not enter into, nor conspire to use, a contract for champerty, maintenance, and/or unlicensed practice of law to the detriment of Plaintiffs.

60.     First, the contract to which the Debtor believes the Clarks may be referring to as a contract for champerty, maintenance, and/or unlicensed practice of law is actually a Sale Agreement and Option agreement to purchase interest in the Kleve Ferrari.  (**Exhibit E**: *Sale Agreement and Option Agreement*, with changes, first dated February 25, 2010).  The Clarks were not a party to the Sale and Option agreements.   Therefore they do not have standing to raise champerty and maintenance claims because the Ohio Supreme Court has stated that the defense of champerty is confined to "the actions or disputes between the *parties* to the champertous contract, and never allow it in an action to recover the claim which was the subject matter of the contract" *Stewart v. Welch*, 41 Ohio St. 483 (1885) at Syllabus ¶ 1 (emphasis added); *see also Compare Oil, Inc. v. Martin*, 381 Ill. 11, 44 N.E.2d 596, 600 (1942)(claim that contract is champertous "may only be invoked by the parties to the agreement"); *Acorn Bankshares, Inc. v. Suburban Bancorp,*

*Inc.*, 1985 U.S. Dist. LEXIS 24209, 1985 WL 2671, 7 (N.D.I ll. 1985) (claims for champerty may only be invoked by parties to the agreement); *Stolz-Wicks, Inc. v. Commercial Television Service Co.*, 271 F2d 586, 589 (7th Cir. 1959)(illegality of contract as a defense is only available to the immediate parties in an action to seek enforcement of an illegal contract).

61.     Debtor has had experience in the procurement and sale of rare cars.   (**Exhibit A**: *Affidavit of Ford RE: Settlement, Gardner Misrepresentations, and London Hi-Jacking*, dated July 15, 2013).  Based on this knowledge, the Debtor was contacted by Christopher Gardner who was contacted by the Clarks (**Exhibit FF**: *Sworn Affidavit of David Clark*, dated October 9, 2013 at #5; **Exhibit A**: *Affidavit of Ford RE: Settlement, Gardner Misrepresentations, and London Hi-Jacking*, dated July 15, 2013).   In addition, the Debtor is an architect, author, and has a law degree, albeit he was not currently licensed to practice law.  (**Exhibit A**: *Affidavit of Ford RE: Settlement, Gardner Misrepresentations, and London Hi-Jacking*, dated July 15, 2013).  Further, David Clark stated in a sworn affidavit that "At no time did we think Ford neither was to act as a lawyer nor did Ford offer to act as lawyer, for us or anyone else.   At no time did the Debtor claim to have acted as Gardner's lawyer."   (**Exhibit FF**:   *Sworn Affidavit of David Clark, dated October 9, 2013*, at #7).

62.     The Debtor should not be punished for participating in litigation as a litigant, not as an attorney—several attorneys of record exist for the Defendants—simply because he had an ownership interest in the Ferrari and could use his experience and knowledge to make suggestions and recommendations as to how the litigation and contracts should be handled.   The Debtor did not file any documents in any legal proceeding representing himself as a licensed attorney. (**Exhibit M**: *Affidavit of Joseph L. Ford, III* dated June 6, 2018).   To the contrary, he clearly stated that he was not licensed, and hired licensed representation accordingly.

63.     Ohio Revised Code § 4705.01 provides: "No person shall be permitted to practice as an attorney and counselor at law, or to commence, conduct, or defend any action or proceeding in which the person is not a party concerned, either by using or subscribing the person's own name, or the name of another person, unless the person has been admitted to the bar by order of the supreme court in compliance with its prescribed and published rules."

64.     Debtor at no point in time held himself out as an attorney in any of the litigation or transaction process. Rather, the Debtor assembled a team of attorneys to represent Lawson and always had attorneys working on the case. (**Exhibit G**: *Kristine Lawson January 16, 2014 Deposition* at 19:10-19).   The Debtor had a legal background in Louisiana and he also had extensive knowledge in classic car transactions. (**Exhibit D**: *Affidavit of Kristi Lawson* dated June 27, 2013 at 5). However, the Debtor only assisted in the investigation, assisted in navigating through the puzzle that had to be put together, and relied on attorneys to practice law (*Id*. at 42:12-18, 45: 8-12, 118:9-12, and 118:25-119:1-10).

65.     Attorney Timothy Smith has known about the Ferrari since the 1970's. (**Exhibit H**: Affidavit of Timothy Smith, Esq. in Support of Motion for Summary Judgment) Smith said that he met with the Debtor in 2010 and stated "[h]e (Ford III) never informed me at this meeting that he had a legal background; rather, he was investigating the matter. He informed me that he had attorneys working on the matter from the Taft law firm. (*Id*. at 9).

66.     Debtor never held himself out as an attorney and never appeared in Court as an attorney. Even if the Debtor assisted in preparation of documents it was under the supervision and approval of attorneys hired in the case, Ohio courts have held that laypersons may assist lawyers in preparing legal papers to be filed in court and managing pending claims, as long as they are carefully supervised, approved and filed by a licensed practitioner. *Columbus Bar Assn. v. Thomas*,

109 Ohio St.3d 89, 2006 Ohio-1930, 846 N.E.2d 31. Therefore, the Debtor could not be considered the unauthorized practice of law since they were supervised and approved by licensed practitioners and such claims cannot stand as a matter of law. Debtor obviously could not have been claimed to have participated in the unauthorized practice of law because he had no interaction with the courts in regards to any of the cases, until case A1306451 and now, in which he is a defendant and always represented by licensed Ohio counsel. (**Exhibit R**: *Affidavit of Joseph Ford, IV*, dated June 5, 2018)

   67. Furthermore, the Debtor did not enter into a contract for champerty or maintenance. Maintenance is "assistance to a litigant in pursuing or defending a lawsuit provided by someone who does not have a bona fide interest in the case." *Rancman v. Interim Settlement Funding Corp.*, 99 Ohio St.3d 121, 2003-Ohio-2721, at 3. Champerty is "a form of maintenance in which a nonparty undertakes to further another's interest in a suit in exchange for a part of the litigated matter if a favorable result ensues." *Id*. citing 14 Ohio Jurisprudence 3d (1995), Champerty and Maintenance, Section 1. The court further went on to state that " 'The doctrines of champerty and maintenance were developed at common law to prevent officious intermeddlers from stirring up strife and contention by vexation and speculative litigation which would disturb the peace of society, lead to corrupt practices, and prevent the remedial process of the law." *Id*. citing 14 Corpus Juris Secondum (1991), Champerty and Maintenance, Section 3.

   68. However, the court goes on to state that although champerty and maintenance have been dormant in Ohio courts in recent years, the doctrines of champerty and maintenance appear in numerous Ohio cases as contract defenses. Id. at 4. *See also Tosi v. Jones,* 115 Ohio App.3d 396, 685 N.E.2d 580 (1996). The *Tosi* court stated that "our research has failed to disclose a single Ohio case which recognizes a cause of action in tort arising out of these ancient doctrines,

18

and the appellant has cited none.   We thus conclude that Ohio has never recognized a common-law tort for champerty and maintenance."   *Tosi v. Jones*, 115 Ohio App.3d 396, at 400, 685 N.E.2d 580 (1996).

69.     The Clarks are not a party to any contract with the Debtor and thus cannot have raised the defense of champerty or maintenance.   Instead, the Clarks have attempted to turn it from a defense into a tort for use by an unrelated third party.   They are attempting to use it like a sword, when it was meant to be a shield.   This is not a tort recognized by Ohio law and therefore the $2.5 Million for the alleged lost commission asserted in the POC should be estimated at $0.00.

70.     If for some reason, however, this court believes that there exists a tort of champerty and maintenance, the Debtor has not entered into contracts for champerty and maintenance.   As stated above, maintenance is assistance to a litigant in pursuing or defending a lawsuit provided by someone who does not have a bona fide interest in the case.   Debtor purchased an ownership interest in the Ferrari.   He knew at the time that the Ferrari was in litigation.   However, like a buyer is permitted to purchase a home that is in foreclosure, which is a type of litigation, so too can an individual buy other types of property that is subject of pending litigation.

71.     Debtor had a bona fide interest in the case, as he had an ownership interest in the subject matter of the case and on April 8, 2010 the Ohio Court recognized Debtor's interest and allowed him to intervene and protect that interest.   Later, the Ohio Appellate Courts recognized Debtor's ownership interest as a party when they handled the multiple appeals.   Having a bona fide interest in the case, Debtor was permitted to assist in pursuing or defending a lawsuit, because he had an ownership interest in the Ferrari, and there was no impropriety in doing so. In *Beatley v. Schwartz*, 2004-Ohio-2945, 03AP911, 04-LW-2478 (10th), the court ruled that a party had a bona fide interest even when they were not a named party to a case and permitted a security deposit

19

of the unnamed party who had a bona fide interest in the case to be used for funding.   Therefore, even though he was not initially a named litigant in the case, the Ohio Court granted Debtor's Motion to Intervene and thus recognized that the Debtor had a bona fide interest in the case and could still provide funding for the case because of that bona fide interest.

72.    As stated above, champerty is a form of maintenance in which a nonparty undertakes to further another's interest in a suit in exchange for a part of the litigated matter if a favorable result ensues.   Debtor did not take an interest in a lawsuit in exchange for a part of the litigated matter if a favorable result ensues, as can be seen by the clear language of the Sale Agreement and Option Agreement. (**Exhibit E**: *Sale Agreement and Option Agreement*, with changes, first dated February 25, 2010)   Rather, he purchased an interest in the Ferrari.   As an owner of the Ferrari, he was entitled to fund upon the sale of the Ferrari.   Additionally, as owner of the Ferrari, he was also burdened by the costs associated with the Ferrari including legal fees and of other litigation expenses.   Providing funding for those costs, which included recovery expenses and yes, litigation expenses, is not undertaking an interest in exchange for a part of the litigated matter if a favorable result ensues.   Debtor was bound by favorable and unfavorable, and it was not contingent on the outcome of a lawsuit, but instead the sale of the Ferrari.   Debtor did not enter into contracts for champerty and maintenance.

73.    Debtor represented that he was an author of an Architectural Book, a retired Architect, a Louisiana licensed attorney with an inactive license, and a former international classic car dealer and exporter. (**Exhibit D**: *Affidavit of Kristi Lawson* dated June 27, 2013). Debtor and Lawson entered into a Sales Agreement and Option Agreement on or about February 25, 2010 which gave Debtor a twenty percent (20%) ownership share with an option to acquire an additional fifty percent (50%) ownership share for $5,000.00 and a promissory note for an additional

20

$95,000.00. (**Exhibit E**:   *Sale Agreement and Option Agreement, with changes*, first dated February 25, 2010) On or about April 8, 2010, the Court in case A1001370 acknowledged that Debtor held seventy percent (70%) majority ownership interest in the Ferrari. (**Exhibit E**: *Sale Agreement and Option Agreement, with changes*, first dated February 25, 2010)

74.   Debtor assembled a team of attorneys to represent Lawson always had attorneys working for her on the case. (**Exhibit G**: *Kristine Lawson January 16, 2014 Deposition* at 19:10-19).  Although the Debtor had a legal background in Louisiana, he also had extensive knowledge in classic car transactions. (**Exhibit D**: *Affidavit of Kristi Lawson* dated June 27, 2013).  However, Debtor only assisted in the investigation, assisted in navigating through the puzzle that had to be put together, and relied on licensed attorneys to practice law (**Exhibit G**: *Kristine Lawson January 16, 2014 Deposition* at 42:12-18, 45: 8-12, 118:9-12, and 118:25-119:1-10)

75.   Attorney Timothy Smith has known about the Ferrari since the 1970's (**Exhibit H**: *Affidavit of Timothy Smith, Esq.*).  Attorney Smith said that he met with the Debtor in 2010 and stated, "Ford, III informed me that he had purchased a portion of the Ferrari from Kristine. He never informed me at this meeting that he had a legal background; rather, he was investigating the matter. He informed me that he had attorneys working on the matter from the Taft law firm." (*Id*. at ¶9) Debtor did not engage in the unauthorized practice of law.

76.   Further, David Clark stated in a sworn affidavit that "At no time did we think Ford neither was to act as a lawyer nor did Ford offer to act as lawyer, for us or anyone else.   At no time did Ford claim to have acted as Gardner's lawyer."  (**Exhibit FF**:   *Sworn Affidavit of David Clark*, dated October 9, 2013, at #7). Debtor did not file any documents in any legal proceeding representing himself as a licensed attorney.  (**Exhibit M**: *Affidavit of Joseph L. Ford, III* dated June 6, 2018).

77.    "A contract making the repayment of funds advanced to a party to a pending case contingent upon the outcome of that case is void as champerty and maintenance."    *Rancman v. Interim Settlement Funding Corp.*, 99 Ohio St.3d 121, 2003-Ohio-2721, at 6.    The Debtor did not enter into a contract making the repayment of funds advanced to a party to a pending case contingent upon the outcome of the case, as shown by the clear language of the Sale Agreement and Option Agreement.    Moreover, the spirit of champerty and maintenance is to "prevent litigants from compromising, or settling their controversies, or which in its tendencies, encourages, promotes, or extends litigation."    *Id*. at 4.    But for the Debtor's ownership interest in the Ferrari, the Kleve sisters would have had no recovery of monies on it, because the English courts had ruled the Swaters as the owners of it.    Instead of providing a disincentive to settle, he promoted settlement.    The subsequent Ohio litigation at hand was not brought about by the Debtor, but instead by the Clarks' greed and misplaced sense of entitlement, wherein they provided no recovery of the Ferrari as stated as a condition in the contract to be fulfilled by David Clark prior to receiving payment.

78.    Therefore, the $2.5 Million POC for interference with a contract, based on the theory that the Debtor entered into a contract for champerty, maintenance, and/or the unauthorized practice of law with the Kleve sisters, should be valued at $0.00.

79.    Additionally, the Clark's claim for interference with a contract is barred by the statute of limitations.    The Clarks were aware of the Debtor in 2010.    (**Exhibit EE**: *Deposition of Deborah Clark* at ¶¶ 53 and 54).    The Clarks waited until 2016 to bring the Ohio litigation. (**Exhibit I**:  **Clarks' First Amended Complaint**).    Claims for tortious interference with a contract has a four-year statute of limitations.    R.C. 2305.09(D).    This is another reason why the $2.5 Million POC for interference with a contract should be valued at $0.00.

### iii.        Public Policy/Disgorgement/Constructive Trust

80.      In their POC, the Clarks make sweeping arguments the Debtor did several things that are against public policy.

81.      As set forth above, Debtor did not hold himself out as a licensed attorney or as someone qualified to handle complex litigation.   The Clarks and Ms. Lawson admit that the Debtor was up front about being an unlicensed attorney and Debtor's very first email to the Clarks, forwarded to Ms. Lawson, recommends that Ms. Lawson immediately hire an Ohio attorney. (**Exhibit M**: *Affidavit of Joseph L. Ford, III* dated June 6, 2018).

82.      If the Kleve sisters made unfounded assumptions that because he had knowledge of rare cars on an international level, and had a law degree, even though they knew he was unlicensed, then that is not the Debtor's fault but that of the Kleve sisters. Ms. Lawson hired an Ohio attorney (Santen-Hughes) for herself within a day of her signing the Sale and Option Agreement while the Debtor hired his own Ohio attorney a week or so after that. (*Id.*)

83.      At no time did the Debtor unlawfully purchase an interest in the Ferrari. There is no law against purchasing property that is the subject matter of litigation.

84.      Neither did the Debtor prey on unsophisticated and uninformed parties. As evidenced by the contracts between the Kleve sisters in 2014 and 2016, the parties stated that they were represented by their own attorneys or had the opportunity to be, and were fully aware of all of the documents in the matter, as well as giving their consent to Kristine Lawson to handle all the dealings with the litigation and Ford, and signing over their interest in the car to Lawson.   Just because the Clarks may have made decisions that they may now regret, they should not be permitted to seek unfounded remedy in someone who bore all the risk, did nothing illegal, and got lucky.   The seller that sold the car to Mr. Kleve for $2,500 originally is not making these claims,

probably because he too knows it to be inappropriate.

85.     The Clarks make sweeping claims that the Debtor violated laws and public policies of the State of Florida, which he did not do.   The Plaintiffs allege that the Debtor took payment for the unlicensed practice of law and entered into contracts for champerty and/or maintenance, which, as is argued above, is false.

86.     The Clarks also claim that the Debtor received proceeds from the sale of the Ferrari and that said proceeds must be disgorged.

87.     "Disgorgement is defined as "the act of giving up something (such as profits illegally obtained) on demand or by legal compulsion." *Miller v. Cloud*, 2016-Ohio-5390, 76 N.E.3d 297, (App. 7 Dist. 2016).   Disgorgement is used when there is a wrongdoing.  *Id*.   There has been no wrongdoing by the Debtor in this matter, and thus disgorgement is not applicable and the Clarks' claims of disgorgement should be valued at $0.00.

88.     Further, "[s]ince disgorgement of profits/gains is not a claim upon which relief can be granted but rather a remedy, all Plaintiffs' claims for disgorgement of profits/gains against Defendants are dismissed." *Id*. at 107. *See also Musial Offices, Ltd. V. County of Cuyahoga*, 2015 Ohio Misc. LEXIS 3310 (Cuyahoga Co. CP 2015).   Therefore, the Clarks' claims of disgorgement should be valued at $0.00.

89.     A constructive trust is a:

trust by operation of law which arises contrary to intention and in invitum, against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy. It is raised by equity to   satisfy the demands of justice.

*Miller v. Cass*, 3d Dist. Crawford. No. 3- 2010 Ohio 1930, P30 (citing *Estate of Cowling v. Estate*

24

*of Cowling*, 109 Ohio St.3d 276, 280-81, 2006 Ohio 2418, 847 N.E.2d 405, P18, citing *Ferguson v. Owens* (1984), 9 Ohio St.3d 223, 225, 9 Ohio B. 565, 459 N.E.2d 1293, quoting 76 American Jurisprudence 2d (1975) 446, Trusts, Section 221).

90.      A constructive trust is considered a trust because "'[w]hen property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.'" *Cowling*, 109 Ohio St. 3d 276, 2006 Ohio 2418, at P18, 847 N.E.2d 405, citing *Ferguson*, 9 Ohio St.3d at 225, quoting *Beatty v. Guggenheim Exploration Co.* (1919), 225 N.Y. 380, 386, 389, 122 N.E. 378.

91.      As stated above, the Debtor did nothing wrong here.

92.      The Clarks are not victims of any wrongdoing.

93.      Ironically, it is David Clark who failed to fund any of the expenses associated with the recovery of the Ferrari, despite the clear and unambiguous language of the very contract the POC seeks to enforce. Therefore, the Clarks' claims for constructive trust should be valued at $0.00.

### iv.    Fraud

94.      The Clarks never alleged a claim for fraud against the Debtor in the Ohio Action. (**Exhibit I**: *Clarks' First Amended Complaint*).

95.      The POC was filed on April 5, 2019.

96.      The statute of limitations for bringing a fraud claim in the State of Ohio is four (4) years as set forth in R.C. 2305.09.  *Swanson v. BSA*, 4th Dist. Vinton, 2008-Ohio-1692, P23.

97.      Noticeably absent from the Supplement to Proof of Claim of David and Deborah Clark (which is attached to the POC) is the date or dates upon which the Debtor allegedly made the alleged fraudulent representations to them.

25

98.     Debtor and this Court are left to guess, but a review of paragraphs 20 and 21 of the Supplement to the POC references to the year 2010 and to Exhibit 2 which is a press release from 2008 "detailing [Debtor's] legal efforts" and "[t]he press releases references in the preceding paragraph was provided to the Clarks and subsequently Kristine Lawson to induce them to rely on [the Debtor] as an attorney with experience in dealing with international, complex litigation involving expensive and/or collectible cars," and Exhibit 3 which is an email from David Clark to Kristine Lawson dated February 21, 2010 attaching the press release.

99.     As such, the four-year statute of limitations for the Clarks' fraud claim expired in 2014 and therefore the Clarks' claim under a fraud theory should be valued at $0.00.

100.     Even if the statute of limitations were found to be inapplicable, in order to prevail on a claim of fraud under Ohio law, the following elements must be proved:  "(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment,  and (f) a resulting injury proximately caused by the reliance." *Id.* (citing *Gaines v. Preterm-Cleveland, Inc.* (1987), 33 Ohio St.3d 54, 55, 514 N.E.2d 709, citing *Burr v. Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St. 3d 69, 23 Ohio B. 200, 491 N.E.2d 1101; *Cohen v. Lamko, Inc.* (1984), 10 Ohio St.3d 167, 10 Ohio B. 500, 462 N.E.2d 407).

101.     David Clark stated in a sworn affidavit that "At no time did we think Ford neither was to act as a lawyer nor did Ford offer to act as lawyer, for us or anyone else.   At no time did Ford claim to have acted as Gardner's lawyer."  (**Exhibit FF**:  *Sworn Affidavit of David Clark, dated October 9, 2013, at #7).*

102.    Moreover, the Clarks fail to allege in the Supplement that their purported resulting injury (the "economic damages including, but not limited to, the lost commission of $2.5 Million) was proximately caused by their purported reliance on the alleged representation or concealment. As such, Clarks' claim under a fraud theory should be valued at $0.00.

## Conclusion

103.    In the case of *In re Trigeant Holdings, Ltd*., Case No. 14-29027-EPK, 2015 Bankr. LEXIS 957 *7-8 (Bankr. S.D. Fla. March 27, 2015) (Kimball, J.), this court estimated an unliquidated claim for lost profits at $0.00:

> If the Court determines that the fixing or liquidation of any contingent or unliquidated claim would unduly delay the administration of the case, then the Court shall estimate the claim for purpose of allowance under section 502 of the Bankruptcy Code. 11 U.S.C. § 502(c)(1). In general, the estimated claim amount becomes binding on the parties for all purposes in the case, including voting on a plan and distribution. In this case, it is not disputed that the fixing or liquidation of BTB's Lost Profits Claim, through a full trial on the merits, would unduly delay the administration of these cases. The Court will estimate the claim pursuant to 11 U.S.C. § 502(c)(1).

> There is no set procedure to estimate the amount of a claim. The bankruptcy court is bound by the legal rules which govern the ultimate value of the claim, should use whatever method is best suited to the circumstances, and will only be overturned in the event of an abuse of discretion. *In re Brints Cotton Mktg., Inc.*, 737 F.2d 1338, 1341 (5th Cir. 1984). In this case, the Court heard argument, considered the briefs, and considered evidence submitted including affidavits, depositions, declarations, agreements, court orders, e-mail communications, and tables. The Court determined that the best approach for estimation in this matter is to multiply the face amount of the Lost Profits Claim by the probability that a trier of fact may find in favor of BTB.

> *        *        *

> Based on the evidence presented, the Court determines that a trier of fact could not find in favor of BTB on the second element (intent and knowledge) or the third element (independently tortious or unlawful conduct) of its Lost Profits Claim. Because there is zero probability that a trier of fact could find in favor of BTB on two elements of the claim, and all elements are required to prevail, there is zero probability that BTB will prevail on its claim. As such, the estimated amount of

BTB's Lost Profits Claim is $0.00, and the claim will be treated as disallowed for all purposes in this case.

*Id*.

104.    Similarly, in this case, this Court should easily find that the Clarks have zero probability that they will prevail on any portion of the POC and estimate their claim in the amount of $0.00.

**WHEREFORE**, Debtor respectfully requests the entry of an order estimating the Claim of David and Deborah Clark at $0.00 for all purposes in this case and for such other relief deemed appropriate under the circumstances.

Dated:  January 2, 2020            Respectfully Submitted,

**LAW OFFICE OF MARK S. ROHER, P.A.**
*Counsel for Debtor*
150 S. Pine Island Road, Suite 300
Fort Lauderdale, Florida 33314
Email:  mroher@markroherlaw.com
Telephone:  (954) 353-2200
Facsimile:  (877) 654-0090

By:    */s/ Mark S. Roher*
            Mark S. Roher
            Florida Bar No. 178098

28

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 2nd day of January, 2020 a true and correct copy of the

foregoing was served by CM/ECF on all parties below.

/s/ *Mark S. Roher*

Mark S. Roher


Patrick R Dorsey on behalf of Creditor David Clark
pdorsey@slp.law, dlocascio@slp.law;dwoodall@slp.law;pmouton@slp.law

Patrick R Dorsey on behalf of Creditor Deborah Clark
pdorsey@slp.law, dlocascio@slp.law;dwoodall@slp.law;pmouton@slp.law

Heidi A Feinman on behalf of U.S. Trustee Office of the US Trustee
Heidi.A.Feinman@usdoj.gov


Edward M Fitzgerald, Esq on behalf of Creditor TL90108, LLC
edward.fitzgerald@hklaw.com, migdalia.petrovich@hklaw.com

Zachary Gottesman on behalf of Creditor David Clark
zg@zgottesmanlaw.com

Zachary Gottesman on behalf of Creditor Deborah Clark
zg@zgottesmanlaw.com

Malinda L Hayes, Esq. on behalf of Creditor Kristine Lawson
malinda@forbusinessandlife.com, mlhbnk@gmail.com

Malinda L Hayes, Esq. on behalf of Creditor Leonard Ray Lawson
malinda@forbusinessandlife.com, mlhbnk@gmail.com

William J Maguire on behalf of Creditor Kristine Lawson
william@maguire-law.com, assistant@maguire-law.com

William J Maguire on behalf of Creditor Leonard Ray Lawson
william@maguire-law.com, assistant@maguire-law.com

Nathan G Mancuso on behalf of Creditor Joseph L. Ford, IV
ngm@mancuso-law.com

Office of the US Trustee
USTPRegion21.MM.ECF@usdoj.gov

John E Page on behalf of Creditor David Clark
jpage@slp.law, dwoodall@slp.law;dlocascio@slp.law;pmouton@slp.law

John E Page on behalf of Creditor Deborah Clark
jpage@slp.law, dwoodall@slp.law;dlocascio@slp.law;pmouton@slp.law

Mark S. Roher, Esq. on behalf of Debtor Joseph Louis Ford, III
mroher@markroherlaw.com, ECF.markroherlaw@gmail.com;ECF2.markroherlaw@gmail.com

Christopher D Wiest on behalf of Creditor Kristine Lawson
chris@cwiestlaw.com

Christopher D Wiest on behalf of Creditor Leonard Ray Lawson
chris@cwiestlaw.com

# IN THE COURT OF COMMON PLEAS
## CIVIL DIVISION
### HAMILTON COUNTY. OHIO



D102815121

FLORENCE SWATERS,
Plaintiff,

v.

KRISTINE KLEVE LAWSON, et.al.,
Defendants

CASE NO. A1001370

Honorable Judge Norbert Nadel

NOTICE OF FILING OF DEFENDANT
FORD'S AFFIDAVIT RE: SETTLEMENT,
GARDNER MISREPRESENTATIONS, AND
LONDON HI-JACKING

---

Now comes Defendant Ford to file the above referenced and attached July 15, 2013

Affidavit of Joseph Ford RE:  Settlement, Gardner Misrepresentations, and London Hi-Jacking.

Respectfully submitted,

*Joseph Ford*

Joseph Ford, Pro Se Defendant
7630 Lago Del Mar Drive #7, Boca Raton, FL,
33433
Cell: 561.818.0384;  Email: fordlogic@gmail.com

---

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document has been served upon Kristine A.
Lawson, Pro Se Defendant, 2887 Harrison Ave, Cincinnati, OH, 45211, and to   Scott K. Jones, Esq.,
Graydon Head & Ritchey LLP, 7759 University Drive, Suite A, West Chester, OH 45069 this *15* day
_July_, 2013.

*Joseph Ford*

Joseph Ford, Pro Se Defendant

Page 1 of 1



EXHIBIT

A,

COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

| | |
|---|---|
| **FLORENCE SWATERS** and **JACK SWATERS**, | **CASE NO. A1001370** |
| Plaintiffs, | Honorable Judge Norbert Nadel |
| v. | NOTICE OF FILING OF DEFENDANT FORD'S AFFIDAVIT RE: SETTLEMENT, GARDNER MISREPRESENTATION, AND LONDON HI-JACKING |
| **KRISTINE KLEVE LAWSON**, et al., | |
| Defendants. | |

**AFFIDAVIT OF DEFENDANT JOSEPH FORD
RE: SETTLEMENT, GARDNER MISREPRESENTATIONS,
AND LONDON MEETING HI-JACKING**

Joseph Ford, being duly sworn, deposes and says:

1.  I am Joseph L. Ford III, age fifty-six, and I live in Boca Raton, Florida. I am a retired Architect with a Masters in Architecture degree from Tulane University in New Orleans in 2004. My Louisiana and Florida Architect licenses are inactive. In 1983 I authored a book called The Hurst House of New Orleans. It was an historical and architectural analysis of one of Louisiana's finest mansions built in 1830. I also earned a Juris Doctor Law Degree from Loyola University in New Orleans. The body of law I chose was Civil Law, based upon the Napoleonic Code. I obtained my Louisiana law license in 1991 and it is now inactive. I have also bought, sold, valued, and exported in excess of one hundred European classic cars when I was a licensed car dealer in the early 1990's. I am familiar with automobile paperwork as to titling, importing, exporting, transporting, and shipping classic cars.

2. In February of 2012 I purchased a seventy-percent (70%) majority ownership stake in a rare and unique Ferrari 375 Plus #0384AM racecar ("Vehicle") from Kristi Kleve Lawson ("Lawson"). A portion of this Vehicle was stolen in 1989 and never recovered. This Vehicle is the subject of a lawsuit in Cincinnati. As a result of my purchase of an ownership stake, I became a Defendant in that lawsuit.

3. In early 2010 I offered Christopher Gardner ("Gardner") of Mont-Sur Rolle, Switzerland a chance to finance certain expenses relative to trial, appeal, and physical recovery of the stolen portion of the Vehicle. At no time did I give away, sell, or in any way transfer any of my 70% majority stake to anyone. The agreement I reached with Gardner was a loan, secured by the parts of the Vehicle that were never stolen. In early 2011, I attempted to increase my ownership stake to 100% but this Court reversed that. In late 2011, Gardner stopped paying as agreed and Ford placed Gardner in default and breach of the financing agreement. The Ford-Gardner financing agreement, already filed with this Court on September 21, 2011 and again on October 19, 2011 is attached herein as **Exhibit A**.

4. In late 2012, after almost three years of intense litigation, Defendants Lawson and Ford began to make real progress. First, Plaintiff's forensic document expert's report of February 23, 2011 proved scientifically that Plaintiff's alleged 1999 settlement document was a forgery – i.e. Plaintiff's expert proved Defendant's case. Second, after Plaintiff's expert proved our case, Plaintiff revealed their true lack of respect for the Ohio Court by preventing our inspection and then by moving the Vehicle from Ferrari

of Italy to somewhere in Belgium, in direct violation of the Ohio Court's April 23, 2010 "Status Quo Order." These significant developments brought Plaintiff to the settlement table.

5.  Attorneys for Plaintiff and Defendant arranged for a settlement meeting to occur in London on January 4, 2013. The purpose of that meeting was to explore a settlement involving the union of both sides' holdings, the sale at auction by a UK based auction house named Bonhams 1793 ("Bonhams"), and the splitting the sale proceeds. I obtained written notarized authority from Lawson to enter into an 80% / 20% split of those proceeds with Plaintiff in London. That Lawson authority is attached herein as **Exhibit B**.

6.  I traveled to London and to my dismay I found that Gardner had misrepresented his role and his authority to Bonhams in Gardner's obvious attempt to avoid the effects of his September 2011 breach. Gardner hi-jacked the London meeting. I was unable to dissuade Bonhams of Gardner's treachery and the scheduled settlement meeting for which I traveled to London did not occur. To this day I have been unable to undo that damage caused by Gardner. I no longer trust anything that Gardner says or does. The email exchange documenting that is attached herein as **Exhibit C**.

7.  A few months after the Gardner treachery, Lawson and I begrudgingly accepted a fifty/fifty split with Plaintiff wherein we would extinguish our claims and

Affidavit of Joseph Ford re: Settlement, Gardner, London Hi-jacking      Page 3 of 25

counterclaims upon distribution of proceeds. Attached herein as **Exhibit D** is that Heads Of agreement ("Heads Of").

8. In the months since January of 2013, I have learned more and more about how classic car collectors around the world are organizing against Gardner due to his multiple deceptions such as by the sales of non-existent rare cars and the claims of ownership of rare cars that are possessed and owned by others. For example, Gardner twice sold a non-existent 1937 Horch Special Roadster Body to two different elderly American collectors Charlie Morse of Washington state and Richard Scott of Ohio. For example, Gardner sold a 1930's Alfa Romeo after misrepresenting it as a rare 8 cylinder car when it was only a six cylinder car to an elderly collector named Ernillio Comelli of Italy. For example, Gardner claimed ownership of two rare Figoni-Falaschi bodied Talbot Lago convertibles when in fact both cars are physically possessed and owned by two other American collectors named Tom Price and Richard Patterson. These latter two gentlemen are pillars of the international classic car community with car collections valued in excess of a hundred million dollars. Attached is an affidavit from Charles Morse as **Exhibit E.** Attached is an affidavit from Richard Scott as **Exhibit F.** Attached are the first few pages of the Comelli lawsuit from Geneva as **Exhibit G.**

9. In the course of this lawsuit, an attorney named Phillip Varrichio out of Las Vegas Nevada has filed his attorney fee lien against Gardner for in excess of $65,000 in

Affidavit of Joseph Ford re: Settlement, Gardner, London Hi-jacking

Page 4 of 25

unpaid legal fees in a Nevada case where Gardner is the Plaintiff. Attached as
**Exhibit H** is the first couple pages of the Varrichio lien.

10. On September 21, 2011, Plaintiff feared Gardner would "clone" or "counterfeit" this
Vehicle, a situation that is similar to what is now being claimed by classic car
collectors Tom Price and Richard Patterson as to their rare Talbot Lagos. Plaintiff did
not want Gardner to have any access to the Ohio Parts that were never stolen.
Accordingly, both Plaintiff and Defendant agreed to a Restraining Order against
Gardner which was filed with this Court on September 21, 2011.

11. At no time have I entered into an agreement that changed the terms of the Ford-
Gardner financing agreement with its binding arbitration agreement. I did once offer
to do so on January 5, 2013 and that offer was induced by Gardner
misrepresentations, was not accepted prior to its withdrawal, and contained a
condition precedent (settlement agreement deadline) that was never met.

Further affiant sayeth naught.

_Joseph Ford_

Subscribed and sworn to before me
this /5 day of July /2013

_Notary_

EDGAR LOWE
NOTARY PUBLIC
STATE OF FLORIDA
Comm# EE187508
Expires 4/8/2016

Affidavit of Joseph Ford re: Settlement, Gardner, London Hi-jacking    Page 5 of 25

# AFFIDAVIT OF
# KARL KLEVE

Page 1 of 2
FERRARI 375 PLUS  Chassis# 0384AM

## STATE OF OHIO

## COUNTY OF HAMILTON

I, KARL KLEVE, being over the age of 18, of sound mind and complete capacity, am a citizen of the United States of America and resident of the State of Ohio, do hereby state by this sworn affidavit the following facts to be true and correct.

1. I am the true owner of a specific Ferrari automobile type 375 PLUS with the chassis number bearing 0384AM.

2. The vehicle was stolen from my possession and was reported to the proper authorities as per the theft report number ( GT89-239 ) dated 01-24-89, by the Green Township Police Department, 6303 Harrison Avenue, Cincinnati, Ohio 45247-6498, Subsequently, the theft was also reported to the F.B.I. The vehicle was not insured.

3. As shown herewith as Exhibit A, is a photostatic copy of the vehicle manufacturer data plate.

EXHIBIT A



The vehicle data plate was photocopied enlarged 1.50 times actual size. For detail identifying purposes.

EXHIBIT
B.

Page 0

Page 2.    DATA PLATE   Affidavit      FERRARI 375 PLUS  Chassis# 0384AM   KARL KLEVE

4.   Request is hereby made to report to the proper authorities that the herein shown data plate missing or stolen from my possession. The item is of histrorical and monetary value.

In confirmation of the foregoing, I execute this document on the Day, Month and Year as witnessed.

Signed:

**KARL KLEVE**

STATE OF OHIO
COUNTY OF HAMILTON

Before me, the undersigned authority, on this day personally appeared KARL KLEVE known to me to be the person whose name is subscribed to the foregoing and being first duly sworn, declares that the statements contained herein are true and correct.

GIVEN UNDER MY HAND AND SEAL OF THIS 11 DAY OF August , 199 9

Notary Public: in and for the State of Ohio
**MARK C. TELLES**
Notary Public, State of Ohio
My Commission Expires Apr. 24, 2004

Printed Name of Notary

( SEAL )

My Commission Expires:

**Page 042 of 101**

## AMENDED AND RESTATED SETTLEMENT AGREEMENT

**THIS AMENDED AND RESTATED SETTLEMENT AGREEMENT** ("Agreement") is made as of this _15th_ day of _July_, 2016, by and among biological sisters Kristine Anne Kleve ("Kristine"), Karyl Renee Kleve ("Karyl") and Katrina Marie Kleve ("Katrina"). Kristine, Karyl and Katrina are sometimes hereinafter referred to collectively as the "Kleve Sisters."

**WHEREAS,** the Kleve Sisters were the daughters of Karl Kleve ("Karl"), who died on December 24, 2003; and

**WHEREAS,** the Kleve Sisters were the sole heirs to Karl's estate and each shared an equal interest in Karl's estate; and

**WHEREAS,** Karl left an item of personal property in his estate described as a 1954 Ferrari 375 Plus 4.9 Grand Prix Roadster, Chassis No. 0384AM (the "Ferrari"), to which the Kleve Sisters inherited full property rights upon Karl's death; and

**WHEREAS,** a dispute arose over the property rights to the Ferrari owned by Karl. Specifically, on or about December 26, 1988, the Ferrari was stolen from Karl. Despite spending the majority of his remaining years searching for those responsible for the Ferrari's theft, Karl died before the Ferrari or any proceeds or money could be recovered from those responsible for the Ferrari's theft; and

**WHEREAS,** the dispute over ownership of the Ferrari ultimately ended up in litigation in the Court of Common Pleas in Hamilton County, Ohio, Case No. A1001370, *Jacques and Florence Swaters v. Kristine Kleve Lawson, et al.* (the "Lawsuit"); and

**WHEREAS,** in furtherance of the Kleve Sisters' mutual desire to resolve any disputes that arose or may have arisen between them in regards to their respective property rights in the Ferrari, the Kleve Sisters entered into a settlement agreement (the "Original Contract") in May, 2014; and

**WHEREAS,** a settlement agreement was reached in the Lawsuit and pursuant to a separate Settlement Agreement and Mutual Release between Joseph L. Ford ("Ford") and Kristine, Ford agreed to pay Kristine the total amount of $720,000.00 as a result of the Kleve Sisters' ownership interest in the Ferrari (the "Settlement Sum"); and

**WHEREAS,** after certain costs and expenses were distributed or accrued out of the Settlement Sum, the then remaining $600,000.00 from the settlement of the Lawsuit ("Net Settlement Proceeds") is to be distributed; and

**WHEREAS,** in anticipation of the distribution of the Net Settlement Proceeds, the Kleve Sisters wish to forever resolve any disputes that may have arisen or may arise between or among them in regards to the administration of Karl's Estate, and all matters connected therewith and with regard to any property rights they have in the Ferrari and/or the distribution of the Net Settlement Proceeds.

**EXHIBIT**

_C₁_

tabbies

Clark v Ford

**NOW THEREFORE**, in consideration of the mutual covenants and agreements set forth herein, and for the good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the Kleve Sisters hereby agree as follows:

## STATEMENT OF AGREEMENT

1.    Distribution of Net Settlement Proceeds

In consideration of Kristine's extraordinary actions taken in furthering the recovery of the Ferrari and negotiating the settlement with Ford, the Kleve Sisters hereby agree that the Net Settlement Proceeds shall be distributed as follows:

     (a)    Kristine is entitled to 50% of the Net Settlement Proceeds for a total payment of $300,000.00.

     (b)    Karyl is entitled to 25% of the Net Settlement Proceeds for a total payment of $150,000.00.

     (c)    Katrina is entitled to 25% of the Net Settlement Proceeds for a total payment of $150,000.00.

2.    Portion of Net Settlement Proceeds Deposited Into Escrow Account

     (a)    The Kleve Sisters acknowledge and agree that there may be ongoing costs and expenses to be incurred in the future associated with the receipt and distribution of the Settlement Sum and/or Net Settlement Proceeds, including, but not limited to, attorney's fees and potential disputes with others claiming a right to a portion of the Settlement Sum and/or Net Settlement Proceeds.

     (b)    The Kleve Sisters agree that they will share in paying for the ongoing costs and expenses on a pro-rata basis in accordance with their respective share of the Net Settlement Proceeds.

     (c)    The Kleve Sisters hereby agree that the following amounts should be withheld from the Net Settlement Proceeds and deposited into an escrow account (the "Escrow Funds"):

          (i)    $20,000 of the Net Settlement Proceeds owed to Kristine shall be withheld from distribution and deposited into an escrow account;

          (ii)    $10,000 of the Net Settlement Proceeds owed to Karyl shall be withheld from distribution and deposited into an escrow account; and

          (iii)    $10,000 of the Net Settlement Proceeds owed to Katrina shall be withheld from distribution and deposited into an escrow account.

2

Clark v Ford

(d) The Escrow Funds shall be deposited into an escrow account to be established (the "Escrow Account"). All deposits, withdrawals, and distributions out of the Escrow Account will be made at the direction of Kristine upon written instructions given to the Escrow Agent from Kristine.

(e) The Escrow Funds shall be withdrawn from the account to pay for costs and expenses associated with the receipt and distribution of the Settlement Sum and/or Net Settlement Proceeds.

(f) If there is no litigation or adverse claims asserted or threatened by March 1, 2017, Kristine will instruct the Escrow Agent to terminate the Escrow Account and disburse all funds remaining therein in accordance with the following: 50% of such Account to Kristine; 25% to Karyl; and the remaining 25% to Katrina.

(g) If any claim is made or threatened to be made, Kristine will promptly notify Karyl and Katrina of such claim and the nature thereof. Further, any documents or other information regarding the foregoing shall be forwarded to their respective counsel upon request or direction.

## 3. Contracts and Decisions Made by Kristine

Karyl and Katrina agree that they and/or their counsel have reviewed all pleadings and filings in the Lawsuit and related appeals, and they accept and agree to be bound by the contracts entered into and the decisions made on their behalf by Kristine. Karyl and Katrina further agree that Kristine retains the full right to continue participating in the Lawsuit and the settlement of the same until its completion.

## 4. Satisfaction of Outstanding Obligations

In a previous transaction, Kristine agreed to purchase Karyl's and Katrina's interests in certain real estate located on Boudinot and Prospect Avenues for a total price of $14,000 or $7,000 each. Of this amount, Karyl and Katrina each received a payment of $3,000. Simultaneously with the execution of this Agreement, Kristine agrees to pay to Karyl and Katrina the sum of $4,000 each as the final payment on this obligation. All parties agree that no interest shall be due and payable on this final payment amount.

## 5. Previous Contracts and Agreements Superseded by this Agreement

This Agreement supersedes any and all prior and contemporaneous oral or written agreements or understandings among the Kleve Sisters, including, but not limited to, the Original Contract entered into in May, 2014.

## 6. Release of all Claims

With the exception of the obligations set forth herein, Karyl and Katrina (on behalf of themselves, their heirs, successors and assigns) hereby fully release, acquit and discharge Kristine (and her heirs, successors and assign) from any and all actions, assertions, disputes or claims which either or both may have, of whatever kind and nature, against Kristine

3

Clark v Ford

as of the date hereof, including those arising from the administration of Karl's Estate, all matters connected therewith and any and all property rights they may have in the Ferrari.

With the exception of the obligations set forth herein, Kristine (on behalf of herself, her heirs, successors and assigns) hereby fully releases, acquits and discharges Karyl and Katrina (and their heirs, successors and assign) from any and all actions, assertions, disputes or claims which she may have, of whatever kind and nature, against Karyl and Katrina as of the date hereof, including those arising from the administration of Karl's Estate, all matters connected therewith and any and all property rights she may have in the Ferrari.

Further, the parties agree that upon final payment of the Net Settlement Proceeds in accordance with the terms and conditions set forth herein, all claims of the parties against each other shall be fully settled, resolved and released.

7.   Covenants and Agreements

This Agreement contains all of the covenants and agreements between the Kleve Sisters with respect to the division of the Ferrari, the Settlement Sum, and the Net Settlement Proceeds.

8.   Integration; Entire Agreement

The Kleve Sisters represent and acknowledge that in executing this Agreement:

(a)   they have not relied upon any representation or statement not set forth herein made by any other party's agents, representatives or attorneys with regard to the subject matter of this Agreement, and

(b)   upon execution of this Agreement, the Original Contract shall be null and void and none of the Kleve Sisters may bring any claim now or in the future against another one of the Kleve Sisters arising out of or in any way connected with the Original Contract or the breach thereof.

9.   Modification

No modification of the representations made herein will be effective unless said representations are in writing and signed by the party against whom enforcement would reasonably be sought.   This Agreement between the Kleve Sisters cannot be amended or modified in any respect except by a subsequent written agreement signed by all of the Kleve Sisters.

10.   Cooperation

The Kleve Sisters will perform any other acts, and will sign and deliver any other documents that are necessary to carry out the intend and provisions of this Agreement.

4

Clark v Ford

11.     Miscellaneous

(a)     The Kleve Sisters agree that this Agreement shall become binding when all signatures below are present and inure to the benefit of their respective legal representatives, heirs, assigns, and successors.

(b)     The Kleve Sisters agree that each of them will have all of the rights and remedies available at law and equity to enforce their respective rights under the Agreement.

(c)     Should any provision of the Agreement be declared or determined by any court of competent jurisdiction to be illegal, invalid, or unenforceable, the validity of the remaining parts, terms, or provisions shall not be affected thereby any illegal, invalid, or unenforceable part, term or provision shall be severed from the Agreement, and deemed not to be a part of the Agreement.

(d)     No other agreement, statement, or promise is valid, binding, or enforceable unless it is contained in this Agreement.

(e)     The Kleve Sisters acknowledge and agree that they are not relying upon any representation, statement, promise, agreement other than what is written herein, or inducement not expressly contained in the Agreement.

(f)     No release, waiver or other promise set forth in the Agreement shall be construed to prohibit Kristine, Karyl and/or Katrina from enforcing the terms of the Agreement in a court of competent jurisdiction.

12.     Governing Law and Jurisdiction

This Agreement is made and entered into in the State of Ohio, and shall in all respects be interpreted, enforced and governed under the laws of the State of Ohio.

13.     Arm's length Negotiations: Drafting

The Kleve Sisters expressly represent and warrant to each other that before executing this Agreement, they fully informed themselves of the terms, contents, conditions and effects of this Agreement; they relied solely and completely upon their own judgment in executing this Agreement; they had the opportunity to seek and did obtain the advice of independent counsel before executing this Agreement, which is the result of arm's length negotiations conducted by and among all of the Kleve Sisters and their respective counsel. This Agreement shall be deemed drafted jointly by the Kleve Sisters and nothing shall be construed against one of the Kleve Sisters as the drafting party.

14.     Confidentiality

Each of the parties agrees to maintain and keep confidential, except to the extent necessary, the terms and provisions of this Agreement. Parties may disclose information which would otherwise be confidential to the extent that: the disclosure is required by law, regulation

5

Clark v Ford

or a government entity; or the information is disclosed on a strictly confidential, need to know basis to the professional advisors, auditors and bankers of any particular one of the parties.

15.    Counterparts

   This Agreement may be executed in any number of counterparts (including by means of facsimile and electronically transmitted portable document format (pdf) signature pages), each of which shall be an original but all of which together shall constitute one and the same instrument.

   **INTENDING TO BE LEGALLY BOUND,** the undersigned have executed this Amended and Restated Settlement Agreement as of the day and year first above written.

KRISTINE ANNE KLEVE

By: _____    Dated: _____, 2016

KARYL RENEE KLEVE

By: _____    Dated: _____, 2016

KATRINA MARIE KLEVE

By: _____    Dated: _____, 2016

6859391.5

6

Clark v Ford
Lawson 000000

## Affidavit of Kristi Lawson

After being duly sworn under oath, affiant makes these following statements under oath:

1. My name is Kristine A. Lawson, also known as Kristi Lawson, formerly Kristine A. Kleve. I am the eldest daughter of Karl Kleve of Cincinnati, Ohio. I live at 2887 Harrison Avenue, Cincinnati, Ohio, 45211.

2. In 1958, my father purchased a rare and unique 1954 Ferrari 375 Plus racecar VIN 0384AM ("Ferrari"). In January of 1989, while dismantled in Cincinnati, Ohio, the stripped down chassis of this Ferrari was stolen from my father ("Stolen Portion"). The remainder of the Ferrari was not stolen because those parts were stored at a different location in Cincinnati ("Ohio Parts").

3. My father died on Dec. 24, 2003, having never recovered the Stolen Portion. I administered my father's estate. The Probate Court transferred the Ohio title to the Ferrari and the Ohio Parts to me and my two sisters. My two sisters later quitclaimed their interests to me.

4. On February 12, 2010, a Belgian car dealer named Jacques Swaters ("Swaters") sued me in Cincinnati, Ohio state court claiming he owned the Ferrari and the Ohio Parts. I did not have the financial resources to hire an attorney. I had not developed evidence to understand or evaluate the merits, if any, of Swaters' claims, or the case. I had heard about Swaters years earlier from my father. Swaters claimed he bought my father's Ohio Parts and the Ferrari rights in 1999 from my father's private investigator. In approximately 2008 and based on my limited understanding, I offered to sell Swaters the Ohio Parts and Ferrari title but he refused.

5. A classic car broker named Dave Clark referred me to Joseph Ford ("Ford") for advice about what to do about the Swaters' lawsuit. I interviewed Ford about his credentials. Ford represented that he was an author of an Architectural Book, a retired Architect, a Louisiana licensed attorney with an inactive license, and a former international classic car dealer and exporter. Ford possessed a unique array of skills, uniquely qualified for my situation. Ford expressed his interest in evaluating my case, and possibly developing the case by working for me on an hourly basis. I told Ford I did not have the money to pay for his review or for an attorney once his review was complete, so we worked out an alternative where Ford took a stake in the case, would build the case, and would select, hire, and direct an Ohio attorney.

6. Ford explained that many, many hours of specialized investigative work would be needed to build the case so that it could be defended, and even more hours to build it to go on the offensive. Ford explained that court was often a "crapshoot" and that there would be no guarantee of success even if we developed great evidence. Ford analogized

Affidavit of Kristine A. Lawson                    Page 1 of 35                    Initials KL



EXHIBIT

D.

JF0168

it like a car race. Ford explained that he would need to be in the "driver's seat" while I would be buckled up in the "back seat". In the course of this race would be many unpredictable "twists and turns." We might win; we might not. I understood and accepted that.

7.  Ford offered to review the case and documents in exchange for a 20% ownership share with an option to acquire an additional 50% ownership share for $5,000 and a promissory note for another $95,000. I agreed and Ford started his review. On February 25, 2010, Ford and I put our agreements in writing as a "Sales Agreement" and an "Option Agreement." [Exhibit A – Sales Agreement and Option Agreement as part of the April 8, 2010 Court Order]

8.  Ford used his Cincinnati, Ohio contact to assemble a team of Cincinnati attorneys. Within two days Ford had hired and briefed Deepak Desai, a Cincinnati attorney to handle the hearing on the Temporary Restraining Order. As for the main attorneys, Ford selected Taft and Ritter. They each basically halved their retainers because of Ford's legal background.

9.  Ford explained that he would probably bring in a financier for the effort. I understood and accepted that. That financier was Christopher Gardner ("Gardner"), a resident of Switzerland though formerly from Louisiana.

10. On April 8, 2010 the Court acknowledged my agreements with Ford. The Court acknowledged Ford as the 70% majority owner and allowed Ford to intervene in Swaters' lawsuit as a Defendant in its "AGREED ORDER GRANTING MOTION TO INTERVENE OF JOSEPH FORD." [Exhibit A] Months later per my subsequent agreement with Ford, Ford's ownership share increased to 100% with me retaining a 10% lien. The Judge later ordered that split back to 70%/30%, and I told Ford that I would honor the 100%/10% lien on a post adjudication basis.

11. On July 16, 2010, Jacques Swaters' partner admitted by affidavit under oath that they had no claim to the Ohio Parts because they were excluded from an alleged 1999 sale. The significance of this meant that the Ohio Parts, worth at least $500,000, were no longer at risk in the lawsuit. We breathed a sigh of relief as this was a partial victory.

12. On September 21, 2011, the Court recognized Gardner as Ford's financier but restrained Gardner from accessing the Ohio Parts in its "AGREED RESTRAINING ORDER AND PRELIMINARY INJUNCTION." The opposing side had brought out the fact that Gardner was a convicted felon and had been accused of duplicating originals. The Court allowed Ford's financing agreement with Gardner to stand because it was only a financing agreement. The financing agreement gave Gardner a contingent lien interest in the Ohio Parts which secured every dollar that Gardner financed such that Gardner's financing was collateralized and not at risk, while Ford's time and efforts were at total risk of loss.

The Court Order recognized Gardner's contingent lien interest but prevented Gardner from accessing the Ohio parts. [Exhibit B]

13. On October 19, 2011, Gardner confirmed with the Court that he had no ownership interest, but did have a contingent lien interest. Attached to that October 19, 2011 court filing are the Ford/Gardner Financing Agreement and the Gardner Affidavit wherein Gardner admits he has no ownership interest and only has a contingent lien interest against Ford's share.

14. From February, 2010 to and through 2012 (almost three years), Ford gathered evidence, document by document and witness by witness. During his many visits to Cincinnati, Ford would spend hours and hours with me, with my husband Ray Lawson, with other witnesses, and with the lawyers. Ford located and obtained the 1989 Federal Trial records as to the original prosecution of the thieves. Ford located and interviewed the district attorney who prosecuted the 1989 case. Ford located and obtained actual exhibits used at the 1989 trial. Ford initiated a publicity campaign on the Ferrari Website ("F Chat") to get our story told. Ford provided "talking points" for my interview on National Public Radio in August of 2010. Ford provided the rough draft of the article that appeared in the Sports Car Market Magazine by John Draneus. Ford provided rough draft material for Chris Roush for his article in the Ferrari Market Letter.

15. Ford's dogged pursuit uncovered evidence that I had no idea existed and interpreted the significance of evidence in ways that I did not know to do. Ford uncovered the "dots" and "connected" those dots for the attorneys and for the FBI. Together with Ford, I met with the FBI. Ford wrote a "Book" (three ring binder, 158pp) so that the various attorneys hired by Ford could begin to grasp and coherently digest the twenty-two year timeline, the thousands of pages of documents, the technical subject matter of this unique Ferrari racecar worth in excess of $10,000,000.

16. As a result of Ford's diligence, persistence, organization, attention to detail, and tenacity, much new evidence was discovered. Ford's actions helped our case grow far stronger such that it became a case that could be well defended and won. It is my view that our case, after Ford's work, is of far greater value when as compared to the raw, almost insurmountable case that it was when we began. I am confident in saying that had I not involved Mr. Ford as I did, the case would likely have been lost in the first year.

17. In September of 2011, I, Herb Haas (my attorney), Ford, and financier Gardner met in Cincinnati where we agreed to let Haas represent all three of us despite Gardner not being a party in the case. Prior to that, Ford had his own attorney as the lead attorney while Haas was my attorney. Gardner provided financing to Ford per Gardner's contract with Ford. [Exhibit B] The new arrangement with Haas allowed Haas to be transparent with Gardner as to privileged attorney-client information.

18. When we agreed to have Haas as our combined attorney, Haas explained his practice was too small for the entire case and that he needed a support attorney. Haas recommended attorney Elizabeth Conklin ("Conklin"). Haas invited her to his office, we interviewed her, and we approved. At the time, it was understood that Gardner, who was the financier for the bills, would engage Conklin. However, about four months later, after Ford had given his book to Conklin, we learn that Gardner failed to pay Conklin. Gardner's failure left the case in the lurch, wasted many months, and lost important momentum. Ford complained and put Gardner on written notice.

> "C [Chris]
> Here is my overview – no shame, no blame – just a dispassionate assessment that we need to get back in gear.
> As we neared T'giving in 2011, your thinking was wait until January 2012 to really start HH [Herb Haas], as nothing really happens during holidays.
> January came and went – HH ends up being very busy with a trial, another trial, etc.
> Then February.
> Then March. HH files 3 short Motions and we end up with a hearing on a dispositive SWA's Motion, with HH not knowing enough to rebut Jones on the spot.
> Before we know it, it is almost April, HH is still just getting into the past files, and just getting into the rhythm of the case – maybe Elizabeth ("EC") has a copy of my book and is reading/orienting.
> I want to let you know that they are NOT sending me any bills, nor are you copying me with their bills (assuming they send them to you), so I do not see what activity, or what pace of activity, is really going on, other than what I can glean and get from HH, HH wants to hear it from you, etc.
> We may need to simplify the chain of communications (me with or without you to HH, soon to EC), and turn them on full speed, with the deliberate goal of trial. I think at least EC will need a retainer, and if it is not $10k, then she is not "ON". If the bills ain't coming, they ain't working. . . "
> **03.20.12 Email at 12:15PM Joe Ford to Chris Gardner**

19. Ford informed me and Gardner that someone had to fill the Conklin void. Ford provided Gardner written terms offering to fill the Conklin void to assist Haas and remedy Gardner's failure.

> "Proposal to Account for JF Attorney Assist Time with Option A, Option B
>
> C,
> Based on the past two years of my in-depth work, any attorney time I contribute going forward is very effective, hard to replace, and thus valuable. . .

Affidavit of Kristine A. Lawson                Page 4 of 35                Initials KL

JF0171

Option A – Cash now, the biggest discount for you, if as follows. Wire the $15k that was due earlier, plus a steady $4,000 per month . . . through trial, appeal, and final recovery . . .

Option B – No cash now, all JF attorney time and JF contributions where JF contributes anything that CG was supposed to do, is applied at final accounting pursuant to our 01.31.11 agreements arbitration clause, such that any net contributions are rewarded the same as CG, from CG share. Because my experience and present knowledge of the file and litigation is unique, difficult to duplicate, and difficult to assign a number, the rate will be $400/hr for any hour of JF attorney assist . . .

So the above is what I propose going forward.

I think Option A is an immediate no brainer for you . . ."

*06.07.12 Email at 11:24AM Joe Ford to Chris Gardner*

20. Ford informed me that Gardner was in default as to Gardner's obligation to finance the *lawsuit. Ford put Gardner on formal written notice.*

"Chris,

I have waited for you to act (i.e. pay to my account), but you have not.

This is formal notice of dispute pursuant to contract term #9.

You have violated, and continue to violate, the contract term #2a that requires you to pay attorney invoices and contract term #2b that requires you reimburse my litigation related expenses.

As you know, when we transitioned to Haas as attorney, you were to pay the retainer of attorney E. Conklin to be Haas' co-chair to do prep and grunt work.

As you know, instead of that retainer with Conklin, you did nothing, so I substituted in and did "attorney assist" work for Haas.

As you know, I made you a "no brainer" discounted proposal to pay me for the attorney assist work by email. At first you seemed agreeable, but you did nothing.

As you know, I withdrew the "no brainer" offer and am tracking my time, will calculate my past time, and will seek full payment and maximum benefit by arbitration. I will seek the maximum to which I am entitled, which includes being rewarded the reimbursement and as well as the share of the prize proceeds that would have flowed to you had you performed your obligations in full. It may be that I am 55% and you are 45%, or, it may be that I am 75% and you are 25%, depending on the arbitration and final figures.

As I have told you, if you disagree with how I am handling it, you are always free to hire another Conklin (please coordinate and get with Haas approval). I would then arbitrate only for my past time before and until the new Conklin is up to speed. Frankly, I could use a break from what is intense, deeply concentrated work involving sorting through, quoting, and comparing hundreds if not thousands of pages of documents. I sent you the MPSJ re: Unclean Hands so that you can see the scope and depth of what is being done. I am now revising the MPSJ re: Altered After Kleve Signed. Then I will do the MPSJ re: Bad Faith Purchaser, and so on, according to the list of MPSJ's in the MPSJ that I sent you. It is a monumental task, and it is what winners do to prepare.

Since you refuse to pay or to reimburse, the proposed solution is that we arbitrate and re-split your share accordingly, which means not only will I be reimbursed, but I will be taking away some or all of your prize share, in accordance with whatever the arbitrator awards. We can arbitrate now or later, and of course we can agree to settle in some fashion without arbitration. Again, do not expect your share of the proceeds to still be at 50% since you have failed to continue making the required payments.

Affidavit of Kristine A. Lawson          Page 5 of 35          Initials KL

I understand that you think you have overpaid, but I assure you that you are incorrect, and that a final accounting will show that in arbitration as well.
I am still pushing hard over here, developing some exhibits based on timelines and grinding out those MPSJ's which will form a roadmap for the remainder of the case that Haas will choose when and how to use. I am his "back office" support doing "attorney assist" work as we have already discussed.
I next plan to do some prep for the FS depo and be in Brussels Sept. 2 - 5.
Attached is the JF/CG contract for your reference. My email "door" is always open.
Joe"

*07.31.12 Email at 10:11PM Joe Ford to Chris Gardner*

21. Ford informed me that Gardner failed to pay Ford's expenses and that Gardner was on Notice about those additional Gardner defaults.

"C
FYI - $1,000 trip and I finalized the Santen Hughes Atty bill and paid it after discounted to half. This was the atty who did the TRO work (before Taft) and he had an outstanding balance (going on 2.5 yrs old) after I terminated him. Reimbursement is due now, and if not promptly paid, we just add to arbitration dispute already accumulating.
J"    (two attachments: the $1,500 bill and "Trip 17" $1,000 breakdown)
*08.13.12 Email at 12:07PM Joe Ford to Chris Gardner*

22. Ford's replacing Conklin was acceptable to me because I personally witnessed Ford's prior work and Ford's work with Haas as Ford drafted Haas' Rule 56 Motion. Ford informed me that Gardner agreed that Ford's attorney assist work was of high quality, effective, and valuable. I agree with Gardner's characterizations that Ford's work was of high quality, effective, and valuable.

"Very nice !"
[Referring to Ford's MPSJ RE: Altered After Kleve Signed]
*08.06.12 Email at 5:57AM Chris Gardner to Joe Ford*

" . . . Great work. You are on the finishing line  !!!!! . . ."
[Referring to Ford's MPSJ re ORC 2117.04 Forever Bars Swaters Claims]
*08.07.12 Email at 3:18AM Chris Gardner to Joe Ford*

"I love it. Great, mind boggling work !! Bravo !"
[Referring to Ford's MPSJ RE Unclean Hands lean mean]
*08.23.12 Email at 2:09PM Chris Gardner to Joe Ford*

23. On November 16, 2012 Haas filed in Court the MPSJ RE Altered After Kleve Signed that Ford had prepared. (MPSJ = Motion for Partial Summary Judgment)

Affidavit of Kristine A. Lawson          Page 6 of 35          Initials KL

24. By late November of 2012, the opposing side began to realize their losing position and indicated their desire to settle. Ford pushed for the right to inspect the car. That push forced Scott Jones (Swaters' attorney) to admit that Swaters had moved the Ferrari from Italy to Belgium in violation of Court order. Swaters' interest in settlement intensified.

25. Haas and opposing counsel agreed to a January 4, 2013 settlement discussion meeting in London. It was agreed as to who would attend.

> "Dear Scott,
> We are good to meet on the Fourth of January. Our line-up; Ford Gardner Kleve. Your line up; Swaters and Phillipe. No attorney at the meeting. We need to meet in London as it works better for us . . . (I believe Phillipe lives there) . . .call me with your thoughts.
> Best regards, Herb"
> > *12.13.12 Email at 2:18PM Herb Haas to Scott Jones*
>
> "Herb,
> I spoke with Florence.
> She agreed to meet in London on January 4. She will have Phillipe with here.
> There will not be attorneys at the meeting.
> Do you think there would be a conference room at the hotel that your clients are staying at that would accommodate them?
> Scott"
> > *12.13.12 Email at 2:58PM Scott Jones to Herb Haas*

26. Ford arranged lodging in a downtown London Hilton boutique hotel with a formal meeting room. Ford traveled to London for the scheduled meet. Unbeknownst to Ford, Gardner had misrepresented his role and authority to the Auction House as if Gardner were the principal. Consequently, when Ford contacted the Auction House, they had no idea of Ford's capacity and authority.

> "Dear Mr. Ford,
> Thank you for your email this morning addressed to my colleague, Phillip Kantor. I am replying on his behalf. I am the director of Bonhams responsible for legal matters and am also dealing overall with the 375 + jointly with Phillip.
> Chris Gardner has mentioned your name to us in connection with the 375 but we do not know exactly how you are involved. To date, all our discussions and correspondence in relation to Chris's involvement with the 375 have been directly and exclusively with him. By copy this email, I am therefor asking Chris to confirm to Philip and to me that he has no objection to your attending with him the meeting arranged at Bonhams. Office at 101, New Bond Street on 4th January at 11:30.
> Subject to Chris's confirmation to us, you are, of course, very welcome to attend the meeting. Kind regards, Anthony MacLean"

*01.02.13 Email at 5:15AM - Anthony MacLean to Joe Ford*

27. The Auction House was misled by Gardner into thinking Gardner was a principal who had an ownership interest – in fact, at best, Gardner held a contingent lien interest against Ford's share.

> "Dear Mr. Ford,
> Thank you for your email last night.
> With respect, the meeting on 4[th] January was not organised or in your words "set" by Ohio lawyers. The meeting was organized directly between Florence Swaters, Chris Gardner and Bonhams in order *to implement the agreement reached between those three parties some time ago.* The meeting is private and Florence, Chris, and Bonhams are free *as principals* (not agents or attorneys) to organize it in any manner they may agree between them. . . .the purpose of the meeting is not for Chris and you to air your differences or to adopt different positions towards Florence; *it is to implement the outline agreement already reached between Florence, Chris, and Bonhams."* [*Emphasis* added]
> *01.03.13 Email at 3:36AM Anthony Maclean to Joe Ford*

28. The Auction House, in a move showing that Gardner continued his misrepresentation, disinvited Ford.

> " Dear Mr. Ford,
> . . . I suggest that Chris and you speak urgently to one another to resolve your differences. I am afraid that unless and until you do so, you are not invited to attend the meeting tomorrow . . . "
> *01.03.13 Email at 3:36AM Anthony Maclean to Joe Ford*

29. Ford notified me and Haas promptly of the Gardner self-dealing and misrepresentation. I was shocked at Gardner's misrepresentations which weakened and undermined our position. I documented the situation and my thoughts by reply email:

> "Seriously? ! Joe, is anyone from our side ACTUALLY on our side? I respect and support you completely. I'm @ work but just checking emails on my phone, hoping for some development. This is unbelievable. Are you there in London? I'm so sorry to hear about this. I'm terribly disappointed in anyone who had a part in this fiasco. Please keep me updated. – Kristi"
> *01.03.13 Email at 10:42AM- Kristi Lawson to Joe Ford*

30. About that time I heard about Richard Scott ("Scott") and Gardner. Not only had Gardner failed to pay Conklin, failed to pay Ford expenses, and misrepresented his authority to the Auction House causing difficulties and weakening our position, but Gardner had been caught involved in two suspicious schemes on two elderly car collectors, one named Charlie Morse ("Morse") from Seattle and one named Richard

Affidavit of Kristine A. Lawson           Page 8 of 35           Initials KL

Scott ("Scott") from Florida. Gardner had sold these two men a dilapidated car body of unknown origin and affirmatively misrepresented it as a 1937-8 Horch Special Roadster body. Between the two schemes, Gardner netted at least $600,000 and used some of this money to finance the lawsuit. Ford informed me that $60,000 paid to Ford by Morse was now known to be the result of this Gardner scheme because Gardner had attempted to do it a second time on Scott and that Scott discovered that Gardner had no such car to sell. In my opinion it is outright fraud on these two elderly men. Ford personally resolved the $60,000 with Morse by personally promising to repay Morse. Please see the Morse affidavit.

"Charles Morse, after being duly sworn, deposes and says:

1. On or about March 17, April 29, and June 7, 2010, I made three $20,000 bank wire transfers for a total of $60,000 to Justin Ford for credit to Joseph Ford (his father, "Ford").

2. I was induced to make those wires by Christopher Gardner ("Gardner"). Gardner led me to believe I owed Gardner the $60,000 as the final balance on my $300,000 purchase from Gardner of a rare 1930's Horch Special Roadster body shell located at his home in Switzerland.

3. After I made those bank wire transfers, I learned that Gardner did not own or possess any such 1930's Horch Special Roadster body shell. In fact, it never existed.

4. I learned that Gardner did not own or possess such a Horch body shell because in September of 2011, Gardner again "sold" the same non-existent rare 1930's Horch Special Roadster body shell for $300,000 to Rick Scott ("Scott") of Florida. Scott, whom I know to be a classic car enthusiast and concours judge, physically examined the body shell in Switzerland and soon after determined it to be the remains of a car of unknown origin and marque. Gardner failed to provide any evidence of any connection to it ever being a Horch Special Roadster body shell to Scott.

5. Ford explained to me his non-involvement with the sale of the non-existent Horch body shell. Ford offered to refund the entire $60,000 amount to me after he receives his proceeds from a recovery of a stolen Ferrari. I accepted Ford's offer. I hereby confirm that I have irrevocably agreed that the $60,000 in wires from me is a loan to Ford. I also agreed that this irrevocable loan agreement with Ford is non-transferrable by me. . . ."
*10.24.12 Affidavit of Charles Morse* [Exhibit C]

31. I am informed that Richard Scott has filed a criminal complaint in Switzerland against Gardner for fraud for trying to sell a non-existent Horch Special Roadtser body shell.

Richard Scott, after being duly sworn, deposes and says:

Affidavit of Kristine A. Lawson          Page 9 of 35          Initials KL

1. My name is Richard Scott. I am 72 years of age and I collect, restore, and show classic cars in competition. I have been a Concours Judge at the Pebble Beach Concours, in California and I have entered classic cars at that event as well as other Concours in the United States. I presently live at 5056 Waters Edge Way, Cooper City, Florida, 33330.

2. On or about September 26, 2011, Christopher Gardner ("Gardner") sold to me his "1937/8 Horch Special Roadster" body shell for the sum of $300,000.00 (three hundred thousand dollars). I drafted the agreement titled "AGREEMENT TO PURCHASE AND BILL OF SALE" and I paid to Gardner the $300,000.00 by bank wire transfer. [Exhibit A]

3. Several months after I made the bank wire transfer, I determined that what had been sold to me was not a "1930's Horch Special Roadster" body shell. After extensive consultation with known Horch experts as well as further measurement and inspection, the body shell was shown to be too narrow to be a "Horch Special Roadster". Further, Gardner could provide no paperwork to prove it ever was a "Horch Special Roadster" body. In fact to this day no one has ever been able to determine that the body was originally made in-period for a specific manufactured car. At this point it is believed that it is some sort of custom body, made after the war and as such has a value of less than 20% of the price that I paid for it.

4. Immediately, prior to my travel to Switzerland and subsequent agreement with Gardner, I learned that Gardner had sold this same orphan body shell, misrepresented to be a "Horch Special Roadster" body shell, to a classic car collector from Seattle, Wa. named Charlie Morse. I learned that Morse had made periodic payments to Gardner that totaled at least $250,000.00.

5. At the closing of my purchase I demanded that Gardner reimburse Charlie Morse for the money that he had put into the body. Gardner stated that he would trade to Morse another car of equal value to make up for this overpayment. I am not aware that this exchange has ever happened, but continues to be promised by Gardner.

5. I demanded the return of my purchase price and expenses from Gardner. Gardner refused. I hired attorneys and filed a **criminal complaint** against Mr. Gardner in Geneva, Switzerland. That criminal complaint is now underway. My attorneys' are Fabio Spirgi and Sanada Bunaciu at Keppeler & Associates, 15, Rue Ferdinand-Hodler, Geneva, Switzerland, telephone 011.41.22.718.6161.

6. I understand that there is another lawsuit in Switzerland against Gardner by another collector named Emilio Comelli. Gardner agreed to sell Comelli an 8 cylinder, 1930's Alfa Romeo chassis for 215,000 Euro but instead delivered a six cylinder chassis. Gardner refused to refund Comelli's money thus the Comelli lawsuit. There is an immense difference in value between a 6 cylinder chassis and 8 cylinder chassis.

*10.24.12 Affidavit of Richard Scott [Exhibit E]*

Affidavit of Kristine A. Lawson          , Page 10 of 35          Initials KL

JF0177

32. I sent Gardner an email summarizing my opinion of him and asking him to excuse himself from this transaction. The earlier revelation about Gardner being a convicted felon had caused me concern about Gardner. When Gardner failed to make his contractually promised payment to Conklin and to Ford, it caused me great concern. The final straw was Gardner's misrepresentations in London, which led me to decide that I would stick to the 70%/30% split. My email is below:

Mr. Chris Gardner, and All:

As I told Mr. Herb Haas, I was preoccupied with other family related events this past week. Now I have time to clear the air with you, Mr. Gardner.

When Judge Nadel ordered the change back to 30% Lawson / 70% Ford, I told Mr. Ford that I would honor the 10% Lawson / 90% Ford on a post adjudication basis. You have ample and irrefutable evidence of this in the several email letters about distribution.

That was then. This is now. Now, because of your actions, I will assert my rights and hold you accountable.

Mr. Gardner, it is my view that your single-handed, deceptive disruption of the Court-sanctioned settlement meeting set for January 4, 2013 caused the London fiasco and weakened the Lawson/Ford interests.

Therefore, Mr. Gardner, I will follow the Judge's Status Quo Order of 30% Lawson / 70% Ford in the post-adjudication scenario. Further, after the auction sale, I will look to you to make up for the damages such as, but not limited to, the Lawson/Ford interests having to accept a 50/50 split instead of an 80/20, or 70/30, or 60/40 split.

Mr. Gardner, it must, by now be clear to all that your less-than-honorable ways as above are not your first and do not appear limited to this case, as evidenced by your interactions with others such as with Mr. Charlie Morse of Washington, Mr. Richard Scott of Florida, and more recently, for all to bear witness, Mr. Phil Varricchio of Arizona.

Mr. Gardner, I request that you excuse yourself from this transaction and cease your interference. You were invited to sign the Heads Of as a means to show your consent to a particular settlement as it was a different ending than the ending contemplated in your financing contract with Mr. Ford. Signing the Heads Of did not elevate your status beyond that of a contingent lien-holder against Mr. Ford's interest. Mr. Ford assures me that you and he will arbitrate your differences.

Affidavit of Kristine A. Lawson          Page 11 of 35          Initials KL

JF0178

Mr. Gardner, finally, I bid farewell to you too.

Kristi Lawson

*06.18.13 8:04PM Email from Kristi Lawson to Chris Gardner*

33. Before discovery of the Gardner schemes and the Gardner misrepresentation, our side was aiming for a 80/20 split of auction proceeds. I gave Ford written and notarized authority for an 80/20 split for the January 4 meeting in London. [Exhibit D] After the Gardner misrepresentation, fiasco, and consequent weakness, we begrudgingly settled for a 50/50 split.

34. Ford informed me that he would file to arbitrate his dispute with Gardner to reduce if not disqualify Gardner from what would have been Gardner's reward had Gardner fully performed and had Gardner not indulged in self-dealing and fraudulent misrepresentations.

35. My email above shows that I learned the fact that Gardner had not paid some Arizona attorney his $65,000+ fee. That attorney brought his lien against Gardner to the attention of all the Ohio litigants. Then I learned that a London attorney had made claims against Gardner relative to Gardner seeking Swiss registrations for a Talbot Lago car that Gardner did not own. Then I learned that a Swiss resident named Wolfgang Fisher had sued Gardner about a replica Bugatti. Mr. Fisher has yet to collect on his judgment against Gardner. As a result, I will ask my attorney to seek a restraining order against Gardner from him having anything more to do with this transaction.

36. Ford asked me for an affidavit. Ford prepared this affidavit. Ford has promised me nothing for this affidavit. Ford has given me nothing for this affidavit.

**Further Affiant Sayeth Naught,**

*Kristine a Lawson*

Kristine A. Lawson

On *June 27th 2013* (date) Kristine A. Lawson personally appeared before me, produced her Ohio driver's license # *RP230409* as identification, and was then duly sworn under oath to make this statement.

*Tammy A. Thompson*

Tammy A. Thompson
Notary Public State of Ohio
My commission Expires June 18th 2017

Notary and Date Commission Expires

Affidavit of Kristine A. Lawson          Page 12 of 35          Initials KL

JF0179

## Sale Agreement

**1. Parties:** The Parties to this agreement, "Agreement" are Kristi Lawson, "Seller", of 2887 Harrison Avenue, Cincinnati, OH, 45211, Cell: 513/616.3214, Email: k-lawson@cinci.rr.com, and Joseph Ford or his assigns, "Buyer", at 7630 Lago Del Mar Dr. #7, Boca Raton, FL, 33433, Cell: 954.675.8445, Email: fordlogic@gmail.com. This Agreement is effective as of the later date signed.

**2. Material Representations:** I, Kristi Lawson, as executor of my father's estate, and personally as an individual, represent and warrant that I own and have the capacity to sell and convey all, or part, of: 1) Current U.S. Ohio title document, "title", for one 1954 Ferrari 375 Plus VIN #0834AM, for the 100% complete Ferrari, 2) multiple Provenance documents and prior Bills of Sales and Titles, "provenance documents" acquired over the years since March 29, 1958; 3) the portion of the Ferrari that was never stolen "rear half plus other parts" including but not limited to door, front hood, rear body panel, headrest hump and pad, gas tank, original VIN data plate, four hubs, three belly-pan panels, three floor pan panels, some with original factory numbers, miscellaneous body grille and fender closure panels, transmission bell housing, and transmission tunnel, plus other various related parts and components removed when my father disassembled the car for repair and restoration; 4) the rights to recover and possess, "recovery and possession rights" the portion of this Ferrari that was stolen, "incomplete front half without motor, trim, or VIN plate", believed to now be in Belgium, cloned or in the process of cloning, and remaining on the reported stolen lists of law enforcement and whose ownership has never been transferred away; and 5) rights to this interesting saga of the Ferrari that began on March 29, 1958 when my father bought the Ferrari, "story rights". Items one through five above, inclusive, shall be known as the "Package" for purposes of this Agreement. Seller also represents that a lawsuit and motion has been filed (Case A1001370, Court of Common Pleas, Hamilton County, OH) as to the above. Attached as Exhibit A is my authority to sign and bind my two sisters.

**3. Items Sold:** Seller hereby sells and conveys to Buyer a twenty percent interest in all the rights, title, and interest in each of the following: 1) title; 2) provenance documents; 3) parts bundle 1; 4) recovery and possession rights and parts bundle 2; and, 5) story rights. Seller admits full receipt of all due and valuable consideration for the items sold. Seller agrees to hold, protect, and store the items with a duty of care as a fiduciary. If necessary for purposes of allowing Buyer to separately represent his interests in court, Seller agrees to segregate the outer body parts of the parts bundle 1 as belonging to Buyer separately and

Sale Agreement                    Page 1 of 3                    KL    JF
                                                    (Initials not required at last page.)



EXHIBIT

E.

divisible, while the percentage of the other items remains undivided and unsegregated.

**4. Restrictions on Items and Location of Items:** Unless noted otherwise herein, Seller agrees never to sell, pledge, or in any way encumber Seller's thirty percent interest, and is of course barred from selling, pledging, or in any way encumbering the remaining interests since they belong to others. Seller shall always consider the items as a group that must remain together. Once the ultimate goal, defined herein, is attained, then there will be a sale and transfer.

**5. The Ultimate Goal:** The ultimate goal is to assemble the resources to take the legal steps and actions necessary to reunite the items as a single vehicle with all of its original parts and documents, for a formal auction sale via an established classic car auction such as Goodings, or Barret-Jackson. Gross proceeds pay for expenses of prepping the bundles into a marketable vehicle once reunited and engaging the auction house to promote and sell the car. The net proceeds of any such sale are to then be split per the Owner's pro-rata share of the Package, which is anticipated to be, at the time of this writing: 20%, 30%, 50%. Proceeds from the story, if saleable and ever sold, shall be split similarly, after deduction of directly related and unavoidable selling expenses. _See change #1_

**6. Whole of Agreement:** This document constitutes the whole of this Agreement. This document supercedes any and all prior oral or prior written proposals or discussions as to the matter described herein.

**7. Binding Nature, Good Faith:** This Agreement shall be binding on all Parties. The Parties agree to act in good faith.

**8. Forbearance or Inaction Is Not A Waiver:** Any action not taken by either Party shall not represent a waiver or forbearance of that Party's rights or benefits.

**9. Disputes, Notices, Period to Resolve a Dispute, Default, Enforcement:** In the event of a dispute arising out of this Agreement, the complaining Party agrees to give the other Party written Notice describing the dispute, the paragraph of this Agreement that has been violated, and the action required that will cure that dispute. The recipient of such Notice has 14 days to cure by taking that action, or to reply with reasons why such action is not required. In the event such an exchange does not resolve the dispute, a Party is free to then seek redress for actual damages and attorney fees and costs, in the local state court in

which the recipient Party resides. All Notices referred to in this Agreement must be made by email _and_ by certified mail, return receipt requested.

**10. Changes:** Parties agree that any changes to this Agreement must be in writing, must be signed by all Parties, and must be consecutively numbered and dated.

**11. Severability:** In the event any part of this Agreement is adjudicated as prohibited by law, then it shall be stricken and the remainder of this Agreement shall be remain in effect.

_Kristi Lawson_ 2-25-10          _Joseph Ford_ 2-25-10
Kristi Lawson  and date               Joseph Ford and date

_Elizabeth Ann Kessler_          Sworn to before me and subscribed
Notary and seal for ~~Kleve~~ signature:     in my presence by Kristi Lawson
_Lawson_                          this 25th day of February, 2010.
_Adams_
Notary and seal for Ford signature:

ELIZABETH ANN KESSLER
Notary Public, State of Ohio
My Commission Expires 06-21-2011



_KL_    KL____ JF
                                    (Initials not required at last page.)

# Change # 1 to Sales Agreement

Joe — I already agreed to pay a 10% (ten-per-cent) commission to Dave Clark if the Ferrari car were to be recovered and sold.

You must promise me to work with Dave Clark to reach a mutually acceptable agreement with Dave Clark that integrates my contract with him into our Sales Agreement.

_Kristi Lawson_    2/5/10
Kristi Lawson

_Joseph Ford_    2-25-10
Joseph Ford

Sworn to before me and subscribed in my presence by Kristine Lawson on 25th day of February, 2010.

_Elizabeth Ann Kessler_

ELIZABETH ANN KESSLER
Notary Public, State of Ohio
My Commission Expires 06-21-2011

Sworn To Before Me And Subscribed in my Presence by Joseph L. Ford III on February 25, 2010.

_Ike Adams_



IKE D. ADAMS
NOTARY
My Comm. Expires
May 21, 2012
DD791036
PUBLIC
STATE OF FLORIDA

## Change #2 to Sales Agreement Dated 2.25.10

The Parties below admit a typo error at paragraph two and agree to correct that typo by changing the "0834am" to "0384am", which reflects what the parties meant all along.


*Joseph Ford* 3/25/10

Signature and Date


*Danielle McCabe* 3.25.10

Notary

Notary Public State of Florida
Danielle McCabe
My Commission DD889893
Expires 05/14/2013


_____

Signature and Date


_____

Notary

## Option Agreement

**1. Parties:** The Parties to this option agreement, "Agreement" are Kristi Lawson, "Seller", of 2887 Harrison Avenue, Cincinnati, OH, 45211, Cell: 513/616.3214, Email: k-lawson@cinci.rr.com, and Joseph Ford or his assigns, "Option Holder ", at 7630 Lago Del Mar Dr. #7, Boca Raton, FL, 33433, Cell: 954.675.8445, Email: fordlogic@gmail.com. This Agreement is effective as of the later date signed.

**2. Material Representations:** I, Kristi Lawson, as executor of my father's estate, and personally as an individual, represent and warrant that I have sold a twenty percent interest, and still own and have the capacity to sell and convey all, or part, of the remaining eighty percent interest of: 1) Current U.S. Ohio title document, "title", for one 1954 Ferrari 375 Plus VIN #0834AM, for the 100% complete Ferrari, 2) multiple Provenance documents and prior Bills of Sales and Titles, "provenance documents" acquired over the years since March 29, 1958; 3) the portion of the Ferrari that was never stolen "rear half plus other parts" including but not limited to door, front hood, rear body panel, headrest hump and pad, gas tank, original VIN data plate, four hubs, three belly-pan panels, three floor pan panels, some with original factory numbers, miscellaneous body grille and fender closure panels, transmission bell housing, and transmission tunnel, plus other various related parts and components removed when my father disassembled the car for repair and restoration; 4) the rights to recover and possess, "recovery and possession rights" the portion of this Ferrari that was stolen, "incomplete front half without motor, trim, or VIN plate", believed to now be in Belgium, cloned or in the process of cloning, and remaining on the reported stolen lists of law enforcement and whose ownership has never been transferred away; and 5) rights to this interesting saga of the Ferrari that began on March 29, 1958 when my father bought the Ferrari, "story rights". Items one through five above, inclusive, shall be known as the "Package" for purposes of this Agreement. Seller also represents that a lawsuit and motion has been filed (Case A1001370, Court of Common Pleas, Hamilton County, OH) as to the above. Attached as Exhibit A is my authority to sign and bind my two sisters.

**3. Option to Purchase Fifty Percent Interest:** Seller admits receipt of due and valuable consideration, and in exchange grants to Option Holder an irrevocable option to buy a fifty percent interest in the Package. This interest is in addition to any interest the Option Holder already has, and is transferable by option Holder. The price of exercising that option in full is to pay five thousand dollars into Seller's bank account for deposit into the Client Trust Account of a licensed Ohio attorney, based in Cincinnati, and to sign this Agreement, this part of which then become a Promissory Note for ninety five thousand dollars with

Option Agreement                     Page 1 of 3                     KL    JF

(Initials not required for last page.)



EXHIBIT
**5**

payment terms as follows: 1) ten thousand dollars into the Client Trust Account every thirty days, starting on the fifteenth day after the initial five thousand dollar payment, until ninety thousand dollars have been paid, and then pay the final five thousand dollars thirty days after that. Once the initial five thousand dollars is paid, Option Holder shall be regarded as an owner of that fifty percent interest since the option has been exercised. Option Holder can certainly prepay some or all of the ninety-five thousand at which point the Promissory Note shall be regarded as paid in full. Option Holder agrees to track all attorney fees and costs that are invoiced on a spreadsheet, and to manage and direct those attorneys as an owner of the property rights being litigated. In no event must the total of all sums paid into that escrow exceed one hundred thousand dollars. The sums deposited in the Client Trust Account are to be spent on attorneys as selected by the owners to represent them in the above lawsuit, and any counterclaims and other actions related to advancing to the ultimate goal as defined in this Agreement.

**4. Restrictions on Items and Location of Items:**  Unless noted otherwise herein, Seller agrees never to sell, pledge, or in any way encumber Seller's thirty percent interest, and is of course barred from selling, pledging, or in any way encumbering the remaining interests since they belong to others. Seller shall always consider their percentage as part of the Package that must remain together. Seller agrees to never sell off, transfer, or pledge as collateral their thirty percent interest until the ultimate goal, defined below, is reached.

**5. The Ultimate Goal:**  The ultimate goal is to take the legal steps and actions necessary to reunite the bundles of parts and paperwork as a single vehicle with all of its original parts and documents, for a formal auction sale via an established classic car auction such as Goodings or Barret-Jackson. The net proceeds of any such sale are to then be split per the Owner's pro-rata share of the Package, which is anticipated to be, at the time of this writing: 20%, 30%, 50%. Proceeds from the story, if saleable and ever sold, shall be split similarly, after deduction of directly related and unavoidable selling expenses.  *See change # 1*

**6. Whole of Agreement:** This document constitutes the whole of this Agreement. This document supercedes any and all prior oral or prior written proposals or discussions as to the matter described herein.

**7. Binding Nature, Good Faith:** This Agreement shall be binding on all Parties. The Parties agree to act in good faith.

Option Agreement                    Page 2 of 3                  KL    JF
(Initials not required for last page.)

**8. Forbearance or Inaction Is Not A Waiver:** Any action not taken by either Party shall not represent a waiver or forbearance of that Party's rights or benefits.

**9. Disputes, Notices, Period to Resolve a Dispute, Default, Enforcement:** In the event of a dispute arising out of this Agreement, the complaining Party agrees to give the other Party written Notice describing the dispute, the paragraph of this Agreement that has been violated, and the action required that will cure that dispute. The recipient of such Notice has 14 days to cure by taking that action, or to reply with reasons why such action is not required. In the event such an exchange does not resolve the dispute, a Party is free to then seek redress for actual damages and attorney fees and costs, in the local state court in which the recipient Party resides. All Notices referred to in this Agreement must be made by email <u>and</u> by certified mail, return receipt requested.

**10. Changes:** Parties agree that any changes to this Agreement must be in writing, must be signed, and must be consecutively numbered and dated.

**11. Severability:** In the event any part of this Agreement is adjudicated as prohibited by law, then it shall be stricken and the remainder of this Agreement shall be remain in effect.

**12. Signatures:** Signatures below indicate understanding and agreement to all of the above terms. This Agreement can be signed and notarized at different locations since the Parties reside in different places.

_Kristi Lawson and date_    _Joseph Ford and date_

Kristi Lawson  and date                 Joseph Ford and date

Notary and seal for Lawson signature:

JUAN E. GARCIA LANZOT
Notary Public, State of Ohio
My Commission Expires 03-16-11

Notary and seal for Ford signature:

IKE D. ADAMS
NOTARY
My Comm. Expires
May 21, 2012
DD791098
PUBLIC
STATE OF FLORIDA

Option Agreement               Page 3 of 3               _____ KL _____ JF
                                                 (Initials not required for last page.)

Change #1 to Option Agreement

Joe - I already agreed to pay a 10% (ten percent) commission to Dave Clark if the Ferrari Car were to be recovered and sold

You must promise me to work with Dave Clark to reach a mutually acceptable agreement with him that integrates my contract with Dave Clark into this Option Agreement.

_Kristi Lawson_    2/25/10

Kristi Lawson

Sworn to before me and subscribed in my presence by Kristine Lawson on 25st day of February , 2010.

_Joseph Ford_ 2-25-10

Joseph Ford

_Elizabeth Ann Kessler_

ELIZABETH ANN KESSLER
Notary Public, State of Ohio
My Commission Expires 06-21-2011

2/25/10
Sworn Before me And
Subscribed in my Presence
By Joseph L Ford III on
February 25, 2010
_Ike D Adams_

IKE D. ADAMS
NOTARY
My Comm. Expires
May 21, 2012
DD791038
PUBLIC
STATE OF FLORIDA

## Change #2 to Option Agreement Dated 2.25.10

The Parties below admit a typo error at paragraph two and agree to correct that typo by changing the "0834am" to "0384am", which reflects what the parties meant all along.


*Joseph Ford 3/25/10*

Signature and Date


*Danielle McCabe 3.25.10*

Notary

> Notary Public State of Florida
> Danielle McCabe
> My Commission DD889893
> Expires 05/14/2013


_____

Signature and Date


_____

Notary

## Change #3 To the 2.25.10 Sales and 2.25.10 Options Agreements

3.1 Kristi Kleve Lawson and Joseph Ford hereby change the above referenced two Agreements as follows per the terms herein.

3.2 As to interests as described by Items 1,2,3, and 4 in those Agreements, Ford hereby buys, and Lawson hereby sells, all of her 30% to Ford for $75,000 (seventy-five thousand dollars) to be paid as below. Also, Ford grants Lawson a lien on the car, to be placed on the new title, and that lien shall equal the dollar amount of ten percent of the net proceeds from the disposition by sale or settlement of the car. Net proceeds are those proceeds left after paying to prepare the parts and car into a marketable bundle for a sale after also deducting all auction house or broker fees related to promoting, listing, and selling the car. Ford agrees to let Lawson keep the original gas tank.

3.3 As to the interests described as Item 5 in those Agreements, Lawson hereby sells to Ford 20% of her interest such that as to Item 5 Ford now owns 90% and Lawson owns 10%. Proceeds from the sale of Item #5, if saleable and ever sold, shall be split 90% and 10%, after deducting directly related and unavoidable selling expenses.

3.4 Lawson re-represents that she is the sole remaining listed owner on the old Ohio title document 3105234917 (her sisters have quitclaimed their interests to her), and Lawson, once paid as below, shall sign her name to the back of the title as a sale to "Joseph L. Ford, c/o Joseph Parker, Stettinius, and Hollister, 425 Walnut Street, Suite 1800, Cincinnati, OH, 45202-3957" for the sum of $175,000. Then, the title will be re-titled in a state of Ford's choice, such that, and as part of that re-titling, "Kristi Kleve-Lawson, 2887 Harrison Ave, Cincinnati, OH, 45211" shall be listed as "lienholder", having a lien interest equal to the dollar value as described in 3.2 above. Ford agrees to pay any sales tax or fees involved in any such re-titling. Once re-titled, Ford shall hold and possess the original title.

3.5 Lawson acknowledges and agrees that as a result of this Change, Ford is now the 100% owner of the Ferrari, and she a lienholder, and that any future sale, or future settlement, or future legal action, anywhere in the world, or for whatever scenario that may evolve with the case and the car, that the decision is at Ford's sole discretion and prerogative since Ford is the Owner. Lawson agrees to continue to participate and cooperate in the lawsuit and all recovery efforts to her fullest extent and in good faith.

3.6 Payment is to be by wire transfer on or before January 29, 2011 to Kristi Kleve' Lawson, in her account, the specific details of which she must email to Ford on or before January 18, 2011.

3.7 Ford and Lawson agree to have Ford's attorney bring this change to the attention of the Court so as to remain in compliance with the Status Quo Order. The parties agree to notarize their signatures, as a mere formality, the next business day.

Signatures:

Joseph Ford and Date          Kristi Kleve-Lawson and Date

Notary for each signature (FL for Ford and OH for Lawson)

Notary Public State of Florida
Danielle McCabe
My Commission DD889893
Expires 05/14/2013

JESSE OBERT
Notary Public, State of Ohio
My Commission Expires
March 6, 2013

```
 1   documents; do you agree?

 2              MR. RINEAR:  Objection.

 3        A.   Yes.

 4              MR. GOTTESMAN:  Is it to the form?

 5              MR. RINEAR:  No, to the substance.

 6              THE WITNESS:  It applied to everyone, and

 7        it applied to the car mostly, I think is what

 8        we meant by this to mean.

 9   BY MR. GOTTESMAN:

10        Q.   Well, it certainly says vehicle parts

11   and/or documents, right?

12        A.   Yes, I see that now.

13        Q.   And you were a party to this, your

14   attorney Dan Randolph signed off on it, right, or

15   Janaya Trotter, right?

16        A.   Yes.

17        Q.   And Joe Ford's attorney Dominick Gerace

18   signed off on it, right?  It's on the next page.

19        A.   Yes.

20        Q.   Now, while that order was still in

21   effect -- in Exhibit 59, would you please turn to

22   page 615?

23        A.   Mine doesn't go that far.

24        Q.   615?

25              MR. SMITH:  615.
```



EXHIBIT
6.

```
 1   BY MR. GOTTESMAN:

 2        Q.   Do you see where I stopped, ma'am?

 3        A.   Yes.

 4        Q.   Now, my question for you is, is that true

 5   or false?

 6             MR. SMITH:   What?

 7        Q.   What you've said in this affidavit?

 8        A.   Yes, I remember hearing him tell me his

 9   credentials.

10        Q.   Now, I just asked you if you knew he was

11   an attorney?

12        A.   I knew that he had a degree in law.  And

13   what he said to me about that was that he was able

14   to help to select attorneys based on what we needed

15   from them and choose a law team and orchestrate

16   things, you know, from a very broad standpoint,

17   including, you know, how to interview lawyers, how

18   to really --

19        Q.   Put together evidence?

20        A.   I can't -- I mean, no, he said he could --

21   he could oversee the entire project --

22        Q.   Manage litigation, is that a fair way to

23   characterize it?

24        A.   If you keep trying to tell me what to say,

25   I'm not going to be able to think of how I want to
```

1      A.    179?

2      Q.    Bottom right-hand corner, JF179, paragraph

3  36.

4      A.    Yes.

5      Q.    It says Ford prepared this affidavit.

6      A.    Yes.

7      Q.    Right?

8      A.    Uh-huh.  Yes.  I guess my answer to what

9  you're saying is that I always had attorneys for as

10  long as I've been in this relationship with Joe

11  Ford, so I never considered Joe my attorney or an

12  attorney acting in this project.

13      Q.    Why don't you take -- I mean obviously you

14  know what you want to tell me about this, so tell me

15  everything Joe Ford did in this case that was not

16  related to management of litigation or preparation

17  and collection of evidence.

18          MR. RINEAR:  Objection.

19          MR. SMITH:  Objection.

20      Q.    Go ahead.

21      A.    I sought out Joe and entered into a

22  relationship with Joe because I was being sued.  And

23  I could not withstand that on my own, so Joe became

24  my partner and co-defendant specifically for this

25  litigation.

1   to life, and parts with the documents with my

2   recollection and stories that came from other people

3   who had been involved over all these years,

4   eventually it was like a jigsaw puzzle that we put

5   together and it finally told the truth.  And through

6   the gathering of all the evidence, which came from a

7   thousand places, became irrefutable to tell the

8   story which I knew all these years to be true, but I

9   never could have proved it the way we can now with

10   all the proof we have.

11        Q.   Do you have any idea how many hours Joe

12   Ford has put into assisting you with the

13   investigation and recovery of this car?

14        MR. GOTTESMAN:  Objection.  Calls for

15        speculation.

16        A.   I could make an estimated guess.

17        Q.   Do your best.

18        A.   I know it's been a full-time job for him,

19   and he's worked at it for four years, so if I had a

20   calculator I could guess.

21        Q.   Okay.  Do you believe, as you sit here

22   today, without Joe Ford's assistance you would have

23   ever recovered this car?

24        A.   No.

25        Q.   Do you know what, other than putting money

1  place.  So, yes, these definitely became useful.

2      Q.   Now, I know the answer to this but you're

3  not an attorney, are you?

4      A.   No.

5      Q.   And a lot of these other people who

6  assisted you and helped with everything you just

7  told us about are not attorneys, right?

8      A.   Right, none of them were.

9      Q.   Because there seemed to be an insinuation

10  earlier that somebody who investigates and brings

11  materials forward to get used in a court case, that

12  can only be done by an attorney.  That's not true,

13  is it?

14      A.   No.

15          MR. GOTTESMAN:  Objection.  It's totally

16      true.

17      Q.   All these other people that helped you

18  over the years, all the work that you did, all the

19  work that Dave Clark did, the FBI did, the police

20  did, Interpol did, did any of them get the results

21  Joe Ford got?

22      A.   No.

23      Q.   Can you explain that?  How much better was

24  he than anybody else that helped you?

25      A.   We got -- it was as though the case came

IN THE COMMON PLEAS COURT

HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| David and Deborah Clark | : | A 1605727 |
| Plaintiffs | : | Judge Heekin |
| v. | : | |
| Joseph L. Ford, III, et. al. | : | |
| Defendants | : | |

## AFFIDAVIT OF TIMOTHY SMITH, ESQ. IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Comes now Timothy Smith, Esq., being duly sworn and over the age of 18, and competent to testify in the matters set forth herein, swears and deposes as follows, based on personal information and belief:

1. My name is Timothy Smith, Esq. I am an attorney in private practice and licensed in Ohio.

2. Prior to his death, I represented Karl Kleve in various matters. Throughout Karl's life, he was a friend and sometimes a client.

3. In approximately 1977 or 1978, I met Karl Kleve. At that time, I became aware of the 1954 Ferrari 375 Plus, Serial No. 0384 AM ("Ferrari").

4. In 1989, the chassis of the Ferrari was stolen.

5. After that the FBI apprehended the car thieves. After that, I assisted Karl in his attempt to recover of the Ferrari body, including participating in a video deposition.

6. Mark Daniels had prepared a written agreement he claimed would assist with the recovery of the Ferrari body. I had initially reviewed this agreement and its limited power of attorney, but referred him to William Howe, Esq. for final review.



EXHIBIT

H.

7. Later, Karl informed me of the forgery of this power of attorney by Daniels that purported to permit the sale of the Ferrari. Karl was adamant that he never sold the Ferrari and was never paid for it.

8. In 2010, Joseph Ford, III showed up at my office unannounced and he took me to lunch to discuss the status the Ferrari.

9. At that 2010 meeting, Ford, III informed me that he had purchased a portion of the Ferrari from Kristine. He never informed me at this meeting that he had a legal background; rather, he was investigating the matter. He informed me that he had attorneys working on the matter from the Taft law firm.

10. Immediately thereafter, in early 2010, I showed Ford, III the few materials I had on the Ferrari from my files.

11. In 2013, Kristine Lawson called me and informed me that she needed a lawyer in connection with a lawsuit surrounding the Ferrari.

12. From approximately summer of 2013, I have represented Kristine Lawson, including in connection with the various dispute(s), involving the Ferrari. This representation included representation in Ohio courts, and in London, England.

13. Not long after I got involved in 2013, Judge Nadel ordered the remainder of the Ferrari shipped to London, UK.

14. In October, 2015, the London, UK court determined that the Ferrari (all of it, including the parts that Kristine Lawson had) did not belong to the Kleve Sisters (including Kristine Lawson), but instead belonged to Florence Swaters.

15. But for Joe Ford, III's involvement and ownership interest that he bought, there would not have been any favorable resolution for Kristine Lawson, or her sisters. Ford, III did

not interfere with the Clark/Lawson/Kleve/English contract – Clark did not recover the Ferrari as promised and it was clear to everyone that Clark could not and did not do so once the lawsuits were filed by the Swaters in 2010.

16. At no time was the Ferrari recovered by Kristine Lawson, her sisters, or anyone acting on their behalf; the chassis was in the possession of Florence Swaters, and the London court determined that the chassis, and the remainder of the Ferrari (including the part that had been in the possession of Kristine Lawson), belonged to Florence Swaters.

17. Neither David Clark nor Deborah Clark ever paid any of my attorney fees to assist with the recovery of the Ferrari. Nor did they assist in any other way with the recovery of the Ferrari.

FURTHER AFFIANT SAYETH NAUGHT

_____

Sworn and Subscribed this _14_ day of _MAY_____, 2018:

_____
Notary Public

CHRISTOPHER DAVID WIEST
ATTORNEY AT LAW
Notary Public, State of Ohio
My Commission Has No Expiration Date
Section 147.03 ORC

NOTARIAL SEAL
STATE OF OHIO

IN THE COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

David and Deborah Clark
3547 Riviera Dr.
San Diego, California 92109,

      Plaintiffs,

vs.

Joseph L. Ford, III
7630 Lago Del Mar Dr., #7
Boca Raton, Florida, 33433,

Ray Lawson
2887 Harrison Ave.
Cincinnati, Ohio 45211,

Kristine Lawson
2887 Harrison Ave.
Cincinnati, Ohio 45211,

Katrina English
3700 Grand Avenue
Middletown, Ohio 45044,

Karyl R. Kleve
321 East 3rd Street,
Covington, Kentucky 41011,

Joseph L. Ford, IV
900 SW 9th Street Circle, Apt. 202
Boca Raton, Florida 33486,

Justin Ford
22132 Boca Place Dr., Apt. 1511
Boca Raton, Florida 33433,

and

John Does 1-10,
Names and addresses unknown,

      Defendants.

Case No. A1605727

Judge Heekin

PLAINTIFFS' FIRST AMENDED
COMPLAINT

COPY FILED
CLERK OF COURTS
HAMILTON COUNTY

FEB 13 2018

AFTAB PUREVAL
COMMON PLEAS COURTS

EXHIBIT
I.

Plaintiffs, through counsel, for their First Amended Complaint state as follows:

## Parties

1.    David Clark and Deborah Clark are husband and wife and live in San Diego California.

2.    Kristine Lawson, Katrina English, and Karyl Kleve (collectively referred to herein as the "Kleve Heirs") are the daughters of Karl Kleve (deceased), and they live in Cincinnati, Ohio, Middletown, Ohio, and Covington, Kentucky, respectively.

3.    Ray Lawson is and for all times relevant hereto was married to Kristine Lawson and lives in Cincinnati, Ohio.

4.    Joseph L. Ford, III (referred to herein as "JLF-3"), lives in Boca Raton, Florida.

5.    Joseph L. Ford, IV (referred to herein as "JLF-4"), is the son of JLF-3, and lives in Boca Raton, Florida.

6.    Justin Ford is the son of JLF-3 and lives in Boca Raton, Florida.

7.    John Does 1-10 are people or entities, the identities of which are not currently known to the Plaintiffs, that have received money from the Defendants for the purposes of defeating creditors' claims.

## Jurisdiction

8.    This Court has personal jurisdiction over JLF-4 and Justin Ford pursuant to R.C. §2307.382 because they have: 1. Transacted business in this state by funding JLF-3's illegal enterprise and paying his counsel fees and other expenses in Ohio; 2. Caused tortious injury in this state by engaging in an unlawful civil conspiracy to profit through champerty, maintenance, and/or the unlicensed practice of law; and 3. Operating a website for and about the Ferrari litigation in the Hamilton County Courts.

2

9.    In Case No. A1306451, Gardner v. Ford, III, et al., this Court found that it had personal jurisdiction over JLF-4 and Justin Ford and denied their Motion to dismiss on such grounds.  See Entry Denying Defendants' Motion to Dismiss on Jurisdiction, attached as **Exhibit 1**.

10.    In Appeal No. C-150018, the First District Court of Appeals dismissed JLF-3 and Justin Ford's appeal of the trial court's decision (Exhibit 1) because it was not a final appealable order.  See Opinion attached as **Exhibit 2**.

### Facts

11.    Prior to 2007, all the Kleve Heirs claimed to have inherited an ownership interest in a 1954 Ferrari 375 Plus that had been owned by and stolen from Karl Kleve.

12.    Mr. Clark and Mrs. Clark are partners in the business of selling and restoring classic and collectible cars.

13.    On 18 July 2007, David Clark contracted with the Kleve Heirs to provide services related to the recovery and sale of the Ferrari.  A copy of the contract (referred to herein as the Clark/Lawson Contract") is attached as **Exhibit 3** and incorporated herein by reference.

14.    The Clark/Lawson Contract provides for Mr. Clark to be the exclusive worldwide agent for selling the Ferrari and be paid a fee of 10% of the proceeds upon the recovery and sale of the Ferrari.

15.    When the Clark/Lawson Contract was made, the Ferrari was in Europe in the possession and control of Jacques Swaters and his daughter, Florence Swaters.

16.    When the Clark/Lawson Contract was made, Mr. Swaters and his daughter claimed that they were the lawful owners of the Ferrari.

3

17.     When the Clark/Lawson Contract was made, the Kleve Heirs were in possession of several original pieces of the Ferrari, including the gas tank, the hood, the rear deck lid, floor panels, and other pieces (collectively referred to herein as the "Spare Parts").

18.     When the Clark/Lawson Contract was made, the Kleve Heirs were in possession of an Ohio Certificate of Title for the Ferrari.

19.     After the Clark/Lawson Contract was made, Mr. Clark initiated negotiations between the Kleve Heirs and the Swaters in an effort to resolve their competing claims of ownership of the Ferrari and the Spare Parts.

20.     The Swaters filed suit[1] against Kristine Lawson and others on 12 Feb. 2010 in the Court of Common Pleas for Hamilton County, Ohio, seeking to recover the Spare Parts and to resolve all competing claims of ownership.

21.     Kristine Lawson notified the Clarks that the Swaters had commenced litigation against her in Hamilton County, Ohio.

22.     The Clarks contacted a prior business acquaintance, Christopher Gardner, and asked if he would be willing to assist Kristine Lawson in the *Swaters v. Lawson* litigation.

23.     Mr. Gardner told the Clarks he was not willing to get involved but suggested that the Clarks contact JLF-3.

24.     For years prior to 2010, JLF-3 was engaged in the illegal and unlicensed practice of law, and he repeatedly held himself out to Mr. Gardner and others as a licensed attorney.

---

[1] Case No. A1001370.
[2] An Arbitration Panel determined that Mr. Gardner substantially performed his

25.     The Clarks spoke with JLF-3 and recommended that Kristine Lawson and JLF-3 confer regarding the *Swaters v. Lawson* litigation.

26.     When the *Swaters v. Lawson* litigation was commenced, JLF-3 had no right, title, interest, or claim in or to the Ferrari at issue.

27.     When the *Swaters v. Lawson* litigation was commenced and for all times relevant to this action, JLF-3 was not actively licensed to practice law in any jurisdiction.

28.     On 25 Feb. 2010, Kristine Lawson entered into two contracts with JLF-3: the Sale Agreement (attached as **Exhibit 4**) and the Option Agreement (attached as **Exhibit 5**).

29.     The Sale Agreement and the Option Agreement are both unlawful and void contracts for champerty, maintenance, and/or the unlicensed practice of law by JLF-3.

30.     By entering into the Sale Agreement and Option Agreement, JLF-3 acquired an interest in the subject matter of the *Swaters v. Lawson* litigation in an attempt to make a profit and Kristine Lawson relinquished her rights as a litigant to control the conduct of the *Swaters v. Lawson* litigation.

31.     In Change #1 to the Sale Agreement and Change #1 to the Option Agreement, JLF-3 expressly promised to "work with Dave Clark to reach a mutually acceptable agreement with him that integrates my [Lawson's] contract with Dave Clark into the Sale Agreement and the Option Agreement". See Change #1 to the Sale Agreement (Exhibit 4) and Change #1 to Option Agreement (Exhibit 5).

32.     From Feb. 2010 until Apr. 2016, JLF-3 and Kristine Lawson expressly held themselves out as partners in several different legal cases and in their efforts to recover the Ferrari.

5

33.    During the pendency of the *Swaters v. Lawson* litigation, JLF-3 and Mr. Gardner entered into a contract (referred to herein as the "Gardner/Ford Contract") for Mr. Gardner's financial support of JLF-3's litigation efforts in exchange for Mr. Gardner receiving an interest in the proceeds of sale of the Ferrari. A copy of the Gardner/Ford Contract is attached hereto as **Exhibit 6.**

34.    During the pendency of the *Swaters v. Lawson* litigation, JLF-3 advised Kristine Lawson regarding her legal rights, prepared legal documents and pleadings, evaluated evidence, interviewed witnesses, managed and directed the litigation, attempted to conduct settlement negotiations, and engaged in other activities that are the practice of law as defined by the Supreme Court of Ohio.

35.    From the time period of Feb. 2010 to Apr. 2016, to support and fund the Ferrari litigation effort, JLF-3 used the bank accounts of JLF-4 and Justin Ford to transfer money from a variety of sources and make payment to attorneys, court reporters and other service providers related to the litigation.

36.    The bank accounts and funds referenced in the preceding paragraph were used to provide critical financial support for the contracts for champerty, maintenance, and/or the unlicensed practice of law with the knowledge of JLF-3, JLF-4 and Justin Ford.

37.    Justin Ford was paid to create and manage a website called Ferrarijustice.com as a legal resource and evidence repository for attorneys working on the *Swaters v. Lawson* litigation in furtherance of the unlawful and void contracts for champerty, maintenance, and/or the unlicensed practice of law by JLF-3. .

38.    In March of 2013, Mr. Gardner, JLF-3, Kristine Lawson, and Florence Swaters signed a settlement agreement (referred to herein as the "Heads of Agreement") to resolve all claims in *Swaters v Lawson*. The Heads of Agreement is attached as **Exhibit 7**.

39.    The Heads of Agreement provided that Bonhams 1793 Limited (referred to herein as "Bonhams") was the exclusive worldwide agent for selling the Ferrari.

40.    JLF-3 was responsible for the decision to sign the Heads of Agreement because Kristine Lawson had relinquished control over the conduct of the litigation.

41.    JLF-3 tortiously interfered with the Clark/Lawson contract by using unlawfully obtained control over the *Swaters v. Lawson* litigation to appoint Bonhams as the exclusive worldwide agent for sale of the Ferrari.

42.    Kristine Lawson breached the Clark/Lawson contract by appointing Bonhams as the exclusive worldwide agent for sale of the Ferrari.

43.    The Heads of Agreement provided that the proceeds of the sale would be divided equally between Florence Swaters on the one hand, and Kristine Lawson and those claiming through her on the other hand.

44.    After the execution of the Heads of Agreement but prior to the auction, there was a dispute between JLF-3 and Mr. Gardner because JLF-3 had wrongfully[2] claimed Mr. Gardner had materially breached the Gardner/Ford Contract and forfeited his right to a portion of the proceeds of the sale of the Ferrari. See email attached **Exhibit 9**.

45.    Because JLF-3 had wrongfully attempted to exclude Mr. Gardner from participating the Ferrari litigation and receiving his share of the proceeds, Mr. Gardner was

---

[2] An Arbitration Panel determined that Mr. Gardner substantially performed his responsibilities and duties under the Agreement and that he did not materially breach the Agreement. See §3, Arbitration Final Award, attached as **Exhibit 8**. This Arbitration Award was confirmed by this Court in Gardner v. Ford, III, et al., Case No. A1306451.

forced to file suit[3] against JLF-3 and Kristine Lawson in the Hamilton County Court of Common Pleas and obtained an injunction to prevent JLF-3 from interfering with the auction. See attached **Exhibit 10**.

46.    On 27 June 2014, Bonhams auctioned the Ferrari at the Goodwood Festival of Speed in Chichester, England, and Copley Motorcars, as agent for Les Wexner/L Brands, Ltd., purchased it for £10,753,450[4]. The "hammer price" was £9.6 Million[5].

47.    Before, during, and after the auction, Kristine Lawson and JLF-3 objected to the sale of the Ferrari by Bonhams, despite their prior consent as given in the Heads of Agreement.

48.    After the auction, the buyer of the Ferrari filed suit in London, England, to rescind the sale because of the claims of ownership asserted by Kristine Lawson and JLF-3.

49.    From February of 2010 until April 2016, there was extensive litigation in multiple forums regarding competing claims of ownership of the Ferrari and division of the proceeds of sale.

50.    On 17 April 2016, JLF-3 and Mrs. Lawson settled their claims regarding the Ferrari in exchange for a payment of £2,349,646[6].

51.    The settlement proceeds were divided among the Defendants as follows: Kristine Lawson received $300,000; Katrina English received $150,000; Karyl Kleve received $150,000; and JLF-3 received $2,412,049. See attached Amended and Restated

---

[3] Case No A1306451.
[4] Based on a then-current conversion rate, this is equal to $18.3 Million. This includes the Buyer's Premium of 10%.
[5] Based on a then-current conversion rate, this is equal to $16.32 Million.
[6] Based on a then-current conversion rate, this is equal to $3,330,858.17.

Settlement Agreement, attached as **Exhibit 11** and Settlement Agreement and Mutual Release, attached as **Exhibit 12**, both of which are incorporated herein by reference.

52.     The Kleve Heirs and JLF-3 have refused to pay the Clarks' 10% commission, which is $1,632,000.

53.     As a result of the $2,412,049 payment to JLF-3, the Kleve Heirs did not receive sufficient funds to pay the Clarks' 10% commission of $1,632,000.

54.     The contracts between JLF-3 and Kristine Lawson are void because they are contracts for champerty, maintenance, and/or the unlicensed practice of law.

55.     With the material and financial support of JLF-4 and Justin Ford, JLF-3 interfered with the Lawson/Clark contract by engaging in the unlicensed practice of law.

56.     With the material and financial support of JLF-4 and Justin Ford, JLF-3 interfered with the Lawson/Clark contract by purchasing an interest for speculative profit in the subject of the *Swaters v. Lawson* litigation and taking away Kristine Lawson's ability to control the litigation.

57.     With the material and financial support of JLF-4 and Justin Ford, JLF-3 interfered with the Lawson/Clark contract by illegally entering into contracts for champerty and/or maintenance.

58.     JLF-3, JFL-4, and Justin Ford acted as partners and/or joint venturers and conspired in the illegal effort to profit from the Kleve Heirs claims of ownership in the Ferrari using contracts for champerty and/or maintenance.

59.     JLF-3, JFL-4, and Justin Ford acted as partners and/or joint venturers and conspired in the illegal effort to profit from the Kleve Heirs claims of ownership in the Ferrari and JLF-3's unlicensed practice of law.

60. JLF-3, JFL-4, and Justin Ford each contributed time, effort, money, and banking resources in an effort to unlawfully interfere in the Clark/Lawson Contract without privilege to do so.

61. JLF-3, JLF-4, and Justin Ford have profited unlawfully from their conspiracy to use JLF-3's contracts for champerty, maintenance, and/or the unlicensed practice of law, all to the detriment of Plaintiffs and other lawful creditors of the Defendants.

### Count 1 – Breach of Contract

62. Plaintiffs incorporate the preceding allegations by reference.

63. The Kleve Heirs have breached the Clark/Lawson Contract by failing to pay Mr. Clark 10% of the sale proceeds.

64. Mr. Clark was an intended third-party beneficiary of Change #1 to the Sale Agreement and Change #1 to the Option Agreement.

65. JLF-3 has breached his obligation to work with Mr. Clark to protect Mr. Clark's 10% commission.

66. JLF-3 and Kristine Lawson breached the Clark/Lawson Contract provision designating Mr. Clark as the exclusive worldwide agent for the sale of the Ferrari by agreeing to allow Bonhams to sell the Ferrari.

67. As a result of Defendants' breaches of their contractual obligations, Plaintiffs have suffered economic damages of at least $1,632,000.

### Count 2 – Interference with a Contract

68. Plaintiffs incorporate the preceding allegations by reference.

69. JLF-3, JLF-4, and Justin Ford, individually and collectively, intentionally and/or maliciously, without privilege to do so, interfered with and interrupted the lawful

performance of the otherwise valid and enforceable Lawson/Clark contract by engaging in illegal acts including, but not limited to, entering contracts for champerty, maintenance, and/or the unlicensed practice of law by JLF-3 in Ohio.

70.    As a direct and proximate result of the conduct described in the preceding paragraph the Clarks have incurred economic damages including, but not limited to, the lost commission of $1,632,000.

### Count 3 - Public Policy/Disgorgement

71.    Plaintiffs incorporate the preceding allegations by reference.

72.    The herein-described acts of JLF-3 including, but not limited to, holding himself out as a licensed attorney (when he is not), holding himself out as qualified to handle complex, commercial, international litigation (when he is not), unlawfully purchasing an interest in the subject matter of litigation, usurping control over the conduct of litigation by preying on the unsophisticated and uninformed parties, and finally, taking $2,412,049 of the settlement proceeds for himself and his sons and leaving the Kleve Heirs to split $600k is outrageous, shocking to the conscience, an abomination, a travesty of justice and violates the laws and public policies of the State of Ohio including, but not limited to, the prohibitions against payment for the unlicensed practice of law and contracts for champerty and/or maintenance.

73.    To prevent the miscarriage of justice, the proceeds from the sale of the Ferrari received by JLF-3, JLF-4, and Justin Ford must be disgorged and held in trust for payment of creditors' claims or distributed to the Kleve Heirs.

### Count 4 - Promissory Estoppel

74.    Plaintiffs incorporate the preceding allegations by reference.

75.    Kristine Lawson, individually and as partner of JLF-3, assured the Clarks that she and/or JLF-3 would pay the 10% commission after JLF-3 was involved in the *Swaters v. Lawson* litigation.

76.    The Clarks justifiably relied on Defendants' representations and refrained from intervening in pending litigation to protect their interests.

77.    As a result of their justifiable reliance on the Defendants' representations, the Clarks have incurred economic damages including, but not limited to, the lost commission of $1,632,000.

### Count 5 – Unjust Enrichment

78.    Plaintiffs incorporate the preceding allegations by reference.

79.    JLF-3, JLF-4, Justin Ford, Ray Lawson, and the Kleve Heirs have all benefited from the efforts put forth in the marketing and brokerage services provided by the Clarks.

80.    Defendants have been unjustly enriched because they received the benefit of Mr. Clarks' services without paying him the agreed upon commission.

81.    As a result of the Defendants' unjust enrichment, the Clarks have incurred economic damages including, but not limited to, the lost commission of $1,632,000

### Count 6 – Conversion

82.    Plaintiffs incorporate the preceding allegations by reference.

83.    JLF-3, JLF-4, Justin Ford, Ray Lawson and the Kleve Heirs have converted money owed to the Clarks for their own use.

84.    As a result, the Clarks have incurred economic damages including, but not limited to, the lost commission of $1,632,000

### Count 7 – Malicious Civil Conspiracy

12

85.    Plaintiffs incorporate the preceding allegations by reference.

86.    JLF-3, JLF-4, Justin Ford, Ray Lawson, and the Kleve Heirs have conspired to take advantage of the labor, advice, and reputation of Mr. Clark for their own economic benefit without paying him for it.

87.    JLF-3, JLF-4, Justin Ford, Ray Lawson, and the Kleve Heirs have conspired to divert the proceeds of sale due and owing to the Clarks for their own benefit intentionally and/or with reckless disregard for the rights of the Clarks.

88.    JLF-3, JLF-4, and Justin Ford conspired to profit illegally from the *Swaters v. Lawson* litigation by purchasing an interest in litigation through contracts for champerty, maintenance, and/or the unlicensed practice of law by JLF-3.

89.    As a result, the Clarks have incurred economic damages including, but not limited to, the lost commission of $1,632,000.

**Count 8 – Fraudulent Transfer**

90.    Plaintiffs incorporate the preceding allegations by reference.

91.    The Lawsons have given JLF-3 at least two mortgage interests in real property owned by them in an effort to encumber that real estate to defeat creditors' claims.

92.    The payment to JLF-3 by the Kleve Heirs is a fraudulent transfer because they had no obligation to pay JLF-3 for the illegal contract for champerty, maintenance, and/or the unlicensed practice of law and that payment has rendered the Kleve Heirs unable to satisfy their obligation to pay the Clarks.

93.    JLF-3, JLF-4, and Justin Ford have received money from the proceeds of the settlement, the payment of which constitutes a fraudulent transfer under R.C. § 1336.01, *et seq.*

94.    The payment from JLF-3 to JLF-4 of more than $1 Million is a fraudulent transfer designed and intended to defeat creditors' claims.

95.    The payment from JLF-3 to Justin Ford of $50,000 is a fraudulent transfer designed and intended to defeat creditors' claims

96.    The Clarks have suffered economic damages as a result of the Defendant's fraudulent transfers because the Kleve Heirs, Ray Lawson, and JLF-3 do not have the financial resources to satisfy their liability to the Clarks.

## Count 9 - Punitive Damages

97.    Plaintiffs incorporate the preceding allegations by reference.

98.    JLF-3, JLF-4, and Justin Ford have engaged in a malicious civil conspiracy to profit from JLF-3's unlicensed practice of law and a contract for champerty and/or maintenance.

99.    The Clarks have sustained economic damages of $1,632,000 and more because of the malicious conduct of JLF-3, JLF-4, and Justin Ford.

100.    As a result, the Clarks are entitled to punitive damages from JLF-3, JLF-4, and Justin Ford in an amount to be determined at trial

WHEREFORE, Plaintiffs demand: Judgment against Defendants for compensatory and punitive damages in excess of $25,000 as proven at trial; disgorgement of all illegal payments for champerty, maintenance, and/or the unlicensed practice of law; all

fraudulent transfers be set aside; costs of this action; attorneys' fees; and, such other relief as this Court deems necessary and just.

Respectfully submitted,

/s/ Zachary Gottesman
Zachary Gottesman (0058675)
Trial Attorney for the Plaintiffs
Gottesman & Associates, LLC
36 East 7th Street, Suite 1650
Cincinnati, Ohio 45202

### Certificate of Service

I hereby certify that a copy of the foregoing pleading was served upon counsel of record by email and/or U.S. Mail as required by the Civil Rules on this 13th day of February 2018.

/s/ Zachary Gottesman
Zachary Gottesman (0058675)

### Praecipe to the Clerk

To the CLERK:

Please serve the Defendants Joseph L. Ford, IV, and Justin Ford by Certified U.S. Mail at the addresses listed in the caption.

/s/ Zachary Gottesman
Zachary Gottesman (0058675)

D108861942

IN THE COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

ENTERED
DEC 1 0 2014

Christopher Gardner                    ]        Case No. A1306451
                                       ]
            Plaintiff,                 ]        Judge Steven E. Martin
                                       ]
v.                                     ]        ENTRY DENYING DEFENDANTS'
                                       ]        MOTION TO DISMISS ON
                                       ]        JURISDICTION
Joseph Ford, III et al.                ]
                                       ]
            Defendants.                ]

---

This matter is before the Court on the Motion to Dismiss filed by Joseph L. Ford, IV and

Justin Ford.  Based on the pleadings, the evidence of record, and the arguments of Counsel, the

Court, being sufficiently advised, finds Defendants' Motion is not well-taken and hereby

DENIES the same.

IT IS SO ORDERED.

Judge Steven E. Martin

This Order Prepared by:

Zachary Gottesman, Esq.
Robert J. Thumann, Esq.
Stephen R. Ramsey, Esq.

With Copies to:

Richard J. Rinear, Esq.
Edward J. Collins, Esq.
Timothy A. Smith, Esq.

EXHIBIT
1

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

CHRISTOPHER GARDNER,

    Plaintiff-Appellee,

vs.

JOSEPH L. FORD, III,

    Defendant,

    and

JUSTIN FORD,

    and

JOSEPH FORD, IV,

    Defendants-Appellants,

    and

KRISTINE KLEVE LAWSON,

    Defendant.

:
:
:
:
:
:
:
:
:
:

APPEAL NO. C-150018
TRIAL NO. A-1306451

*OPINION.*

PRESENTED TO THE CLERK
OF COURTS FOR FILING

OCT 14 2015

COURT OF APPEALS

---

Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Appeal Dismissed

Date of Judgment Entry on Appeal:  October 14, 2015

*Gottesman & Associates, LLP*, and *Zachary Gottesman*, for Plaintiff-Appellee,

*Droder & Miller Co., L.P.A., Richard J. Rinear* and *Edward J*[...]
Defendants-Appellants.

**EXHIBIT 2**

ENTERE[...]

OCT 14 2015

**OHIO FIRST DISTRICT COURT OF APPEALS**

DEWINE, Judge.

{¶1}    This is an appeal of a trial court's denial of a motion to dismiss for lack of personal jurisdiction. We do not reach the merits of the appeal, because the denial of such a motion is not a final order. We therefore dismiss the appeal.

## I. Background

{¶2}    This is yet another episode in a long saga of litigation involving a rare 1957 Ferrari. (For the curious, see *Swaters v.* Lawson, 1st Dist. Hamilton Nos. C-130604 and C-130627, 2014-Ohio-2252, and *Swaters v. Lawson*, 1st Dist. Hamilton Nos. C-140270, C-140334 and C-140361, 2015-Ohio-858.) In the present lawsuit, Christopher Gardner sued a number of defendants alleging the misuse of funds he provided for the purchase of parts of the Ferrari. Mr. Gardner contends that Joseph Ford III misappropriated the money and transferred a portion of the ill-gotten funds to his sons Justin Ford and Joseph Ford IV. Justin Ford and Joseph Ford IV, who live in Florida, filed a motion to dismiss for lack of personal jurisdiction. The court denied the motion, and the two younger Fords appealed.

## II. No Final Appealable Order

{¶3}    As a threshold matter, we address whether the trial court's order was a final order. Courts of appeals have jurisdiction only to review trial courts' final orders. Ohio Constitution, Article IV, Section 3(B)(2). Under the final-judgment rule, "a party must ordinarily raise all claims of error in a single appeal following final judgment on the merits * * * ." *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 374, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981). "Restricting appellate review to 'final decisions' prevents the debilitating effect on judicial administration caused by piecemeal appellate disposition

ENTERED
OCT 14 2015

2

of what is, in practical consequence, but a single controversy." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 170, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

{¶4}    As a general rule, denials of motions to dismiss are not final orders. *See Polikoff v. Adam*, 67 Ohio St.3d 100, 103, 616 N.E.2d 213 (1993); *State Auto. Mut. Ins. Co. v. Titanium Metals Corp.*, 108 Ohio St.3d 540, 2006-Ohio-1713, 844 N.E.2d 1199; *Rigsby v. Albright*, 10th Dist. Franklin No. 10AP-288, 2010-Ohio-5630.   The rule extends to denials of motions to dismiss for lack of personal jurisdiction. *Matus v. S. Farm Bur. Life Ins. Co.*, 5th Dist. Ashland No. CA 1088, 1994 Ohio App. LEXIS 6145 (Dec. 22, 1994); *Burns v. Burns*, 10th Dist. Franklin No. 86AP-1110, 1987 Ohio App. LEXIS 7852 (July 7, 1987).

{¶5}    Notwithstanding the general rule, the Fords insist that our appellate jurisdiction is invoked under R.C. 2505.02(B)(4), which provides that an order granting or denying a provisional remedy is a final order if both of the following apply:

(a)   The order in effect determines the action with respect to the provisional remedy and prevents a judgment in the action in favor of the appealing party with respect to the provisional remedy.

(b)  The appealing party would not be afforded a meaningful or effective remedy by an appeal following final judgment as to all proceedings, issues, claims, and parties in the action.

The Fords maintain that the court's order denied them a provisional remedy and that, if they were made to wait to appeal until there was a final judgment in the action, they would be denied an effective remedy, given the high legal fees and costs that would be necessary to defend themselves.

{¶6}    Thus, the first question is whether the order constitutes a provisional remedy.   A provisional remedy is "a proceeding ancillary to an action," R.C.

ENTERED

OCT 14 2015

OHIO FIRST DISTRICT COURT OF APPEALS

2505.02(A)(3). The Ohio Supreme Court has defined "ancillary proceeding" as one "that is attendant upon or aids another proceeding." *State v. Muncie*, 91 Ohio St.3d 440, 444, 449, 746 N.E.2d 1092 (2001). Applying that definition, the court concluded that a motion to dismiss on double-jeopardy grounds qualified as a provisional remedy because it is "certainly 'attendant' upon the underlying prosecution * * * ." *State v. Anderson*, 138 Ohio St.3d 264, 2014-Ohio-542, 6 N.E.3d 23, ¶ 49. We need not decide whether the definition would extend to a motion to dismiss for lack of personal jurisdiction, because we conclude the order does not meet R.C. 2505.02(B)(4)(b)'s requirement of a lack of meaningful remedy upon appeal following a final judgment.

{¶7}    The Ohio Supreme Court has provided guidance about when a party seeking to appeal an order denying a provisional remedy would not have meaningful or effective relief if his appeal had to wait until final judgment. "In some instances, 'the proverbial bell cannot be unrung and an appeal after final judgment on the merits will not rectify the damage' suffered by the appealing party." *Muncie* at 451. Thus, an interlocutory order authorizing the forced medication of an incompetent defendant was found to be a final order. *Id.* at 451-452. Once the medication was administered, its effects would be difficult—if not impossible—to undo.

{¶8}    In contrast, the prospect of high litigation costs does not make a remedy following final judgment unmeaningful or ineffective. "A delay in obtaining monetary relief is the necessary consequence of most civil litigation and that delay does not render the ultimate remedy ineffective or unmeaningful under R.C. 2505.02(B)(4)(b)." *Katherine's Collection, Inc. v. Kleski*, 9th Dist. Summit No. 26477, 2013-Ohio-1530, ¶ 13. Likewise, in applying substantially similar federal law, the United States Supreme Court "has declined to find the costs associated with

ENTERED
OCT 14 2015

4

unnecessary litigation to be enough to warrant allowing the immediate appeal of a pretrial order." *Lauro Lines S.R.L. v. Chasser*, 490 U.S. 495, 499, 109 S.Ct. 1976, 104 L.Ed.2d 548 (1989). Thus, a foreign cruise line was forced to litigate personal-injury and wrongful-death claims to conclusion in an American court before it could challenge the trial court's denial of its motion to dismiss based upon a forum-selection clause in which the passengers had agreed to litigate their claims in Italy. *Id.* at 501.

{¶9}   A limited exception to the general rule was found in *Sinnott v. Aqua-Chem, Inc.*, 116 Ohio St.3d 158, 2007-Ohio-5584, 876 N.E.2d 1217. That case dealt with a new statutory scheme enacted to deal with the special problems presented by asbestos litigation. The legislation required administrative dismissal of asbestos claims in which plaintiffs failed to make prima-facie showings of certain minimum medical criteria. In concluding that an order denying dismissal of such claims was appealable under R.C. 2505.02(B)(4), the court looked to the expressed legislative purpose of conserving resources for sick claimants by limiting lawsuits by less worthy claimants. It recognized that "as a general rule, 'contentions that appeal from any subsequent adverse final judgment would be inadequate due to time and expense are without merit.' " *Id.* at ¶ 25, citing *State ex rel. Lyons v. Zaleski*, 75 Ohio St.3d 623, 626, 665 N.E.2d 212 (1996). But "[i]n the *limited* context of asbestos litigation, where preservation of resources for the benefit of those actually manifesting injury is a stated purpose of the General Assembly, [the court determined] the incurrence of unnecessary trial expenses is an injury that cannot be remedied by an appeal from a final judgment." *Id.* at ¶ 26. (Emphasis added.) We take the Supreme Court at its word that the exception in *Sinnott* is "limited" to the special problem of asbestos litigation.

ENTERED
OCT 14 2015

OHIO FIRST DISTRICT COURT OF APPEALS

{¶10}    The one outlier case is a recent  Twelfth Appellate District decision that found potential litigation costs sufficient to meet the R.C. 2505.02(B)(4)(b) requirement.  *See Huegemann v. VanBakel,* 12th Dist. Fayette No. CA2013-08-022, 2014-Ohio-1888.  That court acknowledged that "[c]ourts have found that litigation costs and delay in recovering money are generally insufficient to show the absence of a meaningful and effective remedy for purposes of R.C. 2505.02(B)(4)(b) * * * ."  *Id.* at ¶ 24.  But "given the circumstances of this case in which foreign defendants from not just different states but different countries are involved, [the court concluded] the litigation costs and delay in recovering money * * * that appellants undoubtedly will experience should they ultimately prevail in the litigation *are* sufficient to establish the absence of a meaningful and effective remedy for purposes of R.C. 2505.02(B)(4)(b)." *Id.*

{¶11}    We are not persuaded by *Huegemann's* logic and decline to disturb decades of case law to the contrary.  That the Fords face high legal costs does not "essentially destroy" their ability to vindicate their claims after a final judgment is entered.  "Absent a patent and unambiguous lack of jurisdiction, a postjudgment appeal from a decision overruling a motion to dismiss for lack of personal jurisdiction will provide an adequate legal remedy * * * ."  *State ex rel. Toma v. Corrigan,* 92 Ohio St.3d 589, 591-592, 752 N.E.2d 281 (2001).  The trial court's denial of the Fords' motion to dismiss for lack of personal jurisdiction is not a final order.  We dismiss the appeal.

Appeal dismissed.


HENDON, P.J., and FISCHER, J., concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.

ENTERED

OCT 14 2015

6

Jul 18 07 05:49p    Ray Lawson                    5134811477        p.1
Jul 18 07 05:19p    Ray Lawson                    858-483-2904    p.1
Jul 18 07 05:19p    Ray Lawson                    5134811477    p.1

This contract, signed this 18th day of July, 2007 between David L. Clark ("Agent") and Kristine A. Lawson, Karyl R. Kleve and Katrina M. English (collectively referred to as "Sellers"), pertains to the recovery and sale of a 1954 Ferrari 375 Plus, Serial No. 0384AM, formerly owned by Sellers' father, Karl Kleve (the "Kleve Ferrari").

Sellers obtained title to the Kleve Ferrari from the Estate of Karl Kleve.  Sellers are therefore the lawful owners of the Kleve Ferrari.

Sellers have authorized Agent to recover and sell the Kleve Ferrari.  In return, Sellers have agreed to pay Agent ten percent of the proceeds of the sale.

Agent has provided a buyer, Hugh Taylor, for the Kleve Ferrari and agrees to represent Sellers in the recovery and sale of the automobile.  Mr. Taylor shall have first right of refusal to purchase the Kleve Ferrari.  Agent shall be the exclusive representative for Sellers in connection with the recovery and sale of the Kleve Ferrari.  Agent agrees to obtain the utmost value for the Kleve Ferrari.  Should the Sellers decide to sell only the parts of the automobile, they agree to retain Agent for this transaction as well.

Sellers agree to provide Agent with all documents or copies thereof necessary to proceed with the recovery of the Kleve Ferrari.

All expenses associated with the recovery and sale of the Kleve Ferrari shall be paid by Agent and/or the buyer.  Sellers' liability to pay is limited to ten percent of the proceeds of the sale of the Kleve Ferrari, to be paid at the closing or as soon thereafter as is practicable.  In the event that (i) the Kleve Ferrari is not recovered or (ii) the sale of the Kleve Ferrari is not closed, Sellers shall have no obligation to reimburse the Agent, the buyer or any other person for expenses incurred in connection with the recovery and sale of the Kleve Ferrari.

7-18-07                                    _____
                                           Kristine A. Lawson, Seller

JULY 18, 2007                              _____
                                           Karyl R. Kleve, Seller

7/18/07                                    _____
                                           Katrina M English, Seller

                                           _____
                                           David L. Clark, Agent

EXHIBIT

3

GARDNER00636

## Sale Agreement

**1. Parties:** The Parties to this agreement, "Agreement" are Kristi Lawson, "Seller", of 2887 Harrison Avenue, Cincinnati, OH, 45211, Cell: 513/616.3214, Email: k-lawson@cinci.rr.com, and Joseph Ford or his assigns, "Buyer", at 7630 Lago Del Mar Dr. #7, Boca Raton, FL, 33433, Cell: 954.675.8445, Email: fordlogic@gmail.com. This Agreement is effective as of the later date signed.

**2. Material Representations:** I, Kristi Lawson, as executor of my father's estate, and personally as an individual, represent and warrant that I own and have the capacity to sell and convey all, or part, of: 1) Current U.S. Ohio title document, "title", for one 1954 Ferrari 375 Plus VIN #0834AM, for the 100% complete Ferrari, 2) multiple Provenance documents and prior Bills of Sales and Titles, "provenance documents" acquired over the years since March 29, 1958; 3) the portion of the Ferrari that was never stolen "rear half plus other parts" including but not limited to door, front hood, rear body panel, headrest hump and pad, gas tank, original VIN data plate, four hubs, three belly-pan panels, three floor pan panels, some with original factory numbers, miscellaneous body grille and fender closure panels, transmission bell housing, and transmission tunnel, plus other various related parts and components removed when my father disassembled the car for repair and restoration; 4) the rights to recover and possess, "recovery and possession rights" the portion of this Ferrari that was stolen, "incomplete front half without motor, trim, or VIN plate", believed to now be in Belgium, cloned or in the process of cloning, and remaining on the reported stolen lists of law enforcement and whose ownership has never been transferred away; and 5) rights to this interesting saga of the Ferrari that began on March 29, 1958 when my father bought the Ferrari, "story rights". Items one through five above, inclusive, shall be known as the "Package" for purposes of this Agreement. Seller also represents that a lawsuit and motion has been filed (Case A1001370, Court of Common Pleas, Hamilton County, OH) as to the above. Attached as Exhibit A is my authority to sign and bind my two sisters.

**3. Items Sold:** Seller hereby sells and conveys to Buyer a twenty percent interest in all the rights, title, and interest in each of the following: 1) title; 2) provenance documents; 3) parts bundle 1; 4) recovery and possession rights and parts bundle 2; and, 5) story rights. Seller admits full receipt of all due and valuable consideration for the items sold. Seller agrees to hold, protect, and store the items with a duty of care as a fiduciary. If necessary for purposes of allowing Buyer to separately represent his interests in court, Seller agrees to segregate the outer body parts of the parts bundle 1 as belonging to Buyer separately and

Sale Agreement                          Page 1 of 3                          KL        JF
(Initials not required at last page.)



divisible, while the percentage of the other items remains undivided and unsegregated.

**4. Restrictions on Items and Location of Items:** Unless noted otherwise herein, Seller agrees never to sell, pledge, or in any way encumber Seller's thirty percent interest, and is of course barred from selling, pledging, or in any way encumbering the remaining interests since they belong to others. Seller shall always consider the items as a group that must remain together. Once the ultimate goal, defined herein, is attained, then there will be a sale and transfer.

**5. The Ultimate Goal:** The ultimate goal is to assemble the resources to take the legal steps and actions necessary to reunite the items as a single vehicle with all of its original parts and documents, for a formal auction sale via an established classic car auction such as Goodings, or Barret-Jackson. Gross proceeds pay for expenses of prepping the bundles into a marketable vehicle once reunited and engaging the auction house to promote and sell the car. The net proceeds of any such sale are to then be split per the Owner's pro-rata share of the Package, which is anticipated to be, at the time of this writing: 20%, 30%, 50%. Proceeds from the story, if saleable and ever sold, shall be split similarly, after deduction of directly related and unavoidable selling expenses. _See change #1_

**6. Whole of Agreement:** This document constitutes the whole of this Agreement. This document supercedes any and all prior oral or prior written proposals or discussions as to the matter described herein.

**7. Binding Nature, Good Faith:** This Agreement shall be binding on all Parties. The Parties agree to act in good faith.

**8. Forbearance or Inaction Is Not A Waiver:** Any action not taken by either Party shall not represent a waiver or forbearance of that Party's rights or benefits.

**9. Disputes, Notices, Period to Resolve a Dispute, Default, Enforcement:** In the event of a dispute arising out of this Agreement, the complaining Party agrees to give the other Party written Notice describing the dispute, the paragraph of this Agreement that has been violated, and the action required that will cure that dispute. The recipient of such Notice has 14 days to cure by taking that action, or to reply with reasons why such action is not required. In the event such an exchange does not resolve the dispute, a Party is free to then seek redress for actual damages and attorney fees and costs, in the local state court in

Sale Agreement                    Page 2 of 3                    KL      JF
                                                  (Initials not required at last page.)

which the recipient Party resides. All Notices referred to in this Agreement must be made by email _and_ by certified mail, return receipt requested.

**10. Changes:** Parties agree that any changes to this Agreement must be in writing, must be signed by all Parties, and must be consecutively numbered and dated.

**11. Severability:** In the event any part of this Agreement is adjudicated as prohibited by law, then it shall be stricken and the remainder of this Agreement shall be remain in effect.

_Kristi Lawson_ 2-25-10          _Joseph Ford_ 2-25-10
Kristi Lawson  and date          Joseph Ford and date

_Elizabeth Ann Kessler_          Sworn to before me and subscribed
Notary and seal for Kleve signature:    in my presence by Kristi Lawson
                                 this 25ᵗʰ day of February, 2010.
_Ike D. Adams_
Notary and seal for Ford signature:

                                 ELIZABETH ANN KESSLER
                                 Notary Public, State of Ohio
                                 My Commission Expires 06-21-2011



Change # 1 to Sales Agreement

Joe - I already agreed to pay a 10% (ten-per-cent) commission to Dave Clark if the Ferrari car were to be recovered and sold.

You must promise me to work with Dave Clark to reach a mutually acceptable agreement with Dave Clark that integrates my contract with him into our Sales Agreement.

_Kristi Lawson_ 2/05/10
Kristi Lawson

_Joseph Ford_ 2-25-10
Joseph Ford

Sworn to before me and subscribed in my presence by Kristine Lawson on 25th day of February, 2010.

_Elizabeth Ann Kessler_

ELIZABETH ANN KESSLER
Notary Public, State of Ohio
My Commission Expires 06-21-2011

SWORN TO BEFORE ME AND SUBSCRIBED IN MY PRESENCE BY JOSEPH L. FORD III ON FEBRUARY 25, 2010.

_Ike Adams_

IKE D. ADAMS
NOTARY
My Comm. Expires
May 21, 2012
DD791036
PUBLIC
STATE OF FLORIDA

## Change #2 to Sales Agreement Dated 2.25.10

The Parties below admit a typo error at paragraph two and agree to correct that typo by changing the "0834am" to "0384am", which reflects what the parties meant all along.


*Joseph Ford 3/25/10*

Signature and Date




Notary

Notary Public State of Florida
Danielle McCabe
My Commission DD889893
Expires 05/14/2013


_____

Signature and Date


_____

Notary

## Option Agreement

**1. Parties:** The Parties to this option agreement, "Agreement" are Kristi Lawson, "Seller", of 2887 Harrison Avenue, Cincinnati, OH, 45211, Cell: 513/616.3214, Email: k-lawson@cinci.rr.com, and Joseph Ford or his assigns, "Option Holder ", at 7630 Lago Del Mar Dr. #7, Boca Raton, FL, 33433, Cell: 954.675.8445, Email: fordlogic@gmail.com. This Agreement is effective as of the later date signed.

**2. Material Representations:** I, Kristi Lawson, as executor of my father's estate, and personally as an individual, represent and warrant that I have sold a twenty percent interest, and still own and have the capacity to sell and convey all, or part, of the remaining eighty percent interest of: 1) Current U.S. Ohio title document, "title", for one 1954 Ferrari 375 Plus VIN #0834AM, for the 100% complete Ferrari, 2) multiple Provenance documents and prior Bills of Sales and Titles, "provenance documents" acquired over the years since March 29, 1958; 3) the portion of the Ferrari that was never stolen "rear half plus other parts" including but not limited to door, front hood, rear body panel, headrest hump and pad, gas tank, original VIN data plate, four hubs, three belly-pan panels, three floor pan panels, some with original factory numbers, miscellaneous body grille and fender closure panels, transmission bell housing, and transmission tunnel, plus other various related parts and components removed when my father disassembled the car for repair and restoration; 4) the rights to recover and possess, "recovery and possession rights" the portion of this Ferrari that was stolen, "incomplete front half without motor, trim, or VIN plate", believed to now be in Belgium, cloned or in the process of cloning, and remaining on the reported stolen lists of law enforcement and whose ownership has never been transferred away; and 5) rights to this interesting saga of the Ferrari that began on March 29, 1958 when my father bought the Ferrari, "story rights". Items one through five above, inclusive, shall be known as the "Package" for purposes of this Agreement. Seller also represents that a lawsuit and motion has been filed (Case A1001370, Court of Common Pleas, Hamilton County, OH) as to the above. Attached as Exhibit A is my authority to sign and bind my two sisters.

**3. Option to Purchase Fifty Percent Interest:** Seller admits receipt of due and valuable consideration, and in exchange grants to Option Holder an irrevocable option to buy a fifty percent interest in the Package. This interest is in addition to any interest the Option Holder already has, and is transferable by option Holder. The price of exercising that option in full is to pay five thousand dollars into Seller's bank account for deposit into the Client Trust Account of a licensed Ohio attorney, based in Cincinnati, and to sign this Agreement, this part of which then become a Promissory Note for ninety five thousand dollars with

Option Agreement                    Page 1 of 3                    KL        JF

(Initials not required for last page.)

EXHIBIT
**5**

payment terms as follows: 1) ten thousand dollars into the Client Trust Account every thirty days, starting on the fifteenth day after the initial five thousand dollar payment, until ninety thousand dollars have been paid, and then pay the final five thousand dollars thirty days after that. Once the initial five thousand dollars is paid, Option Holder shall be regarded as an owner of that fifty percent interest since the option has been exercised. Option Holder can certainly prepay some or all of the ninety-five thousand at which point the Promissory Note shall be regarded as paid in full. Option Holder agrees to track all attorney fees and costs that are invoiced on a spreadsheet, and to manage and direct those attorneys as an owner of the property rights being litigated. In no event must the total of all sums paid into that escrow exceed one hundred thousand dollars. The sums deposited in the Client Trust Account are to be spent on attorneys as selected by the owners to represent them in the above lawsuit, and any counterclaims and other actions related to advancing to the ultimate goal as defined in this Agreement.

**4. Restrictions on Items and Location of Items:**  Unless noted otherwise herein, Seller agrees never to sell, pledge, or in any way encumber Seller's thirty percent interest, and is of course barred from selling, pledging, or in any way encumbering the remaining interests since they belong to others. Seller shall always consider their percentage as part of the Package that must remain together. Seller agrees to never sell off, transfer, or pledge as collateral their thirty percent interest until the ultimate goal, defined below, is reached.

**5. The Ultimate Goal:**  The ultimate goal is to take the legal steps and actions necessary to reunite the bundles of parts and paperwork as a single vehicle with all of its original parts and documents, for a formal auction sale via an established classic car auction such as Goodings or Barret-Jackson. The net proceeds of any such sale are to then be split per the Owner's pro-rata share of the Package, which is anticipated to be, at the time of this writing: 20%, 30%, 50%. Proceeds from the story, if saleable and ever sold, shall be split similarly, after deduction of directly related and unavoidable selling expenses. *See change # 1*

**6. Whole of Agreement:** This document constitutes the whole of this Agreement. This document supercedes any and all prior oral or prior written proposals or discussions as to the matter described herein.

**7. Binding Nature, Good Faith:** This Agreement shall be binding on all Parties. The Parties agree to act in good faith.

Option Agreement                Page 2 of 3            KL      JF

(Initials not required for last page.)

**8. Forbearance or Inaction Is Not A Waiver:** Any action not taken by either Party shall not represent a waiver or forbearance of that Party's rights or benefits.

**9. Disputes, Notices, Period to Resolve a Dispute, Default, Enforcement:** In the event of a dispute arising out of this Agreement, the complaining Party agrees to give the other Party written Notice describing the dispute, the paragraph of this Agreement that has been violated, and the action required that will cure that dispute. The recipient of such Notice has 14 days to cure by taking that action, or to reply with reasons why such action is not required. In the event such an exchange does not resolve the dispute, a Party is free to then seek redress for actual damages and attorney fees and costs, in the local state court in which the recipient Party resides. All Notices referred to in this Agreement must be made by email and by certified mail, return receipt requested.

**10. Changes:** Parties agree that any changes to this Agreement must be in writing, must be signed, and must be consecutively numbered and dated.

**11. Severability:** In the event any part of this Agreement is adjudicated as prohibited by law, then it shall be stricken and the remainder of this Agreement shall be remain in effect.

**12. Signatures:** Signatures below indicate understanding and agreement to all of the above terms. This Agreement can be signed and notarized at different locations since the Parties reside in different places.

Kristi Lawson  and date                   Joseph Ford and date

Notary and seal for Lawson signature:



JUAN E. GARCIA LANZOT
Notary Public, State of Ohio
My Commission Expires 03-16-11

Notary and seal for Ford signature:

IKE D. ADAMS
NOTARY
My Comm. Expires
May 21, 2012
DD791088
PUBLIC
STATE OF FLORIDA

Change #1 to Option Agreement

Joe - I already agreed to pay a 10% (ten percent) commission to Dave Clark if the Ferrari Car were to be recovered and sold

You must promise me to work with Dave Clark to reach a mutually acceptable agreement with him that integrates my contract with Dave Clark into this Option Agreement.

_Kristi Lawson_ (signature)

Kristi Lawson

2/25/10

Sworn to before me and subscribed in my presence by Kristine Lawson on 25th day of February, 2010.

_Elizabeth Ann Kessler_ (signature)

_Joseph Ford_ (signature) 2-25-10

Joseph Ford

ELIZABETH ANN KESSLER
Notary Public, State of Ohio
My Commission Expires 06-21-2011

2/25/10
SWORN BEFORE ME AND
SUBSCRIBED IN MY PRESENCE
BY JOSEPH L FORD III ON
FEBRUARY 25, 2010

_Ike D Adams_ (signature)

IKE D. ADAMS
NOTARY
My Comm. Expires
May 21, 2012
DD791038
PUBLIC
STATE OF FLORIDA

## Change #2 to Option Agreement Dated 2.25.10

The Parties below admit a typo error at paragraph two and agree to correct that typo by changing the "0834am" to "0384am", which reflects what the parties meant all along.

*Joseph Ford 3/25/10*

Signature and Date

*Danielle McCabe 3.25.10*

Notary

Notary Public State of Florida
Danielle McCabe
My Commission DD889893
Expires 05/14/2013

_____

Signature and Date

_____

Notary

## <u>Change #3 To the 2.25.10 Sales and 2.25.10 Options Agreements</u>

3.1 Kristi Kleve Lawson and Joseph Ford hereby change the above referenced two Agreements as follows per the terms herein.

3.2 As to interests as described by Items 1,2,3, and 4 in those Agreements, Ford hereby buys, and Lawson hereby sells, all of her 30% to Ford for $75,000 (seventy-five thousand dollars) to be paid as below. Also, Ford grants Lawson a lien on the car, to be placed on the new title, and that lien shall equal the dollar amount of ten percent of the net proceeds from the disposition by sale or settlement of the car. Net proceeds are those proceeds left after paying to prepare the parts and car into a marketable bundle for a sale after also deducting all auction house or broker fees related to promoting, listing, and selling the car. Ford agrees to let Lawson keep the original gas tank.

3.3 As to the interests described as Item 5 in those Agreements, Lawson hereby sells to Ford 20% of her interest such that as to Item 5 Ford now owns 90% and Lawson owns 10%. Proceeds from the sale of Item #5, if saleable and ever sold, shall be split 90% and 10%, after deducting directly related and unavoidable selling expenses.

3.4 Lawson re-represents that she is the sole remaining listed owner on the old Ohio title document 3105234917 (her sisters have quitclaimed their interests to her), and Lawson, once paid as below, shall sign her name to the back of the title as a sale to "Joseph L. Ford, c/o Joseph Parker, Stettinius, and Hollister, 425 Walnut Street, Suite 1800, Cincinnati, OH, 45202-3957" for the sum of $175,000. Then, the title will be re-titled in a state of Ford's choice, such that, and as part of that re-titling, "Kristi Kleve-Lawson, 2887 Harrison Ave, Cincinnati, OH, 45211" shall be listed as "lienholder", having a lien interest equal to the dollar value as described in 3.2 above. Ford agrees to pay any sales tax or fees involved in any such re-titling. Once re-titled, Ford shall hold and possess the original title.

3.5 Lawson acknowledges and agrees that as a result of this Change, Ford is now the 100% owner of the Ferrari, and she a lienholder, and that any future sale, or future settlement, or future legal action, anywhere in the world, or for whatever scenario that may evolve with the case and the car, that the decision is at Ford's sole discretion and prerogative since Ford is the Owner. Lawson agrees to continue to participate and cooperate in the lawsuit and all recovery efforts to her fullest extent and in good faith.

3.6 Payment is to be by wire transfer on or before January 29, 2011 to Kristi Kleve' Lawson, in her account, the specific details of which she must email to Ford on or before January 18, 2011.

3.7 Ford and Lawson agree to have Ford's attorney bring this change to the attention of the Court so as to remain in compliance with the Status Quo Order. The parties agree to notarize their signatures, as a mere formality, the next business day.

Signatures:

Joseph Ford and Date                    Kristi Kleve-Lawson and Date

Notary for each signature (FL for Ford and OH for Lawson)

Notary Public State of Florida
Daniella McCabe
My Commission DD889893
Expires 05/14/2013

JESSE OBERT
Notary Public, State of Ohio
My Commission Expires
March 6, 2013

### Ferrari 375 Plus Agreement

JF     CG

1. Joseph Ford ("Ford") and Christopher Gardner ("Gardner"), hereby make this agreement ("Agreement") regarding the Ferrari 375 Plus 0384AM ("0384AM") effective as of the date signed.

2. In exchange for, and contingent upon Gardner's contributions ("Contributions") defined as: a) Gardner's paying the prior and the future attorneys invoices incurred by Ford and incurred by Kristi-Kleve Lawson ("Lawson") for recovery and litigation efforts, on or before the 14th day after Ford's receipt of any invoice, and b) Gardner's paying Ford's past and future expenses incurred relative to Ford's recovery and litigation efforts, Ford hereby grants to Gardner a lien right against Ford's interest, equal to the dollar value of half of Ford's interest and rights as defined by, and to the extent of, the 2.25.10 Sale Agreement ("SA") and the 2.25.10 Option Agreement ("OA") and any changes, including but not limited to changes #1 through #3, the last of which requires Gardner to make $75,000 time of the essence payment to Ford so he can promptly pay the $75,000 to Lawson.

3. The Gardner lien right is contingent upon Gardner performing his ongoing obligations in this Agreement. Ford and Gardner agree not to sell, pledge, or in any way convey or encumber their rights that are granted by, or result from, this Agreement. Ford agrees to place the title and his rights into a trust, for the benefit of Ford and Gardner , with the trustee obligated to promote and sell the car and calculate and distribute the proceeds in accord with this Agreement and in accord with Ford's obligations from the SA and OA. The beneficiaries shall be Ford, Gardner, and Lawson. Ford and Gardner agree to set up this trust during Gardner's next visit to the USA. A key term of the trust is that Ford and Gardner can change any term of the trust if both Ford and Gardner do so in writing, and they then instruct the trustee with that written change, who will be obligated to follow that new instruction.

4. The above described invoices and expenses, and thus Contributions, will likely extend through trial, appeals, and beyond until physical recovery of 0384AM is accomplished so that it can be promoted and sold.

5. A winning or cost effective outcome of the litigation and recovery efforts is not guaranteed nor promised by Ford. Ford agrees to give Ford's share of the parts to Gardner in the event of a failed litigation and failed recovery effort. In the event of a failed litigation and failed recovery efforts, Gardner agrees to sell the parts on the open market within 30 months, and split with Ford on a 50/50 basis the proceeds that remain after first reimbursing Gardner for his Contributions. Until the time of such a failed litigation and failed recovery,

JF     CG

Page 1 of 2



EXHIBIT

6

DEFENDANT'S

*JF* JF *Q.P* CG

Ford and Gardner agree that the parts will be stored in the Ohio storage, in the name of Ford, with Gardner being given access code. If the Court adjudicates final ownership of the parts to Ford and they are no longer needed for the Ohio litigation, then they can be moved to a storage location of Gardner's choice, for safe and secure storage, though they are still the property of Ford, but subject to the lien rights and trust described herein.

6. Gardner agrees to pay all Contributions into an account as designated by Ford in writing, as has been done previously.

7. Ford agrees that after settlement or sale of 0384AM by Ford pursuant to the 2.25.10 SA and 2.25.10 OA with changes, Ford will then payoff the Lawson lien, and Ford will reimburse Gardner for his Contributions from Ford's 100% share, if any, and after that, Ford agrees to give Gardner half of the remaining of Ford's proceeds, if any.

8. Ford and Gardner agree to give written notices by email to each other at fordlogic@gmail.com or to onebugatti@bluewin.ch.

9. In the event of dispute and after giving notice that specifies what term is violated and what the proposed solution to the violation, Ford and Gardner agree to binding arbitration in Palm Beach County, Florida using the rules of the American Arbitration Association. Any final arbitration award shall be non-appealable in court and have the effect of a final judgment as if rendered by a court of law.

10. Any changes to this Agreement must be in writing, numbered sequentially, and must be signed by both parties and notarized in order to have any effect on this Agreement.

11. Ford and Gardner agree to keep this Agreement confidential, and to not use or interpret this Agreement such that it violates the standing Ohio court's Status Quo Order ("Order"). In the event this Agreement were to violate the Order, Ford and Gardner agree to rescind this Agreement, seek and obtain a modification of the Order, and to then automatically reinstate this Agreement. *JF* JF *L4* CG

_____ Joseph Ford/date    _____ Christopher Gardner/date 3/11/2011

### Change No. 1 to the Ford/Gardner Agreement of January 31, 2011.

The undersigned parties, since both are in the same location today, hereby acknowledge and accept the above two page Jan. 31, 11 Agreement (attached herein), accept each other's performance to date in regards to the Agreement, and Ford hereby grants to Gardner a security interest in 0384AM equal to Gardner's share, which can be reflected in a lien on the title (title #31 0640 4902 now in Ford's name) to be recorded at some point in the future when Ford's counsel advises that doing so will not upset the proceedings.


_Joseph Ford_   Ap 5, 2011          _Christopher Gardner_   Ap. 5. 2011

Joseph Ford        Date                    Christopher Gardner      Date


_Danielle McCabe_
Notary            April 5

> Notary Public State of Florida
> Danielle McCabe
> My Commission DD989893
> Expires 05/14/2013

**HEADS OF AGREEMENT**

DATED    March 12, 2013   BETWEEN (1) FLORENCE SWATERS et al ( BC/ The Belgian Contingency ) and Kristie Kinne et al / Joseph L. Ford III and Christopher Gardner (OC/ The Ohio Contingency ) AND FOR THE KLIVE HEIRS AS DEFINED BELOW (ALL REFERRED TO THE "Ohio PARTIES") AND (2) BONHAMS 1793 LIMITED OF 101 NEW BOND STREET, LONDON, W1S 1SR ("BONHAMS")

1.   The parties have entered these Heads of Agreement to set out the terms on which (a) BC and OC Parties have agreed to extinguish all claims and counterclaims between them in relation to a Ferrari 375 Plus motor car, Chassis No 0384AM, Engine No. 0384AM and engine 0397AM, with ALL the parts, documents etc ("the Car") and (b) Bonhams has agreed to sell the Car by public auction.  OC warrants and represents to BC and to Bonham's that THEY have full authority to enter and perform these Heads of Agreement on behalf of all parties other than FS, and to stay all litigation in Ohio relating to the Car.

2.   All claims and counterclaims between BC and OC whether, already asserted or not, are hereby waived and permanently extinguished on distribution of the funds from the sale to the signers of this agreement.  BC and the OC Parties will promptly enter an agreement discontinuing all action in Ohio in such form as is appropriate under Ohio law

3.   Bonhams is appointed the world-wide exclusive agent of BC and of the OC Parties to sell the Car by public auction at no reserve at the Goodwood Revival in September 2013.  Bonhams will pay all marketing, photography and transport costs.  No vendor's commission will be charged by Bonhams but Bonhams will be entitled to charge full buyer's premium at its normal rate.

4.   Bonham's, BC and the OC Parties will all work closely together to resolve all problems relating to the Car's history and ownership and present a detailed and transparent account of the Car's ownership from now.

5.   BC will arrange for the Car and all parts (including a spare engine), documents, records and photographs in her possession to be transported to Bonhams in England for storage until the Car has been sold and paid for.  The OC Parties will arrange for all parts (including original body panels, fuel tank and documents, records and photographs in their possession to be transported to Bonhams in England for storage until the Car has been sold and paid for.  Storage and insurance in England will be for Bonhams' account.

6.   The proceeds of sale of the Car will be divided in the proportion 50% to the BC Parties and 50% to OC — which represents 100% of the hammer price at auction.



EXHIBIT

7

7.  All spare parts (including the spare engine and the original body panels), miscellaneous items, documents, photographs or records relating to the Car will be included in the sale of the Car at no additional cost or charge. All liens on the parts will be released by the lien holder(s).

8.  A comprehensive list of all the parts, documents, certificates, Bill of Sales, Archive materials both originals, certified copies and copies will be submitted by BC and OC parties and defined as their contribution to the whole of the Ferrari package to be auctioned.

9.  BC and the OC Parties will give full disclosure to one another and to Bonhams of all documents and information relating to the Car in their possession or control. All agreements between the parties are to be kept confidential at all times by the parties and by Bonhams. Neither BC nor the OC Parties will enter any discussion with any third party in connection with the sale or marketing of the Car or otherwise in connection with it. The complete list of items to be produced by the parties BC and OC is attached as Schedule One which forms an integral part of this Agreement into which it is hereby incorporated.

10. BC and OC parties will provide at this initial signing, separate complete list of all parts, records, legal paperwork, titles, historical files, archives, spare parts and tools to be included and consigned to Bonham's as a part of the sale of the 375 plus. Nothing will be withheld by all parties from the combining of all existing parts with Bonhams's belonging to the 375 Ferrari for this sale, including all rights to all pieces owned by each of the parties.

11. BC and OC Parties will surrender all existing registration documents, USA titles, Bill of Sales, and all other conveyance documents they possess individually or jointly to be reviewed by Bonham's as to the validity of which documents will be used in the conveyance to a new owner procured by Bonham's for this Ferrari. All documents in the OC parties' possession relating to the purchase and ownership of the Car by Mr. Kleve, including the original Bill of Sale for his purchase of the Car from Jim Kimberley, probate orders and all US license, title and other documents evidencing the ownership of the Ferrari by Mr. Kleve and his heirs.

12. This Agreement shall be governed by English law and any dispute in relation to it will determined by the High Court of Justice in London.

_____   Florence Swaters   12/3/2013

_____   Joseph L. Ford III   3/24/13

_____   Kristie Kleve-Lawson   3-26-13

_____   Christopher Gardner   13/3/2013

_____   Bonhams - London

## AMERICAN ARBITRATION ASSOCIATION
### Commercial Arbitration Tribunal

In the Matter of the Arbitration Between:

RE:    01-14-0002-0316

Christopher Gardner

    (Claimant)

and

Joseph Ford, III

    (Respondent)

## FINAL AWARD

WE, THE UNDERSIGNED ARBITRATORS, have been designated in accordance with the arbitration clause contained in the Ferrari 375 Plus Agreement dated January 31, 2011 entered into by and between the parties, the Order in Case No. A1306451 (styled as *Gardner v. Ford, et al.*) in the Court of Common Pleas for Hamilton County, Ohio, dated September 8, 2014, the Commercial Rules of the American Arbitration Association effective October, 2013, the Arbitrators' Oaths taken in January of 2015, and having been duly sworn, have read the law provided by the parties, heard and considered the testimony of the witnesses and proofs and allegations of the parties, and have considered all pleadings, Motions, Claimant's Proposed ARBITRATORS' DECISION AND AWARD and Respondent's Proposed AWARD OF ARBITRATION PANEL.

The Final Hearing was held on August 4 through August 17, 2015, in the Offices of the American Arbitration Association (AAA) located in Miami, Florida, during which all parties participated and were represented by counsel. The Claimant was represented

EXHIBIT
8

Gottesman, Esq. and Robert J. Thumann, Esq. Respondent was represented by Richard J. Rinear, Esq., Edward J. Collins, Esq., and Timothy Allen Smith, Esq.

A court reporter was present and created a record of the proceedings. Upon the conclusion of each party's presentation of his case, each party confirmed that he was provided a full and complete opportunity to provide the witnesses, testimony and documentary evidence in his case and did not have any further proofs to offer or witnesses to be heard.

Thereafter, upon the completion of final arguments, the parties rested and the evidentiary portion of the final hearing was concluded on August 17, 2015 and the hearing was thereafter closed on August 31, 2015. The parties have stipulated to the Panel entering a Reasoned Award.

THEREFORE, based upon the foregoing, the Panel Finds and Awards as follows:

1.    Jurisdiction has been confirmed by the arbitration clause contained in paragraph 9 of the Ferrari 375 Plus Agreement and the Court Order entered September 8, 2014 (Order Referring Case to Arbitration) Ordering "all matters pled in this case between Plaintiff Christopher Gardner and Defendant Joseph Ford, III are hereby ordered to be arbitrated pursuant to the terms of the Ferrari 375 Plus Agreement, ¶9".

2.    The Ferrari 375 Plus Agreement executed and dated January 31, 2011 and Change No. 1 dated April 5, 2011, are valid and enforceable and bind the parties to their respective performances but contain internal inconsistencies and conflicts which the panel has construed in order to provide a commercially reasonable meaning and to avoid an absurdity, as required by the canons of statutory construction.

3.    Each party substantially performed his responsibilities and duties under the Agreement. Therefore, the Panel finds that neither party materially breached the Agreement.

4.    With respect to Gardner, Ford held himself out as an attorney and acted and performed services normally provided by an attorney. Through this relationship, Ford created a position of trust and confidence that gives rise to a fiduciary duty owed to Gardner.

5.    Additionally, we find that the parties also engaged in business arrangements as partners or joint venturers, which are distinct from the relationship relating to the provision of law-related services. As a matter of law, this relationship gives rise to a fiduciary duty from each partner or joint venturer to the other.

6.    Ford is not entitled to retain fees for providing legal or law related services to Gardner or for Gardner's benefit. Gardner is entitled to reimbursement of all monies he paid to Ford, either directly or indirectly, through Ford's son or any third party as a result of and in compliance with the Ferrari 375 Plus Agreement referred to above.

7.    Notwithstanding the foregoing, Ford is entitled to the benefits conferred on him as a partner or joint venturer with Gardner under the Ferrari 375 Plus Agreement and Change No. 1, which necessarily contemplated and resulted in work for and a benefit conferred upon Gardner which was not related to the providing of law related or legal services.

WHEREFORE, WE THE UNDERSIGNED PANEL AWARD as follows:

A.    Ford shall reimburse and pay to Gardner the sum of $467,673.00, which the evidence shows constitutes all "contributions" paid by Gardner pursuant to the Ferrari 375 Plus Agreement and Change No. 1. We find this sum is contractually obligated to be returned to Gardner prior to any distribution of the proceeds from the sale of the Ferrari 375 Plus 0384AM and its parts.

B.    That after the reimbursement ordered above, Gardner and Ford shall each take 50% of the sums paid or payable from the proceeds recovered from the sale or disposition of the Ferrari 375 Plus 0384AM and it parts. Each party shall be responsible for any third party claim or

3

obligation of which they initiated, without any right of claim, set-off, or indemnification by one against the other.   Specifically, this includes Ford being solely responsible for any interest or monies claimed by Kristine Kleve-Lawson. Each party shall be responsible for its own expenses and costs not contemplated by the Ferrari 375 Plus Agreement or Change No. 1.

C.     The parties have demonstrated by the totality of the evidence that each provided the other with confidential personal and business information, which may cause damage to the other party if disseminated. Therefore, the Panel recommends that any court or tribunal of competent jurisdiction enter an injunction, that enjoins each party from using, utilizing, divulging or disclosing in any manner or form, either written or oral, the other party's confidential information that was obtained in the course of their fiduciary relationships, with or to any third party, person or entity, and shall forthwith return such information previously received from the other party.

D.     The Panel further recommends that any such injunction or judicial order include a provision that, should either party receive a request, subpoena, or other legal process seeking disclosure of the other party's confidential information, that the custodian party shall prior to disclosure immediately provide written notice, in the most expeditious manner possible to the other party, so that judicial relief from disclosure may be sought.

E.     The administrative fees and expenses of the American Arbitration Association and the compensation of this Arbitration Panel shall be borne as accrued without any apportionment between the parties.

F.     The Panel does not find that either party prevailed in this dispute against the other because each party was entitled to relief under their contractual agreement, which contractual obligations were independent of the nature and scope of the claims each party sought.

4

G.    This Award is in full and final settlement of all claims and counterclaims submitted to this Arbitration.  All claims or counterclaims not expressly granted herein are hereby, denied.

THIS AWARD MAY BE EXECUTED IN COUNTERPARTS, EACH OF WHICH SHALL BE DEEMED TO BE AN ORIGINAL, BUT ALL OF WHICH, TAKEN TOGETHER, SHALL CONSTITUTE ONE AND THE SAME AWARD.

DONE AND ORDERED this 25th day of September, 2015.

I, John Arrastia, Jr., do hereby affirm upon my oath as Arbitrator that I am the individual described herein and who executed this instrument which is our Award:

_____
John Arrastia, Jr., Esq., Arbitrator

I, James D. Stokes, do hereby affirm upon my oath as Arbitrator that I am the individual described herein and who executed this instrument which is our Award:

_____
James D. Stokes, Esq., Arbitrator

I, Michael H. Lax, do hereby affirm upon my oath as Arbitrator that I am the individual described herein and who executed this instrument which is our Award:

_____
Michael H. Lax, Esq., Arbitrator,
Chairperson

5

From:  **Joseph Ford**  fordlogic@gmail.com
Subject:  Fwd: Ford Aug 16, 2013 Proposal to Settle with Gardner
Date:  August 16, 2013 at 11:59 AM
To:  Timothy Smith Esq  timsmit@mac.com, Kristine Lawson  kristinelawson@yahoo.com, Ray Lawson  leonard.raylawson@yahoo.com

FYI Keep confidential.

--------- Forwarded message ---------
From: **Joseph Ford** <fordlogic@gmail.com>
Date: Fri, Aug 16, 2013 at 11:57 AM
Subject: Ford Aug 16, 2013 Proposal to Settle with Gardner
To: Christopher Gardner <onebugatti@bluewin.ch>

Mr. Gardner,

We had our hearing on Aug 8. I do not think it will go well for you when Judge Nadel issues his ruling. I do not think Mr. Gottesman is fully informed based on his statements and his approach to the issues.

I will make an offer to settle with you, but first I will list why so I can explain my offer.

1) The day you sold Charles Morse a body to a car that did not exist is the day you tossed your credibility down the drain. DITTO when you did it again to Richard Scott. The pattern of your deceptions is clear.
2) The day you had Morse wire me (my son) money for that non-existant car is the day you breached the Ford-Gardner financing agreemint. It is an early breach and a material breach of $60,000.
3) The day you failed to hire Conklin you were again in material breach.
4) The day you failed to reimburse me for my trip and other out-of-pocket expenses you were, yet again, in material breach.
5) The Jan 4 London hi-jacking and misrepresentations by you - well that is as serious as it gets - that is fraudulent behavior as I see it. It is a delusion to think you deserve any part of any reward.

Please look up the doctrine of first material breach. It is a legal doctrine that basically states a party to a contract who is in breach cannot sit back and demand that the other non-breaching party jump through the hoops of the contract as if there were no first breach. Look up the doctrine of unclean hands.

So, I see NO scenario, in court or arbitration, where you will overcome the consequences of your actions and your first material breach. I can see NO Judge nor arbitrator rewarding you with a piece of the "pie". You will be lucky to get reimbursements of your qualified principal (i.e. "Contributions") which are approximately $250,000. Anyone who tells you otewise is mis-informed or just trying to justify a retainer. The strength of my claim is evident when your attorney must resort to such lame claims against me as the unauthorized practice of law. That shows ALL that you are really grasping at straws.

Further, you have serious legal problems on other fronts that completely undermine your credibility, again. I have seen your ego and your bravado - you need to put them in check. You may want to be dismissive and tell yourself that all these other folks are just the "mafia" or some other such self-deluding nonsense, but I can assure you that such is delusion - they are pillars of the classic car community. The Lawsons and I agree that your bullshit in London likely cost us over a million, and we have the right to add that to our claim against you do not settle.

So, I make this settlement proposal, which expires on midnight of Tuesday, August 20, EST USA. All claims between Ford and Gardner arising out of the Ford-Gardner Ferrari 375 Plus agreement, known or unknown, articulated or not, are settled on payment of $500,000 by wire to Gardner at a bank account of Gardner's designation. We can let the attorneys draft the fine print, but that is basically how we can settle, and how you can avoid the full brunt of a claim where you owe Ford and Lawson a seven figure amount.

Please think about each statement I make above. You need to clear your mind and give each statement a dispassionate analysis. If you do, you will see my offer is reasonable. It lets you recoup and you net a fair return when really the consequences of your actions show you actually owe others.

Thanks for Your Time,

Joseph Ford
Cell: 561.818.0384

EXHIBIT
9

**NOTICE**: This electronic mail transmission from Joseph Ford is private and confidential. It may constitute an attorney-client communication that is privileged at law. It is not intended for transmission to, or receipt by, any unauthorized persons. If I sent this electronic mail transmission in error, such as sending to the wrong email address, please delete it from your system without copying it, and notify me by reply e-mail so that I can correct my mistake. Thanks.
**ALSO**: 18 U.S.C. §§ 2510-2521, the Electronic Communications Privacy Act, applies to e-mail. It prohibits unauthorized interception, use, and disclosure of an e-mail, of the contents of an e-mail, and of any attachments to the e-mail. It provides for civil remedies including damages in cases of unauthorized interception, use, or disclosure of an e-mail, of the contents of an e-mail, or of any attachments to the e-mail.

**IN THE COURT OF COMMON PLEAS**
**HAMILTON COUNTY, OHIO**

CHRISTOPHER GARDNER          :          Case No. A1306451

        Plaintiff,          :          Judge Martin

v.                                          :

JOSEPH FORD, et al.              :          **PRELIMINARY INJUNCTION**

        Defendants.          :

**ENTERED**
**DEC -3 2013**



D104507339

This matter came before the Court upon the Plaintiff's Motion for Preliminary Injunction. The Court being sufficiently advised, based on the pleadings and the testimony and exhibits adduced at hearing finds said motion well-taken and hereby grants Plaintiff's Motion for Preliminary Injunction.

It is hereby Ordered, Adjudged and Decreed, that:

1.    Joseph Ford is enjoined and prohibited from disclosing, using, disseminating, publishing, or in any way communicating to third-parties, information acquired by Joseph Ford in the course of his relationship with Christopher Gardner that pertains to Mr. Gardner's business and/or legal affairs;

2.    Joseph Ford is ordered to return all documents, files, and materials and any copies of such in his possession that he obtained from Christopher Gardner and/or as a result of acting as an adviser in business and/or legal affairs with Mr. Gardner;

3.    Joseph Ford is enjoined and prohibited from interfering in anyway with Christopher Gardner's business and/or legal affairs, including but not limited to, the sale of the Ferrari 375 Plus, No. 0384AM.

The Court further finds that Defendant, Joseph Ford shall pay Plaintiff's legal fees incurred in securing this Preliminary Injunction, in an amount to be determined at a hearing on the

**EXHIBIT**
**10**

SO ORDERED

_____
Judge Martin


/s/ Zachary Gottesman
Zachary Gottesman (0058675)
Trial Attorney for Plaintiff


Have seen and approved:


/s/ Richard Rinear
Richard Rinear (0027114)
Trial Attorney for Defendant, Joseph Ford


/s/ Tim Smith
Tim Smith (0032087)
Trial Attorney for Kristine Lawson


02357001.030

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

THIS SETTLEMENT AGREEMENT ("Agreement") made effective this 25th day of May, 2016 between **JOSEPH L. FORD** ("Ford") and **KRISTINE KLEVE LAWSON** ("Lawson").

### RECITALS:

WHEREAS, the parties have been involved with commonality of interests in certain litigation concerning their claims to a portion of the proceeds from the sale of a Ferrari automobile (the "Litigation"); and

WHEREAS, pursuant to proper court proceedings, there has been placed in an account for the benefit of the parties approximately Three Million Eighty-nine Thousand Six Hundred Fifty-three and 82/00 Dollars ($3,089,653.82) (the "Settlement Account") being handled by **TIMOTHY SMITH**, Attorney at Law; and

WHEREAS, certain items of dispute or contention have arisen between the parties with respect to the assumption of certain obligations and the payment thereof and the distribution of the proceeds from the Settlement Account; and

WHEREAS, the parties entered into various agreements prior hereto, including a Sales Agreement and an Option Agreement dated February 25, 2010; and

WHEREAS, the parties desire to resolve all issues with respect to the Litigation and all prior agreements and proceed forward with all such matters resolved and finalized.

NOW, THEREFORE, it is agreed between Ford and Lawson as follows:

1.     Distribution of Litigation Funds.  Ford and Lawson agree that there shall be distributed to or for the benefit of Lawson from the Settlement Account the sum of Seven Hundred Twenty Thousand US Dollars ($720,000.00) which represents her share of the proceeds from the Litigation involving the Ferrari automobile.

All other amounts received as part of such settlement shall be distributed to Ford.

2.     Payment of Obligations.  Ford hereby acknowledges that he shall be solely responsible for the payment of any and all attorney fees or other costs of Litigation related to the Ferrari automobile and that the sum to be distributed to Lawson set forth above shall be free of any such fees except for three (3) payments; namely, a payment of One Hundred Thousand Dollars ($100,000.00) to **TIMOTHY SMITH**, Attorney at Law, for services rendered; the sum of Ten Thousand Dollars ($10,000.00) to **DAVID CLARK**; and the legal fees of **KEATING MUETHING & KLEKAMP PLL**. No other payments or distributions to any other creditors shall be required by Lawson.

In clarification of the foregoing, Ford agrees to satisfy all other expenses and obligations relating to the Litigation from his share of the Settlement Account and e

EXHIBIT

11

*"BDM" KKL*

holds Lawson harmless therefrom. Such expenses and obligations include but are not limited to amounts due and owing to Randolph Ritter, Ince & Co. LLP, Fisher, PDN, expert witness fees and other costs. Ford agrees to take any and all steps and actions necessary to satisfy and pay such expenses and obligations as soon as practicable.

3.    Herb Haas.  The parties are aware, but deny, that a potential claim for payment may be made by one HERB HAAS for the value of his alleged services rendered in the Ferrari Litigation. With respect to any claim made by HERB HAAS, or on his behalf, Ford agrees that Lawson shall be fully indemnified and held harmless by Ford with respect to any such claim. On the other hand, if any such claim is made against Lawson, she agrees to notify Ford of such claim and further agrees to cooperate fully with him in the defense thereof. Any and all costs of defense, litigation, or other expenses incurred in connection therewith shall be the sole and full responsibility of Ford.

4.    Mutual Release.. Except for the promises and covenants contained in this Agreement, each of the parties hereby releases, acquits, forever discharges and agrees to hold the other (and his or her respective heirs, successors and assigns) harmless from any and all claims, demands, obligations and/or causes of action of any nature which exist as of the date hereof by reason of any matter relating to the Litigation.

5.    Release of Funds.  Upon presenting an originally signed copy of this Agreement by both Ford and Lawson, TIMOTHY SMITH shall be fully authorized to release the funds held by him including a distribution Seven Hundred Twenty Thousand Dollars ($720,000.00) to Lawson and the rest as directed and agreed to between him and Ford and such TIMOTHY SMITH shall be held harmless from following the instructions and directions set forth herein.

6.    Entire Agreement.  The parties specifically acknowledge that this Agreement constitutes and reflects their entire understanding relating to the Litigation and other matters mentioned herein. Any and all prior agreements, communications and representations between the parties shall be disregarded and ignored.

7.    Applicable Law.  The parties acknowledge that this Agreement represents a full compromise of certain matters involving the Litigation. The terms and provisions of this Agreement shall be governed by and construed in accordance with the laws of the State of Ohio and shall be binding upon and inure to the benefit of the respective parties, their heirs, successors and assigns.

IN WITNESS WHEREOF, the parties have signed this Settlement Agreement and Mutual Release as of the date first above written.

_____
JOSEPH L. FORD

_____
KRISTINE KLEVE LAWSON

## ACKNOWLEDGEMENT

The undersigned, **TIMOTHY SMITH**, Attorney at Law, hereby acknowledges a receipt of the above Agreement signed by both parties and shall proceed in accordance with the terms and conditions set forth herein.

_____

**TIMOTHY SMITH**

Dated:_____, 2016

6834605.2

Clark v Ford

## AMENDED AND RESTATED SETTLEMENT AGREEMENT

**THIS AMENDED AND RESTATED SETTLEMENT AGREEMENT** ("Agreement") is made as of this _15th_ day of _July_, 2016, by and among biological sisters Kristine Anne Kleve ("Kristine"), Karyl Renee Kleve ("Karyl") and Katrina Marie Kleve ("Katrina"). Kristine, Karyl and Katrina are sometimes hereinafter referred to collectively as the "Kleve Sisters."

**WHEREAS,** the Kleve Sisters were the daughters of Karl Kleve ("Karl"), who died on December 24, 2003; and

**WHEREAS,** the Kleve Sisters were the sole heirs to Karl's estate and each shared an equal interest in Karl's estate; and

**WHEREAS,** Karl left an item of personal property in his estate described as a 1954 Ferrari 375 Plus 4.9 Grand Prix Roadster, Chassis No. 0384AM (the "Ferrari"), to which the Kleve Sisters inherited full property rights upon Karl's death; and

**WHEREAS,** a dispute arose over the property rights to the Ferrari owned by Karl. Specifically, on or about December 26, 1988, the Ferrari was stolen from Karl. Despite spending the majority of his remaining years searching for those responsible for the Ferrari's theft, Karl died before the Ferrari or any proceeds or money could be recovered from those responsible for the Ferrari's theft; and

**WHEREAS,** the dispute over ownership of the Ferrari ultimately ended up in litigation in the Court of Common Pleas in Hamilton County, Ohio, Case No. A1001370, *Jacques and Florence Swaters v. Kristine Kleve Lawson, et al.* (the "Lawsuit"); and

**WHEREAS,** in furtherance of the Kleve Sisters' mutual desire to resolve any disputes that arose or may have arisen between them in regards to their respective property rights in the Ferrari, the Kleve Sisters entered into a settlement agreement (the "Original Contract") in May, 2014; and

**WHEREAS,** a settlement agreement was reached in the Lawsuit and pursuant to a separate Settlement Agreement and Mutual Release between Joseph L. Ford ("Ford") and Kristine, Ford agreed to pay Kristine the total amount of $720,000.00 as a result of the Kleve Sisters' ownership interest in the Ferrari (the "Settlement Sum"); and

**WHEREAS,** after certain costs and expenses were distributed or accrued out of the Settlement Sum, the then remaining $600,000.00 from the settlement of the Lawsuit ("Net Settlement Proceeds") is to be distributed; and

**WHEREAS,** in anticipation of the distribution of the Net Settlement Proceeds, the Kleve Sisters wish to forever resolve any disputes that may have arisen or may arise between or among them in regards to the administration of Karl's Estate, and all matters connected therewith and with regard to any property rights they have in the Ferrari and/or the distribution of the Net Settlement Proceeds.



EXHIBIT

_12_

Clark v Ford

**NOW THEREFORE**, in consideration of the mutual covenants and agreements set forth herein, and for the good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the Kleve Sisters hereby agree as follows:

## STATEMENT OF AGREEMENT

1. <u>Distribution of Net Settlement Proceeds</u>

In consideration of Kristine's extraordinary actions taken in furthering the recovery of the Ferrari and negotiating the settlement with Ford, the Kleve Sisters hereby agree that the Net Settlement Proceeds shall be distributed as follows:

    (a)    Kristine is entitled to 50% of the Net Settlement Proceeds for a total payment of $300,000.00.

    (b)    Karyl is entitled to 25% of the Net Settlement Proceeds for a total payment of $150,000.00.

    (c)    Katrina is entitled to 25% of the Net Settlement Proceeds for a total payment of $150,000.00.

2. <u>Portion of Net Settlement Proceeds Deposited Into Escrow Account</u>

    (a)    The Kleve Sisters acknowledge and agree that there may be ongoing costs and expenses to be incurred in the future associated with the receipt and distribution of the Settlement Sum and/or Net Settlement Proceeds, including, but not limited to, attorney's fees and potential disputes with others claiming a right to a portion of the Settlement Sum and/or Net Settlement Proceeds.

    (b)    The Kleve Sisters agree that they will share in paying for the ongoing costs and expenses on a pro-rata basis in accordance with their respective share of the Net Settlement Proceeds.

    (c)    The Kleve Sisters hereby agree that the following amounts should be withheld from the Net Settlement Proceeds and deposited into an escrow account (the "Escrow Funds"):

    (i)    $20,000 of the Net Settlement Proceeds owed to Kristine shall be withheld from distribution and deposited into an escrow account;

    (ii)    $10,000 of the Net Settlement Proceeds owed to Karyl shall be withheld from distribution and deposited into an escrow account; and

    (iii)    $10,000 of the Net Settlement Proceeds owed to Katrina shall be withheld from distribution and deposited into an escrow account.

Clark v Ford

(d)     The Escrow Funds shall be deposited into an escrow account to be established (the "Escrow Account"). All deposits, withdrawals, and distributions out of the Escrow Account will be made at the direction of Kristine upon written instructions given to the Escrow Agent from Kristine.

(e)     The Escrow Funds shall be withdrawn from the account to pay for costs and expenses associated with the receipt and distribution of the Settlement Sum and/or Net Settlement Proceeds.

(f)     If there is no litigation or adverse claims asserted or threatened by March 1, 2017, Kristine will instruct the Escrow Agent to terminate the Escrow Account and disburse all funds remaining therein in accordance with the following:  50% of such Account to Kristine; 25% to Karyl; and the remaining 25% to Katrina.

(g)     If any claim is made or threatened to be made, Kristine will promptly notify Karyl and Katrina of such claim and the nature thereof.  Further, any documents or other information regarding the foregoing shall be forwarded to their respective counsel upon request or direction.

3.     <u>Contracts and Decisions Made by Kristine</u>

Karyl and Katrina agree that they and/or their counsel have reviewed all pleadings and filings in the Lawsuit and related appeals, and they accept and agree to be bound by the contracts entered into and the decisions made on their behalf by Kristine.  Karyl and Katrina further agree that Kristine retains the full right to continue participating in the Lawsuit and the settlement of the same until its completion.

4.     <u>Satisfaction of Outstanding Obligations</u>

In a previous transaction, Kristine agreed to purchase Karyl's and Katrina's interests in certain real estate located on Boudinot and Prospect Avenues for a total price of $14,000 or $7,000 each.   Of this amount, Karyl and Katrina each received a payment of $3,000.  Simultaneously with the execution of this Agreement, Kristine agrees to pay to Karyl and Katrina the sum of $4,000 each as the final payment on this obligation.  All parties agree that no interest shall be due and payable on this final payment amount.

5.     <u>Previous Contracts and Agreements Superseded by this Agreement</u>

This Agreement supersedes any and all prior and contemporaneous oral or written agreements or understandings among the Kleve Sisters, including, but not limited to, the Original Contract entered into in May, 2014.

6.     <u>Release of all Claims</u>

With the exception of the obligations set forth herein, Karyl and Katrina (on behalf of themselves, their heirs, successors and assigns) hereby fully release, acquit and discharge Kristine (and her heirs, successors and assign) from any and all actions, assertions, disputes or claims which either or both may have, of whatever kind and nature, against Kristine

3

Clark v Ford

as of the date hereof, including those arising from the administration of Karl's Estate, all matters connected therewith and any and all property rights they may have in the Ferrari.

With the exception of the obligations set forth herein, Kristine (on behalf of herself, her heirs, successors and assigns) hereby fully releases, acquits and discharges Karyl and Katrina (and their heirs, successors and assign) from any and all actions, assertions, disputes or claims which she may have, of whatever kind and nature, against Karyl and Katrina as of the date hereof, including those arising from the administration of Karl's Estate, all matters connected therewith and any and all property rights she may have in the Ferrari.

Further, the parties agree that upon final payment of the Net Settlement Proceeds in accordance with the terms and conditions set forth herein, all claims of the parties against each other shall be fully settled, resolved and released.

7.    Covenants and Agreements

This Agreement contains all of the covenants and agreements between the Kleve Sisters with respect to the division of the Ferrari, the Settlement Sum, and the Net Settlement Proceeds.

8.    Integration; Entire Agreement

The Kleve Sisters represent and acknowledge that in executing this Agreement:

(a)    they have not relied upon any representation or statement not set forth herein made by any other party's agents, representatives or attorneys with regard to the subject matter of this Agreement, and

(b)    upon execution of this Agreement, the Original Contract shall be null and void and none of the Kleve Sisters may bring any claim now or in the future against another one of the Kleve Sisters arising out of or in any way connected with the Original Contract or the breach thereof.

9.    Modification

No modification of the representations made herein will be effective unless said representations are in writing and signed by the party against whom enforcement would reasonably be sought.  This Agreement between the Kleve Sisters cannot be amended or modified in any respect except by a subsequent written agreement signed by all of the Kleve Sisters.

10.    Cooperation

The Kleve Sisters will perform any other acts, and will sign and deliver any other documents that are necessary to carry out the intend and provisions of this Agreement.

4

Clark v Ford

11.    Miscellaneous

(a)    The Kleve Sisters agree that this Agreement shall become binding when all signatures below are present and inure to the benefit of their respective legal representatives, heirs, assigns, and successors.

(b)    The Kleve Sisters agree that each of them will have all of the rights and remedies available at law and equity to enforce their respective rights under the Agreement.

(c)    Should any provision of the Agreement be declared or determined by any court of competent jurisdiction to be illegal, invalid, or unenforceable, the validity of the remaining parts, terms, or provisions shall not be affected thereby any illegal, invalid, or unenforceable part, term or provision shall be severed from the Agreement, and deemed not to be a part of the Agreement.

(d)    No other agreement, statement, or promise is valid, binding, or enforceable unless it is contained in this Agreement.

(e)    The Kleve Sisters acknowledge and agree that they are not relying upon any representation, statement, promise, agreement other than what is written herein, or inducement not expressly contained in the Agreement.

(f)    No release, waiver or other promise set forth in the Agreement shall be construed to prohibit Kristine, Karyl and/or Katrina from enforcing the terms of the Agreement in a court of competent jurisdiction.

12.    Governing Law and Jurisdiction

This Agreement is made and entered into in the State of Ohio, and shall in all respects be interpreted, enforced and governed under the laws of the State of Ohio.

13.    Arm's length Negotiations; Drafting

The Kleve Sisters expressly represent and warrant to each other that before executing this Agreement, they fully informed themselves of the terms, contents, conditions and effects of this Agreement; they relied solely and completely upon their own judgment in executing this Agreement; they had the opportunity to seek and did obtain the advice of independent counsel before executing this Agreement, which is the result of arm's length negotiations conducted by and among all of the Kleve Sisters and their respective counsel. This Agreement shall be deemed drafted jointly by the Kleve Sisters and nothing shall be construed against one of the Kleve Sisters as the drafting party.

14.    Confidentiality

Each of the parties agrees to maintain and keep confidential, except to the extent necessary, the terms and provisions of this Agreement. Parties may disclose information which would otherwise be confidential to the extent that: the disclosure is required by law, regulation

5

Clark v Ford

or a government entity; or the information is disclosed on a strictly confidential, need to know basis to the professional advisors, auditors and bankers of any particular one of the parties.

15.    <u>Counterparts</u>

This Agreement may be executed in any number of counterparts (including by means of facsimile and electronically transmitted portable document format (pdf) signature pages), each of which shall be an original but all of which together shall constitute one and the same instrument.

**INTENDING TO BE LEGALLY BOUND**, the undersigned have executed this Amended and Restated Settlement Agreement as of the day and year first above written.

KRISTINE ANNE KLEVE

By: _____    Dated: _July 15_, 2016

KARYL RENEE KLEVE

By: _____    Dated: _July 15_, 2016

KATRINA MARIE KLEVE

By: _____    Dated: _July 15_, 2016

6859391.5

6

Jul 18 07 05:49p    Ray Lawson                                      5134811477              p.1
Jul 18 07 05:55p    Deborah & D                                     858-483-2904
Jul 18 07 05:19p    Ray Lawson                                      5134811477    p.1    p.1

This contract, signed this 18th day of July, 2007 between David L. Clark ("Agent") and Kristine A. Lawson, Karyl R. Kleve and Katrina M. English (collectively referred to as "Sellers"), pertains to the recovery and sale of a 1954 Ferrari 375 Plus, Serial No. 0384AM, formerly owned by Sellers' father, Karl Kleve (the "Kleve Ferrari").

Sellers obtained title to the Kleve Ferrari from the Estate of Karl Kleve. Sellers are therefore the lawful owners of the Kleve Ferrari.

Sellers have authorized Agent to recover and sell the Kleve Ferrari. In return, Sellers have agreed to pay Agent ten percent of the proceeds of the sale.

Agent has provided a buyer, Hugh Taylor, for the Kleve Ferrari and agrees to represent Sellers in the recovery and sale of the automobile. Mr. Taylor shall have first right of refusal to purchase the Kleve Ferrari. Agent shall be the exclusive representative for Sellers in connection with the recovery and sale of the Kleve Ferrari. Agent agrees to obtain the utmost value for the Kleve Ferrari. Should the Sellers decide to sell only the parts of the automobile, they agree to retain Agent for this transaction as well.

Sellers agree to provide Agent with all documents or copies thereof necessary to proceed with the recovery of the Kleve Ferrari.

All expenses associated with the recovery and sale of the Kleve Ferrari shall be paid by Agent and/or the buyer. Sellers liability to pay is limited to ten percent of the proceeds of the sale of the Kleve Ferrari, to be paid at the closing or as soon thereafter as is practicable. In the event that (i) the Kleve Ferrari is not recovered or (ii) the sale of the Kleve Ferrari is not closed, Sellers shall have no obligation to reimburse the Agent, the buyer or any other person for expenses incurred in connection with the recovery and sale of the Kleve Ferrari.

7-18-07                              _____
                                     Kristine A. Lawson, Seller

JULY 18, 2007                        _____
                                     Karyl R. Kleve, Seller

7/18/07                              _____
                                     Katrina M English, Seller

                                     _____
                                     David L. Clark, Agent

EXHIBIT J

GARDNER00636

**HEADS OF AGREEMENT**

DATED    March 12, 2015  BETWEEN (1) FLORENCE SWATERS et al ( "BC/ The Belgian Contingency ) and Kristie Kieve et al./ Joseph L. Ford III and Christopher Gardner ("OC/ The Ohio Contingency ) AND FOR THE KLIVE.NEIRS AS DEFINED BELOW (ALL REFERRED TO THE "Ohio PARTIES") AND (3) BONHAMS 1793 LIMITED OF 101 NEW BOND STREET, LONDON, W1S 1SR ("BONHAMS")

1.  The parties have entered these Heads of Agreement to set out the terms on which (a) BC and OC Parties have agreed to extinguish all claims and counterclaims between them in relation to a Ferrari 375 Plus motor car, Chassis No 0384AM, Engine No. 0384AM and engine 0394AM, with ALL the parts, documents etc ("the Car") and (b) Bonhams has agreed to sell the Car by public auction.  OC warrants and represents to BC and to Bonhams that THEY have full authority to enter and perform these Heads of Agreement on behalf of all parties other than PS, and to stay all litigation in Ohio relating to the Car.

2.  All claims and counterclaims between BC and OC whether already asserted or not, are hereby waived and permanently extinguished on distribution of the funds from the sale to the signers of this agreement.  BC and the OC Parties will promptly enter an agreement discontinuing all action in Ohio in such form as is appropriate under Ohio law.

3.  Bonhams is appointed the world-wide exclusive agent of BC and of the OC Parties to sell the Car by public auction at no reserve at the Goodwood Revival in September 2015.  Bonhams will pay all marketing, photography and transport costs.  No vendor's commission will be charged by Bonhams but Bonhams will be entitled to charge full buyer's premium at its normal rate.

4.  Bonham's, BC and the OC Parties will all work closely together to resolve all problems relating to the Car's history and ownership and present a detailed and transparent account of the Car's ownership from now.

5.  BC will arrange for the Car and all parts (including a spare engine), documents, records and photographs in her possession to be transported to Bonhams in England for storage until the Car has been sold and paid for.  The OC Parties will arrange for all parts (including original body panels), fuel tank, and documents, records and photographs in their possession to be transported to Bonhams in England for storage until the Car has been sold and paid for.  Storage and insurance in England will be for Bonhams' account.

6.  The proceeds of sale of the Car will be divided in the proportion 50% to the BC Parties and 50% to OC — which represents 100% of the hammer price at auction.





EXHIBIT

K.

7. All spare parts (including the spare engine and the original body panels), miscellaneous items, documents, photographs or records relating to the Car will be included in the sale of the Car at no additional cost or charge. All liens on the parts will be released by the lien holder(s).

8. A comprehensive list of all the parts, documents, certificates, Bill of Sales, Archive materials both originals, certified copies and copies will be submitted by BC and OC parties and defined as their contribution to the whole of the Ferrari package to be auctioned.

9. BC and the OC Parties will give full disclosure to one another and to Bonhams of all documents and information relating to the Car in their possession or control. All agreements between the parties are to be kept confidential at all times by the parties and by Bonhams. Neither BC nor the OC Parties will enter any discussion with any third party in connection with the sale or marketing of the Car or otherwise in connection with it. The complete list of items to be produced by the parties BC and OC is attached as Schedule One which forms an integral part of this Agreement into which it is hereby incorporated.

10. BC and OC parties will provide at this initial signing, separate complete list of all parts, records, legal paperwork, titles, historical files, archives, spare parts and tools to be included and consigned to Bonham's as part of the sale of the 375 plus. Nothing will be withheld by all parties from the combining of all existing parts with Bonham's belonging to the 375 Ferrari for this sale, including all rights to all pieces owned by each of the parties.

11. BC and OC Parties will surrender all existing registration documents, USA titles, Bill of Sales, and all other conveyance documents they possess individually or jointly to be reviewed by Bonham's as to the validity of which documents will be used in the conveyance to a new owner procured by Bonham's for this Ferrari. All documents in the OC parties' possession relating to the purchase and ownership of the Car by Mr. Kleve, including the original Bill of Sale for his purchase of the Car from Jim Kimberley, probate orders and all US license, title and other documents evidencing the ownership of the Ferrari by Mr. Kleve and his heirs.

12. This Agreement shall be governed by English law and any dispute in relation to it will determined by the High Court of Justice in London.

Florence Swaters  A8/3/2013

Joseph L. Ford III  3/24/13

Kristie Kleve-Lawson  3-26-13

Christopher Gardner  25/3/2013

Bonhams - London

COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

**FLORENCE SWATERS**
24, Clos des Cheneaux
B-1390 Grez-Doiceau
Belgium

**JACQUES "JACK" SWATERS**
143, Chaussee de Charleroi
B-1060 Brussels
Belgium

Plaintiffs,

vs.

*Process*

**KRISTINE KLEVE LAWSON**
individually and in her capacity as
a beneficiary of the Estate of Karl Kleve
2887 Harrison Avenue
Cincinnati, Ohio  45211

**John Does 1-2**
**unknown beneficiaries of the Estate**
of Karl Kleve

**John Does 3-4**
**Unknown transferees of Kristine Kleve**
**Lawson**

Defendants.

Case No.  A1001370

Judge

**COMPLAINT**

FILED
2010 FEB 12 P 3 14
PATRICIA M CLANCY
CLERK OF COURTS
HAMILTON COUNTY

( ) ORIG, COMP, PARTIES, SUMMONS
(X) CERT MAIL   ( ) SHERIFF   ( ) WAVE
( ) PROCESS SERVER   ( ) NONE
CLERKS FEES _____
SECURITY FOR COST _____
DEPOSITED BY _____
FILING CODE _____

For their complaint against Defendants Kristine Kleve Lawson and John
Does 1-4, Plaintiffs, Florence Swaters and Jack Swaters (collectively, "Plaintiffs"),
state as follows:

<u>BACKGROUND</u>

1.    Karl Kleve was a collector of cars who lived in Westwood, Ohio.



**EXHIBIT**
L

ELECTRONICALLY FILED 12/28/2016 11:42 / ANJD / A 1605727 / CONFIDIA...

2.    Among his 300+ collection of cars and parts was a Ferrari 375 Plus Grand Prix Roadster, serial number 0384AM ("Vehicle").

3.    In 1958, Karl Kleve purchased the Vehicle from an individual in Chicago, Illinois for $2,500. The Vehicle was sold to Karl Kleve in damaged condition as a result of a fire to the wiring system in the dash area. Copies of the 1958 Bill of Sale and an Affidavit of Karl Kleve attesting to this purchase and condition of the Vehicle are attached collectively as Exhibit A.

4.    Sometime between 1985 and 1989, the Vehicle and its VIN data plate were stolen from Karl Kleve. In January 1989, Karl Kleve reported the theft to the Green Township police department and the F.B.I. A copy of the Affidavit of Karl Kleve attesting to the theft is attached as Exhibit B.

5.    In 1989, the Vehicle entered Belgium through an auto trader named "L'Exception Automobile" based in Brussels.

6.    Because the Vehicle had been reported as stolen in the United States, the Criminal Investigation Department of the Office of the Kings Prosecutor in Belgium seized the Vehicle in customs and conducted an investigation.

7.    In February 1990, the Belgian authorities lifted the seizure of the Vehicle and allowed L'Exception Automobile to sell it in Belgium. A copy of the communication lifting the seizure along with a certified translated copy, is attached as Exhibit C.

8.    In March 1990, Jack Swaters (who owned an exclusive Ferrari import and distribution business in Belgium), partnered with Philippe Lancksweert ("Lancksweert") and purchased the Vehicle in good faith from

2

L'Exception Automobile in Belgium. A copy of the photograph of the Vehicle in its damaged condition at the time of this purchase is attached as Exhibit D.

9.    Despite its damaged condition, the Vehicle retained an extremely high value as a collector's item (only 6 were ever made by Ferrari) and the possibility of restoration. The more complete the vehicle, the higher the value.

10.    Swaters and Lancksweert restored the Vehicle in Belgium and Italy at Ferrari headquarters for the sole purpose of racing it throughout Europe. Copies of the Vehicle in various stages of restoration are attached collectively as Exhibit E.

11.    In or around 1997, Karl Kleve retained the services of Mark Daniels, President of National Search Services, Inc. located in Palm Beach Gardens, Florida, to locate the Vehicle and resolve any ownership disputes.

12.    Mark Daniels caused a lien to be placed on the title of the Vehicle in Ohio during his search for the Vehicle. A copy of the Ohio title evidencing this lien is attached as Exhibit F.

13.    Once the Vehicle was located, Karl Kleve appointed Mark Daniels as his agent and attorney-in-fact to pursue negotiations with Swaters and Lancksweert to resolve all ownership issues. A copy of the Letter of Authority, Letter of Authority Affidavit of Karl Kleve, and the Limited Power of Attorney executed by Karl Kleve are collectively attached as Exhibit G.

14.    Jack Swaters designated Philippe Lancksweert as his agent for the purpose of consummating the transactions with Karl Kleve regarding the Vehicle. A copy of the Designation of Agent is attached as Exhibit H.

3

15.    On September 2, 1999, Karl Kleve, Mark Daniels, and Philippe Lancksweert executed documents transferring all ownership rights claimed by Karl Kleve to Lancksweert and Swaters.

16.    Mark Daniels executed a Bill of Sale on behalf of Karl Kleve, together with his respective predecessors in interest, legal successors and assigns, agents, attorney, and representatives, in favor of Lancksweert. A copy of the Bill of Sale is attached as Exhibit I.

17.    Karl Kleve, Mark Daniels, and Philippe Lancksweert executed a Settlement Agreement evidencing the settlement of all ownership issues regarding the Vehicle and setting forth the obligations of the parties with respect to the Vehicle and its ownership. A copy of the Settlement Agreement is attached as Exhibit J.

18.    Upon execution of the Settlement Agreement and pursuant to its terms, Lancksweert escrowed $625,000 - $400,000 for Karl Kleve and Mark Daniels, $225,000 for Mark Daniels' company, National Search Services. Copies of both checks are attached collectively as Exhibit K.

19.    As set forth in the Letter of Authority and Limited Power of Attorney, Mark Daniels collected and cashed the escrowed funds on behalf of himself and Karl Kleve. A copy of the endorsed check is attached as Exhibit L.

20.    Following receipt of the funds, Mark Daniels executed a Lien Release and signed the Ohio title as agent and attorney-in-fact for Karl Kleve, as seller. A copy of the Lien Release is attached as Exhibit M, along with a copy of the Ohio title evidencing the lien release and transferor/seller signature as Exhibit N.

4

21.    Both theft reports with the Green Township police department and the F.B.I. were cancelled and the Vehicle no longer listed as stolen. Copies of the removal of theft status confirmations from Green Township and the F.B.I. are attached collectively as Exhibit O.

22.    Karl Kleve also executed a Release of Theft Status Agreement releasing the theft status of the Vehicle that he had reported in 1989 and agreed to deliver the Vehicle to Lancksweert and Swaters "for its and their use forever." A copy of the Release of Theft Status Agreement is attached as Exhibit P.

23.    The Settlement Agreement was specifically amended to allow the parties to issue a statement regarding the Vehicle that "all claims with regard to ownership of the automobile have been resolved." A copy of the Amendment is attached as Exhibit Q.

24.    Pursuant to the Settlement Agreement, Karl Kleve agreed to "transfer good and clear title and executed relevant documents for the benefit of Lancksweert" for the Vehicle.

25.    Also pursuant to the Settlement Agreement, Karl Kleve and Mark Daniels agreed to indemnify and hold harmless Lancksweert and/or any other person or entity he may designate, from all claims, expenses or damages (including reasonable attorney's fees and cost) arising from or related to their ownership, possession or control of the Vehicle and any breach of any representation or covenant.

26.    Following execution of the transfer documents and receipt of the Ohio title, Lancksweert did not sign the title as buyer or register the Vehicle in Ohio because it had been in Belgium since 1989 and at that time, was never

5

intended to be registered in Ohio but intended for restoration and classic races in Europe only.

27.    Neither Karl Kleve nor Mark Daniels ever delivered any parts or the VIN plate to Lancksweert.

28.    In December 2003, Karl Kleve died and his daughter, Kristine Kleve Lawson ("Lawson"), a beneficiary of his estate, was appointed Administrator by the Hamilton County Probate Court, case no. 2004000216.  A copy of the Entry Appointing Fiduciary – Letters of Authority appointing Lawson as the Administrator is attached as Exhibit R.

29.    As the Administrator of Karl Kleve's estate, Lawson had the authority and responsibility to perform and fulfill all contractual obligations of her father, the decedent, Karl Kleve, regarding the Vehicle.

30.    Instead, Lawson executed an Application for Sale/Transfer of Motor Vehicle and stated that she was in possession of a Ferrari with the serial number 0384AM and requested that the Vehicle be transferred to herself, and Karyl Kleve and Katrina English, both beneficiaries of the estate.  A copy of the Application for Sale/Transfer of Motor Vehicle is attached as Exhibit S.

31.    Lawson also executed an Application to Sell Personal Property in which she attached a Description of Automobiles and listed "Miscellaneous Parts" valued at $25,000.  A copy of the Application to Sell Personal Property is attached as Exhibit T.

32.    Karyl Kleve and Katrina English both consented to the sale of personal property and thereafter, the court granted Lawson's application.  Copies

6

ELECTRONICALLY FILED 12/28/2016 11:42  /  ANJD  /  A 1605727  /  CONFIRMATION NUMBER 585016

of the Consents to Sale of Personal Property and the Entry Authorizing Sale of Personal Property are attached collectively as Exhibit U.

33. In November 2004, Lancksweert sold his ownership in the Vehicle to Swaters and Florence Swaters ("Florence") began helping her father, Jack Swaters, manage the Vehicle.

34. In August 2005, Lawson engaged the services of Kruse International, an auction company to auction the vehicles and parts from Karl Kleve's estate. A copy of the press release advertising the auction is attached as Exhibit V.

35. Florence and Swaters learned that Lawson claimed to possess and intended to auction parts to the Vehicle, including but not limited to, the VIN data plate, fuel tank, engine cover, steering wheel, wheel supports, three wheels, one rear wing, and five instruments (collectively, "Parts").

36. Upon learning that Parts to the Vehicle were to be auctioned, Florence and Swaters hired Bruce Whitmer, Esq. who contacted Lawson as Administrator of the Estate, and demanded the return of any Parts to the Vehicle prior to the auction. A copy of Mr. Whitmer's correspondence to Lawson, the Administrator, is attached as Exhibit W.

37. Upon information and belief, Lawson did not introduce the Parts at the auction but retained possession of them.

38. In November 2006, one year following the auction and notice of Swaters' ownership and demand, Lawson, as Adminstrator, transferred title in the Vehicle to herself individually. A copy of the Vehicle registration search is attached as Exhibit X.

7

ELECTRONICALLY FILED 12/28/2016 11:42  /  ANJD  /  A 1605727  /  CONFIRMATION NUMBER 585016

39.   In March 2009, Florence became an equal owner of the Vehicle with her father.

40.   Despite demand, Lawson has refused to transfer title or the Parts to the rightful owners of the Vehicle – Florence and Swaters.

## PARTIES

41.   Jack Swaters is an individual residing in Brussels, Belgium, Europe.

42.   Florence Swaters is an individual residing in Grez-Doiceau, Belgium, Europe.

43.   Kristine Kleve Lawson is an individual who, upon information and belief, resides in Cincinnati, Ohio, Hamilton County.

44.   John Does 1-2 are unknown beneficiaries of the estate of Karl Kleve who may claim an ownership interest in the Vehicle and the Parts, and are believed to be residents of Hamilton County.

45.   John Does 3-4 are unknown transferees of Lawson who may have possession of any Parts or titles of the Vehicle, whose residence is unknown.

## JURISDICTION AND VENUE

46.   This Court has personal jurisdiction over the Defendants because Defendants are residents of Hamilton County and have transacted business and their affairs in Hamilton County.

47.   Venue is proper because a substantial part of the events or omissions giving rise to the claims occurred in Hamilton County; all of the Defendants are, upon information and belief, residents of Hamilton County; and the Parts and title to the Vehicle are located in Hamilton County.

8

ELECTRONICALLY FILED 12/28/2016 11:42  /  ANJD  /  A 1605727  /  CONFIRMATION NUMBER 585016

## COUNT ONE
### Breach of Contract Against Lawson

48. Plaintiffs repeat the allegations contained in paragraphs 1 through 47 above as if fully rewritten herein.

49. Pursuant to the terms of the Settlement Agreement and Bill of Sale, Karl Kleve was required to transfer the entire Vehicle to Swaters through Lancksweert.

50. Mark Daniels signed the title of the Vehicle and executed a Lien Release evidencing his company's release of the lien on the Vehicle.

51. Lawson, as beneficiary of the estate of Karl Kleve and with the authority and responsibility as the duly appointed Administrator, was obligated to perform the contractual obligations of Karl Kleve as his legal successor under the Settlement Agreement, and transfer any and all Parts of the Vehicle and the title, to Swaters through Lancksweert.

52. Swaters and Lancksweert performed their obligations under the Settlement Agreement and deposited the required funds into escrow.

53. Even after receiving notice of Swaters's ownership in the Vehicle and a demand to return all Parts, Lawson as Administrator and individual, breached the Settlement Agreement and Bill of Sale by refusing to transfer any and all Parts of the Vehicle and by transferring title in the Vehicle to herself individually.

54. As a result of Lawson's breach, Florence and Swaters have been damaged in an amount to be determined at trial but believed to be in excess of $25,000.00.

9

ELECTRONICALLY FILED 12/28/2016 11:42 / ANJD / A 1605727 / CONFIRMATION NUMBER 585016

## COUNT TWO
### Specific Performance Against Lawson

55. Plaintiffs repeat the allegations contained in paragraphs 1 through 54 above as if fully rewritten herein.

56. The Bill of Sale and Settlement Agreement are certain, unambiguous contracts, mutually entered into and executed by the parties based on valuable consideration.

57. The Bill of Sale and Settlement Agreement are fair in all parts, free from misrepresentation or misapprehension, fraud, mistake, imposition, surprise, or unconscionability.

58. Specific performance of the Bill of Sale and Settlement Agreement would not be unconscionable on Lawson as the transfer of any and all Parts to the Vehicle and the title, would only serve to fulfill her father's intent and obligation under the contracts.

59. This Court has the authority to direct Lawson to fulfill the obligations set forth in the Bill of Sale and Settlement Agreement and Plaintiffs demand specific performance of both contracts.

## COUNT THREE
### Conversion Against Lawson

60. Plaintiffs repeat the allegations contained in paragraphs 1 through 59 above as if fully rewritten herein.

61. In November 2006, Lawson, as Administrator, transferred the Parts and title to the Vehicle to herself individually.

10

ELECTRONICALLY FILED 12/28/2016 11:42 / ANJD / A 1605727 / CONFIRMATION NUMBER 585016

Case 19-10309-EPK   Doc 246   Filed 01/02/20   Page 145 of 401

62.     By retaining possession of the Parts and title of the Vehicle and to the exclusion of Florence and Swaters, the rightful owners of the Vehicle, Lawson has unlawfully converted them.

63.     Lawson acted with malice or insult when she transferred the Parts and title to herself individually after she was notified of Swaters' ownership in the Vehicle.

64.     As a result of Lawson's conversion, Florence and Swaters have been damaged in an amount including punitive damages, to be determined at trial and believed to be in excess of $25,000.00.

## COUNT FOUR
### Replevin Against Lawson and John Does 1-2

65.     Plaintiffs repeat the allegations contained in paragraphs 1 through 64 above as if fully rewritten herein.

66.     Florence and Swaters are the rightful owners of the Vehicle which includes all Parts and title, and have the right to immediate possession.

67.     Lawson has refused to return the Parts and transfer title and unlawfully retains possession of the Parts and title of the Vehicle which are believed to be in Hamilton County.

68.     John Does 1-2 may also unlawfully retain possession of Parts or an interest in the title of the Vehicle which are currently believed to be in Hamilton County.

69.     John Does 3-4 may also unlawfully retain possession of Parts or an interest in the title of the Vehicle as a result of any unlawful transfer by Lawson.

70.     The value of the Parts and title are believed to exceed $25,000.00.

11

71.     The Parts and title have not been taken for any tax assessment or fine levied by virtue of any law or statute of the State of Ohio, nor have they been seized under any execution or attachment against the goods and chattels of Plaintiffs liable to execution.

72.     Consequently, the Plaintiffs are entitled to a prejudgment order for possession of the Parts and title to the Vehicle.

## COUNT FIVE
### Unjust Enrichment Against Lawson and John Does 1-2

73.     Plaintiffs repeat the allegations contained in paragraphs 1 through 72 above as if fully rewritten herein.

74.     By performing their obligations under the Settlement Agreement, Lancksweert and Swaters conferred a substantial benefit to Karl Kleve.

75.     Lancksweert and Swaters did not perform their obligations gratuitously but with the expectation that Karl Kleve would transfer to them any and all Parts to the Vehicle along with good, clear title.

76.     As beneficiaries of the estate of Karl Kleve, Lawson and John Does 1-2 knew of the benefits conferred by Lancksweert and Swaters and have retained such benefits under circumstances where it would be unjust to do so.

77.     Plaintiffs have been damaged by Defendants' unlawful retention of benefits and have been unjustly enriched in an amount to be determined at trial but believed to be in excess of $25,000.00.

## COUNT SIX
### Equitable Restitution Against Lawson and John Does 1-4

78.     Plaintiffs repeat the allegations contained in paragraphs 1 through 77 above as if fully rewritten herein.

12

ELECTRONICALLY FILED 12/28/2016 11:42  /  ANJD  /  A 1605727  /  CONFIRMATION NUMBER 585016

79.    Plaintiffs notified Lawson of their ownership rights in the Vehicle and demanded the return of any and all Parts in her possession, but Lawson refused.

80.    Because the Vehicle can be properly identified as belonging to the Plaintiffs, Lawson must return any and all Parts she possesses, including good, clear title to the Vehicle, to Plaintiffs.

81.    Because Lawson knew of Swaters' ownership interest in the Vehicle, any transfer, sale, or conveyance of any Parts or title to John Does 3-4 is unlawful and Plaintiffs are entitled to recover the products of such transfers.

<u>COUNT SEVEN</u>
<u>Accounting</u>

82.    Plaintiffs repeat the allegations contained in paragraphs 1 through 81 above as if fully rewritten herein.

83.    As a beneficiary, Administrator, and otherwise, Lawson has a duty to Plaintiffs to account for the Parts of the Vehicle in her possession and belonging to Plaintiffs.

84.    Plaintiffs are entitled to an accounting and inventory of all Parts of the Vehicle in Lawson"s possession or in the possession of any third-party or transferee, known by Lawson to exist.

85.    As a direct result of Lawson's failure to account for any of the Parts of the Vehicle, Plaintiffs have suffered and will continue to suffer damages in an amount to be determined at trial.

13

ELECTRONICALLY FILED 12/28/2016 11:42  /  ANJD  /  A 1605727  /  CONFIRMATION NUMBER 585016

## COUNT EIGHT
### Declaratory Judgment

86.　Plaintiffs repeat the allegations contained in paragraphs 1 through 85 above as if fully rewritten herein.

87.　An actual and bona fide controversy, which is justifiable in character, exists between Plaintiffs and Lawson regarding the parties' obligations and rights pursuant to the Bill of Sale and Settlement Agreement.

88.　Plaintiffs contend that they are the true owners of the Vehicle and that Lawson is obligated to transfer any and all Parts and good, clear title of the Vehicle to Plaintiffs.

89.　Upon information and belief, Lawson contends that she is not obligated to transfer anything regarding the Vehicle to Plaintiffs.

90.　The Court's declaration of the provisions, meaning and interpretation of the parties' rights and responsibilities pursuant to the Bill of Sale and Settlement Agreement, may resolve this controversy and is necessary to the preservation of parties' rights that may otherwise be impaired or lost.

91.　Pursuant to Ohio Rev. Code § 2721, et. seq., Plaintiffs request that this Court declare that the Bill of Sale and Settlement Agreement are valid, enforceable contracts; that Plaintiffs are the rightful owners to the Vehicle and any and all Parts of the Vehicle; and Plaintiffs are entitled to good, clear title to the Vehicle pursuant to the contracts.

## COUNT NINE
### Temporary and Permanent Injunctive Relief

92.　Plaintiffs repeat the allegations contained in paragraphs 1 through 91 above as if fully rewritten herein.

14

**Page 036 of 101**

93. Plaintiffs currently possess the original chassis of the Vehicle along with a Bill of Sale and Settlement Agreement from its prior owner, Karl Kleve, conveying all rights and title to the Vehicle to Plaintiffs.

94. Because Lawson has refused to return any Parts and registered another title to herself individually, despite knowledge of Plaintiffs' ownership, Plaintiffs will suffer immediate and irreparable injury if the Court does not enjoin Lawson from selling, transferring, or conveying or attempting to sell, transfer, or convey any interest in the Parts, the title, or the Vehicle.

**WHEREFORE**, Plaintiffs requests that the Court enter judgment in Plaintiffs' favor on each of Plaintiffs' claims as follows:

1. for breach of contract damages in an amount to be proven at trial;

2. for specific performance of the Bill of Sale and Settlement Agreement;

3. for damages, including punitive damages, for unlawful conversion of the Parts and title to the Vehicle;

4. for judgment directing Defendants to appear for the purpose of showing cause why a prejudgment order for possession should not issue and the Parts and title to the Vehicle be delivered to Plaintiffs; awarding Plaintiffs judgment for possession of the Parts and title of the Vehicle; and awarding Plaintiffs the costs and expenses of removing the Parts and transferring title in the Vehicle, and the costs of such bond or undertaking as may be ordered by the Court;

5. for damages for unjust enrichment in an amount to be proven at trial;

15

ELECTRONICALLY FILED 12/28/2016 11:42  /  ANJD  /  A 1605727  /  CONFIRMATION NUMBER 585016

6.   for restitution of all Parts and title to the Vehicle;

7.   for an accounting of all Parts of the Vehicle in Defendants' possession, in the possession of any third parties or transferees, or known to exist by Defendant Lawson;

8.   for a declaration that the Plaintiffs are the rightful owners of the Vehicle, including all Parts, and are entitled to good clear, title;

9.   for temporary and permanent injunctive relief enjoining Defendants from taking any actions regarding the Vehicle, Parts, and title;

10.   for all costs and attorneys' fees;

11.   and for any and all further relief this Court deems just and appropriate.

Respectfully submitted,

Of counsel:

Michael A. Hirschfeld (0018163)
Tina Williams (0077220)
*Attorneys for Plaintiffs*
*Jack Swaters and*
*Florence Swaters*
1900 Fifth Third Center
511 Walnut Street
Cincinnati, OH 45202
(513) 629-2729
(513) 333-4363
twilliams@graydon.com

GRAYDON HEAD & RITCHEY LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, OH 45202
(513) 621-6464

2494774.5

16

ELECTRONICALLY FILED 12/28/2016 11:42  /  ANJD  /  A 1605727  /  CONFIRMATION NUMBER 585016

BILL OF SALE

March 20, 1958

TO WHOM IT MAY CONCERN :

I James H. Kimberly, with address, 2340 des Plaines Ave,
Chicago, Illinois, being the owner of the here described
automobile, do hereby sell and convey, free of any lien,
to the buyer, Karl Kleve, of Cincinnati, Ohio, for the
sum of $2,500.

Year: 1954-55
Make: FERRARI
Model: 375 PLUS 4.9  Grand Prix Roadster
Chassis No. 0384 AM
Odometer: 4,340

The automobile is in damaged condition.

Seller: James H. Kimberly

PLAINTIFF'S
EXHIBIT

A

Page 038 of 101

## AFFIDAVIT
## OF
## KARL KLEVE

STATE OF OHIO

COUNTY OF HAMILTON

I, KARL KLEVE, being over the age of 18, of sound mind and complete capacity, am a citizen of the United States of America and resident of the State of Ohio, do hereby state by this sworn affidavit the following facts to be true and correct;

1.    As herewith attached shown as EXHIBIT A, a copy of a document entitled "Bill of Sale", stating the following information THAT:

    a.    On March 20, 1958, James H. Kimberly, at address: 2340 des Plaines Ave., Chicago, Illinois, did sell the subject vehicle as referenced below, to Karl Kleve, of Cincinnati, Ohio.

    b.    As stated the subject vehicle was sold for the amount of $2, 500 ( Two Thousand five-hundred dollars ).

    c.    As stated, the vehicle information as follows:
    Year: 1954-55
    Make: Ferrari
    Model: 375 Plus 4.9 Grand Prix Roadster
    Chassis No.: 0384 AM
    Odometer: 4,340

    d.    As stated, the automobile was sold in damaged condition. ( The damage was the result of a fire to the wiring system in the dash area. ) The vehicle was not destroyed and was repairable.

    e.    The subject vehicle was sold to me Karl Kleve, by the owner James H. Kimberly, through Howard Hively, a known race driver of the vehicle.

Signed the Date as here witnessed.

_____
KARL KLEVE

STATE OF OHIO

COUNTY OF HAMILTON

Before me, the undersigned authority, on this day personally appeared KARL KLEVE, known to me being first duly sworn, to be the person whose name is subscribed and has executed the foregoing document.

Given under my hand and seal of office this

_____
NOTARY PUBLIC; in and for the State of Ohio                    (SEAL)

_____
Printed Name of Notary

DENISE M. SCHMIDT
Notary Public, State of Ohio
My Commission Expires Aug. 16, 2011

My Commission Expires:

# AFFIDAVIT OF
# KARL KLEVE

Page 1 of 2

FERRARI 375 PLUS  Chassis# 0384 AM

## STATE OF OHIO

## COUNTY OF HAMILTON

. I, KARL KLEVE, being over the age of 18, of sound mind and complete capacity, am a citizen of the United States of America and resident of the State of Ohio, do hereby state by this sworn affidavit the following facts to be true and correct.

1. I am the true owner of a specific Ferrari automobile type 375 PLUS with the chassis number bearing 0384 AM.

2. The vehicle was stolen from my possession and was reported to the proper authorities as per the theft report number ( GT89-239 ) dated 01-24-89, by the Green Township Police Department, 6303 Harrison Avenue, Cincinnati, Ohio 45247-6498, Subsequently, the theft was also reported to the F.B.I. The vehicle was not insured.

3. As shown herewith as Exhibit A, is a photostatic copy of the vehicle manufacturer data plate.

EXHIBIT A



The vehicle data plate was photocopied enlarged 1.50 times actual size. For detail identifying purposes.

PLAINTIFF'S EXHIBIT

*Page 04* of 101  B

ALL-STATE LEGAL®

Page 2.    DATA PLATE  Affidavit    FERRARI 375 PLUS  Chassis# 0384AM   KARL KLEVE

4.  Request is hereby made to report to the proper authorities that the herein shown data plate missing or stolen from my possession. The item is of historical and monetary value.

In confirmation of the foregoing, I execute this document on the Day, Month and Year as witnessed.

Signed:

_KARL KLEVE_

STATE OF OHIO
COUNTY OF HAMILTON

Before me, the undersigned authority, on this day personally appeared KARL KLEVE known to me to be the person whose name is subscribed to the foregoing and being first duly sworn, declares that the statements contained herein are true and correct.

GIVEN UNDER MY HAND AND SEAL OF THIS 11 DAY OF _August_ , 199 9

Notary Public; in and for the State of Ohio
**MARK C. TELLES**
Notary Public, State of Ohio
My Commission Expires Apr. 24, 2004

( SEAL )

Printed Name of Notary

My Commission Expires:

ELECTRONICALLY FILED 12/28/2016 11:42  /  ANJD  /  A 1605727  /  CONFIRMATION NUMBER 585016

PARQUET DU
PROCUREUR DU ROI

POLICE JUDICIAIRE

• SECTION

N°

ANNEXE

Rapport

Transmis à Monsieur ....KRUCH Michel, gérant de ...L'Except
Automobil

Bruxelles......... .......... le ...14... février......... 19 90

Le Commissaire xxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxx

CONCERNE:  épave voiture FERRARI type 375 plus, numéro de série 0384 AM

Le soussigné WATERPLAS Michel, Commissaire à la P.J. à Bruxelles,
atteste par le présent que, suite à la décision de Mr.le Procureur du
Roi à Bruxelles(Dr.27.11.1233/89) la saisie de la voiture dont question
supra a été levée ce 14.2.90.
Mr.KRUCH peut dès lors disposer librement de cette voiture.

Signé: WATERPLAS M.

PLAINTIFF'S
EXHIBIT

C

ALLSTATE LEGAL®

Page 43 of 101

<u>TRANSLATION FROM FRENCH</u>

OFFICE
OF THE KING'S
PROSECUTOR

Communicated to Mr. Michel <u>KRUCH</u>, manager of
"L'Exception Automobile"

CRIMINAL
INVESTIGATION
DEPARTMENT

Brussels, February 14, 1990

[illegible] SECTION
No. . . . . .
ANNEX

Report

<u>RE</u>:  wreck of FERRARI type 375 plus automobile, serial number 0384 AM

The undersigned Michel WATERPLAS, Superintendent at the Brussels Criminal Investigation Department, hereby certifies that, further to the ruling handed down by the King's Prosecutor in Brussels (Dr.27.11.1233/89), seizure of the automobile referenced above has been lifted today, 2/14/90.

Mr. KRUCH may therefore have free use of this automobile.

Signed:  M. WATERPLAS

(signature)

ELECTRONICALLY FILED 12/28/2016 11:42  /  ANJD  /  A 1605727  /  CONFIRMATION NUMBER 585016

## CERTIFICATION

I, Irwin K. Styles, of ALL-LANGUAGE SERVICES, INC.,
545 Fifth Avenue, New York, New York 10017, hereby
certify that the foregoing is a true and faithful translation
of the original document.

State of New York    )
                     )  SS.:
County of New York )

Sworn to before me this
20th day of March, 1990

TRANSLATION BY *All-Language Services, Inc.* · 545 FIFTH AVENUE, NEW YORK, N.Y. 10017 / (212) 986-1688.

ELECTRONICALLY FILED 12/28/2016 11:42  /  ANJD  /  A 1605727  /  CONFIRMATION NUMBER 585016



PLAINTIFF'S
EXHIBIT

101  D

ALL-STATE LEGAL®

PLAINTIFF'S
EXHIBIT

ALL-STATE LEGAL®

of 101  E



ELECTRONICALLY FILED 12/28/2016 11:42  /  ANJD  /  A 1605727  /  CONFIRMATION NUMBER 585016



OHIO CERTIFICATE OF TITLE

STATE OF OHIO    No. 3100400566

COUNTY OF HAMILTON
ORIGINAL

PLAINTIFF'S
EXHIBIT
F

Page 04 of 101

## LETTER OF AUTHORITY

Page 1 of 2

FERRARI 375 PLUS  Chassis# 0384AM

This letter to confirm that I, KARL KLEVE, being of sound mind, over the age of 18 years of age, a citizen of the United States of America, and a resident of the State of Ohio, do hereby give MARK DANIELS, my agent and attorney-in-fact, authority to pursue negotiation with interested persons, or entities, for possible settlement of acceptance in monetary value for the property described herein.

TO WIT:

FERRARI 375 PLUS
Serial Number: 0384 AM
Body # 113-505

Stolen: Theft report # GT89-239
Green Township Police Dept.

*Approved by Karl Klene*

With power to take all lawful ways and means with respect to the property, including, but not limited to: present offers, receive offers, offer contingent upon approval by the undersigned. Giving and granting to this agent and attorney-in-fact power and authority to do every act necessary and proper to be done in the exercise of any of the foregoing powers as I might or could possibly do if present, with full power of substitution and revocation, hereby ratifying and conforming all that the agent and attorney-in-fact shall lawfully do or cause to be done by virtue of this document.

The offer process would be presented as follows:

*by Karl Kleve*

1.     We ( Mark Daniels ) would submit an amount approved, in counter offer.
2.     Upon acceptance of an amount of settlement by the interested parties, an Agreement to settle would be drafted in accordance with terms and conditions agreed.
3.     Karl Kleve would require the settlement amount to be placed in escrow to be payable to the benefit of Karl Kleve, upon terms and conditions met by the parties. Karl Kleve would require strict confirmation and proof of amount in escrow.
4.     The conditions would be as follows:

   a.   Karl Kleve will provide a signed Agreement releasing the theft status of the property and other relative releases contingent upon the transfer of escrow.
   b.   Karl Kleve would provide transfer of Bill of Sale and ownership documents contingent upon the transfer of escrow.

PLAINTIFF'S
EXHIBIT
ALL-STATE LEGAL®
Page 0 0 of 101  G

Page 2.  *Letters of Authority*        FERRARI 375 PLUS  Chassis# 0384AM   KARL KLEVE

In confirmation of the foregoing, I execute this document on the Day, Month and Year as witnessed.

Signed:

~~KARL KLEVE~~

STATE OF OHIO
COUNTY OF HAMILTON

Before me, the undersigned authority, on this day personally appeared KARL KLEVE known to me to be the person whose name is subscribed to the foregoing and being first duly sworn, declares that the statements contained herein are true and correct.

GIVEN UNDER MY HAND AND SEAL OF THIS _18_ DAY OF _June_ _____ , 199_9_ .

Notary Public in and for the State of Ohio
Notary Public, State of Ohio
My Commission Expires Aug 13, 2000                              ( SEAL )

Printed Name of Notary                                         My Commission Expires: _____

ELECTRONICALLY FILED 12/28/2016 11:42  /  ANJD  /  A 1605727  /  CONFIRMATION NUMBER 585016

## LETTER OF AUTHORITY
### Affidavit of KARL KLEVE

I, KARL KLEVE, am over 18 years of age, being of sound mind and complete capacity, a U.S. citizen and resident of the State of Ohio, DO HEREBY attest to and state the following:

1. I am the true and rightful owner of the herein below referenced automobile:

   **FERRARI 375 PLUS ( GRAND PRIX ROADSTER )**
   **CHASSIS NO.: 0384AM**

2. The subject automobile was stolen from my rightful possession on December 26, 1988, and of which a theft report was made in proper form to the local law enforcement in and for the State of Ohio.

3. Further, reports of the theft were made in proper form to Federal and International law enforcement.

4. I continue to maintain my rightful ownership.

5. By this instrument I authorize authority, give, grant, constitute and appoint, MARK DANIELS, a U.S. Citizen and resident of the State of Florida, my true and lawful Attorney-in-Fact with power and authority to act in my stead and in my behalf regarding the subject automobile. This Agent -in-fact to have full complete authority and power, to investigate, negotiate, present documents, receive documents, make endorsements, to sign and swear to any document, to perform any act that may be necessary or requires by United States, or International law or regulation, to recover collect and receive all such properties, interests, assets and demands whatsoever, whether in law or in equity, and take lawful ways and means for the benefit and recovery thereof by legal process, or any other act thereof to be executed

6. This power and authority shall remain in full force until the month and day herein executed of the year 2007.

7. This instrument shall be binding and continue upon my death or incapacity for the continuing benefit of my estate, successors and assigns.

In confirmation of this document, I sign my name this the _____ day of _____, 199___ .

SIGNED:

_____
KARL KLEVE

STATE OF OHIO
COUNTY OF _____Ohio_____

Before me, the undersigned authority, on this day personally appeared KARL KLEVE , known to me being first duly sworn, to be the person whose name is subscribed and has executed the foregoing document.

Given under my hand and seal of office this ___6a___ day of __March__, 199_7_ .

( SEAL )

NOTARY PUBLIC, in and for the State of __OHIO__
THOMAS G. WELCH, JR.
Notary Public, State of Ohio
My commission Expires June 28, 1998
Printed Name of Notary

My Commission expires: _6-2-7-98_

## LIMITED POWER OF ATTORNEY
### KNOWN ALL MEN BY THESE PRESENTS:

That I, **KARL KLEVE**, being of sound mind and complete capacity, a U.S. citizen and resident of the State of Ohio, and true rightful owner of the below described property, DO HEREBY constitute and appoint, **MARK DANIELS**, a U.S. Citizen and resident of the State of Florida, my true and lawful Attorney-in-Fact with power to act in my stead and in my behalf regarding:

**FERRARI 375 PLUS ( GRAND PRIX ROADSTER )**
**CHASSIS NO.: 0384AM**

With full complete authority and power,  to investigate, negotiate, present documents. receive documents, make endorsements, to sign and swear to any document, to perform any act that may be necessary or required by United States, or International law or regulation, to recover collect and receive all such properties, interests, assets and demands whatsoever, whether at law or in equity, and take lawful ways and means for the benefit and recovery thereof by legal process, or any other act thereof to be executed.

Giving and granting to this Attorney-in-Fact power and authority to do and perform every act necessary and proper to be done in the exercise of any of the foregoing powers as fully as I might or could possibly do if present, with full power of substitution and revocation, hereby ratifying and conforming all that my Attorney-in-Fact shall lawfully do or cause to be done by virtue of this document.

This power shall remain in full force until the Month and Day herein executed, of the Year 2007.

In confirmation of this document, I sign my name this the _____ day of _____ 199____ .

SIGNED:


_____
KARL KLEVE


STATE OF OHIO
COUNTY OF  HAMILTON

Before me, the undersigned authority, on this day personally appeared **KARL KLEVE** , known to me being first duly sworn, to be the person whose name is subscribed and has executed the foregoing document.

Given under my hand and seal of office this   6   day of   March , 199 7 .

_____                                ( SEAL )
NOTARY PUBLIC; in and for the State of: OHIO

THOMAS G. WELCH, JR.
Notary Public, State of Ohio
Printed Name of Notary  My Commission Expires June 29, 1998

My Commission expires:  6-29-98

ELECTRONICALLY FILED 12/28/2016 11:42  /  ANJD  /  A 1605727  /  CONFIRMATION NUMBER 585016

## Designation of Agent

I, Jack Swaters, hereby designate Phillipe Lancksweert ("Lancksweert") as agent on behalf of a business partnership between Lancksweert and myself (the "Business Partnership"), with due authority to take all necessary actions and execute and deliver all necessary documents to consummate the transaction contemplated under the Settlement Agreement between Mark Daniels, Karl Kleve and Lancksweert, executed on September 2, 1999.

I, Jack Swaters, hereby further agree that upon consummation of the contemplated transaction, title to the vehicle at issue (e.g., Ferrari 375 Plus, serial number: 0384AM) shall be placed in the name of Phillipe Lanksweert, as agent for the Business Partnership.

Jack Swaters

Jack SWATERS

PLAINTIFF'S EXHIBIT

ALL-STATE LEGAL®

Page 166 of 101

## BILL OF SALE

BY THIS BILL OF SALE, **KARL KLEVE**, both in his individual and representative capacity, **MARK DANIELS**, acting agent and Attorney-in-Fact, together with all of his respective predecessors in interest, legal successors and assigns, agents, attorneys, representatives, and each of them ( the "SELLER") contingent and pursuant to the terms and conditions of a Settlement Agreement between Karl Kleve ( Kleve ), Mark Daniels (Daniels ) and Philippe Lancksweert (Lancksweert ), for good and valuable consideration, the receipt of which is hereby acknowledged, does hereby sell, transfer, convey, assign an deliver unto Philippe Lancksweert ("Buyer"), its successors and assigns, *good and marketable title to the Subject Vehicle ( as that term is defined in the Settlement Agreement ), free and clear of any and all liens, claims, liabilities or encumbrances of every kind and nature, to have and hold such Subject Vehicle unto Buyer its successors and assigns, to and for its or their use forever.*

The Subject Vehicle being conveyed hereunder shall be as set forth and described on Schedule A attached hereto. This document is being executed in accordance with and is subject to the terms of the Settlement Agreement, entered into as of _September 2_, 1999, between Kleve, Daniels and Lancksweert.

In confirmation of the foregoing, I execute this document on the Day, Month and Year as witnessed.
Signed:

_____

**MARK DANIELS**
**Attorney-in-Fact for KARL KLEVE**
( attached )

STATE OF _New York_
COUNTY OF _New York_

Before me, the undersigned authority, on this day personally appeared Mark Daniels known to me to be the person whose name is subscribed to the foregoing and being first duly sworn, declares that the statements contained herein are true and correct.

GIVEN UNDER MY HAND AND SEAL OF THIS _2_ DAY OF _September_, 199_9_.

_____
Notary Public, in and for the State of _New York_

YVONNE WILLIAMS
Notary Public, State of New York
( SEAL )No. 414780572
Qualified in Queens County
Commission Expires Nov. 30 19_99_

_____
Printed Name of Notary

My Commission Expires: 11/30/99

PLAINTIFF'S
EXHIBIT
I
ALL-STATE LEGAL®

## SETTLEMENT AGREEMENT

THIS AGREEMENT made the Day, Month and Year as executed by and between Mark Daniels ("Daniels"), Karl Kleve ("Kleve") and Philippe Lancksweert ("Lancksweert") (otherwise collectively referred to herein as the "Parties" ).

### Agreement Recitals

WHEREAS, Kleve is the owner of the herein referenced automobile, of which, was removed from his possession in or about 1989. The automobile described TO WIT:

**FERRARI 375 PLUS serial number: 0384AM ("Subject Automobile")**

Thereafter, Kleve retained the services of Mark Daniels/National Search Services to locate and recover the subject automobile, or alternatively, negotiate any resolution, disposition or settlement, subject to the satisfactory approval of Kleve, and;

WHEREAS, Daniels is the corporate officer of National Search Services, Inc., having encumbrance for services rendered for the benefit of Kleve on the subject automobile, and; Daniels personally is the appointed Attorney-in-Fact, holder of a Power of Attorney executed by Kleve, and;

WHEREAS, Lancksweert, is the agent/representative of the person or entity currently is possession of the subject automobile for purposes of settlement, resolution and disposition of the aforementioned subject automobile, and;

WHEREAS, the Parties, are negotiating and acting in thier capacity for the benefit respective of their agency.

NOW, THEREFORE, in consideration of the foregoing, the Parties hereby agree as follows:

1.      THAT as soon as reasonably possible upon execution of this Agreement: Lancksweert shall deposit an amount equal to [ S /,35,000.00 ] in lawful United States currency, in an escrow account ("the Account" ), satisfactory to Lancksweert, such amounts to be released only upon written direction of Lancksweert after satisfaction of the conditions set forth in *Section 2* below.

2.      Upon deposit of the escrow amount and written notice to Daniels or a designated representative's verification of the escrow deposit, Daniels shall, within two days following such notice, deliver to a designated representative of Daniels, executed ownership documents of the subject automobile: to include, the Title, Power of Attorney, Letter of Authority, Lien Release and Bill of Sale, all of which have been reviewed by Lancksweert in advance (collectively, the "Transfer Documents",). In addition to the Transfer Documents, Daniels and Kleve shall provide a letter certifying that the release of the theft status of the subject automobile and the transfer of good and clear title and executed relevant documents for the benefit of Lancksweert, or to any other person or entity as Lancksweert may designate shall be valid and released to Lancksweert

PLAINTIFF'S
EXHIBIT

ALL STATE LEGAL®

Page 0[illegible] of 101

und satisfactory evidence that Lancksweert has deposited the full and complete amount and the reciept thereof, as previously herein indicated in *Section 1*. Simultaneously, upon release of the Transfer Documents to Lancksweert, the funds in the Account shall be released to Daniels, or designated representative. If Daniels fails to deliver the transfer documents and related documents, the funds held in escrow shall returned to Lancksweert immediately.

3.    (a). Kleve and Daniels represent and warrant, jointly and severally, that upon consumation of the transactions provided for above, Lancksweert, or any other person or entity that Lancksweert may designate, shall have good and clear title to, and hold all rights, title and interests in the subject automobile free and clear of any claims, liens or encumbrances.

(b). Daniels and Kleve represent and warrant, jointly and severally, that good and free title to the subject automobile shall be conveyed to Lancksweert free and clear of all liens, claims, charges and encumbrances of any kind or nature.

(c). Daniels and Kleve represent and warrant, jointly and severally, that there are no claims, litigation, actions, proceedings, hearings or other administrative or judicial matters pending or threatened, or third party concents required from any person or entity, which would in any way affect the ownership of the subject automobile.

4.    **Indemnification Obligations of Daniels and Kleve:**

Daniels and Kleve expressly agree, jointly and severally, to defend, indemnify and hold harmless Lancksweert and/or any other person or entity he may designate against and from (a) all claims, expenses or damages ( including attorney's fees and cost ) arising from or related to thier ownership, possession or control of the subject automobile, or (b) any breach by Daniels or Kleve of any representation or covenant contained herein.

5.    **Non Performance or Breach by Lancksweert:**

Lancksweert expressly agrees that he and/or any person or entity on whose behalf Lancksweert is acting, or any person or entity who is acting on behalf of Lancksweert, breaches or fails to remit the complete and full payment as stipulated herein to Daniels for the benefit of Kleve and Daniels, Kleve and Daniels withdrawl any agreements or representations, and shall reserve all rights to the subject automobile, as well as, any and all rights to pursue any necessary legal remedies and action.

6.    **Amendments/Confidentiality:**

This Agreement shall not be modified, amended or superseded except pursuant to an instrument in writing executed and delivered on behalf of each of the Parties hereto. The Parties to this Agreement expressly agree that any and all terms and conditions of this Agreement shall remain strictly confidential.

ELECTRONICALLY FILED 12/28/2016 11:42  /  ANJD  /  A 1605727  /  CONFIRMATION NUMBER 585016

7.   **Headings:**

The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning of interpretation of this Agreement.

8.   **Entire Agreement:**

This Agreement and the instruments to be delivered by the Parties pursuant to the provisions hereof constitute the entire agreement between the Parties and shall supersede any prior agreements, understandings, representations or communications between the Parties with respect to the subject matter hereof. The release and covenant not to sue for the benefit of all Parties and/or any other person or entity that may be designated shall be considered incorporated into the Agreement. This Agreement may be executed in counterparts.

9.   **New York Law**

This Agreement will be construed in accordance with and governed by the internal laws of the State of New York without reference to the conflicts of laws principals thereof.

SIGNED and AGREED:

**MARK DANIELS**

Acting Agent ( Attorney-in-Fact ) for Karl Kleve, and;
as corporate officer of National Search Services

Before me, the undersigned authority, on this day personally appeared MARK DANIELS known to me to be the person whose name is subscribed to the foregoing GIVEN UNDER MY HAND AND SEAL OF THIS 19 DAY OF _____ July _____ , 1999

Notary Public; in and for the State of ____ Florida ____

( SEAL )   Eric M Salani
My Commission CC837563
Expires May 17, 2003

**KARL KLEVE**

Before me, the undersigned authority, on this day personally appeared KARL KLEVE known to me to be the person whose name is subscribed to the foregoing GIVEN UNDER MY HAND AND SEAL OF THIS 16 DAY OF ____ July ____ , 1999

Notary Public; in and for the State of _____

DENISE M. SCHMIDT
Notary Public, State of Ohio
My Commission Expires Aug. 15, 2003

**PHILIPPE LANCKSWEERT**

Before me, the undersigned authority, on this day personally appeared PHILIPPE LANCKSWEERT known to me to be the person whose name is subscribed to the foregoing GIVEN UNDER MY HAND AND SEAL OF THIS 2 DAY OF ____ September ____ , 1999

Notary Public; in and for the State of ____ New York ____   ( SEAL )

YVONNE WILLIAMS
Notary Public, State of New York
No. 414780572
Qualified in Queens County
Commission Expires Nov. 30, 2000

*Page 058 of 101*

# Fiduciary Trust Company International

September 02, 1999

292497

1·792
230

PAY EXACTLY
Four hundred thousand and 00/100 Dollars

TO THE ORDER OF

KARL KLEVE AND MARK DANIELS

PAY

OFFICIAL CHECK

AUTHORIZED SIGNATURE

For Settlement of Ferrari # 0384 AM

⑈00292497⑈ ⑆0260079230⑆11 049⑈            ⑈0040000000⑈



PLAINTIFF'S
EXHIBIT

Page 059 of 401

## LIEN RELEASE

BY THIS LIEN RELEASE, Mark Daniels, both in his individual and representative capacity as the President and corporate officer of **National Search Services, Inc.,** 4521 PGA Blvd., Suite 253, Palm Beach Gardens, Florida 33418, together with all of his respective predecessors in interest, legal successors and assigns, agents, attorneys, representatives, and each of them, herein known as "Lien Holder", contingent and pursuant to the terms and conditions of a Settlement Agreement between Karl Kleve ( Kleve ), Mark Daniels (Daniels ) and Philippe Lancksweert ( Lancksweert ), for good and valuable consideration, the receipt of which is hereby acknowledged, does hereby release any lien, liability and encumbrance, and does hereby deliver unto Philippe Lancksweert ("Buyer"), its successors and assigns, good and marketable title to the Subject Vehicle ( as that term is defined in the Settlement Agreement ), free and clear of any and all liens, claims, liabilities or encumbrances of every kind and nature, to have and hold such Subject Vehicle unto Buyer its successors and assigns, to and for its or their use forever.

The Subject Vehicle being conveyed hereunder shall be as set forth and described on Schedule A attached hereto. This document is being executed in accordance with and is subject to the terms of the Settlement Agreement, entered into as of _September 2_, 1999, between Kleve, Daniels and Lancksweert.

IN WITNESS HEREOF, the undersigned has caused this document to be signed this _2nd_ Day of _September_, 1999.

By:    Mark Daniels

Attorney-in-Fact for Karl Kleve
President: National Search Services, Inc.

STATE OF _New York_
COUNTY OF _New York_

Before me, the undersigned authority, on this day personally appeared Mark Daniels known to me to be the person whose name is subscribed to the foregoing and being first duly sworn, declares that the statements contained herein are true and correct.

GIVEN UNDER MY HAND AND SEAL OF THIS _2_ DAY OF _September_, 199 _9_

Notary Public; in and for the State of _New York_

( SEAL )

YVONNE WILLIAMS
Notary Public, State of New York
No. 414780572
Qualified in Queens County
Commission Expires Nov. 30 19 _99_

_Yvonne Williams_
Printed Name of Notary

My Commission Expires: _11/30/99_

PLAINTIFF'S
EXHIBIT
M
ALL-STATE LEGAL®

*Page 066* 101

**<u>Schedule A</u>**

The description of the subject vehicle being conveyed to this Bill of Sale is:

FERRARI 375 PLUS  serial number 0384AM

ELECTRONICALLY FILED 12/28/2016 11:42  /  ANJD  /  A 1605727  /  CONFIRMATION NUMBER 585016



PLAINTIFF'S
EXHIBIT

Page 062 of 101  N

ERASURES AND ALTERATIONS VOID THIS TITLE ASSIGNMENT. (Type or print in ink.)

ASSIGNMENT OF OWNERSHIP

I (we) certify the vehicle or watercraft or outboard motor described in this title was transferred for the price of $ _____ to:

Transferee's/Buyer's printed name _____

Transferee's/buyer's printed address _____

ODOMETER CERTIFICATION

Federal and State laws require that you state the mileage in connection with transfer of ownership. Failure to complete or providing false information may result in fines and/or imprisonment.

I (we) certify to the best of my (our) knowledge that the odometer now reads [1] [4] [3] [4] [0] no (no tenths) miles and that the actual mileage of the vehicle unless one of the following statements is checked.

☐ The mileage stated is in excess of the mechanical limits.    ☐ The odometer reading is not the actual mileage. WARNING : ODOMETER DISCREPANCY

I (we) warrant the title to be free of all liens.

MACK DANIELS ATTORNEY-IN-FACT FOR KARL KLEVE
Transferor's/Seller's printed name                    Transferor's/Seller's signature

Transferor's/Seller's address _____

Sworn to and subscribed YVONNE WILLIAMS MARK DANIELS this 2nd day of SEPTEMBER 19 99

Notary Public, State of New York
No. 414780572
Qualified in Queens County
Commission Expires Nov 30 19 ___                    Yvonne Williams — Notary

TRANSFEREE'S/BUYER'S ACKNOWLEDGEMENT OF ABOVE ODOMETER CERTIFICATION

Transferee's/Buyer's printed name                    Transferee's/Buyer's signature

Warning to transferor and transferee (seller and buyer). You are required by law to state the true selling price. A false statement or failure to complete the assignment in violation of section 4549.42 of the Ohio Revised Code and is punishable by six months imprisonment and a fine of up to one thousand dollars, or both. All transferees are notified by the Department of Taxation. The seller and buyer must provide any information requested by the Department of Taxation. The buyer may be assessed any additional tax found to be due.

APPLICATION FOR CERTIFICATE OF TITLE (Type or Print in ink.) (You or seller be failure to apply for title within 30 days of assignment.)

Check type of application(s):  ☐ Motor Vehicle   ☐ Watercraft   ☐ Outboard Motor   ☐ Memorandum   ☐ Salvage

Applicant's printed name _____                    SSN/EIN _____

Applicant's address _____

Purchase Price $ _____ Dealer's Permit Number _____ Vendor's Number _____
Condition of vehicle or watercraft or outboard motor (check only one): ☐ Good  ☐ Fair  ☐ Poor  ☐ Wrecked

Tax exemption ☐ Yes   Reason _____                    Tax Paid $ _____
LIEN INFORMATION: If no lien, state "none". If more than one lien, attach statement of all additional liens.

Lienholder _____ Address _____

I (we) state that all information contained in this application is true and correct.

Applicant's signature _____

Sworn to and subscribed in my presence by _____ this _____ day of _____ 19 ___

My commission expires _____ 19 ___

(seal)    Clerk, Deputy Clerk, or County Notary

*Page 063 of 101*



# Green Township Police Department

## JAMES L. SUDER / CHIEF OF POLICE

6303 HARRISON AVENUE
CINCINNATI, OHIO 45247-6498

OFFICE: (513) 574-0007 • FAX: (513) 574-9919

September 2, 1999

National Search Services
Attn: Mr. Mark Daniels
4521 P.G.A. Blvd., Suite 253
Palm Beach Gardens, Florida 33418

|  |  |
|---|---|
| *RE:* | Karl Kleve – Ferrari Case |
| *Local Case #:* | GT89-239 |
| *N.C.I.C. #:* | V067936276 |
| *Vin #:* | 0384AM |

Dear Mr. Daniels:

Based upon the correspondence that you have previously provided and your FAX transmission of today, we have closed the Theft report we have on file and removed the stolen vehicle entry from N.C.I.C.

Please contact me if I can be of further assistance in the future.

Sincerely,

Bart W. West, Lt. Col.

BWW:bm

PLAINTIFF'S EXHIBIT

Page 64 of 101

09/02/99 THU 13:51 FAX 801 579 4500 FBI SALT LAKE @001

FD-448 (Rev. 2-16-95)



# FBI FACSIMILE
## COVERSHEET

**PRECEDENCE**
- ☐ Immediate
- ☐ Priority
- ☐ Routine

**CLASSIFICATION**
- ☐ Top Secret
- ☒ Secret
- ☐ Confidential
- ☐ Sensitive
- ☐ Unclassified

Time Transmitted: _____
Sender's Initials: _____
Number of Pages: 2
(including coversheet)

To: _Steven Greenspan, Esquire_          Date: 09/02/99
Name of Office

Facsimile Number: 1(212) 218-5520

Attn: _____
Name        Room        Telephone

From: _Salt Lake City_
Name of Office

Subject: _NCIC Check on VIN 0384AM_
_"Vehicle is not in NCIC"_

Special Handling Instructions: _____

Originator's Name: _Ken Cenh_          Telephone: (801) 579-4619

Originator's Facsimile Number: (801) 579-4500

Approved: _____

Brief Description of Communication Faxed: _____

ELECTRONICALLY FILED 12/28/2016 11:42 / ANJD / A 1605727 / CONFIRMATION NUMBER 585016

```
09/02/99  THU 15:41 FAX 801 575 4600      FBI SALT LAKE                    002
```

FROM NCIC  ON 09/02/99 AT 15:32:14
1L01UTPWWW203212032
UTFBISU00

NO RECORD VIN/0384AM

*This is the vin number submitted
to NCIC's stolen file.
As you can see there is no record.
This means that the car
is not currently reported stolen.*

*To Steven Greengan*

*Regards –
Ken Crook
09/02/99*



PLAINTIFF'S
EXHIBIT

ALL STATE LEGAL®

*Page 00069 of 101* P

# ENTERED

## PROBATE COURT OF HAMILTON COUNTY, OHIO JAN 15 2004
## JAMES CISSELL, JUDGE IMAGE No. 38

ESTATE OF Karl Kleve _____, DECEASED

CASE NO. ~~2004000210~~

## ENTRY APPOINTING FIDUCIARY- LETTERS OF AUTHORITY
### [For Executors and all Administrators]

Name and Title of Fiduciary Kristine Lawson    Administrator _____

On hearing in open Court the application of the above fiduciary for authority to administer decedent's estate, the Court finds that:

Decedent died [**check one of the following**] ☐ testate - ☒ intestate - *on* December 24, 2003 domiciled in Cincinnati, Ohio

[**Check one of the following**] ☐ Bond is dispensed with by the Will- ☐ Bond is dispensed with by law- ☒ Applicant has executed and filed an appropriate bond, which is approved by the Court; and

Applicant is a suitable and competent person to execute the trust.

The Court therefore appoints applicant as such fiduciary, with the power conferred by law to fully administer decedent's estate. This entry of appointment constitutes the fiduciary's letters of authority.

_1-15-04_
Date

James Cissell, Probate Judge

Christopher J. Skufca (#0063223)
Keating, Muething & Klekamp PLL
1400 Provident Tower
Cincinnati, OH 45202
513-579-6400

## CERTIFICATE OF APPOINTMENT AND INCUMBENCY

The above document is a true copy of the original kept by me as custodian of the records of this Court. It constitutes the appointment and letters of authority of the named fiduciary, who is qualified and acting in such capacity.

FILED
COURT COMMON PLEAS PROBATE DIV
J....

James Cissell, Probate Judge/Clerk

[Seal]

by_____

Date

FORM 4.5 - ENTRY APPOINTING FIDUCIARY: LETTERS OF AUTHORITY

07/01/77

PLAINTIFF'S EXHIBIT
ALL STATE LEGAL®

Page 06 of 101 R



**ENTERED**

OCT 2 7 2006

## PROBATE COURT OF HAMILTON COUNTY, OHIO
## JAMES CISSELL, JUDGE

IMAGE No. 12

ESTATE OF Karl Kleve

CASE NO. 2004000216

# APPLICATION FOR SALE/TRANSFER OF MOTOR VEHICLE

The undersigned, fiduciary of the estate, represents that (s)he is in possession of the following described motor vehicle belonging to the estate:

Year 1955    Body Type CN    Model G/P    Make Ferrari

Mfrs. Serial No. 0384AM    Cert. of Title No. 3105200139

Applicant states that the following person is entitled to such motor vehicle:

- ☐ by virtue of the Will;
- ☒ by the statute of descent and distribution;
- ☐ by family allowance;
- ☐ by purchase.

Applicant requests that the above described motor vehicle be transferred to.

Karyl Kleve, Kristine Lawson & Katrina English
Name

2887 Harrison Avenue
Address
Cincinnati, OH  45211

Necessary Consents (except for sales):

Applicant
Kristine A. Lawson        Administrator

# ENTRY AUTHORIZING SALE/TRANSFER OF MOTOR VEHICLE

The Court finds that the application is well taken and that the above transferee is entitled to such motor vehicle. It is therefore ordered that said fiduciary transfer said motor vehicle as prayed for.

Joseph P. Rouse (#0021800)
Keating, Muething & Klekamp PLL
One East Fourth Street, Suite 1400
Cincinnati, OH  45202
513-579-6400

James Cissell, Probate Judge

**Magistrate**

H.C. FORM 9.4 - APPLICATION AND ENTRY FOR SALE - TRANSFER OF MOTOR VEHICLE        02/10/03

PLAINTIFF'S EXHIBIT
ALL-STATE LEGAL®
Page 06  f 101   S

Probate Form 9.0

## PROBATE COURT OF HAMILTON COUNTY, OHIO
## JAMES CISSELL, JUDGE

ESTATE OF Karl Kleve _____, DECEASED

CASE NO. 2004000216 _____

# APPLICATION TO SELL PERSONAL PROPERTY
### [R.C. 2113.40, 2113.41, 2113.42, and 2113.43]

The fiduciary asks the Court to authorize sale of the personal property of the decedent listed on the within schedule, at a public or private sale, for a fixed price or for the best price obtainable, and for cash or on terms as the Court may determine.

The fiduciary states that the sale will be in the best interests of the estate, that none of the property listed is subject to a demand for distribution in kind made by the surviving spouse or other beneficiary entitled to such distribution, and that none of the property listed is subject to a wish expressed by the decedent in the Will that it not be sold. Further, none of the property listed is specifically bequeathed; or if some or all of the property is specifically bequeathed, as noted on the schedule, either its sale is necessary to pay debts, or the persons entitled to it consented to the sale.

The fiduciary further states that: **[Check the applicable boxes]**

☐ The sale is before the expiration of the time within which the surviving spouse may elect to take at the appraised value and ☐ the surviving spouse consents to such sale or waives notice thereof ☐ the surviving spouse does not consent to such sale, ☐ the property is not perishable and the surviving spouse is entitled to notice of the sale as provided by law.

☐ The fiduciary further states that: [Include any special allegations or information]

_____

_____

The fiduciary further states that for a public sale, notice will be given by advertisement appearing at least three times in a newspaper of general circulation in the county during a period of fifteen days next preceding such sale and/or by advertisement posted not less than fifteen days next preceding such sale in at least five public places in the township or municipal corporation where such sale is to take place.

_____
Fiduciary
Kristine A. Lawson

## CONSENT TO SALE AND WAIVER OF NOTICE

The undersigned, being the decedent's surviving spouse or other interested persons, hereby waive notice and consent to the sale as described herein.

| | |
|---|---|
| Surviving Spouse | **FILED** |
| None | COURT COMMON PLEAS PROBATE DI |
| | JAMES CISSELL |
| | 05 OCT -7 PM 1: 58 |

H.C. FORM 9.0 - APPLICATION TO SELL PERSONAL PROPERTY

PLAINTIFF'S EXHIBIT
ALL-STATE LEGAL®
101

Perfect Form 9.0

CASE NO. 2004000216

## SCHEDULE OF PERSONAL PROPERTY FOR SALE

| Item | Sale Method Public/Private | Price Fixed/Best | Payment Cash/Terms |
|---|---|---|---|
| Automobiles and auto parts described on Amended Inventory filed with this Court | Private | Best Price Obtainable | Cash |

Page 2 of 2                H.C. FORM 9.0 - APPLICATION TO SELL PERSONAL PROPERTY

**Page 070 of 101**

EXHIBIT D TO AMENDED INVENTORY
AND SCHEDULE OF ASSETS
ESTATE OF KARL KLEVE
CASE NO. 200400216

| | Description of Automobiles | Value |
|---|---|---|
| 1. | Ahrens Fox (1918) | $1,680.00 |
| 2. | Alfa Romeo (1950) | 650.00 |
| 3. | Chrysler Imperial (1931) | 7,200.00 |
| 4. | Ford Coupe (1934) | 1,040.00 |
| 5. | Franklin Sedan (1930) | 1,080.00 |
| 6. | Jaguar Coupe (1957) | 2,200.00 |
| 7. | Kleve Convertible (1947) | N/A |
| 8. | Kleve Convertible (1956) | N/A |
| 9. | Packard Hearse (1937) | 1,640.00 |
| 10. | Pierce Arrow Tour Sedan (1937) | 2,000.00 |
| 11. | Rolls-Royce Roadster (1923) | 4,800.00 |
| 12. | Rolls-Royce Convertible (1927) | 4,800.00 |
| 13. | Rolls-Royce Convertible (1929) | 4,800.00 |
| 14. | Rolls-Royce Convertible (1931) | 5,000.00 |
| 15. | Rolls-Royce Sedan (1934) | 5,000.00 |
| 16. | Rolls-Royce Sedan (1938) | 3,400.00 |
| 17. | Rolls-Royce Town Car (1939) | 3,400.00 |
| 18. | Daimler Convertible (1922) | 5,000.00 |
| 19. | Daimler Sedan (1937) | 2,000.00 |
| 20. | LaSalle (1937) | 880.00 |
| 21. | Cadillac 2-dr (1978) | 600.00 |
| 22. | Cadillac 2-dr (1972) | 640.00 |
| 23. | Cadillac 2-dr (1975) | 600.00 |
| 24. | Cadillac 2-dr (1976) | 640.00 |
| 25. | Cadillac 2-dr (1975) | 640.00 |
| 26. | Cadillac Limo/Ambulance | 640.00 |

ELECTRONICALLY FILED 12/28/2016 11:42  /  ANJD  /  A 1605727  /  CONFIRMATION NUMBER 585016

– 2 –

| | | | |
|---|---|---|---|
| 27. | Lincoln Continental 2-dr (1975) | | 580.00 |
| 28. | Lincoln Continental 2-dr (1977) | | 380.00 |
| 29. | Chevrolet Camaro (1977) | | 480.00 |
| 30. | Trotwood Trailer (1966) | | 0 |
| 31. | Miscellaneous Parts | | 25,000.00 |
| 32. | Boat | | 0 |
| | | TOTAL: | $86,770.00 |

I certify the above information to be complete and accurate to the best of my knowledge. These values were determined after reviewing *Old Cars Price Guide* and *Old Car Trader* valuation guides.

_Kristine A. Lawson_

Kristine A. Lawson, Administrator
Estate of Karl Kleve, Deceased

1391886.1

ELECTRONICALLY FILED 12/28/2016 11:42  /  ANJD  /  A 1605727  /  CONFIRMATION NUMBER 585016



### IN THE COURT OF COMMON PLEAS
### PROBATE DIVISION
### HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | : | |
| Estate of | ) | Case No. 2004000216 |
| | : | |
| KARL KLEVE, | ) | **CONSENT TO SALE OF** |
| | : | **PERSONAL PROPERTY** |
| deceased | ) | |

The undersigned, being a person interested in the estate of Karl Kleve, does hereby waive notice and consent to the sale of the decedent's personal property by Kristine A. Lawson, Administrator.

_Katrina English_
Katrina English

1509423_1

FILED
COURT COMMON PLEAS PROBATE DI
JAMES CISSELL, JUDGE

05 OCT -7 PM 1: 58

201.70



**PLAINTIFF'S EXHIBIT**
ALL-STATE LEGAL®

# IN THE COURT OF COMMON PLEAS
## PROBATE DIVISION
## HAMILTON COUNTY, OHIO

In the Matter of:                    )
                                     :
    Estate of                    )    Case No. 2004000216
                                     :
        KARL KLEVE,              )    **CONSENT TO SALE OF**
                                     :    **PERSONAL PROPERTY**
        deceased                 )

The undersigned, being a person interested in the estate of Karl Kleve, does hereby waive

notice and consent to the sale of the decedent's personal property by Kristine A. Lawson,

Administrator.

                          Karyl Kleve

1509423_1

FILED
COURT COMMON PLEAS PROBATE DI
JAMES CISSELL JUDGE

05 OCT -7 PM 1: 58

ELECTRONICALLY FILED 12/28/2016 11:42 / ANJD / A 1605727 / CONFIRMATION NUMBER 585016





ENTERED
OCT 07 2005
IMAGE NO. 148

## PROBATE COURT OF HAMILTON COUNTY, OHIO
## JAMES CISSELL, JUDGE

**ESTATE OF** <u>Karl Kleve</u> _____, **DECEASED**

**CASE NO.** <u>2004000216</u> _____

## ENTRY AUTHORIZING SALE OF PERSONAL PROPERTY

The Court finds that the sale of the personal property of the decedent as set forth in the application is not prohibited by law and will be in the best interests of the estate.

It is hereby ordered: **[Check the applicable boxes]**

☒ That the fiduciary is authorized to sell the personal property in accordance with the terms and conditions as set forth in the application.

☐ That the fiduciary is authorized to sell the personal property in accordance with the terms and conditions as set forth in the application, except as follows: _____

_____

_____

**[Check if applicable]** - ☐ The time has not expired within which the surviving spouse may elect to purchase personal property at its appraised value; the surviving spouse has not consented to the sale, and the property is not perishable. It is therefore ordered that the fiduciary serve at least ten days notice of the sale upon the surviving spouse, as provided by law.

_____
Date

_____
James Cissell, Probate Judge

_____
Joseph P. Rouse (#0021800)
Keating, Muething & Klekamp PLL
1400 Provident Tower
Cincinnati, OH  45202
513-579-6400

_____
Magistrate

FILED
COURT COMMON PLEAS PROBATE DI
JAMES CISSELL, JUDGE

05 OCT -7  PM 1: 58

FORM 9.1 - ENTRY AUTHORIZING SALE OF PERSONAL PROPERTY

10/01/98

ELECTRONICALLY FILED 12/28/2016 11:42  /  ANJD  /  A 1605727  /  CONFIRMATION NUMBER 585016





**NEWS AT KRUSE INTERNATIONAL**

**FOR IMMEDIATE RELEASE**      Kruse International 800-968-4444
1-260-927-0717 Fax

Michelle Kuhlhorst
Public Relations Director
PO Box 190
Auburn, IN 46706
PH: 260-920-1692
Fax: 260-925-5467
Michelle.k@kruse.com

## Kruse International to Auction the Estate of Karl Kleve

August 15, 2005

*Immediate Release*

**Greater Cincinnati, OH –** On Monday, **August 29th**, at 10am Kruse International will auction the **2,000 item estate of Karl Kleve, all at No Reserve**, in Cleves, Ohio.

For almost 70 years, Karl Kleve designed, built, and collected over 400 cars. He designed and built 24 Kleve Supercars, and collected some 400 more cars including Cadillacs, Rolls-Royces, Lincolns, and an occasional Bugatti and Duesenberg. The cars have been stored outside and are in various states of dis-repair with several still in restorable condition.

In December of 2003, Karl Kleve passed away at the age of 90. Now, the

PLAINTIFF'S EXHIBIT

ALLSTATE LEGAL

V

remnants of his eclectic collection will all be auctioned to the highest bidder.

## Some of the items include:

» Extremely rare 1933 Chrysler Imperial Dual Windshield Phaeton

» Two Duesenberg Long Wheel Base Frames

» Original Duesenberg J-102 Engine – nearly complete

» Many other Duesenberg parts, block, bell housing, and more

» Set of Duesenberg 19" Wheels

» Two Original Buggati Engines, one for a Royale and one for a Type 46

» Front-end for a Buggati Type 46

» Bugatti Radiator

» Four Packard 8 cyl Engines

» Cadillac V-16, V-12, and V-8 Engines

» Cord 810/812 hood and fenders

» Plus **over 30 vehicles** including the following marks: Rolls-Royce, Packard, Chrysler, Kleve, Cadillac, Ahrens Fox, Jaguar, LaSalle, Lincoln and more.


Don't miss this opportunity to celebrate the life of this truly remarkable man.  Call Kruse International at 800-968-4444 for more information.  For an updated parts list, visit www.kruse.com.

ELECTRONICALLY FILED 12/28/2016 11:42  /  ANJD  /  A 1605727  /  CONFIRMATION NUMBER 585016

Case 19-10309-EPK    Doc 246    Filed 01/02/20    Page 190 of 401

← **Back**

About    News    ▮

⚷ SITE HELP    ✉ MAILING LIST

Copyright © 2001-2009 Kruse International
Send mail to info@kruse.com with questions or comments.
Kruse International • 5540 County Rd 11A, Auburn, IN 46706 • 800-968-4444

https://www.kruseinternational.com/news/2005_0815_Kleve_pr.asp    1/21/2010

ELECTRONICALLY FILED 12/28/2016 11:42  /  ANJD  /  A 1605727  /  CONFIRMATION NUMBER 585016

**BRUCE L. WHITMER**
ATTORNEY AT LAW

SUITE 155, EAST TOWER
ATLANTA FINANCIAL CENTER
3343 PEACHTREE ROAD, N.E.
ATLANTA, GEORGIA 30326

Phone (404) 231-3000 Fax (404) 231-9974
E-mail: bruce@brucewhitmer.com

August 3, 2005

Ms. Kristine A. Lawson, Administrator
Estate of Karl Kleve, Deceased
2887 Harrison Avenue
Cincinnati, OH 45202

Dear Ms. Lawson:

    I represent the owner of Ferrari 375 Plus, Chassis number 0384AM. It has come to our attention that your father's estate has advertised that it intends to offer for public auction some parts for a Ferrari 375 on August 29, 2005. Your father sold this automobile to my client and my client paid your father's duly authorized agent for this car in 1999, to include all of its parts. In case you do not have these documents, I am enclosing a copy of a "Limited Power of Attorney," dated August 18, 1999, naming Mark Daniels as your father's Attorney-in-Fact to deal with the automobile (one of many such documents signed by Mr. Kleve appointing or confirming Mr. Daniels as his agent); a copy of a "Settlement Agreement," dated September 2, 1999 which describes the details and obligations surrounding the sale and purchase of the automobile; a copy of a "Bill of Sale," dated September 2, 1999, signed by Mr. Daniels as your father's Attorney-in-Fact; a copy of an "Agreement Release of Theft Status," dated September 2, 1999, signed by Mr. Daniels as your father's Attorney-in-Fact; a copy of a "General Release and Covenant Not to Sue from Karl Kleve," dated September 2, 1999, signed by Mr. Daniels as your father's Attorney-in-Fact; and a copy of the front and back of a check in the amount of $400,000.00, payable to Karl Kleve and Mark Daniels, and endorsed by "Karl Kleve by Mark Daniels POA" and by "Mark Daniels," showing payment in full of the amount due your father under the Settlement Agreement.

    We respectfully request to know when and where we may collect the remainder of the parts belonging to my client's automobile so as not to interfere with the orderly conduct of the auction. Please let me know if you have any questions.

Sincerely yours,

Bruce L. Whitmer

BLW/cbd
Enclosures

Cc: Christopher K. Skufca, Attorney At Law

PLAINTIFF'S
EXHIBIT

Page 0139 of 101

24/7 Search and Technical Assistance 1-866-277-8407

Main Menu | My Account | Print | Contact Us | Log Out

| People | Businesses | Assets | Licenses | Phones | Courts |

| Last Name | First Name | Middle Name | Company Name |

Street Address    City    State    Zip    SSN

Reference Code:
pa187/100001

VIN    Tag Number    License Number    (Florida Only)
0384AM

Phonetic Search: ☐

Output Type: ⦿ Formatted HTML    ◯ Cut and Paste / Printer Friendly Text (No Reports)

**Important:** The Public Records and commercially available data sources used in this system have errors. Data is sometimes entered poorly, processed incorrectly and is generally not free from defect. This system should not be relied upon as definitively accurate. Before relying on any data this system supplies, it should be independently verified. For Secretary of State documents, the following data is for information purposes only and is not an official record. Certified copies may be obtained from that individual state's Department of State.

Accurint does not constitute a "consumer report" as that term is defined in the federal Fair Credit Reporting Act, 15 USC 1681 et seq. (FCRA). Accordingly, Accurint may not be used in whole or in part as a factor in determining eligibility for credit, insurance, employment or another permissible purpose under the FCRA.

**Note:** Not all of the information contained in these search results is derived from governmental agencies. Some information may have been enhanced by additional sources.

**Search completed**                                    **Records: 1 to 2 of 2**

SEARCH: VIN Number: 0384AM                              Edit Search | New Search

Export to Excel    Icon Legend        Click Icons Below To Run a Report

All    Vehicle Information

Description: 1955 - CONVERTIBLE    VIN: 0384AM
State of Origin: OHIO
Owner(s):
  Name: KRISTINE A LAWSON    Title Number: 3105234917
  Potential SSN ⓘ: 293-62-xxxx    Title Issue Date: 11/30/2006
  Address: 2887 HARRISON AVE, CINCINNATI OH 45211-7197

Description: 1955 - CONVERTIBLE  —    VIN: 0384AM
State of Origin: OHIO
Owner(s):
  Name: KARL KLEVE
  Address: 3077 JADARO CT, CINCINNATI OH 45248-4903    Title Number: 3105200139
    Title Issue Date: 10/18/2006

SEARCH: VIN Number: 0384AM                              Edit Search | New Search
Your DPPA Permissible Use: Civil, Criminal, Administrative or Arbitral Proceedings
Your GLBA Permissible Use: Persons Holding a Legal or Beneficial Interest Relating to the Consumer

https://secure.accurint.com/app/bps/main

PLAINTIFF'S EXHIBIT
ALL STATE LEGAL®
Page 030 of 101

**COURT OF COMMON PLEAS**
**HAMILTON COUNTY, OHIO**

DAVID CLARK, et al.                    :        **CASE NO. A 1605727**
    **Plaintiffs,**                      :
                                     :        **Judge Heekin**
**v.**                                 :
                                     :
**JOSEPH FORD, III, et al.**           :
                                     :        <u>**AFFIDAVIT OF JOSEPH FORD III**</u>
    **Defendants.**                     :
                                     :

      Comes now Joseph Ford, III, being duly sworn and over the age of 18, and competent to testify in the matters set forth herein, swears and deposes as follows, based on personal information and belief:

1. My name is Joseph Ford III. I am a Defendant in Case No. A 1605727. Joseph Ford IV and Justin Ford are my sons.

2. After Mr. Clark told me that about a stolen Ferrari he tried to recover in which the possessor had filed a lawsuit against Ms. Lawson, the theft victim's heir, I stated my concerns in my very first email to David Clark dated February 21, 2010 8:22:30 PM:

      "I do not think Ms. Lawson et.al. has a moment to waste in developing the legal approach, and THEN assembling the correct Ohio based legal talent for the Ohio portion . . . After receipt and review of the files, I can make my suggestions about whether and how I propose to be involved. Under no circumstance should Ms. Lawson not hire an Ohio attorney and answer on time, even if as a request for more time to answer."  [EXHIBIT A (attached)]

3. On or about the day after Ms. Lawson and I reached an agreement, she hired Ohio attorney Deepak Desai of Santen-Hughes to represent her 30% interest in case A1001370. In the

Page <strong>1</strong> of <strong>3</strong>


**EXHIBIT**
M,

months and years afterwards and representing Ms. Lawson's 30% interest were Ohio attorneys Dan Randolph and Janaya Trotter of Ritter Randolph, then Herbert Haas, and then Timothy Smith. As to my Ohio attorneys representing my 70% interest, I had Joseph Parker and Dominic Gerace of Taft, Stettinus, and Holister, then Bruce Whitman of Whitman Law, then I joined with Ms. Lawson who allowed Herb Haas to add me and Mr. Gardner as his clients (3 total), then I appeared pro se, then I hired Rick Rinear and Ed Collins of Droder Miller.

4.  Except for two brief meetings, once in March 2010 and once in March 2011, I had no communications with Ms. Katrina English nor Ms.Karyl Kleve. I only communicated, mostly by email and telephone, with Ms. Lawson, and on occasion, with Mr. Lawson as a relay.

5.  I did not prepare nor file any documents in any legal proceeding on which I represented myself as a licensed attorney.

6.  The London court is the only court in any jurisdiction that has ruled on the ownership of the Ferrari and parts located in Ohio. In its 53pp October 11, 2015 Decision the London court ruled Ms. Florence Swaters of Belgium owned both the Ferrari and the Ohio Parts. There has been no successful appeal of this ruling.

7.  I objected to Bonhams selling the Ferrari before, during, and after the Heads of Agreement contract.

8.  I was the only Ford Defendant in this case that received money from the settlement of the

2

London litigation about what the London court ruled was *Swaters'* Ferrari. That April 17,

2016 Global Settlement required that I and other involved parties dismiss with prejudice all

of our Ohio and Florida litigation, as specified on page 3, which we did. [Exhibit B

attached.]


FURTHER AFFIANT SAYETH NAUGHT

STATE OF _____ *FL* _____

COUNTY OF _____ *Palm Beach* _____

  Sworn to and subscribed in my presence by the said Joseph Ford, III on this ___*6*___ day

of ___*June*___, 2018.

Notary Public

Commission Expires: ___*5/17/2021*___

WILLIAM ALEXANDER BOWLES, I
MY COMMISSION # GG 105739
EXPIRES: May 17, 2021
Bonded Thru Notary Public Underwriters

3

**GATLIN VOELKER**
**A Professional Limited Liability Company**

**Kristi Lawson**

| | |
|---|---|
| **From:** | <DavidC876@aol.com> |
| **To:** | <K-Lawson@cinci.RR.Com> |
| **Sent:** | Sunday, February 21, 2010 12:10 PM |
| **Subject:** | Fwd: Kristine Lawson Next Move re; Fer #0384 |

From: fordlogic@gmail.com
To: Davidc876@aol.com
Sent: 2/20/2010 8:22:30 P.M. Pacific Standard Time
Subj: Kristine Lawson Next Move re; Fer #0384

Dave

Read up on the subject. Got pics of what arrived at Jacque Swaters place, and the new phony VIN plate.

Tactical errors have been made in the past, and may repeat without an aggressive, car savy gameplan with dispassionate decision makers in the driver's seat. Based on our talk today, and what I found in local papers, tactical errors are already at play for this very case.

The decision maker must be prepared to follow rational advice, and put this matter in the hands of talent, not friends,
not other car nuts, not bounty hunters, not sympathizers, but talent that can assess, synthesize, mobilize, and play.

The opponents have chosen the field, and put the first players on that field. They are well capitalized and well respected.

Let me repeat. They are well capitalized and well respected.

I do not think Ms. Lawson et. al. has a moment to waste in developing the legal approach, and THEN assembling the correct Ohio based legal talent for the Ohio portion.

The very first thing is to send me a copy of the recent court filing (complete), a copy of earlier court docs, prior
attorney names and contact info, investigator reports, police reports, police conclusions, etc. Absolutely everything. Don't wait until all is gathered,
send a copy of what she has immediately. A 1/2" thick legal document can take days to truly and fully assess.

I would like to know what is left of 0384 (what docs, hist docs, parts, etc), who owns (name, address, teles, emails), and who
is the authorized decision maker for that entity. If there are several persons, then I need to have them sign off and appoint a single
one. If any have unrealistic expectations, or dilly dally with decisions, then it will harm and hobble the effort.

After receipt and review of files, I can make my suggestions about whether and how I propose to be involved.

Under no circumstance should Ms. Lawson not hire an Ohio attorney and anwser on time, even if as a request
for more time to answer. The best case is to have hired the right Ohio attorney after the above has

**Exhibit  A**

12/12/2016

occurred.

You may show this direct to Ms. Lawson as I want the purest path for communications.

Joe
Cell: 954.675.8445

_____ Information from ESET NOD32 Antivirus, version of virus signature database 4887 (20100222) _____

The message was checked by ESET NOD32 Antivirus.

http://www.eset.com

Dated _____ 2016


(1)     **BONHAMS 1793 LIMITED**

**- and -**

(2)     **MS KRISTINE KLEVE LAWSON**

**- and -**

(3)     **MR JOSEPH FORD III**

**- and -**

(4)     **MR CHRISTOPHER GARDNER**

**- and -**

(5)     **MS FLORENCE SWATERS**

**- and -**

(6)     **COPLEY MOTORCARS CORPORATION**

**- and –**

(7)     **MR LESLIE WEXNER**

---

**SETTLEMENT DEED**

---

Mishcon de Reya LLP
Africa House
70 Kingsway
London WC2B 6AH
JLL/AG/40750.2

# Exhibit B

**THIS DEED (collectively with all its schedules, hereinafter the "Deed")**

**DATED 17 APRIL 2016**

**BETWEEN**:

(1) **BONHAMS 1793 LIMITED**, a private limited company registered in England and Wales with registration number 04326560 and registered office Montpelier Galleries, Montpelier Street, London SW7 1HH ("**Bonhams**");

(2) **MS KRISTINE KLEVE LAWSON** of 2887 Harrison Avenue, Cincinnati, OH 45211, USA ("**Ms Lawson**");

(3) **MR JOSEPH L FORD III** of 7630 Lago Del Mar Drive #7, Boca Raton, FL 33433, USA ("**Mr Ford**");

(4) **MR CHRISTOPHER GARDNER** of 13 Route Du Chateau, 1185 Mont-sur-Rolle, Vaud, Switzerland ("**Mr Gardner**");

(5) **MS FLORENCE SWATERS** of Finca Maria de la Luz, Urbanizacion Rancho de la Luz, 29650 Midas (Malaga), Spain  ("**Ms Swaters**");

(6) **COPLEY MOTORCARS CORPORATION**, a corporation registered in the Commonwealth of Massachusetts with registration number 043485347 and registered address 37 Chestnut Street, Needham, MA 02492, USA ("**Copley**"); and

(7) **MR LESLIE WEXNER** of 1 Whitebarn Road, New Albany, OH 43054, USA ("**Mr Wexner**" and, together with Copley and the Property Trust, the "**Buyers**").

(together the "**Parties**" and each individually a "**Party**".)

**RECITALS**

(A)    Certain issues have arisen between the Parties in relation to the sale and purchase of the Ferrari (as defined below), the legal ownership of the Ferrari at the time of the Auction (as defined below), and claims by various parties regarding their ownership of the Ferrari.

(B)    In order to achieve full and final settlement of the Claims (as defined below), the Parties have agreed to settle the Claims, subject to the terms set out below , in accordance with the terms and conditions set out in this Deed.

1

**IT IS AGREED:**

1.      Definitions and Interpretation

1.1     In this Deed unless the context requires otherwise, the following definitions have the following meanings:

| | |
|---|---|
| **Auction** | means the auction The Goodwood Festival of Speed Sale, Collector's Motor Cars and Automobilia, Chichester, Sussex (sale no. 21906), held by Bonhams on 27 June 2014. |
| **Claims** | means any claim of any nature in anyway related to the Ferrari including without limitation any Encumbrance and any claim asserted, or which could have been asserted in Claim no. CL-2016-000105, Claim no. CL-2014-000358, Claim no. CL-2014-000258, and Claim no. CL-2014-000937. |
| **Consignors** | means (without any Party's admissions as to title to, or ownership of, the Ferrari, in whole or part, at that time or at any time) the parties that consigned the Ferrari to Bonhams for sale at the Auction, namely Mr Gardner and Ms Swaters.  "Consignors" herein excludes Ms Lawson and Mr Ford. |
| **Encumbrance** | means any mortgage, charge, pledge, lien, hypothecation, guarantee, trust, right of set-off or other third party right or interest (legal or equitable) including any assignment by way of security, reservation of title or other interest of any kind, howsoever created or arising, or any other agreement or arrangement (including any sale and repurchase agreement having similar effect) or any liability, charge or lien in respect of any form of tax, duty or tariff in favour of any tax authority or customs authority which exists or could arise as a consequence of any act, event or omission occurring on or before transfer of title in the Ferrari to the Buyers, pursuant to this Deed or as a consequence of transfer of title in the Ferrari to the Buyers in accordance with the terms and conditions of this Deed. |
| **Ferrari** | means the 1954 Ferrari 4.9-Litre 375-Plus Sports Racing Two-Seat Spider Competizione (chassis number 0384, engine number 0384), advertised and sold as Lot 320 at the Auction and comprising all the parts of Lot 320. |
| **Ohio Contingent** | means, collectively, Ms Lawson, Mr Ford and Mr Gardner. |
| **Ohio Proceedings** | means all rights, claims, counterclaims, defences, rights of appeal, Motions, depositions, procedures, Motions for contempt, Motions for |

an injunction prohibiting litigating Ohio issues in England, claims for costs and the like in any way related to the Ferrari that are currently being pursued in the United States and/or that could have been served and pursued, including but not limited to:

- Claim No. A1001370 – Florence Swaters v Kristine Kleve Lawson, Joseph L Ford III and Christopher Gardner;
- Claim No. A14 04305 – Kristine Kleve Lawson v Florence Swaters
- Claim No. A13 06451 – Gardner v Ford
- Claim No. C1500018 – Gardner v Joseph L. Ford III
- Claim No. C1400762 – Gardner v Joseph L. Ford III
- Case: 2:16-CV-00058 – Gardner v Anderson and Hollinger
- And for the avoidance of doubt, the Florida Proceedings in Case No 50 2015 CA 013920

**Florida Proceedings**   Claim 50 2015 CA0 13920 – Joseph L Ford III v Gardner

**Property Trust**   means the Trustees of the 1990 Family Property Trust A, Leslie H. Wexner Grantor.

**US Proceedings**   means any currently commenced legal proceedings in United States in any way related to the Ferrari as between Ms Lawson and/or Mr Ford on the one hand and Mr Gardner on the other hand including, in particular, in the Ohio Proceedings case A1306451 (including appeals) between Ms Lawson and/or Mr Ford on the one hand and Mr Gardner on the other hand and the Florida arbitration proceedings between Mr Ford and Mr Gardner or proceedings related thereto and the Ohio Proceedings as set out at the definition of the Ohio Proceedings. For the avoidance of doubt, the Florida Arbitration Decision between Mr Gardner and Ford insofar as it does not specifically relate to the Ferrari shall remain in full force and effect

1.2   The headings in this Deed are for ease of reference only and do not affect the interpretation of this Deed.

1.3   References to a "Clause" are to a clause of this Deed.

1.4   General words are not to be given a restrictive meaning because they are preceded or followed by words indicating a particular class of acts, matters or things.

1.5   Unless otherwise specified, references to any gender include the other gender, references to the singular include the plural, and references to the plural include the singular.

3

2.    **EXECUTION OF SETTLEMENT DOCUMENTS AND INITIAL DELIVERY OF PAYMENTS**

2.1    The Parties agree to execution and delivery of the following settlement documents and delivery of the initial payments:

    2.1.1    The Buyers, Bonhams, Ms Swaters, Mr Gardner, Mr Ford, and Ms Lawson shall execute the consent order as shown at Schedule 1. In the case of Ms Lawson, the consent order at Schedule 1 shall be executed in the presence of a notary appointed by the Buyers.

    2.1.2    Mr Ford and Ms Lawson shall execute the documents exhibited at Schedules 2 - 4.

    2.1.3    Ms Swaters, Mr Gardner, Mr Ford and Ms Lawson shall execute the documents exhibited at Schedule 5.

    2.1.4    Mr Gardner, Mr Ford and Ms Lawson shall execute the documents exhibited at Schedule 6 and Mr Ford shall obtain the consent of his two sons who are defendants to the Stipulation of Dismissal with Prejudice.

    2.1.5    Each party shall deliver the executed original documents required by Clauses 2.1.1 to 2.1.4 above to counsel for Mr Wexner except that Ms Lawson shall send by email to James.Libson@Mishcon.com a copy of each of the documents that she has executed in accordance with Clauses 2.1.1 to 2.1.4 above. She shall also send the originals by registered post to James Libson, Mishcon de Reya LLP, Mishcon de Reya LLP, Africa House, 70 Kingsway London WC2B 6AH.

    2.1.6    Bonhams shall pay an amount agreed by separate agreement with Mishcon de Reya LLP on behalf of Mr Wexner and Copley to the client account of Mishcon de Reya LLP, the details of which are as follows:

        National Westminster Bank Plc
        214 High Holborn
        London WC1V 7BX
        Client Account:  36933112
        Sort Code:      60 30 06
        REF:            40750.1

    2.1.7    Bonhams shall pay an amount agreed by separate agreement with Mr Ford and Ms Lawson to the client account of Mishcon de Reya LLP, the details of which are as follows:

        National Westminster Bank Plc
        214 High Holborn
        London WC1V 7BX

4

Client Account: 36933112
Sort Code:      60 30 06
REF:            40750.1

Upon entry by the appropriate courts of each of Schedules 1 and 5 and upon issuance of an Ohio certificate of title in the name of the Property Trust, free and clear of any and all Claims and Encumbrances, the funds deposited pursuant to this Clause 2.1.7 shall be released to the US based joint account of Mr Ford and Ms Lawson at PNC Bank, ABA 267-084-199, Acct # 1207766315.

2.1.8    Bonhams, Mr Gardner, Ms Swaters, Ms Lawson and Mr Ford hereby deliver the Ferrari to the Property Trust free of all Claims and Encumbrances, with full legal and beneficial title.

2.1.9    Mr Ford, Ms Lawson and Mr Gardner agree to take, and shall take, all steps requested by counsel for Mr Wexner to procure the removal of any hold on title or any other impediment to the Property Trust obtaining an Ohio certificate of title to the Ferrari from the Ohio Bureau of Motor Vehicles.

2.1.10   Mr Ford and Ms Lawson hereby transfer sole and exclusive title and registration to the Ferrari to the Property Trust on the records of the Ohio Bureau of Motor Vehicles and agree to execute the assignment on the existing certificate of title (No. 31 0670 8040; issue date 05/08/2012; sealed by Tracy Winkler, clerk of the Courts on 8 May 2012) in the joint name of Mr Ford and Ms Lawson.

3.    **SETTLEMENT OF CLAIMS**

3.1    Upon completion of the conditions set out in Clause 2 above this Clause 3 shall become effective.

3.2    The Buyers withdraw their notice of rescission, terminate their actions to obtain rescission and shall accept delivery of the Ferrari.

3.3    Bonhams, on its own behalf and on behalf of its parent company, subsidiaries, assignees, transferees, representatives, principals, officers and directors, and Ms Swaters, Mr Gardner, Mr Ford and Ms Lawson each individually release, waive and discharge any claim, right or interest of any nature whatsoever to or in the Ferrari that they have or may have in any jurisdiction, whether known or unknown to all Parties or known to one or more and concealed from (or otherwise unknown by) any other Party, and hereby assign or transfer the same to the Property Trust and further undertake to take any and all such further steps in their power as may be necessary to effect such assignment or transfer.

3.4    Except in respect of any breach of contract claim that any Buyers may hereafter have against any other Party for breach of any of the provisions of this Deed, this Deed is

5

made in full and final settlement of (and each Party hereby releases and forever discharges) any and all claims, actions, rights, demands and set-offs (whether in this jurisdiction or any other), whether or not presently known to all the Parties (or known to one or more and concealed from (or otherwise unknown by) any other Party), or to the law (and whether in law or equity) which each Party, on its behalf and on behalf of its parent company, subsidiaries, assignees, transferees, representatives, principals, officers and directors or any of them have, has, had or may have (or hereafter can, shall or may have) against the Property Trust, any other Party and/or any other Party's parent company, subsidiaries, assignees, transferees, representatives, principals, officers and/or directors arising out of or connected with the Claims and/or the underlying facts relating to the Claims.

3.5    A judgment shall be entered by the English Court in the form of the Order exhibited at Schedule 1 terminating all claims currently before the London Commercial Court between the Parties (namely: in Claim no. CL-2016-000105, Claim no. CL-2014-000358, Claim no. CL-2014-000258, and Claim no. CL-2014-000937) relating to the Ferrari and evidencing the Buyers' good title to the Ferrari.

3.6    The Parties agree and undertake that they shall do all acts and things in their power and execute, acknowledge and deliver all such deeds, instruments or documents as may be required by the Buyers to carry out the assignment of title to the Property Trust as contemplated by this Deed, the entry of the Consent Final Judgment attached as Schedule 5, the entry of the attached Schedules 6 and 7, and the issuance of an Ohio certificate of title in the name of the Property Trust, including without limitations each of the actions specified in Clause 2.

3.7    This Deed shall be deemed to be without prejudice and subject to contract until such time as it is signed and dated by the Parties, when it shall be treated as an open document evidencing a binding agreement.

3.8    Except in respect of any breach of contract claims any Buyer may hereafter have against any other Party for breach of any provision of this Deed, Bonhams, on its own behalf and on behalf of its parent company, subsidiaries, assignees, transferees, representatives, principals, officers and directors, Copley, Mr. Wexner, Ms Swaters, Mr Gardner, Ms Lawson and Mr Ford, all jointly and severally, agree not to sue, commence, voluntarily aid in any way, prosecute or cause to be commenced or prosecuted against each other Party any claim, action, suit or other proceeding concerning the Claims, in this jurisdiction or in any other.

3.9    Ms Swaters, Mr Gardner, Mr Ford and Ms Lawson each individually release, waive and discharge any claim against Bonhams and against each other for any part of the proceeds of sale of the Car at the Auction in consideration of the payments referred to in Clause 4 and for the avoidance of doubt, such release, waiver and discharge includes any sums due or otherwise payable under the Florida Arbitration Award, save that such award shall remain in full force insofar as it does not specifically relate to the Ferrari.

6

3.10   For the avoidance of doubt, the Ohio Contingent expressly releases each and every claim in any jurisdiction that they may have or may exist in relation to Ms Swaters.

4.   **PAYMENT OUT OF THE PROCEEDS OF SALE OF THE FERRARI**

Upon the fulfilment of their obligations pursuant to Clauses 2 and 3, the sums separately agreed and documented as between Bonhams and each of Ms Swaters and Mr Gardner shall be paid from the proceeds of sale of the Ferrari at Auction as soon as possible, in each case to such bank account as is advised to Bonhams in writing. The above payments shall be made in full without any deduction, set off, claim, counterclaim, attachment or the like by Bonhams or by any other Party.

5.   **THE UNITED STATES PROCEEDINGS**

5.1   In addition to the settlement of the Claims as set out in this Agreement, this Agreement fully and finally settles the Ohio Proceedings and the US Proceedings, including any right of appeal, claim for a contribution, claim to legal costs or the like as between each of the Parties.

5.2   Judgment shall be entered in the courts of Hamilton County, Ohio, in the form of the Orders exhibited at Schedules 5 and 6, terminating all claims currently before the courts of Hamilton County between the Parties relating to the Ferrari.

5.3   Judgment shall be entered in the court of Palm Beach County, Florida, in the form of the Order exhibited at Schedule 7 terminating the claim currently before that court.

6.   **NO ADMISSION**

This Deed is entered into in connection with the settlement of the Claims on the terms set out in this Deed.  It is not, and shall not be represented or construed by the Parties as an admission of liability or wrongdoing on the part of any Party to this Deed or any other person or entity.

7.   **POWER AND AUTHORITY**

7.1   Save as the transactions between Ms Lawson, Mr Ford and Mr Gardener (and only between them) disclosed previously and the assignment of the Ferrari by Copley and Mr Wexner to the Property Trust, each Party warrants and represents to the other that it has not sold, assigned, transferred or otherwise disposed of any of its interests in the Ferrari or any of the Claims, actions, rights and/or demands referred to in this Deed.

7.2   For the avoidance of doubt, Ms Lawson warrants that Ms Lawson, Mr Ford and Mr Gardner have the sole and exclusive ownership of, and interest in, any claim the estate of Karl Kleve may have ever had relating in any way to the Ferrari and no other member of the Kleve family including but not limited to Ray Lawson, Karyl Kleve and Katrina English has any ownership interest in, or claim in any way related to, the Ferrari.

7

7.3 Each Party warrants and represents to the other with respect to itself that it has the full right, power and authority to execute, deliver and perform this Deed and to carry out all commitments and actions contemplated by this Deed.

## 8. GENERAL

8.1 This Deed constitutes the entire agreement between the Parties relating to the subject matter contemplated herein and replaces or supersedes any and all prior oral or written communications related to same.

8.2 Each Party acknowledges that, in entering into this Deed, it does not rely wholly or partly on any statement, representation, assurance or warranty of any person made by or on behalf of the other Party (whether orally or in writing) other than as expressly set out in this Deed.

8.3 This Deed may not be varied except in writing signed by each Party.

8.4 The failure of any Party to exercise or enforce a right under this Deed shall not be deemed to be a waiver of that right, nor operate to bar the exercise or enforcement of it.

8.5 The Parties agree that the terms of this Deed run for the benefit of, and are enforceable by, the Property Trust but are not otherwise enforceable by any third Party under the Contracts (Rights of Third Parties) Act 1999.

8.6 This Deed and its Schedules may be signed in any number of counterparts, each of which, when executed and delivered, shall be an original and all of which together shall constitute the same Deed. Faxed signatures shall be deemed the same as original signatures and shall be considered legal and binding for the purposes of this Deed and its Schedules.

8.7 Each Party represents and agrees that it has had the opportunity to seek and has sought from a legal advisor any such advice as it deems appropriate with respect to signing this Agreement or the meaning of it. Each Party has undertaken such independent investigation and evaluation as it deems appropriate and is entering into this Agreement in reliance on that and not in reliance on any advice, disclosure, representation or information provided by or expected from any other Party or Party's legal advisor. This is an agreement of settlement and compromise, made in recognition that the Parties may have different, disputed or incorrect understandings, information and contentions, as to facts and law, and with each Party compromising and settling any potential correctness or incorrectness of its understandings, information and contentions as to the facts, law, claims, duties, disclosures and conduct occurring before or during the entry into this Agreement. No conduct, failure, misunderstanding or misinformation and no claim of duress, fraud or fraudulent inducement occurring prior

8

to or in connection with the execution hereof shall be a ground for rescission hereof or for recovery of damages.

9. **GOVERNING LAW AND JURISDICTION**

9.1　This Deed, and any non-contractual obligations arising out of or in connection with it, or concerning the carrying into effect of it, will be governed by, and construed in accordance with, Ohio law, except for Clauses 2.1.6, 2.1.7, 3.5, 4 and 8.5 that shall be subject to the laws of England and Wales.

9.2　any claim or dispute arising out of or in connection with, or concerning the carrying into effect of, this Deed (including any dispute relating to any non-contractual obligations arising out of or in connection with it) will be subject to the exclusive jurisdiction of the courts of Franklin County, Ohio, and the Parties irrevocably submit to the exclusive jurisdiction of the courts of Franklin County, Ohio for these purpose, with the exception of (a) any claim or dispute out of or in connection with, or concerning the carrying into effect of Clauses 2.1.6, 2.1.7, 3.5, 4 and 8.5 of this Deed (including any dispute relating to any non-contractual obligations arising out of or in connection with it) will be subject to the exclusive jurisdiction of the courts of England and Wales; and (b) any proceedings to enforce the Consent Final Judgment attached as Schedule 5 and the Stipulation of Dismissal attached as Schedule 6, which shall be subject to the exclusive jurisdiction of the Courts of Hamilton, County, Ohio.

9.3　Nothing in this Deed shall in any way impair the viability and enforceability of Mr Justice Flaux's judgment on the preliminary issue in Claim CL-2014-000358 dated 10 November 2015 and/or the judgment to be entered in the form of the Consent Order attached as Schedule 1.

**EXECUTED** as a deed on behalf of
**BONHAMS 1793 LIMITED**

Signature

[Authorised person][Director]

Print name

Witness signature _____

Name (in BLOCK CAPITALS)    _____

Address _____


**SIGNED** as a deed by
**JOSEPH L FORD III**
in the presence of:

Signature

Witness signature _____

Name (in BLOCK CAPITALS)    _____

Address _____


**SIGNED** as a deed by **FLORENCE SWATERS**

Signature

Witness signature _____

Name (in BLOCK CAPITALS)    _____

Address _____

10

**SIGNED** as a deed by **CHRISTOPHER GARDNER**

| Signature |
|---|
|  |

Witness signature _____

Name (in BLOCK CAPITALS) _____

Address _____

---

**EXECUTED** as a deed by
**COPLEY MOTORCARS CORPORATION**
acting by a director, in the presence of:

| Signature |
|---|
| Director |
| Print name |
|  |

Witness signature _____

Name (in BLOCK CAPITALS) _____

Address _____

---

**SIGNED** as a deed by
**LESLIE WEXNER**
in the presence of:

| Signature |
|---|
|  |

Witness signature _____

Name (in BLOCK CAPITALS) _____

11

Address _____

_____

_____
Witness

_____
Witness

**KRISTINE KLEVE LAWSON**

STATE of Ohio                    )
                                 ) ss:
COUNTY OF _Hamicton_             )

        Sworn to before me and subscribed in my presence this 17 day of _April_,
2016.

_____
(Notary Public)
NOTARY PUBLIC · STATE OF OHIO
My Commission has no expiration
date, Section 147.03 O.R.C.

12

**Schedule 1**

**Draft Order**

**IN THE HIGH COURT OF JUSTICE**                                    **CL-2014-000358**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

**The Honourable Mr Justice [FLAUX] (sitting in public)**
**Dated this      day of              2016**

**BETWEEN:**

                                                                    **CL-2014-000358**

**BONHAMS 1793 LIMITED**

                                                    **Applicant / Stakeholder**

**- and -**

**(1) Ms KRISTINE KLEVE LAWSON**
**(2) Mr JOSEPH L. FORD, III**
**(3) Mr CHRISTOPHER GARDNER**
**(4) Ms FLORENCE SWATERS**
**(5) COPLEY MOTORCARS CORPORATION**
**(6) Mr LESLIE WEXNER**
**(7) Mr JOSE ZANOTTI CAVAZZONI**

                                                            **Respondents**

**AND BETWEEN:**

                                                            **CL-2014-000937**

**BONHAMS 1793 LIMITED**

                                                                **Claimant**

**-and-**

**(1) Ms KRISTINE KLEVE LAWSON**
**(2) Mr JOSEPH L. FORD, III**

                                                            **Defendants**

**AND BETWEEN:**

                                                            **CL-2016-000105**

**(1) COPLEY MOTORCARS CORPORATION**
**(2) LESLIE WEXNER**

                                                            **Claimants**

**- and -**

**(1) BONHAMS 1793 LIMITED**

13

**(2) FLORENCE SWATERS**
**(3) CHRISTOPHER GARDNER**

<u>**Defendants**</u>

---

### CONSENT ORDER

---

**UPON** the application of the parties, other than Mr Zanotti.

**AND UPON** the parties, other than Mr Zanotti, by their respective legal representatives having in writing agreed to the terms of this Order.

**AND UPON** the parties, other than Mr Zanotti, agreeing terms of settlement by the Settlement Deed dated 17 April 2016, copies of which shall be retained by each of the parties' legal representatives.

**AND UPON** Bonhams and Mr Zanotti agreeing terms of settlement by a Consent Order dated 15 April 2016 which conclusively terminates all claims by Mr Zanotti.

**AND UPON** the preliminary issue in Claim CL-2004-000358 being determined by the Honourable Mr Justice Flaux in a judgment handed down on 10 November 2015.

**IT IS DECLARED BY CONSENT THAT:**

1.  Copley Motorcars Corporation and the Trustees of the Family Property Trust A (Leslie H. Wexner Grantor) (the **"Property Trust"**) acting on behalf of Leslie Wexner acquired good and exclusive title to the 1954 Ferrari 4.9-Litre 375-Plus Sports Racing Two-Seat Spider Competizione (chassis number 0384, engine number 0384) (the **"Ferrari"**), advertised and sold as Lot 320 at The Goodwood Festival of Speed Sale, Collector's Motor Cars and Automobilia, Chichester, Sussex (sale no. 21906), held by Bonhams on 27 June 2014 ("**the Auction**"), to the exclusion of any claim, right or interest of any nature whatsoever in the Ferrari by Ms Kristine Kleve Lawson, Mr Joseph L. Ford III, Mr Christopher Gardner, Ms Florence Swaters and Mr Jose Zanotti Cavazzoni, or their heirs, executors or assignees.

2.  The Court declares that the parties (a) – (f) named in paragraph 4 below have no claim to ownership or an interest or contingent interest in the Ferrari.

**IT IS ORDERED BY CONSENT THAT:**

14

3.    The proceedings between the parties to this Order (Claim nos. CL-2014-000358, CL-2014-000937 and CL-2016-000105) are dismissed.

4.    The following parties release and waive, or in the case of Mr Zanotti Cavazzoni, have released and waived, any claim to ownership or an interest or contingent interest in the Ferrari in any jurisdiction:

   (a)    Bonhams 1793 Limited

   (b)    Ms Kristine Kleve Lawson

   (c)    Mr Joseph L. Ford, III

   (d)    Mr Christopher Gardner

   (e)    Ms Florence Swaters

   (f)    Mr Jose Zanotti Cavazzoni

5.    The Stakeholder monies shall be paid to Bonhams for disbursement as they have agreed with each of Ms Lawson, Mr Ford, Mr Gardner and Ms Swaters.

6.    This Consent Order resolves all competing claims to the Ferrari; as such all parties acknowledge that Copley intends to assign its interest in the Ferrari to the Property Trust, and upon such assignment the Property Trust shall have clear and unencumbered title that is transferable without claim by any party, and the Ferrari shall be titled solely and exclusively in the name of the Property Trust by the Ohio Bureau of Motor Vehicles and any non-Ohio title or registration documents to the contrary shall be void.

7.    There be no order, as between the parties to this Order, as to the costs of these proceedings and, as between each of the parties separately:

   (a)    No sum paid pursuant to any previous order for costs shall be required to be repaid;

   (b)    No previous order for costs be further enforced.

8.    All appeals and rights to appeal are waived.

15

.........................................

Jones Day, 21 Tudor Street, London EC4Y 0DJ

Legal representative for Bonhams 1793 Limited

Applicant (CL-2014-000358), Claimant (CL-2014-000937 and CL-2014-000258), and First Defendant (Claim no. CL-2016-000105)

.........................................

Kristine K. Lawson, self-represented

First Respondent (CL-2014-000358) and First Defendant (CL-2014-000937)

Witness

Witness

STATE OF OHIO                    )
                                 ) ss:
COUNTY OF *Hamilton*             )

Sworn to before me and subscribed in my presence this 17 day of *April*, 2016.

Notary Public

MICHAEL J. PILE III, Attorney at Law
NOTARY PUBLIC · STATE OF OHIO
My Commission has no expiration
date. Section 147.03 O.R.C.

.........................................

Joseph L Ford III, self-represented

Second Respondent (CL-2014-000358) and Second Defendant (CL-2014-000937)

16

.........................................

Christopher Gardner, self-represented

Third Respondent (CL-2014-000358) and Third Defendant (Claim no. CL-2016-000105)

.........................................

Ross & Co. Solicitors LLP, 1 New Square, Lincoln's Inn, London WC2A 3SA

Legal representative for Florence Swaters

Fourth Respondent (CL-2014-000358) and Second Defendant (Claim no. CL-2016-000105)

.........................................

Mishcon de Reya LLP, Mishcon de Reya LLP, Africa House, 70 Kingsway London WC2B 6AH.

Legal representative for Copley Motorcars Corporation and Leslie Wexner

Fifth and Sixth Respondents (CL-2014-000358) and First and Second Claimants (Claim no. CL-2016-000105)

**Schedule 2**

**Assignment And Bill Of Sale**

For good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, Kristine K. Lawson and Joseph L. Ford, III each hereby irrevocably grant, sell, transfer, assigns and conveys to the Trustees of the 1990 Family Property Trust A, Leslie H. Wexner Grantor (the "Property Trust") any and all right, title and interest they hold, either individually or jointly, in the Ferrari 375 Plus, #0384AM and the remainder of items contained in Lot 320 of the June 27, 2014 sale at Goodwood Festival of Speed.

_____
Witness

_____
Witness

_____
Kristine K. Lawson


STATE OF OHIO                    )
                                 ) ss:
COUNTY OF _Hamilton_             )

Sworn to before me and subscribed in my presence this _17_ day of _April_ 2016.

_____
Notary Public

RICHARD J. RINEAR, Attorney at Law
NOTARY PUBLIC - STATE OF OHIO
My Commission has no expiration
date. Section 147.03 O.R.C.


_____
Witness

_____
Witness

_____
Joseph L. Ford, III

STATE OF _____          )
                                ) ss:

1

COUNTY OF _____                    )

      Sworn to before me and subscribed in my presence this ___ day of _____, 2016.

                                            _____

                                            Notary Public

2

**Schedule 3**

**<u>Assignment and Powers of Attorney</u>**

For good and valuable consideration, the receipt, adequacy and sufficiency of which is hereby acknowledged, Kristine K. Lawson ("Lawson") and Joseph L. Ford, III ("Ford") each hereby irrevocably grants, sells, transfers, assigns and conveys to the Trustees of the 1990 Family Property Trust A (Leslie H. Wexner, Grantor) (the "Property Trust") any and all right, title and interest they hold, either individually or jointly, in and arising under that certain Ohio Certificate of Title No. 31 0670 8040 (a copy of which is attached hereto as Exhibit A) and the motor vehicle described therein.

Lawson and Ford have each executed Powers of Attorney (attached hereto as Exhibits B and C) in the form prescribed by the Ohio Bureau of Motor Vehicles (modified to reflect their waiver of rights of revocation and substitution) irrevocably appointing Ryan D. Depew as attorney-in-fact.  Lawson and Ford each authorize Ryan D. Depew, their designated attorney-in-fact, to execute and deliver on their behalf any and all documentation required to effect this assignment and transfer of title to the Property Trust, hereby ratifying and confirming all that said attorney-in-fact shall lawfully do or cause to be done by virtue hereof.  All rights of revocation or substitution are hereby waived.

1

_____
Witness

_____
Witness

_____
Kristine K. Lawson


STATE OF Ohio )
                        ) ss:
COUNTY OF HAMILTON )

Sworn to before me and subscribed in my presence this _17_ day of _April_,
2016.

_____
Notary Public

RICHARD J. RINEAIR, Attorney at Law
NOTARY PUBLIC - STATE OF OHIO
My Commission has no expiration
date. Section 147.03 O.R.C.


_____
Witness

_____
Witness

_____
Joseph L. Ford, III


_____ )
                        ) ss:
COUNTY OF _____ )

Sworn to before me and subscribed in my presence this ___ day of _____,
2016.

_____
Notary Public


2

# EXHIBIT A
## (to Assignment and Powers of Attorney)

# OHIO CERTIFICATE OF TITLE

## STATE OF OHIO   No. 31 0870 8040

ISSUING CNTY HAMILTON
RESIDENT CNTY HAMILTON

**ORIGINAL**

ISSUE DATE
05/08/2012

IDENTIFICATION NUMBER
**0384AM**

COMMENTS

| YEAR | MAKE | MAKE DESCRIPTION |
|------|------|------------------|
| 1965 | FERR | FERRARI |

PURCHASE PRICE
$.00

| BODY TYPE | MODEL | MODEL DESCRIPTION |
|-----------|-------|-------------------|
| CN | — | GP |

TAX
$.00

MILEAGE
4,340

EVIDENCE
OH 3106404802

CONVERSION

MILE BRAND **ACTUAL**

BRAND(S)

OWNER
**KRISTINE A. LAWSON**
**& JOSEPH L. FORD III.**
**2887 HARRISON AVE**
**CINCINNATI, OH 45211**

PREVIOUS OWNER
**JOSEPH L. FORD III.**

**3990 YEARLING CT #10**
**CINCINNATI, OH 45211**

LIEN DISCHARGE
Lienholder

By
Authorized signature   date
CLERK OF COURTS LIEN CANCELLATION
By
Deputy Clerk   date

LIEN DISCHARGE
Lienholder

By
Authorized signature   date
CLERK OF COURTS LIEN CANCELLATION
By
Deputy Clerk   date

WITNESS MY HAND AND OFFICIAL SEAL THIS 8th DAY OF MAY 2012.

7.109242306

*%109242306*

%109242306

**TRACY WINKLER**
**CLERK OF COURTS**

RGLANDORF
RGLANDORF

G

⚠ DO NOT ACCEPT TITLE SHOWING ANY ERASURES, ALTERATIONS OR MUTILATIONS. ⚠

ERASURES AND ALTERATIONS VOID THIS TITLE ASSIGNMENT. (Type or print in ink.)

## ASSIGNMENT OF OWNERSHIP

I (we) certify the vehicle or watercraft or outboard motor described in this title was delivered on _____ for the price of $ _____ to: 

Is Seller a Minor? ☐ Yes ☐ No

Transferee's/Buyer's printed name _____

Transferee's/Buyer's printed address _____

## ODOMETER CERTIFICATION

Federal and State laws require that you state the mileage in connection with transfer of ownership. Failure to complete or providing false information may result in fines and/or imprisonment.

I (we) certify to the best of my (our) knowledge that the odometer now reads _____ (no tenths) miles and is the actual mileage of the vehicle unless one of the following statements is checked.

☐ The mileage stated is in excess of the mechanical limit.

☐ The odometer reading is not the actual mileage. WARNING - ODOMETER DISCREPANCY.

This vehicle was a (if applicable): ☐ Former Law Enforcement Vehicle   ☐ Former Taxi   ☐ Flood Vehicle

I (we) warrant the title to be free of all liens.

Transferee's/Seller's printed name

X _____
Transferee's/Seller's signature

Transferee's/Seller's printed address

NOTE: All blank spaces above must be completed before acknowledgement.

Sworn to and subscribed in my presence by _____ this _____ day of _____ yr. _____

My commission expires _____ yr. _____

Printed Notary Name _____

(Seal) Clerk, Deputy Clerk of Courts - Notary _____

## TRANSFEREE'S/BUYER'S ACKNOWLEDGEMENT OF ABOVE ODOMETER CERTIFICATION

X _____
Transferee's/Buyer's printed name          Transferee's/Buyer's signature

Warning to transferor and transferee (seller and buyer.) You are required by law to state the true selling price. A false statement is in violation of section 2921.13 of the Ohio Revised Code and is punishable by six months imprisonment and a fine of up to one thousand dollars, or both. All transfers are audited by the Department of Taxation. The seller and buyer must provide any information requested by the Department of Taxation. The buyer may be assessed any additional tax found to be due.

## APPLICATION FOR CERTIFICATE OF TITLE (Type or Print in Ink)  (Fee of $5.00 for failure to apply for title within 30 days of assignment)

Check type of application: ☐ Motor Vehicle   ☐ Memorandum   ☐ Watercraft   ☐ Outboard Motor   ☐ Salvage

Applicant's printed name _____ SSN/FIN _____

Applicant's printed address _____
STREET                     CITY          ZIP        COUNTY

Purchase Price $ _____ Class Tax Due $ _____ Vendor's Discount $ _____ Tax Paid $ _____

Trade in Allowance $ _____ Condition of vehicle/watercraft/outboard motor (check one): ☐ Good ☐ Fair ☐ Poor ☐ Wrecked

Tax exemption: ☐ Yes  Reason _____ Dealer's Permit Number _____ Vendor's Number _____

LIEN INFORMATION. If no lien, state "none". If more than one lien, attach statement of all additional liens.

Lienholder _____ Address _____

I (we) state that all information contained in this application is true and correct.

Is Applicant a Minor? ☐ Yes ☐ No

Applicant's signature X _____        ☐ Printed   ☐ Non Printed

Sworn to and subscribed in my presence by _____ this _____ day of _____ yr. _____

My commission expires _____

(Seal) Clerk, Deputy Clerk of Courts - Notary _____

# EXHIBIT B

## (to Assignment and Powers of Attorney)



Ohio Bureau of Motor Vehicles

# POWER OF ATTORNEY

*Know all men by these presents, that the undersigned does hereby make, constitute and appoint*

| LAST NAME Depew | | FIRST NAME Ryan | | MI D |
|---|---|---|---|---|
| STREET ADDRESS 317 Eastchester Court | CITY Gahanna | STATE OH | ZIP CODE 43230 |

My true and lawful attorney-in-fact for me and in my name, place and stead, to make and execute the assignment of or application for my Certificate of Title covering the following described motor vehicle, to-wit:

| MAKE Ferrari | YEAR 1954 | SERIAL NO. 0384AM |
|---|---|---|

And granting to my said attorney-in-fact full authority to do and perform all and every act and thing whatsoever, requisite, necessary and proper to be done in and about the premises as fully and to all intents and purposes as the undersigned might or could do, hereby ratifying and confirming all that said attorney shall lawfully do or cause to be done by virtue hereof.

In Witness whereof, the undersigned has caused his name to be subscribed hereto this_____ day of_____, 20_____.

X_____        _____
Joseph L. Ford, III (Person Giving Power Of Attorney)        SOCIAL SECURITY NUMBER

## ACKNOWLEDGEMENT

      Subscribed and sworn to before me a Notary Public in and for said County personally appeared_

_____who acknowledged the signing of the foregoing instrument and that such signing is his free act and deed.

In Testimony Whereof, I have hereunto set my hand and affixed my official seal this_____day of_____,20  in the county of_____State of Ohio.

X_____
NOTARY PUBLIC

My commission expires _____

# EXHIBIT C
## (to Assignment and Powers of Attorney)



Ohio Bureau of Motor Vehicles

# POWER OF ATTORNEY

*Know all men by these presents, that the undersigned does hereby make, constitute and appoint*

| LAST NAME Depew | FIRST NAME Ryan | | MI D |
|---|---|---|---|
| STREET ADDRESS 317 Eastchester Court | CITY Gahanna | STATE OH | ZIP CODE 43230 |

My true and lawful attorney-in-fact for me and in my name, place and stead, to make and execute the assignment of or application for my Certificate of Title covering the following described motor vehicle, to-wit:

| MAKE Ferrari | YEAR 1954 | SERIAL NO. 0384AM |
|---|---|---|

And granting to my said attorney-in-fact full authority to do and perform all and every act and thing whatsoever, requisite, necessary and proper to be done in and about the premises as fully and to all intents and purposes as the undersigned might or could do, hereby ratifying and confirming all that said attorney shall lawfully do or cause to be done by virtue hereof.

In Witness whereof, the undersigned has caused his name to be subscribed hereto this _17th_ day of _April_, 20_16_.

X _Kristine Kleve Lawson_
Kristine Kleve Lawson (Person Giving Power Of Attorney)          SOCIAL SECURITY NUMBER

## ACKNOWLEDGEMENT

Subscribed and sworn to before me a Notary Public in and for said County personally appeared _Kristine Kleve Lawson_ who acknowledged the signing of the foregoing instrument and that such signing is his free act and deed.

In Testimony Whereof, I have hereunto set my hand and affixed my official seal this _17th_ day of _April_ 20_16_ in the county of _Hamilton_ State of Ohio.

X _____
NOTARY PUBLIC

My commission expires

RICHARD J. BINEAR, Attorney at Law
NOTARY PUBLIC · STATE OF OHIO
My Commission has no expiration
date. Section 147.03 O.R.C.

**Schedule 4**

POWERS OF ATTORNEY



Ohio Bureau of Motor Vehicles

# POWER OF ATTORNEY

*Know all men by these presents, that the undersigned does hereby make, constitute and appoint*

| LAST NAME Depew | | FIRST NAME Ryan | | MI D |
|---|---|---|---|---|
| STREET ADDRESS 317 Eastchester Court | CITY Gahanna | STATE OH | ZIP CODE 43230 | |

My true and lawful attorney-in-fact for me and in my name, place and stead, to make and execute the assignment of or application for my Certificate of Title covering the following described motor vehicle, to-wit:

| MAKE Ferrari | YEAR 1954 | SERIAL NO. 0384AM |
|---|---|---|

And granting to my said attorney-in-fact full authority to do and perform all and every act and thing whatsoever, requisite, necessary and proper to be done in and about the premises as fully and to all intents and purposes as the undersigned might or could do, hereby ratifying and confirming all that said attorney shall lawfully do or cause to be done by virtue hereof.

In Witness whereof, the undersigned has caused his name to be subscribed hereto this_____ day of_____, 20____.

X_____          _____
Joseph L. Ford, III (Person Giving Power Of Attorney)          SOCIAL SECURITY NUMBER

## ACKNOWLEDGEMENT

Subscribed and sworn to before me a Notary Public in and for said County personally appeared_ _____who acknowledged the signing of the foregoing instrument and that such signing is his free act and deed.

In Testimony Whereof, I have hereunto set my hand and affixed my official seal this_____day of_____,20____ in the county of_____State of Ohio.

X_____
NOTARY PUBLIC

My commission expires _____



Ohio Bureau of Motor Vehicles

# POWER OF ATTORNEY

*Know all men by these presents, that the undersigned does hereby make, constitute and appoint*

| LAST NAME | | FIRST NAME | | | MI |
|---|---|---|---|---|---|
| Depew | | Ryan | | | D |
| STREET ADDRESS | CITY | | STATE | ZIP CODE | |
| 317 Eastchester Court | Gahanna | | OH | 43230 | |

My true and lawful attorney-in-fact for me and in my name, place and stead, to make and execute the assignment of or application for my Certificate of Title covering the following described motor vehicle, to-wit:

| MAKE | YEAR | | SERIAL NO. |
|---|---|---|---|
| Ferrari | 1954 | | 0384AM |

And granting to my said attorney-in-fact full authority to do and perform all and every act and thing whatsoever, requisite, necessary and proper to be done in and about the premises as fully and to all intents and purposes as the undersigned might or could do, hereby ratifying and confirming all that said attorney shall lawfully do or cause to be done by virtue hereof.

In Witness whereof, the undersigned, has caused his name to be subscribed hereto this _____17th_____ day of _____April_____, 20_16_.

X _Kristine Kleve Lawson_

Kristine Kleve Lawson (Person Giving Power Of Attorney)          SOCIAL SECURITY NUMBER

## ACKNOWLEDGEMENT

Subscribed and sworn to before me a Notary Public in and for said County personally appeared _Kristine Kleve Lawson_ who acknowledged the signing of the foregoing instrument and that such signing is his free act and deed.

In Testimony Whereof, I have hereunto set my hand and affixed my official seal this _____17th_____ day of _____April_____ 20____ in the county of _____Hamilton_____ State of Ohio.

X _____

NOTARY PUBLIC

RICHARD J. RINEAR, Attorney at Law
My commission expires: NOTARY PUBLIC - STATE OF OHIO
My Commission has no expiration
date, Section 147.03 O.R.C.

**Schedule 5**

**COURT OF COMMON PLEAS**

**HAMILTON COUNTY, OHIO**

| | | |
|---|---|---|
| FLORENCE SWATERS, | : | A1001370 |
| | : | |
| Plaintiff, | : | Judge Dinkelacker |
| | : | |
| vs. | : | **CONSENT FINAL JUDGMENT** |
| | | **AND DISMISSAL WITH PREJUDICE** |
| | : | |
| KRISTINE K. LAWSON, *et al.*, | : | |
| | : | |
| Defendants. | : | |

This action comes before the Court for entry of final judgment by consent of the parties pursuant to their settlement of the claims set forth in this action.  By an entry dated June 12, 2015, this Court stayed all proceedings in this action until certain litigation venues in London, England (the "London Litigation") was resolved.  The London Litigation now has been terminated, by a settlement and Consent Order, to which each of the parties to this action, Hamilton County Common Pleas Case No. A1001370, (the "Parties") are bound.

To effectuate their settlement, each of the Parties irrevocably agrees and stipulates that:

1.      This action concerns the ownership of the 1954 Ferrari 4.9-Litre 375-Plus Sports Racing Two-Seat Spider Competizione (chassis number 0384AM, engine number 0384) together with other parts and items advertised and sold as Lot 320 at The Goodwood Festival of Speed Sale, Collector's Motor Cars and Automobilia, Chichester, Sussex (sale no. 21906), (collectively, the "Ferrari") held by Bonhams 1793 Limited on June 27, 2014 (the "Auction").

2.      The 1990 Family Property Trust A (Leslie H. Wexner, Grantor) (the "Property Trust"), by and through its agent Copley Motorcars Corporation ("Copley"), was the winning bidder on the Ferrari at the Auction and has paid the required consideration in full.  The settlement in the London Litigation to which the Parties have agreed recognizes that, as a result of the Auction sale, the trustees of the Property Trust acquired good and exclusive title to the Ferrari, free and clear of all claims of the Parties, their assignees and creditors.

3.      As such, the Parties each irrevocably assign any ownership of, or right, title or interest to, the Ferrari to the Property Trust and release any claim of any nature to the Ferrari or against the Property Trust, Copley or Mr. Wexner.

4.      The Parties have each assigned, or agreed to assign, all existing Ohio certificates of title listing them as owners of the Ferrari ("Existing Ohio Titles") to the Property Trust and agree that a new Ohio certificate of title, free and clear of all liens and encumbrances, should be issued in the name of the Property Trust as the assignee.

5.  Each of the Parties represents and warrants that, by signing this Consent Final Judgment, he or she (i) is fully authorized and empowered to do so, (ii) is doing so voluntarily, (iii) intends to be fully and finally bound to each of the terms hereof, and (iv) has had adequate opportunity to review the terms of this Consent Final Judgment with legal counsel of his or her choosing and has, in fact, done so.

6.  Each of the Parties (i) consents to the Court's entry of this Consent Final Judgment and waives any errors or irregularities in connection therewith; (ii) consents to, and agrees not to contest or challenge, the Court's jurisdiction over the subject matter of this action; (iii) waives any and all rights to notice of filing and hearing of the Court's consideration of this Consent Final Judgment; and (iv) irrevocably waives all rights of appeal of this Consent Final Judgment and all other entries, decisions and orders in this action, and further waives all rights of post-trial relief and collateral attack.

7.  Each of the Parties agrees that this Consent Final Judgment is intended to benefit the Property Trust and irrevocably consents to any intervention requested by the Property Trust after entry of this Consent Final Judgment seeking enforcement of any of its provisions.

Based upon the foregoing stipulations and the consent and agreement of the Parties, it is ORDERED, ADJUDGED and DECREED that:

A.  Each of the stipulations by the Parties set forth above is incorporated, approved, and adopted as part of this Consent Final Judgment.

B.     The Property Trust has sole and exclusive ownership of the Ferrari, free and clear of any lien, encumbrance or claim of any Party to this action, their assigns or creditors.

C.     Each of the Parties is hereby PERMANENTLY ENJOINED from asserting any claim of ownership, right, title to, or interest in, the Ferrari.

D.     The Ohio Bureau of Motor Vehicles ("OBMV") is directed to issue a new certificate of title for the Ferrari naming the Property Trust as its sole and exclusive owner, free of all liens and encumbrances.  If any Party fails to assign an Existing Ohio Title to the Property Trust (including but not limited to Ohio Certificate of Title, No. 31 0670 8040), the OBMV is directed to void and cancel such Existing Ohio Title and proceed to issue a new certificate of title for the Ferrari, free and clear of liens and encumbrances, to the Property Trust.

E.     Each of the parties to this action is hereby PERMANENTLY ENJOINED from interfering with (i) the issuance of a new certificate of title for the Ferrari to the Property Trust as the sole and exclusive owner of the Ferrari, free and clear of all liens and encumbrances, and (ii) the voiding and cancellation of any Existing Ohio Title if not assigned to the Property Trust.

F.     This Consent Final Judgment is intended to benefit the Property Trust and may be enforced by the Property Trust as though the Property Trust were a party to this action.

G.    All claims and counterclaims asserted in this action, and all claims and counterclaims that could have been asserted in this action, are DISMISSED WITH PREJUDICE, each Party to bear his or her own fees and costs.

H.    This action is hereby TERMINATED.  The Court shall retain jurisdiction over the Parties to enforce this Consent Final Judgment.  Bond waived.

IT IS SO ORDERED.


_____

COMMON PLEAS JUDGE

AGREED, STIPULATED AND APPROVED:


_____    _____    _____    _____
Scott K. Jones (0069859)          Date       Florence Swaters                        Date

Stacy A. Cole (0080075)

GRAYDON HEAD & RITCHEY LLP

7759 University Drive, Suite A

West Chester, OH 45069

Direct:  (513) 755-4501

Fax:  (513) 755-9588

E-Mail:  sjones@graydon.com


*Attorneys for Plaintiff Florence Swaters*


_____    _____    _____    _____
Zachary Gottesman (0058675)   Date       Christopher Gardner                  Date

GOTTESMAN & ASSOCIATES

36 East 7th Street, Suite 2121

Cincinnati, Ohio 45202

Phone:  (513) 651-2121

Fax:  (513) 651-2131

E-Mail:  zg@zgottesmanlaw.com

*Counsel for Intervenor-Defendant*
*Christopher Gardner*

_____       _____ *Kristine Kleve Lawson* 4-17-16

Timothy A. Smith (0032087)                Date        Kristine Kleve Lawson        Date

LAW OFFICE OF TIMOTHY A. SMITH

810 Sycamore Street, 5th Floor

Cincinnati, Ohio 45202

Phone:  (513) 421-1890

Fax:  (513) 621-8703

E-Mail:  timsmith@mac.com

*Attorney for Defendant Kristine Kleve*
*Lawson*

_____       _____       _____

Richard J. Rinear (0027114)               Date        Joseph Ford, III        Date

Edward J. Collins (025833)

DRODER & MILLER CO., L.P.A.

125 West Central Parkway

Cincinnati, Ohio 45202

Phone:  (513) 721-1504

E-Mail:  rrinear@drodermiller.com

          ccollins@drodermiller.com

*Attorneys for Intervenor-Defendant*

*Joseph Ford, III*

596456

**Schedule 6**

COURT OF COMMON PLEAS

HAMILTON COUNTY, OHIO

CHRISTOPHER GARDNER,         :     Case No. A 1306451

        Plaintiff,         :     Judge Steven E. Martin

vs.                   :     **STIPULATION OF DISMISSAL**

                          **WITH PREJUDICE**

JOSEPH FORD, *et al.*,        :

        Defendants.        :

Pursuant to Rule 41(A)(1)(b) of the Ohio Rules of Civil Procedure, all of the parties, by and through their respective undersigned counsel, hereby dismiss all claims, counterclaims and crossclaims in this action WITH PREJUDICE. Each party shall bear his, her, or its own costs and attorney fees. This action is therefore TERMINATED.

SO STIPULATED:

_____                    _____
Witness                                    Joseph L. Ford, III


_____
Witness


_____          )
                                 ) ss:
COUNTY OF _____         )

     Sworn to before me and subscribed in my presence this ___ day of _____,
2016.

                                           _____
                                           Notary Public

*Attorney for Defendants*

*Joseph Ford, III, Joseph Ford, IV and Justin Ford*

**Schedule 7**

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

Joseph L. Ford,                                    ]
                                                   ]      Case No.  2015 CA 013920
               Plaintiff,                          ]
                                                   ]      Judge:
vs.                                                ]
                                                   ]
Christopher C. Gardner, et al.,                    ]
                                                   ]
               Defendants.                         ]
                                                   ]

---

NOTICE OF PLAINTIFF'S VOLUNTARY DISMISSAL OF ACTION WITH PREJUDICE
PURSUANT TO FLORIDA RULE OF CIVIL PROCEDURE 1.420(a)(1)

---

        Pursuant to Fl. R. Civ. P. 1.420(a)(1), Plaintiff, Joseph L. Ford, hereby dismisses the

above-captioned action with prejudice.  Costs to Plaintiff.

                                            Respectfully submitted,



        _____        Joseph L. Ford
                                            Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served upon all counsel of record and unrepresented parties by electronic mail and/or ordinary U.S. Mail this _____ day of April, 2016.

Respectfully submitted,

_____

Joseph L. Ford
Plaintiff

David Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

71

1      MR. HAWLEY:  I'm not going to agree to that.

2      MR. GOTTESMAN:  But if you won't agree to that,

3  what we're going to do, I will instruct my client not to

4  answer and we going to get a protective order from the

5  court.

6      MR. GATLIN:  Is there an agreement that we will

7  continue this deposition so that we can follow up with

8  questions with Mr. Clark after we have received the

9  information in that protective order?

10      MR. GOTTESMAN:  If that's something you need, Jack,

11  to discuss I'll discuss it.  But I don't want to do it

12  now.  Mr. Hawley and his clients haven't produced

13  anything or done anything.  I'm not agreeing to continue

14  this deposition.  We're here today.  If there's a reason

15  to talk to my clients again and it's what I think is a

16  reasonable reason, I'll certainly agree to it.

17      MR. HAWLEY:

18      Q.  This mystery buyer that you said you had back

19  in 2014 never came through to buy the Ferrari, did he?

20      MR. GOTTESMAN:  Dave, that's a question to you.

21      THE WITNESS:  No.

22      MR. HAWLEY:

23      Q.  You actually had an agreement with all the

24  people you're suing now that if that buyer came through

25  with his $25 million deal that you would get 10 percent

EXHIBIT

D

```
 1   litigation.  What chance would I have to really sell
 2   that car in litigation?  The whole Ferrari world knew
 3   that it was in court.
 4        Q.  So that buyer -- you had a buyer that you're
 5   not going to name, but it really never came close to a
 6   deal.  There wasn't a price.
 7        A.  His attitude, Tom, his attitude was I'm not
 8   going to appraise the car for him.  When Joe Ford --
 9   Gardner knows deals.  But Joe Ford doesn't know how it
10   works.  You don't tell rich people how to do things.
11   They do things the way they want.  For him to say send
12   this money to this bank and then we'll see if you can
13   buy the car, it was dead.  It was never going to work.
14   I never had an opportunity.  And then Bonhams sending
15   things out.  You know, it just was never going to work,
16   Tom.
17        Q.  Did you have any other potential buyers for the
18   car besides this mystery buyer and Hugh Taylor?
19        A.  Not directly.  There were some other people.  I
20   think you have the emails.  One of them was an English
21   person that I know who deals in high-end cars.  He had
22   somebody who had an interest in the car.  I hate to say
23   that were going to buy the car.  They had an interest in
24   the car.  But he was from England.  And he said,
25   "Dave --" he goes -- not Dave.  He said, "The car's --
```

LITIGATION SUPPORT SERVICES
Cincinnati, Ohio (513) 241-5605 / Toll-Free (844) 321-3376

David Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

106

1      MR. GATLIN:  If we could go through the stack of

2  documents.  And I think it's towards the end.  Mine's

3  kind of got separated here, but it's in the initial PDF,

4  and the Bates stamp on the bottom is 00013.

5      THE WITNESS:  Do you want to find that for me?

6      MR. GATLIN:  Mark this as Defendant's Exhibit 7 I

7  think we're up to.

8                  -FURTHER EXAMINATION-

9      BY MR. GATLIN:

10      Q.  This is an email that was sent to

11  davidclarksd@gmail.com from Anthony Maclean.  Have you

12  seen this email before today?

13      A.  Yeah.  I saw it yesterday.

14      Q.  You had never seen it before yesterday?

15      A.  You know, I can't say.  It's been a long time.

16      Q.  So when Tom was asking you questions you had

17  referenced letters that Bonhams had sent out.  Is this

18  one of those letters?

19      A.  I can't say for sure.  I really can't.

20      Q.  So this email says -- I'll just read a few

21  parts of it.  The first paragraph says:  "With my

22  colleague Phillip Kantor, I am the director of Bonhams

23  1793 Ltd., London, responsible for the sale of the car.

24  As you are aware, Bonhams is the exclusive world-wide

25  agent for the sale of the car which it is intended will

David Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

107

1  be sold by Bonhams by public auction later this year."

2  Do you remember receiving this --

3      A.  No.

4      Q.  -- January 25th 2014?

5      A.  No.  But I could have received it.

6      Q.  But at some point you were notified by Bonhams

7  that they were the exclusive world-wide agent for the

8  sale of the Ferrari, correct?

9      A.  Yes.  Yes.

10     Q.  In fact, you testified with Tom that Bonhams

11  sent out emails, letters that in your words kind of --

12  all of the known Ferrari buyers knew Bonhams was the

13  exclusive agent at that time.  Is that fair?

14     A.  Well, I think I said they sent letters out to

15  people I was talking to and they sent letters out

16  threatening them.  That's what I believe I testified to,

17  but I could be wrong.

18     Q.  But you don't remember receiving this email or

19  discussing it with Debbie on January 25th 2014?

20     A.  I don't remember.  I really don't.  I may have

21  discussed it with her, Jack, but I can't say for sure.

22  I mean, I'm sure I did, you know?  It's just I don't

23  remember.

24     Q.  And then in the fourth paragraph, if you could

25  just read that fourth paragraph to me.

David Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

108

1      A.   "If you do have a client interested in buying

2  the car on the terms indicated by Tim Smith, please send

3  me not later than 5 p.m. London time on 31st 2014 your

4  written offer to purchase the car, accompanied by the

5  confirmation of a recognized financial institution that

6  you have freely available funds at your unrestricted

7  disposal equal to the amount of the offer.  The offer

8  must be for a fixed amount."  Okay.  What do you want to

9  know?

10      Q.   Did you ever provide a buyer to Bonhams?

11      A.   Not at all.

12      MR. GATLIN:  Nothing further.  That's all I've got.

13      THE WITNESS:  They were offering the car for

14  10 million pounds.  Go ahead.

15      MR. GOTTESMAN:  Dave, there's not a question on the

16  table.  I understand there might be a couple more

17  follow-up questions so just bear with us.

18      MR. HAWLEY:  I hate to say it, but I'm going to ask

19  you to bring this stack of documents out again with

20  those emails.  Don't ask me, ask the court reporter.  He

21  can do it.

22                    -FURTHER EXAMINATION-

23      BY MR. HAWLEY:

24      Q.   Turn to the one that's towards the back.  And

25  it's marked on the lower right-hand corner DC0065.  It's

## COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| **DAVID CLARK, et al.** | : | **CASE NO.  A 1605727** |
| **Plaintiffs,** | : | |
| | : | **Judge Heekin** |
| **v.** | : | |
| | : | |
| **JOSEPH FORD, III, et al.** | : | <u>**AFFIDAVIT OF JUSTIN FORD**</u> |
| **Defendants.** | : | |
| | : | |

Comes now Justin Ford, being duly sworn and over the age of 18, and competent to testify in the matters set forth herein, swears and deposes as follows, based on personal information and belief:

1. My name is Justin Ford. I am a Defendant in Case No. A 1605727.

2. I first became involved in the Ferrari litigation in 2010. At that time my father, Joseph Ford III was doing business with Christopher Gardner related to classic cars and other business ventures, one of which was the recovery of a stolen Ferrari.

3. At first I used my existing bank account to help my father. Later I opened a second bank account at Bank of America to dedicate to my father's business.

4. I also received a few thousand dollars in which I billed hourly to create the Ferrari litigation website, a private, password protected website that my father used to post documents, videos, and recordings for those working with him in the stolen Ferrari litigation.

5. Approximately $150,000 flowed through my accounts regarding my father's Ferrari related business. Most of the money came from Christopher Gardner.

6. I made the private website and paid some attorney bills when directed by my father.

GATLIN VOELKER
A Professional Limited Liability Company

**EXHIBIT**

Q.

I did not have any involvement in the Ferrari case. I was never privy to the Ferrari settlement.

7. In June of 2016 I unexpectedly received $50,000 from my father, unaware of where it had come from. I regarded this $50,000 as a gift. My father told me it was for repayment of the money I had loaned him and, unbeknownst to him, my mother which I put and carried on my credit cards, years earlier, when my parents separated and then divorced.

FURTHER AFFIANT SAYETH NAUGHT

STATE OF _Florida_

COUNTY OF _Orange_

Sworn to and subscribed in my presence by the said Justin Ford on this _06_ day of _June_, 2018.

KEREN CANCEL
MY COMMISSION # GG 214823
EXPIRES: May 6, 2022
Bonded Thru Notary Public Underwriters

Notary Public

Commission Expires: _5/6/22_

2

GATLIN VOELKER
A Professional Limited Liability Company

**COURT OF COMMON PLEAS**
**HAMILTON COUNTY, OHIO**

| | | |
|---|---|---|
| **DAVID CLARK, et al.** | : | **CASE NO.  A 1605727** |
| **Plaintiffs,** | : | |
| | : | **Judge Heekin** |
| **v.** | : | |
| | : | |
| **JOSEPH FORD, III, et al.** | : | |
| | : | **AFFIDAVIT OF JOSEPH FORD IV** |
| **Defendants.** | : | |
| | : | |

Comes now Joseph Ford, IV., being duly sworn and over the age of 18, and competent to testify in the matters set forth herein, swears and deposes as follows, based on personal information and belief:

1. My name is Joseph Ford IV. I am a Defendant in Case No. A 1605727. Joseph Ford III is my father.

2. I first became aware of my father's litigation about a stolen Ferrari sometime in late 2011 when, according to my father, Chris Gardner began defaulting on his promise to fund the litigation. At about that time my father asked me to pay a $17,000 bill of Ohio attorney Herb Haas.

3. My only real understanding of the stolen Ferrari case is that parts of the Ferrari were stolen and parts were still in the United States.

4. Around 2012 I agreed to loan my father money to assist with his legal fees and his other costs of the Ferrari litigation. While my father could have gone elsewhere for money, I agreed to loan him the money at eleven percent annual interest rate. Over the years the amounts I loaned grew beyond either of my or my father's initial expectations.

EXHIBIT
R.

5.  About 60% of the money I loaned was put on my credit cards and the rest was as checks and wire transfers. My payments include paying the bills of Ohio attorneys, the Florida arbitration, and UK attorneys, airfare, lodging, rental cars, and etc., all at the request of my father.

6.  At no time did I ever have an active role in the Ferrari litigation.

7.  Over the roughly four year period of time, I lent my father between $900,000 and $960,000 for his Ferrari litigation. It was not until early June of 2016 that my father repaid me $1.1 million which includes some but not all of the interest. I have never done a formal accounting on an annual basis to calculate exactly how much interest was really owed. I accepted that.

8.  At no time did I ever speak to Karyl Kleve or Katrina English. The only time I ever spoke to Kristine Lawson and Ray Lawson was in late 2015 when I met them for the first time in Miami at a Mexican restaurant.

FURTHER AFFIANT SAYETH NAUGHT

STATE OF ___FL___

COUNTY OF ___Broward___

Sworn to and subscribed in my presence by the said Joseph Ford, IV on this __5__ day of __June__, 2018.

LEONARD STEINBERG
Notary Public - State of Florida
My Comm. Expires Oct 14, 2018
Commission # FF 154077
Bonded through National Notary Assn.

Notary Public

Commission Expires: _Oct 14, 2018_

2

GATLIN VOELKER
A Professional Limited Liability Company



Neutral Citation Number: [2015] EWHC 3257 (Comm)

Case No: 2014 – 000358
(Formerly 2014 Folio 836 & others)

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Rolls Building
Fetter Lane
London, EC4A 1NL

Date: 10/11/2015

Before:

**THE HONOURABLE MR JUSTICE FLAUX**
- - - - - - - - - - - - - - - - - - - - -
Between:

|  |  |
|---|---|
| **BONHAMS 1793 LTD** | **Claimant** |
| - and - | |
| **(1) MS KRISTINE KLEVE LAWSON** | **Defendants** |
| **(2) MR JOSEPH L FORD III** | |
| **(3) MR CHRISTOPHER GARDNER** | |
| **(4) MS FLORENCE SWATERS** | |
| **(5) COPLEY MOTORCARS CORPORATION** | |
| **(6) MR LESLIE WEXNER** | |
| **(7) MR JOSE ZANOTTI CAVAZZONI** | |

- - - - - - - - - - - - - - - - - - - - -

**Mr Ian Mill QC & Mr Mark Vinall** (instructed by **Jones Day**) for the **Claimant**
**Mr Richard Eschwege** (instructed by **Ross & Co Solicitors LLP**) for the **Fourth Defendant**
**Mr Joseph Ford the Second Defendant in person**

**The other parties did not attend**

Hearing dates: 19th and 20th October 2015
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

THE HONOURABLE MR JUSTICE FLAUX

**EXHIBIT**
**5.**
tabbies

**The Honourable Mr Justice Flaux:**

Introduction

1.  By an Order dated 5 June 2015 (as varied by an Order dated 9 September 2015), I ordered the trial of the following preliminary issue:

    > "As at 27 June 2014, before the auction of the Ferrari model 375 Plus Grand Prix Roadster, serial no. 0384AM (the "Car"), did:
    >
    > (i)  Ms Swaters; or
    >
    > (ii)  Ms Lawson and Mr Ford
    >
    > have title to the Car (including, for the avoidance of doubt, any spare parts)
    >
    > without prejudice to any dispute as to title between Ms Lawson and Mr Ford on the one hand, and Mr Gardner on the other."

2.  The Car is one of only six 375 Plus Ferraris ever made, only four of which remain in existence. It is presently in a container in Southampton in a fully restored condition pending the determination of the disputes between all the various parties arising from the auction by Bonhams at the Goodwood Festival of Speed in 2014. Although the preliminary issue refers to "the Car" there are in fact three elements to consider: (i) the chassis; (ii) the spare parts and (iii) the original engine. There is no dispute that Ms Swaters owns the original engine which she located in the United States and purchased for U.S. $610,000 in 2009. The preliminary issue concerns title to the chassis and the spare parts.

3.  The purpose of ordering the preliminary issue was to determine one of the principal issues concerning the ownership of the Car, that between Ms Swaters on the one hand and Ms Lawson and Mr Ford on the other, with a view to narrowing the remaining issues for determination at any subsequent trial involving other parties. At the 5 June 2015 hearing, Bonhams, Ms Swaters and Mr Wexner were agreed that there should be a trial of the preliminary issue. Ms Lawson and Mr Ford, who were then represented by the same solicitors and counsel, resisted the ordering of a preliminary issue. Their position was and is that all issues of title between themselves and Ms Swaters should be determined in Ohio, in proceedings in the Court of Common Pleas in Hamilton County where Ms Swaters commenced proceedings in February 2010 to recover the spare parts.

4.  Ms Lawson and Mr Ford in fact issued a Part 11 application seeking to set aside or stay the proceedings against them but I dismissed that application, determining that it was made far too late and after they had both submitted to the jurisdiction of this court by the filing of their Defence and Counterclaim. Although they clearly do not like that ruling, neither of them has sought permission to appeal it to the Court of Appeal and they are bound by the ruling.

5.      The Car had been bought by Ms Lawson's father Karl Kleve from a James Kimberly in a damaged condition in 1958. The wrecked chassis is alleged by Ms Lawson and Mr Ford to have been stolen from a field at the premises of Mr Kleve in Ohio on about 13 January 1989 and then sold by the thieves to a car dealer in Georgia, Guy Anderson. Mr Anderson in turn sold it to Michel Kruch, a Belgian dealer whose company traded as L'Exception Automobile.

6.      Ms Swaters' case is that her father, Jacques Swaters, acquired title to the chassis when he bought it in good faith from L'Exception Automobile pursuant to a written contract in Belgium on 15 March 1990. The spare parts and the engine were missing when he acquired the chassis. The chassis remained in the possession of Mr Swaters until his death in 2010 and since then has been in the possession of his daughter. Further or alternatively, Ms Swaters says that, on 2 September 1999, pursuant to a Settlement Agreement governed by New York law, Mr Kleve settled any claims he had to the Car as a whole (including the spare parts) and transferred to Mr Swaters any and all rights which he might have had in the Car. Accordingly, Ms Swaters' case is that Mr Swaters acquired good title to the Car either under Belgian law or New York law and Ms Lawson and Mr Ford have no rights to the Car.

7.      Mr Kleve died in Ohio in 2003. Ms Lawson has continued to claim that she inherited the Car despite the 15 March 1990 sale contract and the 2 September 1999 Settlement Agreement. Mr Ford, whose business is the acquisition of distressed assets, purchased a majority share in whatever interest Ms Lawson had in February 2010. Before then, he had had no involvement with the Car or its history.

8.      Both in the proceedings in Ohio and in the present proceedings, Ms Lawson and Mr Ford have advanced a series of allegations, some of which are quite improper, against Ms Swaters and her father in their attempt to establish a claim to the Car. Their case has shifted and changed. For a long time, they made allegations of forgery in relation to the Settlement Agreement, but those allegations have been shown to be false by the joint report of the expert forensic document examiners.

9.      By the time of the trial of the preliminary issue, Ms Lawson and Mr Ford had dispensed with the services of their solicitors and counsel. Ms Lawson declined to attend the trial, writing a letter to the court dated 14 October 2015 in which she again sought to challenge the jurisdiction of this court to determine the ownership issue, notwithstanding my previous ruling that the court had jurisdiction and that she had submitted to the jurisdiction, a ruling which she has not sought to appeal.

10.     Mr Ford represented himself at the trial. Although he has a qualification as an attorney in Louisiana, it appears that he has hardly practised. As I have said his business is the acquisition of disputed and distressed assets. As he put it in cross-examination he cherry picks what to acquire and is a consultant solving complex problems. Although he was not familiar with English court procedure, he was well able to present and argue his case and had some assistance from Mr Timothy Smith, an Ohio criminal attorney who was an acquaintance of Mr Kleve and had given certain advice to him and who has acted for Ms Lawson in the Ohio proceedings since 2013. Mr Smith also attended the trial of the preliminary issue to give evidence.

11.     The case of Ms Lawson and Mr Ford as pleaded by counsel then acting for them in relation to the issue whether Mr Swaters had acquired good title in the Car in March

1990 was set out in the Amended Defence and Counterclaim served on 6 July 2015. In summary, that case was that Mr Swaters had not acted in good faith because (i) he was an experienced dealer; (ii) this was the only unrestored Ferrari 375 Plus; (iii) prior to the purchase there had been a high profile criminal trial in Atlanta concerning the theft of the vehicle; (iv) the theft had also been covered in industry publications; (v) Mr Swaters was aware at the time of the purchase that there was an allegation that the car he was purchasing had been stolen in Ohio; (vi) the Car was being sold without its VIN (Vehicle Identification Number) plate; (vii) he purchased it at considerably below market value for the equivalent of less than U.S. $100,000 when its real value was about U.S. $500,000; (viii) there were irregularities in the documentation accompanying the Car including that the receipt for the sale to Mr Kruch was for a price of only U.S. $4,500, the bill of lading described it wrongly as "racing automobile parts" and the import declaration differed from the bill of lading and correctly described the Car but gave its value as U.S. $4,500; (ix) as part of the alleged purchase, Mr Swaters agreed that he would deal with any claims in the event a third party claimed to be the true owner; (x) shortly after the alleged purchase, Mr Swaters offered to purchase Mr Kleve's rights to the Car for U.S. $85,000; (xi) not having obtained any such agreement with Mr Kleve, Mr Swaters subsequently arranged for the Car to be restored in Italy using the VIN 0394 which he knew to be incorrect; (xii) that in the premises there was at least reasonable doubt as to the true ownership and title of which Mr Swaters was on notice.

12.     At the trial, it appeared that Mr Ford maintained all these allegations but he also went further and sought to suggest that the sale contract was some sort of sham and that Mr Swaters had actively sought to conceal the Car from being discovered by Mr Kleve or others by describing it with a chassis number 0394AM rather than 0384AM. In effect, he accused Mr Swaters of dishonesty in relation to those matters, neither of which was pleaded. It is wholly unacceptable that such serious allegations should be advanced without being pleaded or supported by any evidence.

13.     In relation to the Settlement Agreement, the pleaded case as set out in the Amended Defence and Counterclaim was that there was no valid and binding settlement. The following allegations were advanced: (1) that Mr Kleve only ever agreed to enter a Settlement Agreement for a price of U.S. $3 million not the price of U.S. $625,000 set out on the first page of the Settlement Agreement and his offer to do so expired; (2) Mr Mark Daniels, the agent who concluded the Settlement Agreement on his behalf, did not have actual authority as a matter of New York law to conclude the Settlement Agreement for U.S. $625,000 because it was agreed between him and Mr Kleve that any actions taken by him were subject to Mr Kleve's approval, the Settlement Agreement was concluded by Mr Daniels for his own benefit, not that of Mr Kleve and that the Limited Power of Attorney dated 18 August 1999 did not reflect the true scope of Mr Daniels' authority; (3) Mr Daniels did not have apparent authority as a matter of New York law to conclude the Settlement Agreement because there were numerous irregularities which would have put a reasonable or prudent person on enquiry; and (4) there was no contract formed in respect of the Settlement Agreement because Mr Kleve's offer made on 16 July 1999 was not accepted within a reasonable time as required by the New York Uniform Commercial Code and/or because Mr Lancksweert failed to make full payment to *Daniels for the benefit of Kleve and Daniels"* as required by clause 5 of the Settlement Agreement.

14.     The specific matters relied upon in support of the allegation that there were
        irregularities which would have put a reasonable person on enquiry are: (i) that Mr
        Philippe Lancksweert (Mr Swaters' former business partner who negotiated and
        concluded the Settlement Agreement on his behalf) knew or should have known that
        Mr Daniels' statement that the spare parts had been stolen was not true; (ii) that there
        were redacted signatures in the documentation presented by Mr Daniels on 1
        September 1999; (iii) that there was a lapse of time of 44 days between Mr Kleve's
        signature on 16 July 1999 and 2 September 1999, during which time the price of U.S.
        $625,000 was negotiated; (iv) that Mr Daniels was unable to produce the Power of
        Attorney referred to on the first page of the Settlement Agreement but only a letter of
        authority dated 18 June 1999 which required Mr Kleve's consent before any
        agreement as to price was reached; (v) that Mr Daniels produced only a copy of the 18
        August 1999 Power of Attorney which it is alleged had been fraudulently altered; (vi)
        that Mr Daniels requested two cheques to be paid over, one for U.S. $400,000 made
        out to Kleve and Daniels and one made out to National Search Services ("NSS"), Mr
        Daniels' company, for U.S. $225,000; (vii) that Mr Daniels requested and Mr
        Lancksweert agreed to omit the identity of the escrow agent and (viii) that Mr
        Lancksweert demanded an affidavit from Mr Daniels concerning liability for any
        deficiency in his authority.

15.     At trial, it appeared that all these points were still being pursued by Mr Ford, together
        with further points such as (i) that Mr Lancksweert and the New York attorneys who
        advised him in relation to the Settlement Agreement were on notice of Mr Daniels'
        absence of authority because the 18 August 1999 Power of Attorney was
        asynchronous with Mr Kleve's signature of the Settlement Agreement on 16 July
        1999; (ii) the request for payment to NSS was suspicious in that it indicated that Mr
        Daniels was defrauding Mr Kleve and payment to the agent was not permitted by the
        Power of Attorney as a matter of New York law so that the Settlement Agreement
        was in some way invalid and (iii) Mr Kleve never received any payment under the
        Settlement Agreement so that it was void for want of consideration.

16.     Ms Lawson and Mr Ford also relied on Ohio law, to which the New York lawyer
        whom they called as an expert, Mr Jason Racki, said the New York courts would
        defer, for two propositions which they contended defeated Ms Swaters' claim: (i) that
        Ohio law imposes a six month time limit for claims to be brought against the estate of
        a deceased and no claim had been brought by Ms Swaters against Mr Kleve's estate in
        relation to the Car within six months of his death, so that her claim in the present
        proceedings was somehow time barred and (ii) that the Certificate of Motor Vehicle
        Title Act of Ohio imposes certain requirements for a valid transfer of title of an Ohio
        titled vehicle and there were irregularities in the title document transferring title to Mr
        Swaters, so that there was not a valid conveyance of title to him. For reasons set out
        below, Ohio law is irrelevant, but even if it were relevant, these are both thoroughly
        bad points.

The witness evidence

17.     Before making my findings as to whether Mr Swaters acquired good title to the Car in
        1990 or 1999, I should state my views on the evidence of the witnesses called by the
        parties. Ms Swaters gave evidence. Inevitably, her evidence about events in the 1990s
        was limited to matters of which her father had informed her as she had no
        involvement with the Car until later, after the Settlement Agreement, but she gave her

evidence in a straightforward and honest manner. Mr Lancksweert also gave evidence
for her. He had been Mr Swaters' business partner for many years and he was
involved both in the decision to acquire the chassis in 1990 and in the negotiation and
conclusion of the Settlement Agreement in 1999. I formed a favourable impression of
him as a man of integrity and I accept his evidence.

18.    Mr Swaters died in December 2010. Before he died, he swore an affidavit dated 15
May 2010 in the Ohio proceedings setting out the circumstances in which he had
bought the chassis and his attempts to establish that it was indeed 0384AM as
opposed to some other chassis number, given the confusion that had existed, both at
the time that the various 375 Plus cars had been raced in the 1950s and subsequently,
as to which cars bore which chassis number and which had crashed, leading to
uncertainty as to which chassis had survived. Ms Swaters has served a Civil Evidence
Act notice in respect of that affidavit. Despite Mr Ford's attempt to impugn the
integrity and good faith of Mr Swaters, I see no reason not to accept the evidence he
gave in that affidavit.

19.    Mr Ford called Mr Timothy Smith, who as I have said, is an Ohio criminal attorney
who was an acquaintance of Mr Kleve and provided advice to him at various times.
His evidence was confused and implausible. He has acted for Ms Lawson in the Ohio
litigation since August 2013 and, like her, refuses to acknowledge the jurisdiction of
this court. He has a financial interest if the litigation is concluded in favour of Ms
Lawson and Mr Ford and he also accepted that he had been in some professional
trouble, having been on probation in the United States and therefore suspended from
practice. I had doubts as to his probity and did not consider him a reliable witness.

20.    Mr Ford gave evidence himself. He was not in a position to give any direct evidence
of events in the 1990s, not having been involved with the Car or the people concerned
until he purchased what is in effect a majority share of Ms Lawson's interest in the
litigation in 2010. This lack of any personal knowledge did not stop him from
expressing opinions and speculating both in his witness statement (most of which was
strictly inadmissible) and in his oral evidence. He was, as Mr Eschwege for Ms
Swaters described him, a professional litigant and his evidence was of no assistance to
the court other than to highlight that he was prepared to advance any argument,
however outrageous or outlandish, that he thought might assist his cause.

21.    One factual witness for Mr Ford and Ms Lawson, who might have been in a position
to give relevant evidence, particularly in cross-examination, was Ms Lawson herself.
For example, she could have given evidence about her father's knowledge of the
Settlement Agreement and the settlement monies. Her absence is particularly striking
in circumstances where it is alleged by her and Mr Ford that no monies were received.
The fact that she declined to attend to give evidence, but her attorney, Mr Smith did
give evidence was extraordinary. Mr Eschwege invited me to draw appropriate
adverse inferences against Ms Lawson and Mr Ford from her failure to give evidence,
applying the principles in *Wisniewski v. Central Manchester Health Authority* [1998]
PIQR 324 at p.340 *per* Brooke LJ.

22.    The parties produced expert reports from forensic document examiners, Mr Steven
Slyter for Ms Swaters and Mr Stephen Cosslett for Ms Lawson and Mr Ford, but in
the event, they produced a joint report in which they agreed that there had been no
alteration to the amount entry of U.S. $625,000 on the first page of the Settlement

Agreement, so that there is no question of the Agreement having been somehow fraudulently altered, a point which was previously centre stage in Ms Lawson and Mr Ford's allegations. It was agreed that it was not necessary for the experts to give evidence. I set out their findings in more detail when I deal with the Settlement Agreement below.

23. The parties also produced expert reports from Belgian lawyers, Professor Matthias Storme for Ms Swaters and Mr Stan Brijs for Ms Lawson and Mr Ford, but, as is apparent from their Joint Report, on the critical aspects of Belgian law for present purposes, they were in agreement so that it was not necessary for them to give oral evidence.

24. Reports were produced on New York law from New York lawyers, Mr John Kiernan, co-chair of the litigation department of Debevoise & Plimpton LLP in New York for Ms Swaters and Mr Jason Racki for Ms Lawson and Mr Ford. They both gave oral evidence. Mr Kiernan was an impressive witness, as Mr Eschwege rightly described him the epitome of what this court expects of an expert, measured and objective. The same could not be said of Mr Racki. I have considerable doubt as to whether he could properly be described as an expert on New York law at all, since he seems only to have qualified as an attorney in 2011 or 2012 and appears to work on contract to firms as some sort of independent contractor for particular projects. He was certainly not measured or objective but was prepared to advance a series of curious propositions, such as that a New York court interpreting the Settlement Agreement would have deferred to Ohio law, which were clearly designed not to assist the court in establishing the relevant New York law but to assist Ms Lawson and Mr Ford if he could in winning the case, in complete disregard of the duty of an expert to the court. Save where his evidence corresponded with that of Mr Kiernan, I reject it and I accept the evidence of Mr Kiernan on every point of New York law.

25. I gave permission to Ms Lawson and Mr Ford at the case management conference on 9 September 2015 to call expert evidence of Ohio law although I was convinced (and remain convinced) that it is of no relevance for the reasons set out below. Ms Lawson and Mr Ford produced a report from William Graf and Ms Swaters one from Bryce Lenox. Neither was called to give evidence, but I accept Mr Eschwege's submissions that Mr Graf's report, which proceeds on an erroneous factual basis, is flawed and should be rejected. I accept the evidence of Mr Lenox.

Events leading up to the purchase of the Car by Mr Swaters

26. Mr Swaters was a highly decorated war hero, having fought in the Belgian resistance in the Second World War. After the war, he took up motor racing and raced for a number of years as a "gentleman" driver. He set up a racing team which became known as Ecurie Francorchamps which raced classic cars including Ferraris. In 1952, he became the first official Belgian importer of the marque and began a long relationship with the Ferrari factory and friendship with Enzo Ferrari himself. He established Garage Francorchamps as a Ferrari and classic car dealership. In 1980, he entered into a business partnership with Mr Lancksweert. As Mr Lancksweert said in his witness statement they had a good reputation and built up a highly respected dealership.

27.     As Ms Swaters described in her witness statement, in 1989 Mr Swaters was
        approached by a well-known Belgian car dealer, Michel Kruch, who sought assistance
        from him in identifying whether the wreck of a car that Mr Kruch had located in the
        United States was a Ferrari. Mr Kruch showed her father a photograph of the wreck
        and asked if he thought it was a Ferrari. He had apparently asked some other Belgian
        car dealers whether they thought the car in the photograph was a Ferrari. Mr Swaters
        investigated the photograph and, with the assistance of the Ferrari factory concluded
        that despite its terrible state, it could be a Ferrari. He told Mr Kruch that if he bought
        it, Mr Swaters in turn would buy it from him in order to restore it. Mr Ford sought to
        suggest in his submissions that in some way this involvement of Mr Swaters before
        the chassis was imported into Belgium demonstrated that he was on notice or was
        aware that the chassis was stolen. There is no evidential basis for this assertion.

28.     Mr Kruch purchased the car from Guy Anderson's company in Georgia, the
        Worldwide Exchange, for U.S. $4,500. The sales invoice issued by Worldwide
        Exchange described the car as "1 car disassembled in parts" and described the car in
        a Note: "This is as is where is. The car is only 40% complete, no engine, no seats, no
        interior, no wheels, no bodywork in rear. Car only includes chassis, trans, nose
        section (severely damaged) 1 spare tire". Mr Ford submitted that the price of U.S.
        $4,500 was at a gross undervalue. He also submitted that the bill of lading pursuant to
        which Mr Anderson shipped the container with the wreck inside was suspicious
        because it referred to the contents as "Racing Automobile Parts". He went so far as to
        suggest that this was an attempt on the part of both Mr Anderson and Mr Kruch to
        conceal the exportation of the chassis out of the United States from the U.S. Customs.
        In this context it is important to note that Mr Anderson and two other men named
        Kelley and Christian were charged with interstate transportation of stolen motor
        vehicles and conspiracy (the two thieves pleaded guilty). They stood trial in Atlanta in
        November 1989 but, at least so far as Mr Anderson and Mr Kelley are concerned,
        they were acquitted, as the prosecution was unable to establish to the satisfaction of
        the jury that they had known the chassis was stolen when they took possession of it.
        In my judgment, the description of the contents of the container in the bill of lading
        was not inherently suspicious. It accorded with the description of the car in the sales
        invoice as a car "disassembled in parts".

29.     One of the leitmotifs of Mr Ford's submissions was that the criminal trial in some
        way would prove his case that Mr Kruch and Mr Swaters had not acted in good faith.
        Given that the man who sold Mr Kruch the chassis was acquitted and neither Mr
        Kruch nor Mr Swaters were involved in the trial, it is difficult to see how anything
        that occurred at that criminal trial in the United States could implicate Mr Kruch or
        Mr Swaters. In any event, although Mr Ford referred to transcripts of the trial which
        would in some way establish his case, he only produced a handful of pages from the
        transcripts and exhibits at the trial in his supplementary bundle for the preliminary
        issue trial. Since he drew the court's attention to these in his skeleton argument for the
        hand down of the judgment, I have considered them carefully but contrary to his
        submissions, do not consider that they assist in the determination of the preliminary
        issue.

30.     He also relied upon the fact that the same Ferrari expert, Mr Nowak, who later
        ascribed a value to a 375 Plus in restored condition of U.S. $3 million had given
        expert evidence at the criminal trial that the chassis was worth U.S. $500,000, Mr

Ford's intention being to demonstrate that both the sale by Mr Anderson to Mr Kruch and the sale by Mr Kruch to Mr Swaters were at a gross undervalue. However, he did not produce copies of any expert report Mr Nowak had provided and, although he produced a single page from the transcript of Mr Nowak's evidence at the criminal trial, in which Mr Nowak asserted that the chassis was worth U.S. $500,000, Mr Nowak was not called to give evidence at the trial before me. Given the seriousness of the allegation that the sale to Mr Swaters was at a gross undervalue, the court would have expected the party making the allegation, Mr Ford, to call expert evidence as to the value of the chassis in its then condition in 1989, not merely to rely on evidence at a criminal trial in the United States more than twenty five years ago, which Ms Swaters has had no opportunity to challenge.

31.     Even if such evidence that the chassis was worth U.S $500,000 was given at the criminal trial I would find it very difficult to accept that the chassis in its then condition was worth anything like that amount. Although Mr Ford cavilled at the description of the chassis as "a burnt-out wreck", Mr Eugene Glenn of the Federal Bureau of Investigation ("FBI") described it in a letter to Ferrari in Italy on 6 October 1994 as *"dilapidated carcass"*. In his affidavit, Mr Swaters refers to the chassis number being almost illegible: *"due to the vehicle's damaged condition and also a result of fire"*. In a report in February 1996, the FBI described the Car in these terms: *"the rear portion of the Plus, its hood, two doors, wheels, and three brake drums had been removed"*. They also described how the VIN plate had been prised from the firewall by vandals the year before the theft.

32.     In my judgment a chassis in that dilapidated condition with no VIN plate to definitively identify it was not worth a fraction of U.S. $500,000. If it had been worth anything like that much, it would surely not have been left in a field by Mr Kleve. After his death, his entire collection of other classic vehicles was valued (in Exhibit D to in the Amended Schedule of Assets filed by Ms Lawson as Administrator of her father's estate with the Probate Court in Ohio) at only U.S. $86,770. Tellingly, the 375 Plus chassis was not included in his assets on his death by Ms Lawson. However, if the chassis when he was in possession of it had been worth anything like U.S. $500,000, it would surely have been given pride of place in his collection, not left to moulder in a field. Furthermore, this is an example of an issue on which Ms Lawson could have been asked questions if she had attended the trial and given evidence. I reject Mr Ford's suggestion that the price paid by Mr Kruch for the burnt out chassis was at a gross undervalue.

33.     Returning to events in Belgium, it appears that the U.S. authorities became aware that the chassis was in Belgium and requested the Belgian authorities to return the vehicle to Mr Kleve in the United States. In August 1989, Mr Kruch became aware of the allegations that the chassis had been stolen and immediately informed the Belgian authorities that he was the owner of the chassis, scarcely the act of a man with a guilty conscience. The Belgian authorities seized the chassis and the public prosecutor ("procureur du Roi") conducted an investigation. It appears that the investigation included a request for information from Mr Paramore, a Belgian lawyer instructed by Mr Kleve, although it is unclear whether Mr Kleve ever provided the information sought by Mr Paramore in his letter of 1 February 1990.

34.     On 14 February 1990, the office of the public prosecutor issued a written release lifting the seizure of the Car and permitting Mr Kruch "free use" of the Car. The

original French refers to "disposition libre" which seems to me to make it clear that the prosecutor was saying that Mr Kruch was free to dispose of the Car as he wished, including by sale. The release provided in full, in translation, as follows:

> "RE: wreck of Ferrari type 375 plus automobile, serial number 0384 AM
>
> The undersigned Michel WATERPLAS, Superintendent at the Brussels Criminal Investigation Department, hereby certifies that, further to the ruling handed down by the King's Prosecutor in Brussels (Dr. 27.11.1233/89), seizure of the automobile referenced above has been lifted today, 2/14/90.
>
> Mr. KRUCH may therefore have free use of this automobile."

35.    In his submissions, Mr Ford sought to suggest that the Belgian authorities had not investigated thoroughly the circumstances in which Mr Kruch acquired the chassis. He even seemed to be insinuating that there had been some sort of complicity between the Belgian authorities and Mr Kruch and Mr Swaters designed in some way to thwart Mr Kleve. Those allegations are very serious and, whilst I am prepared to make every allowance for the distrust some Americans have for Europeans, the allegations should not have been made. They are unpleaded and unsupported by any evidence and I reject them.

36.    Although the release by the public prosecutor referred to the vehicle as 0384AM, because of the absence of the VIN plate it remained unclear whether the chassis was indeed that of 0384AM because, as Mr Swaters says in his affidavit, the chassis number was almost illegible on the frame due to its damaged condition and as a result of fire. Mr Kruch arranged for an x-ray inspection of the chassis by Sabena Technics (the technical department of the Belgian airline) to determine the true chassis number. In a letter dated 21 February 1990, they stated: *"we hereby confirm that by x-ray inspection we discover the number 3?4AM (? =8 or 9) on the vehicle frame. I am also convinced that this frame is original"*. In other words, that x-ray analysis could not determine whether the chassis number on the frame was 0384AM or 0394AM. Mr Ford sought to cast doubt upon the status of this letter because it contained the notation at the bottom "For internal purposes only". Whatever the reason for that notation, the report did not remain internal to Sabena Technics but was given to Mr Kruch (who had commissioned it) and annexed to the contract of sale to Mr Swaters (see below). In any event, I consider there can be little doubt that the report sets out accurately what Sabena Technics were able to discern from their x-ray analysis. I will return to the uncertainty as to chassis numbers of Ferrari 375 Plus cars a little later in the judgment, when I deal with Mr Ford's contentions as to why the sale to Mr Swaters was not in good faith.

37.    On 15 March 1990, a written sales contract was entered into between L'Exception Automobile, represented by its chief executive, Mr Kruch, and Garage Francorchamps represented by its directors, Mr Swaters and Mr Lancksweert, for the sale of the chassis. The preamble to the contract stated: (i) the vendor had purchased the wreck of a vehicle presented as a Ferrari 375 Plus with the chassis number given as 384AM, in the United States in February 1989; (ii) the vendor had lawfully imported this wreck to Belgium from the United States and paid the import duties;

(iii) there had been legal proceedings in the United States against various persons suspected of having concealed the wreck which had allegedly been stolen from its owner; (iv) that in August 1989, having learnt that the wreck was sought by the judicial authorities, the vendor immediately informed the authorities of the fact that it owned the wreck which had been stored in its garage for several months; (v) that the wreck was therefore put under seal at the garage and the vendor was interviewed by the Belgian judicial authorities; (vi) that following detailed explanation by Mr Kruch as to how he had purchased the wreck in good faith and as to his peaceful, public, continued and unequivocal possession of the wreck, the seals were lifted on 14 February 1990, with the vendor having free use of the vehicle, as set out in the letter from the public prosecutor which was annexed to the contract; (vii) that the vendor had had a technical assessment carried out by Sabena Technics, their report also being annexed to the contract, which established that the 3 and the 4 were legible but there was doubt as to whether the middle figure was an 8 or a 9 and that their assessment showed the numbers were those struck originally and not therefore altered by subsequent improper modifications; and (viii) the purchaser was a professional in the field of vintage Ferraris and prior to the agreement had had every opportunity to examine the wreck in detail and form a detailed opinion with regard to its origin and history, taking account notably of its consultation of the archives of the Ferrari factory in Italy.

38.    The contract then provided that the vendor sold the wreck to the purchaser on the basis that the sale was at the exclusive risk and cost of the purchaser, without any guarantee for hidden defects or for breach of quiet possession due to a third party. The only guarantee given was as to the accuracy of the preamble. It was expressly agreed that if the wreck became the object of claims by any third party (including anyone claiming rightly or wrongly to be the dispossessed true owner) the purchaser was solely responsible for such claims. The sale price agreed was 3,500,000 Belgian francs for which receipt was duly given. Transfer of ownership took place from that day, 16 March 1990. The agreement was governed by Belgian law. It was signed by Mr Kruch, Mr Swaters and Mr Lancksweert.

39.    In addition to the sales contract, there was an invoice from L'Exception Automobile to Garage Francorchamps for the price of the vehicle, which was described as *"vehicule en epave"* in translation, a vehicle which is a wreck. That invoice set out the purchase price of 3,500,000 Belgian francs. After addition of 33% value added tax, the total price was 4,655,000 Belgian francs. That invoice was signed by both parties and above the seller's (i.e. Mr Kruch's) signature is written: *"Recu cheque KB No 222367"*, confirmation that Mr Kruch had received a cheque in payment of the price.

Acquisition of good title in the chassis as a matter of Belgian law

40.    At the time when that agreement transferred title, the chassis was in Belgium. On normal conflicts of laws principles, Belgian law as the *lex situs* governs whether good title to the chassis was transferred to Mr Swaters: see *Dicey, Morris & Collins, The Conflict of Laws* (15th edition) [24R-001].

41.    Belgian law has two modes by which a person may acquire title to property: (i) transfer based on contract and (ii) bona fide acquisition pursuant to Article 2279 of the Belgian Civil Code. So far as the application of the first mode is concerned, Mr

Swaters bought the chassis pursuant to a sales contract with Mr Kruch's company so that, if Mr Kruch acquired good title to the chassis, then Mr Swaters acquired good title in any event. As Mr Storme points out in his report, under the relevant provisions of the Belgian Criminal Code, the public prosecutor could only release the chassis to and upon the demand of the owner and the restitution of the chassis to Mr Kruch indicates that the public prosecutor was satisfied that Mr Kruch was the owner i.e. that he had acquired it in good faith. In the circumstances, I consider that Mr Kruch did have good title as a matter of Belgian law when he subsequently entered into the sale contract with Mr Swaters, from which it follows that Mr Swaters acquired good title pursuant to that contract.

42.     If Mr Kruch did not have good title then the issue arises whether Mr Swaters nonetheless acquired good title pursuant to Article 2279. That provides, so far as relevant (in translation):

> "I. In matters of personalty, possession is equivalent to title.
>
> II. Nevertheless, one who has lost or from whom was stolen a thing may claim it during three years, counting from the day of the loss or theft, against the one in whose hands he finds it, saving for that one his recourse against him from whom he holds it..."

43.     The Article has two requirements: (i) possession and (ii) good faith at the time of the acquisition. The relevant principles of Belgian law are essentially agreed between the Belgian law experts:

(1)     It is sufficient for the possessor to be in good faith for the purposes of Article 2279 at the time he acquires possession. Good faith is to be assessed on the basis of his knowledge at the moment of acquisition. That does not exclude subsequent conduct (such as intentionally hiding possession) as evidence of lack of good faith at the moment of acquisition.

(2)     There is a rebuttable presumption that the possessor acquired possession in good faith.

(3)     Good faith means that the possessor believed and could have believed that he acquired the goods from the owner or from a person who had capacity or authority to transfer title, even if this was not the case in reality.

(4)     The good faith of the possessor is a fact intensive enquiry which takes into account all the circumstances. It is thus a question of fact for this court and not for the experts, although Mr Brijs purported to express his view on the issue.

44.     So far as the third of these agreed propositions is concerned, in their joint report the two Belgian law experts cited as an example of a case where that proposition was applied the decision of the Cour de Cassation (the highest Belgian court) of 16 December 2010. Mr Storme had in fact cited that decision for this proposition in [78] of his report. In an extraordinary passage in his closing submissions, Mr Ford contended that he had downloaded and translated the case, that it did not support the proposition for which Mr Storme contended and that this somehow cast doubt upon

the veracity of Mr Storme. Mr Ford had apparently overlooked that the experts agreed the proposition and referred to the case in their joint report. This was another regrettable example of the impermissible lengths to which Mr Ford was prepared to go in seeking to disparage anyone involved with Ms Swaters (here her Belgian law expert) in support of his case.

45.     So far as the fourth agreed proposition is concerned, the Belgian law experts agree that the release of the chassis by the public prosecutor does not give rise to *res judicata* but is a relevant factor for determining the buyer's good faith, although they disagree as to its significance. Ultimately, that is a question of fact for the court.

46.     One issue about which the Belgian law experts were not agreed was whether the effect of Article 2279 (II) is to vest title in the possessor immediately, or only to do so after three years. Mr Storme's view is that under the Article the possessor who has acted in good faith will acquire at least a conditional title immediately and that his title will only be set aside by a "revindication", court proceedings commenced under Article 2279 (II) by the person from whom the goods were stolen or who has lost them within three years of the theft or loss. Mr Brijs on the other hand considers that the possessor only acquires good title after three years in the case of goods which were stolen or lost. If this point mattered, I would prefer the analysis of Mr Storme, but it is not necessary to decide the point, because on any view Mr Kleve did not commence proceedings to regain possession or revindication within three years of the chassis being stolen, from which it follows that, if Mr Swaters' possession was in good faith when he acquired the chassis, by 13 January 1992, at the latest, Mr Swaters had good title in the chassis and has had good title ever since.

47.     On the question of whether the purchase of the chassis was made in good faith, Mr Swaters stated that he and Mr Lancksweert had acted in good faith in his affidavit in Ohio, where he said: *"In March 1990, I partnered with Philippe Lancksweert and purchased the Vehicle in good faith from L'Exception Automobile in Belgium."* In his witness statement, Mr Lancksweert made it very clear that he and Mr Swaters were only prepared to buy the chassis after the investigation by the Belgian authorities had concluded in the release of the Car to Mr Kruch on the basis he had free disposition of it. Mr Lancksweert said: *"Jacques and I had not been prepared to buy the chassis if there was any question mark over its ownership. Mr Kruch also reassured us that he had bought the Car in good faith. The release of the chassis by the Belgian authorities was the critical moment for Jacques and me. The Belgian authorities had investigated the allegations and were satisfied that Mr Kruch could sell the Car. The release gave us the assurance that in Belgium we in turn as buyers from a Belgian seller were now free to work on the chassis."*

48.     In cross-examination by Mr Ford, Mr Lancksweert said that, as Ferrari representatives in Belgium, he and Mr Swaters would not have agreed to buy a stolen car. Mr Ford put to him an advertisement in the Ferrari Market Letter in February 1989 about stolen Ferraris, including the 375 Plus, but Mr Lancksweert said he had not seen this advertisement and did not know whether Mr Swaters had. They had not known the Car was stolen until after they bought it. I see no reason not to accept the evidence of Mr Lancksweert, whom as I have said I considered an honest witness. I consider that, despite the slurs on his and Mr Swaters' character insinuated by Ms Lawson and Mr Ford, it is inconceivable that, as reputable dealers and the sole Ferrari distributors in Belgium, they would have risked their reputation by buying the chassis, if they had

known it was stolen or if the person from whom they were buying it was implicated in theft.

49.    Of course they knew that there had been allegations in the United States that it was stolen and criminal proceedings against various people in the United States, since this is recorded in the preamble to the sales contract but that is not the same thing as knowing that the chassis was in fact stolen, let alone that Mr Kruch was implicated in the theft (which, of course, he was not). They were entitled to rely upon the fact that the Belgian public prosecutor had investigated the circumstances in which Mr Kruch had acquired the chassis and released the chassis back to him on the basis that he was free to dispose of it as he wished. As I held in [41] above, the public prosecutor would only have released the chassis to Mr Kruch if satisfied he was the owner and had acquired the chassis in good faith. In the circumstances, I consider that in relying upon the restitution of the chassis to Mr Kruch by the public prosecutor, Mr Swaters and Mr Lancksweert themselves acted in good faith for the purposes of Article 2279.

50.    So far as the points relied upon by Ms Lawson and Mr Ford as demonstrating lack of good faith at the time of the sale contract are concerned, in the findings I have just made, I have dealt with the allegations referred to in sub-paragraphs (i), (iii) to (v), (viii) and (ix) of [11] above. Apart from the issue of the absence of the VIN plate, in order to determine whether there is any force in the other allegations, it is necessary to set out some of the history of the confusion over chassis numbers of Ferrari 375 Plus cars and some of the events and correspondence subsequent to the sales contract, whilst bearing in mind the agreed principle of Belgian law that subsequent events are irrelevant to the issue whether the possessor acted in good faith at the time of acquisition, save to the extent that those subsequent events and correspondence are indicative of bad faith at the time of acquisition.

51.    In relation to the allegation about the absence of the VIN plate being indicative that the provenance of the chassis was suspicious, in cross-examination Mr Lancksweert denied that there was anything alarming or strange about the VIN plate having been ripped off, saying that there are cars which are sold without a VIN plate and that was why the Sabena Technics report was required. Quite apart from that evidence, which I accept, the suggestion by Ms Lawson and Mr Ford that the absence of the VIN plate was suspicious is unconvincing, given that the VIN plate was not removed because of or during the theft but had been torn off by vandals prior to the theft in an unconnected incident.

52.    Mr Swaters exhibits to his affidavit in the Ohio proceedings material which precedes the sale contract which supports the case that there was uncertainty as to the chassis numbers of Ferrari 375 Plus cars, even in the 1950s when they were being raced. For example, in an article from 1984 in Cavallino magazine, which describes itself as the magazine for Ferrari enthusiasts, it is stated that the 375 Plus cars were built solely for the offensive of the half dozen races of the Sports Car Championship of 1954, there were only a few constructed and many early Ferrari race cars have disappeared because Ferrari usually set them aside when done with them.

53.    In relation to the 1954 races, the article describes how in the Tour of Sicily, a 375 Plus driven by Umberto Maglioli went off the road and crashed heavily, but it is not known which chassis this was and whether it was repaired. The article describes how two 375 Pluses were entered in the Mille Miglia in May 1954, one for Farina and one

for Maglioli. Farina's car went off the road and hit a tree and the chassis of that car is reportedly known as 0386AM. It was said to have been discarded as beyond repair, but that was not definite. Maglioli's car was reported as 0394AM, with certain distinctive features such as a streamlined headrest and a more penetrating nose, but that car crashed as well. In the next race at Silverstone a car similar in appearance to 0394AM appeared driven by Froilan Gonzalez, which won the race. The article then describes how other evidence suggests that the car which won at Silverstone was in fact 0392AM.

54.     The article continues that at Le Mans in June 1954, Ferrari entered three cars, one driven by Maglioli and Paolo Marzotto, numbered 3 which some commentators have said was 0394AM, because of its similarity to the winner at Silverstone, but the competition record for 0392AM states that it was car number 3. Having described subsequent races, the article stated: *"There is a great deal of confusion over all these 375 Pluses, not only at Le Mans, but at all the other races as well. The only thing that can be stated with any certainty is that the real winning car may never be known conclusively."*

55.     Another example, which Mr Swaters exhibits to his affidavit, of the confusion over the chassis numbers is Ferrari Album 2 from 1981 which describes the car driven by Gonzalez at Silverstone and then driven by Maglioli and Marzotto at Le Mans in 1954 as 0394AM, which was then sold to Jim Kimberly. The Album includes photographs of "0394AM" at Silverstone where it was driven to victory by Gonzalez and of Mr Kimberly in practice in 0394AM at March Field in 1954. Mr Swaters also exhibits a Ferrari Album Letter from March 1986 which includes a photograph with the caption: *"Jim Kimberly's 375 Plus S/N 0394. Car did not finish the 1954 24 Hours of Le Mans, with Paolo Marzotto and Umberto Maglioli."* The text of the letter states: *"Attempting to put together the individual history for each car requires a heavy reliance on the physical appearance of the cars. Until recently, given the fact that S/N 0384 was not believed to have been a 375 Plus and S/N 0386 had been destroyed, it was fairly simple-only S/N 0394 had the streamlined nose. But now S/N 0384 can lay claim to the same feature."*

56.     What emerges from those articles is that, at the time of the sales contract, there was considerable confusion, even among the specialists, as to what the chassis numbers were of the 375 Pluses, whether 0384AM and 0394AM was the same car, which 375 Plus had won which race and which 375 Pluses had survived into the 1980s. This provides an illuminating background to two allegations made by Ms Lawson and/or Mr Ford, that the sale to Mr Swaters and Mr Lancksweert at a price equivalent to about U.S. $100,000 was at a substantial undervalue and that Mr Swaters concealed the true identity of the Car by describing it as 0394AM.

57.     So far as the first of those allegations is concerned, this was strenuously denied by Mr Lancksweert in his evidence. In his witness statement he says that the price they paid reflected the wrecked condition of the chassis and the risk they were taking that the wreck might not turn out to be one from the famous car. In support of that he refers to Mr Swaters' affidavit. In cross-examination, Mr Ford put to him that the price at which Mr Kruch bought from Mr Anderson of U.S. $4,500 was an absurdly low price, to which his response was: *"it is a low price but nothing to do with us. We paid the right price for a wreck"*. Given the uncertainty as to whether the wreck was the car raced by Maglioli at the Mille Miglia and by him and Marzotto at Le Mans and by

Gonzalez at Silverstone and the physical condition of the chassis at the time of purchase, I am quite satisfied that the price paid by Mr Swaters and Mr Lancksweert of 3,500,000 Belgian francs was a reasonable and fair price as Mr Lancksweert maintained, and not a purchase at an undervalue. As I have already found, I reject the case advanced by Ms Lawson and Mr Ford based upon some undisclosed and untested expert evidence in the U.S. criminal proceedings that the chassis was worth U.S. $500,000 at the time of the purchase by Mr Swaters and Mr Lancksweert in March 1990.

58.     Despite Mr Ford's assertion in his submissions that Mr Swaters was aware, at the time of the purchase in March 1990 and thereafter, that the wreck was definitely that of 0384AM and that he then deliberately concealed its true identity by describing it as 0394AM, the contemporaneous correspondence belies that suggestion. In his witness statement Mr Lancksweert describes how he and Mr Swaters were aware of Mr Kleve's claims and after the purchase did not want Mr Kleve to continue to make allegations about the Car and try to damage their reputation. He describes how they approached Mr Kleve to see what they could do to stop him making claims and also to obtain the missing parts for the Car such as the fuel tank if Mr Kleve had them. He describes writing to Mr Kleve direct and through lawyers and how he even went to Ohio to meet Mr Kleve to see if he would be willing to settle his claim that the chassis was his, but at that stage the discussions came to nothing. He found Mr Kleve an odd man to deal with, quite eccentric.

59.     This evidence of Mr Lancksweert was not challenged in cross-examination and is borne out by the contemporaneous correspondence. On 26 March 1990, Mr Lancksweert wrote to Mr Kleve on Garage Francorchamps notepaper with a Ferrari logo a letter which confirmed that Ferrari of Belgium (clearly a reference to Garage Francorchamps) in addition to paying him a sum of money for the frame of the car would feature him and his assistance in the recovery of the car in the history to be written after the car had been restored at the Ferrari factory and subsequently exhibited at the Ferrari Museum in Brussels.

60.     At about the same time, on 2 April 1990, New York attorneys acting for Mr Swaters and Mr Lancksweert wrote to Mr Kleve. Criticism is made by Mr Ford of the fact that the letter stated: *"As you know I represent Ferrari"* as somehow misrepresenting the position. There is no basis for that criticism. Garage Francorchamps was the exclusive representative of Ferrari in Belgium and this statement presumes that Mr Kleve knew who he represented. There is no evidence Mr Kleve was misled. The letter went on to offer him U.S. $85,000 for the title to the car, stating that for that sum Ferrari would also expect his assistance in locating other parts from the original car and in providing his knowledge of its history.

61.     Mr Ford submitted that the fact that, within days, Mr Lancksweert was prepared to offer Mr Kleve U.S. $85,000 for the Car demonstrated that the sale contract with Mr Kruch was at an undervalue. In my judgment, that submission is based upon a misapprehension. The offer of U.S. $85,000 was clearly made on the basis that Mr Swaters had already purchased the chassis from Mr Kruch for the equivalent of about U.S. $100,000, so that that offer of U.S. $85,000 was the price for buying out Mr Kleve in respect of his claims to the Car, together with purchasing the spare parts he had. That offer has no bearing or relevance to the price Mr Swaters was prepared to agree for the chassis.

62.    Mr Lancksweert explains the reasons for these approaches to Mr Kleve in his witness statement:

> *"We did not doubt that we had title to the Car, but we were prepared to see what we could do so that Mr Kleve would not continue to make claims about the Car, which, as far as we were concerned were not correct. Of course at the time we had bought only the chassis. It was damaged and incomplete. It was missing the parts such as the fuel tank. If there were spare parts retained by Mr Kleve it made sense to reunite these with the chassis even if their true value was low or doubtful. That was why we approached Kleve in 1990..."*

63.    That explanation makes perfect sense and again was not challenged by Mr Ford in cross-examination. The correspondence certainly does not suggest that Mr Swaters and Mr Lancksweert knew the chassis was stolen, only that Mr Kleve was claiming it was his. Also that correspondence belies the suggestion that they were concealing the Car from Mr Kleve. They were quite open about their intention to restore the Car at the Ferrari factory in Italy then exhibit it in the Ferrari Museum.

64.    At around the same time, there was correspondence about the Car between Mr Swaters and a well known Ferrari expert in the United States, Mr David Seibert, editor of Prancing Horse Magazine. Mr Seibert sent a fax to Mr Swaters on 3 April 1990 saying he was fairly certain that 0384AM was the car driven by Marzotto in the 1954 Mille Miglia where it crashed. He said he had a copy of the assembly sheets indicating the car was revised for the Carrera Messicana run in November 1954, but he did not believe it ran in the race. He continued that, as Mr Swaters knew, the car ended up near Cincinnati, Ohio in a field with a number of other cars, all apparently owned by Mr Kleve. Mr Seibert then set out some of the history of the theft of the vehicle, some of which subsequently proved inaccurate. The only significance of what Mr Seibert said for present purposes is that it would suggest to someone in the position of Mr Swaters in Belgium that the history was confused but that, although the car may well have been stolen at some stage, if he had purchased in good faith, as I have held that he did, he would be the owner. Indeed, having referred to the fact that none of those charged in the United States criminal proceedings made any claim to ownership, Mr Seibert himself stated: *"It is possible that a subsequent 'purchaser' in Europe may be able to make some claim of having purchased the car in good faith, and therefore has some ownership interest."*

65.    Mr Swaters' response on 4 April 1990 to this fax was enthusiastic:

> *"Thank you very much for your fax of yesterday. What a wonderful documentation you sent me. This will help me a lot for the negotiation and for the rebuild of this car. ...*
>
> *Don't you think that this car, which is definitely the 0384 is the car that was entered by Ferrari at the Mille Miglia for Maglioli at the Le Mans Marzetto/Maglioli and Silverstone Gonzales?*

> *At the three events Ferrari entered the car under the number 0394. But 0394 according to the factory was never build, was only an engine sold to Vandervell/Whitehead.*
>
> *According to Ferrari documentation, 0384 was rebuild 1954 Sept 2 and sold to Kimberly.*
>
> *On the chassis of this car you can found the number 03?4. The ? is for sure either a 8 or a 9.  That's why I think it possible that, by mistake they entered 0384 at the Mille Miglia, Le Mans and Silverstone under the number 0394.*
>
> *Last week I was in Maranello and looked through the archives and found:*
>
> *0384 KIMBERLY*
>
> *0392 GOLDSMITH*
>
> *0396 EDGAR*
>
> *0398 VALIENTE*
>
> *0400 DESTROYED BY THE FACTORY*
>
> *Do you know what happened between KIMBERLY and KARL KLEVE (Cincinnati)??"*

66.    This information was evidently derived from Mr Swaters' own researches into the history of the Car, both from the various publications which he exhibited to his affidavit twenty years later and in the Ferrari archives. This version of the history contradicts what Mr Seibert was fairly certain about in his fax, as Mr Seibert admits in his subsequent fax referred to below. Mr Ford alighted on the statement by Mr Swaters in his fax that the car *"is definitely the 0384"* as demonstrating that he knew that the car he had bought was 0384AM stolen from Karl Kleve and he had actively sought to conceal its identity thereafter by misdescribing it as 0394. In my judgment, the fax demonstrates nothing of the kind, only the obvious enthusiasm of a Ferrari expert who hopes he has purchased the chassis of a famous car, although there are still doubts as to whether it really is 0384. As Ms Swaters said when Mr Ford suggested to her in cross-examination that her father had sought to conceal the identity of the Car: *"I remember my father didn't know which number it was due to the Sabena x-ray and he was obsessed with knowing the truth"*.  In that context, it is also striking that, in their report in February 1996 the FBI state: *"From 0384's first race it was mistakenly identified by sports writers as 0394AM and is still historically identified in motorsports literature as 0394AM."*

67.    Mr Seibert responded to Mr Swaters' fax the following day saying that: *"if this chassis really 'owns' the history usually ascribed to 0394, many questions might be answered. My belief that 0384 was the Marzotto car (crashed) from the 1954 Mille Miglia was based on the assumption that 0394 was a different car, that the car crashed by Farina was 0386 and that Marzotto was driving a 4.9 liter car. By process*

*of elimination this would most likely have been 0384. If, instead, this is the car which is usually described as 0394, then its history would include the Maglioli entry at the 1954 Mille Miglia. Marzotto and Maglioli at Le Mans and Gonzalez at Silverstone. The car would then have been sold to Jim Kimberly who sold it to Howard Hively of Cincinnati, Ohio. Another interesting fact, tending to support your theory, is that I have data sheets for several 375 Pluses: 0384, 0392, 0396 and 0398. These seem to be the only ones sold from the factory, if 0400 was destroyed and 0394 was only an engine. On the other hand, if the Maglioli MM car was 0384, then I'm not sure of the identity of the Marzotto car-could it perhaps have been 0400?"*

68.     Mr Swaters responded the next day saying he had asked Ferrari to search in the old documentation for something more *"and at actual point they think 0394 may have existed and been sold with another engine and that engine 0394 have been sold to Vandervell. They are specially trying to find the original invoice to Kimberly."* I have referred extensively to this correspondence to demonstrate that, contrary to Mr Ford's assertion, there was no certainty about the precise identity and chassis number of the Car. Rather, here were two Ferrari enthusiasts swapping theories on the subject.

69.     On 11 April 1990, Mr Swaters faxed Mr Seibert to say his attorney, Nick Ackerman, who was trying to buy 0384 for him from Mr Kleve, had spoken to a William Victor who was a good friend of Mr Kleve. Apparently Mr Kleve would never sell to a trader but would sell to a real Ferrari Museum and Mr Victor was ready to convince him. The problem was Mr Victor did not know Mr Swaters and was not convinced he would restore the car with the help of the Ferrari factory for final destination in a Ferrari Museum. Mr Swaters asked Mr Seibert to speak to Mr Victor to explain the story of Mr Swaters and Garage Francorchamps.

70.     Mr Seibert then spoke to Mr Victor, as recorded in his fax to Mr Swaters also on 11 April 1990. Mr Victor worked for a Mr Stegman, a Ferrari collector, and he was familiar in general terms with Mr Swaters and his cars. He and Mr Stegman both knew Mr Kleve well and described him as eccentric. He doubted whether Mr Kleve would sell as he wanted to start his own museum. He referred to Mr Kleve having many parts of the Car including the gas tank, the other wheel and the steering assembly.

71.     Mr Swaters responded on 12 April 1990 thanking Mr Seibert for his help. He summarised the situation in these terms:

      1.     *I would like very much to buy the car and rebuild it with the help of the Factory, make clear the situation, 384 or 394 and keep it in the future museum. I think this car is worthwhile.*

      2.     *I have already spoken with the factory and they agree to help me to found the real story and to rebuild the car.*

      3.     *The man who owns the car in Belgium is ready to sell to me the car, because he realises he will never be able to rebuilt the car, but he is a trader and is asking 1.000.000 US $ towards the Belgian law, he is the real owner, because he bought it in good faith, imported it regularly, paid the taxes...*

4.  *Before to reach at an acceptable deal with the actual legal owner in Belgium, I want to make an acceptable agreement with Karl Kleve.*

5.  *If I don't buy the car, the actual owner for sure will sell it to another trader. I think that Lamplough [a dealer whom Mr Seibert had said had been in Cincinnati and offered Mr Kleve US $800,000 for the car] wants to pay 500.000 US $ for the car but he wants the ownership and physically the remain of the chassis."*

72.  Mr Seibert replied on 17 April 1990 and said he supported Mr Swaters' attempt to buy the Car from the Belgian owner as well as from Karl Kleve. He would like to see the Car restored and believed Mr Swaters was the person to do this. He said that legally he suspected that by international law and Belgian law, the owner in Belgium had the right to sell the Car to him, even though it was stolen prior to purchase. From talking to Mr Victor he believed Mr Kleve did not understand this and believed his car was going to be returned to him and only he had the right to sell it. Mr Seibert did not believe that he could explain the matter to Mr Victor and Mr Kleve in such a way that they would accept his representations. Mr Swaters' attempts to buy Mr Kleve's title via Mr Seibert seem to have ended there.

73.  Mr Ford relied upon Mr Swaters' fax of 12 April 1990 quoted at [71] above as evidence that Mr Swaters had not in fact purchased the chassis at that date and that therefore the sale contract of 16 March 1990 was not genuine, but in effect a sham. The fax of 12 April 1990 is certainly a curious document, but on the other hand, an allegation that the sales contract was not genuine or a sham is an allegation that the signatories of that contract, namely Mr Kruch, Mr Swaters and Mr Lancksweert were acting deceitfully: (see the classic definition of a "sham" by Diplock LJ in *Snook v London and West Riding Investments Limited* [1967] 2 QB 786 at 802C-E). Whilst Mr Ford cross-examined Ms Swaters about the fax of 12 April 1990 and put his case to her, notwithstanding that, since she was not involved at the time, she was unable to throw any light on what was going on, he did not put the fax or his case to Mr Lancksweert who was the one person giving evidence, who not only signed the allegedly sham contract, but might have been able to provide an explanation for Mr Swaters' fax. In view of that omission to put the allegation to Mr Lancksweert, I would be extremely reluctant to conclude that he had participated in a sham and, indeed, given the potential adverse effect on his reputation of such a conclusion, I consider it would be quite wrong to reach that conclusion.

74.  Quite apart from that difficulty for Mr Ford's case, the question remains what is the most likely explanation for the fax of 12 April 1990. In my judgment, the most likely explanation is that, for whatever reason, Mr Swaters did not want Mr Seibert to know he had already purchased the chassis from the Belgian owner. Mr Ford's case that the fax represents the true position, namely that he had not purchased the Car at that stage so that the sales contract was not genuine is frankly implausible. That case must involve the sales contract having been created subsequently to make it appear that Mr Swaters had purchased the chassis in March 1990. However, if that is right, why on earth fabricate a sales contract document with a price appreciably lower than the price at which the 12 April 1990 fax states that the Belgian owner was prepared to sell. Surely if any contract was being fabricated subsequently, it would have contained a price which was the same as the U.S. $1 million referred to in the fax or more, particularly since, on this hypothesis, those who fabricated the sales contract

document were not acting in good faith and would have been anxious to avoid any suggestion of a sale at an undervalue. Furthermore, the manuscript notation on the invoice referred to at [39] above is clear evidence that the price of 3,500,000 Belgian francs was paid by Mr Lancksweert at the time, a strong indication that the sales contract was made on 15 March 1990 and is genuine.

75.    Accordingly, as I have said, it seems to me that the far more likely explanation is that the sales contract was genuine but that, for whatever reason, Mr Swaters did not want to tell Mr Seibert that he had already purchased the chassis. Obviously that gives rise to the question whether that subsequent conduct (which would otherwise be irrelevant to the question of whether Mr Swaters purchased in good faith as a matter of Belgian law on 16 March 1990) indicates lack of good faith as at 16 March 1990. In circumstances where Mr Lancksweert, who as I have said, might have been able to provide a legitimate explanation, was not asked about this in cross-examination, I would be extremely reluctant to conclude that the fax was indicative of lack of good faith.

76.    Aside from the issue of price which I have dealt with, Mr Ford's principal point as to lack of good faith is that Mr Swaters was trying to conceal from Mr Kleve the whereabouts of the Car. Given that part of the context of the correspondence with Mr Seibert was a negotiation with Mr Kleve for the purchase of his rights, any suggestion that the fax of 12 April 1990 was designed to conceal the whereabouts of the chassis from Mr Kleve is entirely fanciful. The approaches to Mr Kleve by Mr Swaters, Mr Lancksweert and the U.S. attorneys made it quite clear that Mr Swaters and/or Mr Lancksweert had physical possession of the chassis, so that there is no question of them trying to conceal the Car or its provenance from Mr Kleve. In my judgment, the suggestion that Mr Swaters tried to conceal the true position as regards ownership or the location of the Car from Mr Kleve is unsustainable.

77.    Mr Ford also alleged that Mr Swaters subsequently tried to conceal the whereabouts of the Car when he had it shipped to Ferrari in Italy for the repair and restoration work in 1991 and 1992 because all the invoices and shipping documents described the Car with chassis number 0394. This allegation is fanciful in the extreme.  There was genuine uncertainty as to the identity of the Car and it does seem to have been interchangeably described as 0394 or 0384. The continuing confusion as to the identity of the Car and as to chassis numbers appears from the FBI letter to Ferrari of 6 October 1994: *"During the August 1992 FF-40 exhibition sponsored by Garage Francorchamps, Francorchamps owner Jacques Swaters displayed a newly restored 375 Plus, reported to be chassis number 0394AM. This vehicle is an exact duplication of the Umberto Maglioli, Froilan Gonzalez, Paolo Marzotto, Jim Kimberly and Howard Hively car with its distinguishing notched headrest, sloping front and headlights, and overhanging front, universally referred to in racing periodicals as 0394AM but which now appears to be the stolen 0384AM of Mr Kleve's"*. There is nothing in the suggestion that Mr Swaters was trying to hide the Car from Mr Kleve or anyone else. He was open about and understandably proud of his restoration project.

78.    In the circumstances, nothing in Mr Swaters' subsequent conduct has any bearing on his good faith at the time of his purchase of the chassis in March 1990 and, in my judgment, he obtained good title to the chassis as a matter of Belgian law in March 1990. Furthermore, although Mr Kleve had some correspondence with the U.S.

Embassy in Brussels in April and May 1990 seeking their assistance in recovering the chassis from which it is pretty clear he knew Mr Swaters had the chassis, he did not commence proceedings in Belgium for revindication within three years of the theft or at all, notwithstanding that he received advice from a Belgian lawyer, Mr Paramore. Accordingly, on any view, Mr Swaters had good title as a matter of Belgian law from 13 January 1992.

Events leading up to the Settlement Agreement

79.     The restoration of the Car undertaken by Mr Swaters was a long and expensive process. As the FBI recorded, in August 1992 the Car returned to Belgium from Italy and was exhibited at an event to celebrate the 40th anniversary of Ferrari Francorchamps, which was attended by individuals from Ferrari in Italy. In all, including the subsequent purchase of the original engine, Ms Swaters and her father have spent some £637,500 restoring the Car.

80.     In December 1994, Mr Lancksweert left Garage Francorchamps to work for Ferrari in the United States. As part of his exit deal, Mr Lancksweert and Mr Swaters agreed to divide their interest in the Car equally.

81.     Although Mr Kleve made no claim to the ownership of the Car in Belgium, in Ohio he made a series of applications to the Ohio authorities to have issued to him a number of 'certificates of title' (dated 24 March 1994, 16 March 1995 and 21 March 1997) recording that he was the purported owner of the Car. I agree with Mr Eschwege that these documents are irrelevant to the analysis of ownership. I accept the evidence of Mr Lenox that possession of an Ohio certificate of title cannot of itself confer ownership of a vehicle. The certificates of title cannot apply to the chassis, which was in Belgium, and cannot apply to the spare parts, which do not in themselves fall within the scope of the Ohio Certificate of Motor Vehicle Title Act, which only applies to a "motor vehicle" as defined. The spare parts do not fall within that definition.

82.     On 5 April 1995, Mr Kleve appointed Mr Mark Daniels of NSS as his agent to recover the Car. He entered into arrangements to pay NSS a commission if the Car was recovered which was set out in a Contract dated 23 August 1995 as 30% with all costs included in the fee, although informants' fees were not to exceed U.S. $250,000, to be paid at the time of final disposition (liquidation, settlement or return of the property to Mr Kleve). Mr Kleve signed a series of powers of attorney giving Mr Daniels authority to act on his behalf in relation to the Car, in particular Limited Powers of Attorney dated 6 March 1997 and 28 October 1998.

83.     The Power of Attorney dated 6 March 1997 seems to have been given in anticipation of discussions which took place between Mr Daniels and a Doug Freedman who acted as an intermediary between Mr Daniels and Mr Swaters. Apparently in anticipation of a possible settlement, on 21 March 1997, NSS was registered with the Ohio court (as recorded on the certificate of title granted to Mr Kleve that day) as first lienholder of the Car, the lien presumably being in respect of any fee or commission due to NSS if there was a settlement. However, whatever discussions took place in March 1997 came to nothing. It was not until the spring of 1999 that serious negotiations to resolve the dispute as to ownership took place.

84.    Mr Swaters appointed Mr Lancksweert, who was then living in Los Angeles, as his agent in the negotiations. In due course, Mr Swaters executed a document headed "Designation of Agent" which designated Mr Lancksweert as agent on behalf of the business partnership between them with due authority to take all necessary actions and execute and deliver all necessary documents to consummate the transaction contemplated under the Settlement Agreement between Mark Daniels, Karl Kleve and Mr Lancksweert.

85.    Mr Daniels acted on behalf of Mr Kleve. Mr Lancksweert instructed the New York law firm Seyfarth, Shaw, Fairweather and Geraldson ("SSFG") to act for him and negotiate with Mr Daniels. As he explained in his evidence, SSFG vetted and arranged all the documents, formalities and payment mechanisms. This is an important reality check as regards the plausibility of many of Ms Lawson and Mr Ford's multitude of arguments as to why the Settlement Agreement was not valid and binding on Mr Kleve. If they are right, then SSFG were negligent at best, possibly worse. It is inherently unlikely that experienced New York lawyers would not have satisfied themselves, for example, that Mr Daniels was authorised to enter into the Settlement Agreement and that any documents he presented were genuine.

86.    Drafts of the Settlement Agreement and associated documentation were being negotiated by April 1999. This is apparent from a fax of 29 April 1999 from Mr Steven Greenspan of SSFG to Mr Daniels, enclosing the "attached revised Settlement Agreement, General Release and Covenant not to Sue for both Karl Kleve and yourself and the Bill of Sale". In that draft the settlement amount is recorded as U.S. $750,000. Mr Lancksweert's evidence is that that was the figure he and Mr Swaters were prepared to offer. Although Mr Ford sought to make much (by reference principally to telephone conversations between Mr Daniels and Mr Kleve which Mr Kleve recorded and to which I return in more detail below) of the suggestion that Mr Kleve was only prepared to settle for U.S. $3 million, Mr Lancksweert's evidence, which I accept, is that no-one ever told him that Mr Kleve wanted U.S. $3 million.

87.    On 16 June 1999, Mr Daniels faxed Mr Nathaniel Akerman of SSFG sending revised agreements, saying: *"After much discussion with Karl, this is what he has agreed to and has already said has or will be executed."* The attached agreements were essentially in the form eventually signed by the parties. The amount of the settlement (which was to be paid by Mr Lancksweert into an escrow account) is left completely blank on the first page of the Settlement Agreement faxed on that occasion.

88.    On 23 June 1999, SSFG sent the draft agreements back to Mr Daniels with a number of suggested amendments in manuscript, including a modification to the "Transfer Documents" Mr Kleve would be required to deliver pursuant to clause 2, to include the original VIN plate. This presented Mr Kleve with a problem, since he could not locate the original VIN plate. It had not been stolen with the chassis, since as noted above, prior to that, it had been ripped off by vandals, but he could not locate it. In due course, at Mr Daniels' suggestion he reported it to his local police in Green Township, Cincinnati, Ohio, as recently lost or stolen and also swore an affidavit to that effect which was provided to SSFG.

89.    On 16 July 1999, Mr Kleve appeared before Denise Schmidt, a notary public in Ohio, and signed the Settlement Agreement. The notarisation stated: *"Before me, the undersigned authority, on this day personally appeared KARL KLEVE known to me to*

*be the person whose name is subscribed in the foregoing. GIVEN UNDER MY HAND AND SEAL THIS 16 DAY of JULY 1999"*. The Settlement Agreement which he signed consisted of three pages and, as I find, in all probability, at the time of his signature, the settlement amount on the first page was left blank. This not only accords with the fact that the amount was still to be negotiated between Mr Daniels and Mr Lancksweert, but is borne out by the expert opinion of the forensic document examiners, to which I refer below. On 19 July 1999, the Settlement Agreement was then signed by Mr Daniels *"Acting Agent (Attorney in Fact) for Karl Kleve and as corporate officer of National search Services"* before Eric Salani, a notary public in Florida, who subscribed the same rubric as set out above.

90.    On 27 July 1999, SSFG sent Mr Lancksweert a draft of an escrow agreement pursuant to which SSFG would act as escrow agent. Under clause 1 of the draft Settlement Agreement (and indeed of the executed Agreement) Mr Lancksweert was to pay the settlement amount into the escrow account, from where, under clause 2, it would not be released until Mr Daniels had delivered executed Transfer Documents. Mr Ford pointed out that the draft escrow agreement set out the documents that Mr Daniels was to present at closing of the transaction, including *"Letter of Authority from Kleve authorising Daniels to enter into the transaction contemplated under the Settlement Agreement"*, but no such letter had ever been produced. I do not regard that as in any sense suspicious, given the width of the Power of Attorney which Mr Kleve undoubtedly did sign, as referred to below. SSFG also sent Mr Lancksweert a draft amendment to the Settlement Agreement to deal with keeping it confidential. That draft amendment also stated: *"Mr Karl Kleve and the current owner of the 1955 Ferrari 375 Plus serial number 0384AM have reached a mutually satisfactory settlement with regard to the sale of the automobile. As a result of the settlement, all claims with regard to ownership of the automobile have been resolved."* In due course, that amendment was signed by both Mr Lancksweert and Mr Daniels on behalf of Mr Kleve.

91.    On 31 July 1999, Mr Lancksweert faxed back to Mr Greenspan of SSFG the signed escrow agreement and amendment. He asked Mr Greenspan to check with Mr Daniels if he could provide all the requested documents. He stated: *"We should find an agreement on the amount within 48 hours"*. On 5 August 1999, Mr Lancksweert telephoned Mr Greenspan to say that, in light of the missing VIN plate and certain original parts (for example the front bonnet and the fuel tank) the parties had agreed to adjust the settlement amount downwards from U.S. $750,000 to $625,000. Mr Lancksweert explained this in his witness statement: *"Jacques and I had originally been prepared to pay Mr Kleve U.S. $750,000 in order for him to release any claims. However, as far as Jacques and I were concerned the agreement was in relation to the Car as a whole, and the releases were in respect of the Car as a whole. But since the Car was missing the VIN plate and some other parts, Jacques and I thought that there should be a reduction in the settlement price to U.S. $625,000"*.

92.    Although, understandably, in his statement Mr Lancksweert said he could not remember the negotiations in detail, this demonstrates that, at around that time at the beginning of August 1999, Mr Daniels told Mr Lancksweert that the VIN plate and spare parts were missing. Ms Lawson and Mr Ford have a pleaded case that Mr Daniels told Mr Lancksweert that the spare parts were stolen, a statement which Mr Lancksweert knew or should have known was false because SSFG had copies of

Case 19-10309-EPK    Doc 246    Filed 01/02/20    Page 275 of 401

Double-click to enter the short title

photographs of the spare parts on display at Mr Kleve's premises and a FBI report listed those parts as not being reported stolen. This is said to be one of the matters that should have put Mr Lancksweert on enquiry so that Mr Daniels did not have ostensible authority. This was always an odd plea, but none of it was put to Mr Lancksweert in cross-examination. In any event the mere fact that there were photographs of the spare parts does not mean that they could not have been stolen subsequently, so that it is difficult to see how it could be said that Mr Lancksweert was put on enquiry.

93.    Furthermore, given that Mr Kleve in fact still had the spare parts, if his agent Mr Daniels did lie to Mr Lancksweert and say that the spare parts had been stolen when they had not, I do not see how that could have put Mr Kleve (and therefore by definition Ms Lawson and Mr Ford) in a better position as regards the issue whether, on the true construction of the Settlement Agreement, Mr Kleve forewent any claims and transferred title to the spare parts. Otherwise, Mr Kleve would have been able to profit from his agent's dishonesty. In cross-examination of Mr Lancksweert, Mr Ford sought to extract from him an admission that, because the price was reduced, the spare parts were excluded from the Settlement Agreement, but in my judgment, although Mr Lancksweert showed some tendency to accept that, the issue whether the Settlement Agreement included the spare parts is ultimately a question of construction for the court.

94.    On 11 August 1999, Mr Daniels faxed Mr Greenspan apologising for the delay, saying that whenever he needed something from Mr Kleve it took ten times longer than it should. He referred to the fact that there was now an affidavit about the VIN plate. In relation to the question of release of his lien, he said that the Head Supervisor Clerk of the Title Division of the State of Ohio had told him that, if he released the lien, it would no longer be valid, which would leave him with some exposure. The procedure was that, once the lien was satisfied by receipt of payment, the lienholder would sign off the lien portion and forward it to the State and the Clerk's Office would stamp it "Cancel". Alternatively, on payment the lienholder would forward Title to the new owner, who would then forward it to the Clerk for cancellation and the Title would be delivered to the new owner's address. This would obviously cause some delay, so Mr Daniels proposed a solution which was that he would forward a lien release agreement and SSFG would then make a wire transfer to NSS whose bank details he set out and once SSFG got the [cancelled] Title back from the clerk, then they would make a second wire transfer or a cashier's cheque payable to Mark Daniels and Karl Kleve for the remaining amount. This is obviously the genesis of the payment of the two cheques.

95.    On 18 August 1999, Mr Kleve appeared before Ms Schmidt the notary public again and signed a Limited Power of Attorney which was notarised by the notary with the same rubric as set out at [89] above. The Power of Attorney constituted and appointed Mr Daniels Mr Kleve's true and lawful Attorney-in-Fact:

>    "with power to act in my stead and in my behalf regarding Ferrari 375 Plus (Grand Prix Roadster) Chassis No: 0384AM With full complete authority and power, including but not limited to, investigate, negotiate, present documents, receive documents, convey, make endorsements, to sign and swear to any document, to perform any act that may be necessary or

*require[d] by United States or International law or regulation...*

*Giving and granting to this Attorney-in-Fact power and authority to do and perform every act necessary and proper to be done in the exercise of any of the foregoing powers as fully as I might or could possibly do, if present, with full power of substitution and revocation, hereby ratifying and conforming all that my Attorney-in-Fact shall lawfully do or cause to be done by virtue of this document.*

*This power shall remain in full force until cancelled in writing...*

*This power shall be binding upon and inure to the benefit of the parties herein, their estate, successors and assigns".*

96.    On 23 August 1999, Mr Daniels faxed various documents to Mr Greenspan, including the report from Mr Kleve to his local police department on 17 August 1999, that, at some point in the last year, the VIN plate had been lost or stolen.

97.    On 30 August 1999, no doubt in anticipation of the closing meeting that was to take place at SSFG's offices in New York on 2 September 1999, Mr Daniels had a copy of the original 18 August 1999 Power of Attorney certified by a notary public in Palm Beach, Florida where he lived. The notary certified and sealed an Affidavit of Certified Copy which provided: *"I, Beth A Ryan, a Notary Public in and for the State of Florida, do hereby state and certify based on satisfactory evidence and the production of documentation by the presentor, that the attached document is a true and correct copy of the original document personally viewed."* On 1 September 1999, the same notary public certified and sealed an Affidavit of Certified Copy in the same terms in respect of the Settlement Agreement. The copy which she certified now contained the settlement amount of U.S. $625,000, strong evidence that, on or before 1 September 1999, that amount had been written on to the original Settlement Agreement by Mr Daniels.

98.    On 1 September 1999, Mr Daniels also faxed to Mr Greenspan copies of the Settlement Agreement (the first page of which had the settlement amount of U.S. $625,000 in his manuscript), copies of three different versions of a General Release and Covenant Not to Sue, to be provided by each of Mr Kleve, Mr Daniels and Mr Lancksweert, an Agreement Release of Theft Status, a Lien Release and a Bill of Sale. On the same day, on 1 September 1999, Mr Daniels faxed Colonel West of the Green Township police department referring to the fact that, at the point that settlement was reached, it would be necessary to remove the vehicle from theft status. Mr Daniels sent as part of the fax copies of the notarised Power of Attorney and Letter of Authority executed by Mr Kleve for his file. He said that if settlement was reached, he would forward a request to remove the vehicle from theft status.

The closing meeting and the agreements signed

99.    On 2 September 1999, the closing meeting took place at SSFG's offices in New York. Both Mr Lancksweert and Mr Daniels were in attendance. In his witness statement Mr

Lancksweert said that the meeting went smoothly. He executed the necessary documents. In particular, Mr Lancksweert signed the original Settlement Agreement (with the settlement amount of U.S. $625,000 in it) upon which Mr Kleve and Mr Daniels had already placed their notarised signatures. Mr Lancksweert's signature was notarised by Yvonne Williams a notary public in the State of New York, with the same rubric as set out at [89] above. The notary public also certified a true and correct copy of the original Settlement Agreement. Mr Lancksweert's signature on the Amendment referred to at [91] above and the General Release and Covenant not to Sue from him were also notarised by the same notary public.

100.   Mr Daniels signed the other documents as the Attorney-in-Fact of Karl Kleve, pursuant to the Power of Attorney: the Amendment, the Bill of Sale, the General Release and Covenant not to Sue from Karl Kleve, the Lien Release and the Agreement Release of Theft Status. Mr Daniels also signed the General Release and Covenant not to Sue from himself. His signature on all those documents was witnessed and notarised by Ms Williams, the notary public.

101.   In proof of his authority to act and sign on behalf of Mr Kleve, Mr Daniels produced the copy of the 18 August 1999 Power of Attorney which had been certified by the Florida notary public, together with her Affidavit of Certified Copy in respect of the Power of Attorney. At the closing meeting, Mr Daniels also signed (and his signature was witnessed and notarised by Ms Williams, the New York notary public) an Affidavit which referred to the Power of Attorney dated 18 August 1999 giving him complete authority to convey the Car to Mr Lancksweert and to take whatever action was necessary to convey that property including execution of the various documents. He confirmed in the Affidavit that he had no knowledge of the death or incapacity of Mr Kleve or of any revocation of the Power of Attorney and represented that he had complete authority under the Power of Attorney to convey the Car under the operative sales documentation he was signing and executing that day. He agreed to return any consideration paid to him in the event that his authority under the Power of Attorney did not apply to the transaction.

102.   Mr Ford sought to rely upon the fact that Mr Daniels had provided this Affidavit, evidently at the behest of SSFG, as somehow demonstrating that Mr Lancksweert and SSFG were aware that he did not have authority to enter into the Settlement Agreement or the other documentation. In my judgment, it demonstrates nothing of the kind. It is far more likely that this was the New York lawyers being ultra-cautious in circumstances where Mr Kleve was not at the closing meeting and the Power of Attorney had been signed a fortnight earlier. It is certainly not indicative of knowledge of any defect in his authority.

103.   So far as the terms of the documents signed at the closing meeting are concerned, the Settlement Agreement itself provided in the Recitals:

"WHEREAS Kleve is the owner of the herein referenced automobile, [of] which was removed from his possession in or about 1989. The automobile described TO WIT

FERRARI 375 PLUS serial number: 0384AM ("Subject Automobile")

Thereafter Kleve retained the services of Mark Daniels/National Search Services to locate and recover the subject automobile, or alternatively negotiate any resolution, disposition or settlement, subject to the satisfactory approval of Kleve and;

WHEREAS Daniels is the corporate officer of National Search Services Inc having encumbrance for services rendered for the benefit of Kleve on the subject automobile and Daniels personally is appointed Attorney-in-Fact holder of a Power of Attorney executed by Kleve, and;

WHEREAS Lancksweert is the agent/representative of the person or entity currently in possession of the subject automobile for purposes of settlement, resolution and disposition of the aforementioned subject automobile and;

WHEREAS the parties are negotiating and acting in their capacity for the benefit respectively of their agency."

104.    The operative provisions of the Settlement Agreement provided inter alia as follows:

1.    THAT as soon as reasonably possible upon execution of this Agreement Lancksweert shall deposit an amount equal to U.S. $625,000 in lawful United States currency in an escrow account ("the Account") satisfactory to Lancksweert, such amounts to be released only upon written direction of Lancksweert after satisfaction of the conditions set forth in section 2 below.

2.    Upon deposit of the escrow amount and written notice to Daniels or a designated representative's verification of the escrow deposit, Daniels shall within two days following such notice, deliver to a designated representative of Daniels executed ownership documents of the subject automobile; to include the Title, Power of Attorney, Letter of Authority, Lien Release and Bill of Sale, all of which have been reviewed by Lancksweert in advance (collectively the "Transfer Documents"). In addition to the Transfer Documents, Daniels and Kleve shall provide a letter certifying that the release of the theft status of the subject automobile and the transfer of good and clear title and executed relevant documents for the benefit of Lancksweert or to any other person or entity as Lancksweert may designate shall be valid and released to Lancksweert upon satisfactory evidence that Lancksweert has deposited the full and complete amount and the receipt thereof, as previously herein indicated in

Section 1. Simultaneously upon release of the Transfer Documents to Lancksweert, the funds in the Account shall be released to Daniels or designated representative. If Daniels fails to deliver the transfer documents and related documents, the funds held in escrow shall be returned to Lancksweert immediately.

3.  (a)    Kleve and Daniels represent and warrant, jointly and severally, that upon consumation [sic] of the transactions provided for above, Lancksweert, or any other person or entity that Lancksweert may designate, shall have good and clear title to and hold all rights, title and interests in the subject automobile free and clear of any claims, liens or encumbrances.

(b)  Kleve and Daniels represent and warrant, jointly and severally, that good and free title to the subject automobile shall be conveyed to Lancksweert free and clear of all liens, claims, charges and encumbrances of any kind or nature.

(c)  Kleve and Daniels represent and warrant, jointly and severally, that there are no claims, litigation, actions, proceedings, hearings or other administrative or judicial matters pending or threatened, or third party consents required from any person or entity, which would in any way affect the ownership of the subject automobile.

5  Non Performance or Breach by Lancksweert

Lancksweert expressly agrees that he and/or any person or entity on whose behalf Lancksweert is acting, or any person or entity who is acting on behalf of Lancksweert, breaches or fails to remit the complete and full payment as stipulated herein for the benefit of Kleve and Daniels, Kleve and Daniels withdrawl [sic] any agreements or representations, and shall reserve all rights to the subject automobile, as well as, any and all rights to pursue and necessary legal remedies and action.

9  New York Law

This Agreement will be construed in accordance with and governed by the internal laws of the State of New York without reference to the conflicts of laws principals [sic] thereof.

105.    The Bill of Sale provided that Karl Kleve: *"for good and valuable consideration, the receipt of which is hereby acknowledged, does hereby sell, transfer, convey, assign and deliver unto Philippe Lancksweert ("Buyer")...good and marketable title to the Subject Vehicle (as that term is defined in the Settlement Agreement), free and clear of any and all liens, claims, liabilities or encumbrances of every kind and nature, to have and hold such Subject Vehicle unto Buyer its successors and assigns, to and for its or their use forever"*. The Release of Theft Status provided that Mr Kleve agreed to release the theft status as reported to the Green Township Police Department in the theft report dated 24 January 1989. It is not necessary to set out the terms of the General Releases save to note that they reflected the terms and purpose of the Settlement Agreement to resolve and settle any and all disputes between the parties in respect of the Car.

106.    The Lien Release provided by Mr Daniels provided that *"for good and valuable consideration, the receipt of which is hereby acknowledged, [he] does hereby release any lien, liability and encumbrance"* and then continued in similar terms to the Bill of Sale. In fact, Mr Daniels produced at the closing meeting the 21 March 1997 Ohio Certificate of Title of Karl Kleve which had recorded the lien, with notation by NSS that the lien had been discharged and a stamp from the Clerk of Courts in Ohio dated 26 August 1999 "Lien Cancelled". On the reverse of the Certificate Mr Daniels as Attorney-in-Fact for Mr Kleve warranted that the title was free of all liens. That warranty was sworn to and subscribed by him before Ms Williams, the notary public in New York on 2 September 1999.

107.    At the closing meeting Mr Lancksweert also produced two cashier's cheques drawn on an account with Fidelity Trust Company International dated 2 September 1999, one in favour of National Search Services for U.S. $225,000 and one in favour of Karl Kleve and Mark Daniels for U.S. $400,000. Although clause 2 of the Settlement Agreement provided that the monies were to be held in escrow until Mr Daniels provided the Transfer Documents, since he provided the Transfer Documents and the Certificate of Title with the stamp "Lien Cancelled" on it at the closing meeting, it is apparent that the escrow account did not in fact need to be operated and the cheques were released to Mr Daniels.

108.    On 2 September 1999, Mr Kenneth Crook, the FBI agent who had investigated the theft and subsequent history of the chassis and who had been in contact at various stages with Mr Kleve, sent Mr Greenspan of SSFG a fax confirming that the Car was not currently reported stolen because there was no record of the VIN with the NCIC, the FBI's National Crime Information Center. From this it is clear that Mr Crook knew that the Settlement Agreement was being concluded and it would be surprising, to say the least, if he knew that, but Mr Kleve did not.

109.    It appears that the cheques were presented by Mr Daniels promptly to his bank, since on the cheque in favour of Mr Kleve and Mr Daniels there is an endorsement by him in favour of Mr Kleve on the reverse on which the stamps indicate that this was endorsed at a bank in Orlando, Florida on 3 September 1999. I deal later in the judgment with the suggestion by Ms Lawson and Mr Ford that Mr Kleve did not receive any money.

110.    On 11 November 1999, the Green Township Police Department produced a statement requesting that the case of the theft of the vehicle be cleared due to the civil

agreement (i.e. the Settlement Agreement) reached on 2 September 1999. Again, it would be surprising if this statement from the police was provided without Mr Kleve's knowledge.

Authenticity of the Settlement Agreement

111.   As noted above, until relatively recently, the main case pursued by Ms Lawson and Mr Ford, as set out in Further Information served on 17 April 2015, was that the Settlement Agreement had somehow been fraudulently altered, in particular that the amount of U.S. $625,000 had been substituted in some way for the amount of U.S. $3 million which it was alleged was originally on the document or that Mr Daniels replaced the original page one of the Settlement Agreement, which bore the figure U.S. $3 million, with a page one bearing the figure U.S. $625,000. There was never any evidence to support this forgery allegation. In particular, Ms Lawson and Mr Ford have never produced a copy of the Settlement Agreement signed by Mr Kleve bearing the figure U.S. $3 million. Although Mr Kleve seems to have faxed a copy of the Settlement Agreement to FBI Agent Crook on 6 June 2000 with the figure of U.S. $3 million filled in on the first page, that copy was unsigned by anyone, so it cannot have been a copy of the document actually signed by Mr Kleve on 16 July 1999.

112.   The case that the Settlement Agreement signed by the parties had been fraudulently altered is comprehensively exploded by the expert evidence of the forensic document examiners. In their joint report, Mr Slyter and Mr Cosslett, who examined the original at different times, agree that there was no evidence of abrasion of the surface of the paper associated with the U.S. $625,000 entry on the first page. They concluded this entry had not been altered. Mr Cosslett examined the document using the ESDA technique to see what indented impressions there were on the second and third pages. He found impressions on both of the amount entry U.S. $625,000 showing that the amount was written on the first page whilst it was above the second and third pages and he found no impressions of any other amount entry.

113.   In my judgment, that demonstrates that the only amount ever entered on the first page of the original as signed by all three signatories was U.S. $625,000, which was almost certainly inserted by Mr Daniels at a time when the first page was stapled to the second and third pages. If the pages had been loose, the impressions on the second and third page of that amount entry would in all likelihood have been slightly blurred. Mr Slyter was able to examine the three staples on the top left hand and concluded there was no evidence they had been removed and that the three pages could not have been changed after they were stapled. By the time of Mr Cosslett's examination the staples had been removed, but there was an entirely innocent explanation for this, that it had been done by staff at Bonhams' solicitors, Jones Day, for photocopying purposes.

114.   Mr Slyter found that the three pages of the original all had the same physical properties and were in all probability from the same stock of paper. He also examined the copy of the Settlement Agreement certified by the Florida notary public, Beth Ryan, on 1 September 1999 and concluded that the Settlement Agreement had not been altered since that certified copy was made.

115.   The suggestion that Mr Kleve signed the Settlement Agreement at a time when page one bore the figure U.S. $3 million and Mr Daniels subsequently swapped that page

one for another page one bearing the figure U.S. $625,000, is implausible in the extreme. It involves the hypothesis that Mr Kleve or someone else inserted the figure U.S. $3 million on the original page one at a time when it was not stapled to or sitting on top of pages two and three, because otherwise there would be some indented impression of that figure on the original page three, which there is not. It seems highly unlikely that the figure would have been inserted on the original at a time when the pages were separated in that way. Furthermore, unless the three pages were being dealt with loose which seems highly unlikely, Mr Daniels could not have replaced the first two pages of the document after they were stapled together, given Mr Slyter's evidence that the staples had not been removed and his conclusion that the three pages could not have been changed after the corner had been stapled.

116.    On the basis of that expert evidence, I consider that, in all probability, when Mr Kleve signed the Settlement Agreement on 16 July 1999, the amount of the first page was blank. That would also be consistent with the fact that at that time negotiation of the settlement amount was still ongoing between Mr Lancksweert and Mr Daniels. Mr Daniels then filled in the amount of U.S. $625,000 on the first page at a later date, in all probability at around the time on 1 September 1999 when Mr Daniels had the copy of the Settlement Agreement notarised in Florida and when all three pages were stapled together. There is no evidence that Mr Kleve ever signed the third page of the original Agreement with any figure filled in on the first page as is borne out by the fact that Mr Cosslett found the impression of the U.S. $625,000 but no other figure on the third page actually signed by Mr Kleve.

117.    In my judgment, the Settlement Agreement is clearly an authentic document which was binding on Mr Kleve if Mr Daniels had authority to enter into the Settlement Agreement and it is to that issue of authority which I now turn.

Mr Daniels' actual authority to conclude the Settlement Agreement

118.    Ms Swaters' primary case is that Mr Daniels had actual authority, conferred by the 18 August 1999 Power of Attorney signed by Mr Kleve. The law of New York on the effect of such a power of attorney as stated by Mr Kiernan is very clear and is essentially the same as English law. It can be summarised as follows. A power of attorney signed by a principal constitutes a grant of actual authority to the agent. The agent designated in the power of attorney becomes the principal's alter ego, with full power and authority to bind the principal within the scope specified in the power of attorney. Where a third party relies on a signed power of attorney, questions concerning the scope of authority that arise from ambiguities in the language of the power of attorney are resolved against the principal in favour of the third party. The Court of Appeals of New York (the highest state court) stated the purpose of a power of attorney in these terms in *Keyes Metropolitan Trust Co* (1917) 220 N.Y. 237: *"The purpose of a written power of attorney is not to define the authority of the agent, as between himself and his principal, but to evidence the authority of the agent to third parties with whom the agent deals"*. Mr Racki seemed to cavil at that principle because the case was decided a hundred years ago, but his unwillingness to accept a basic principle of New York law seemed to me to demonstrate both what an unsatisfactory witness he was and that he was not really an expert on New York law at all.

119.    The 18 August 1999 Power of Attorney was clearly in wide enough terms to authorise Mr Daniels to execute the Settlement Agreement and agree the amount of the settlement. It gave Mr Daniels power to act *"in my stead and in behalf regarding"* the Car and gave him *"full complete authority and power" "including but not limited to"* a list of actions, which included conveying, a clear indication that the powers given included to convey title to the Car. Mr Kiernan's evidence, which I accept, is that, as a matter of New York law, the 18 August 1999 Power of Attorney gave Mr Daniels actual authority to bind Mr Kleve to the Settlement Agreement. According to the joint report, Mr Racki was not prepared to give an opinion on that question, a reticence I found distinctly unimpressive.

120.    Ms Lawson and Mr Ford seek to challenge the 18 August 1999 Power of Attorney in a number of ways, all of which I consider to be without merit. First they allege in their pleading that Mr Daniels fraudulently altered the Power of Attorney from the one which Mr Kleve signed, but there is absolutely no evidence to support that allegation, which should not have been pleaded. Mr Kleve clearly did sign the Power of Attorney on 18 August 1999, since it was witnessed by a notary public. Mr Daniels then had the Power of Attorney notarised by a notary public in Florida, where he was resident. The statement by that notary demonstrates that she saw the original and was confirming that what she notarised was a true copy. Mr Ford (who as I have said is a non-practising Louisiana attorney) went so far as to assert that it was not open to a notary to do this as a matter of Florida law, which was plainly a nonsensical suggestion made in an effort to overcome an obvious obstacle in his and Ms Lawson's case.

121.    Equally, there was nothing in the point which he also advanced that all that was produced by Mr Daniels to the New York lawyers for Mr Lancksweert was the certified copy of the Power of Attorney and not the original. The fact that it was a certified copy establishes that there was a genuine valid Power of Attorney which the notary public had seen, of which she was certifying the copy and that it had not been altered.

122.    Second, Ms Lawson and Mr Ford's pleaded case is that Mr Daniels' authority to conclude the Settlement Agreement was circumscribed by a letter of authority signed by Karl Kleve on 18 June 1999. That contains manuscript additions: *"approved by Karl Kleve"* and *"by Karl Kleve"* which are in Mr Timothy Smith's handwriting and which purport to limit Mr Daniels' power to present offers to any counterparty to offers approved by Mr Kleve. Mr Smith claimed in his witness statement that this was done whilst he was on the phone with Mr Kleve. In cross-examination he was unable to say when the manuscript amendments were made although he did not think that he would have altered the letter after Mr Kleve had signed it. Mr Eschwege put to him another copy of the letter with different manuscript, albeit the same words, which he said was also in his handwriting. He was unable to explain why he had added manuscript amendments to two copies of the letter, nor why he had not got Mr Kleve to countersign the amendments, which would have been the usual practice of any competent lawyer. In any event, he was unable to say when the amendments were made.

123.    In my judgment, it cannot be safely assumed that these manuscript amendments were made at or around the time that the letter of authority was signed by Mr Kleve, as opposed to at a much later date. As I have said I did not consider Mr Smith a reliable

witness and he has a financial interest in this litigation being determined in favour of Ms Lawson and Mr Ford. However, whenever the letter was altered, it had been and was superseded by the 18 August 1999 Limited Power of Attorney, so that, at the time that the Settlement Agreement was actually concluded on 2 September 1999, the letter of authority (even if the handwritten amendments had been made to it by then) cannot circumscribe Mr Daniels' actual authority which was clearly granted by the later document, the 18 August 1999 Power of Attorney. Furthermore, Mr Lancksweert's evidence, which I accept, is that he neither received nor saw the 18 June 1999 letter of authority at the time of negotiation and conclusion of the Settlement Agreement. That is borne out by the fact that there is no copy of the letter of authority in SSFG's closing file.

124.   Ms Lawson and Mr Ford's pleading also includes a somewhat bizarre allegation that Mr Daniels was unable to produce the Power of Attorney referred to on the first page of the Settlement Agreement, but only the 18 June 1999 letter of authority. In so far as this is a variation on another theme of their case, that Mr Daniels could only have been authorised to conclude the Settlement Agreement by a Power of Attorney in existence at the time when Mr Kleve signed that Agreement on 16 July 1999, the point is based on a wholly misconceived analysis. Whether as a matter of New York law or English law, there was no concluded contract until Mr Lancksweert signed the Settlement Agreement on 2 September 1999 and what matters in terms of the authority of Mr Daniels to conclude a contract on that day is what Power of Attorney he then had, which was, of course, the 18 August 1999 Power of Attorney. The fact that the authority clearly conferred by that Power of Attorney was not given by Mr Kleve to Mr Daniels until after Mr Kleve signed the Settlement Agreement is wholly irrelevant.

125.   Furthermore, since Mr Lancksweert's evidence which, as I have said, I accept, is that he never saw the 18 June 1999 letter of authority, this particular allegation appears to be based on a fundamental factual misapprehension as well. In any event, it was not suggested to Mr Lancksweert by Mr Ford in cross-examination that he did not see the 18 August 1999 Power of Attorney but only a letter of authority.

126.   Third, as I have said, Ms Lawson and Mr Ford have produced transcripts of a number of telephone calls between Mr Kleve and Mr Daniels which Mr Kleve appears to have recorded, according to Mr Smith because he was concerned about being cheated. These calls are relied upon in support of two aspects of their case: (i) that Mr Kleve was only ever prepared to settle for U.S. $3 million and that (ii) there was a limitation on Mr Daniels' authority that any settlement amount had to be approved by Mr Kleve. Generally, I agree with Mr Eschwege's submission that little reliance can be placed on these transcripts. Much of what is said, particularly by Mr Kleve who was by this stage 85 and who was evidently quite eccentric, is confused.

127.   However, what does emerge is that at some stage he and Mr Daniels were intending to trick Mr Lancksweert into signing the settlement documents so that in some way this would amount to an admission which would incriminate him and Mr Swaters, which would assist them in litigation to recover the Car. Thus, on 10 July 1999 Mr Daniels is recorded as saying: *"What I want to do is get these idiots to commit. After they see that you've signed this stuff, get them to sign it, and then I've got those suckers locked"*. Then again on 17 July 1999, he is recorded as saying: *"in this case, with them, being Swaters or his representative, being Philippe, committing to something in*

*written form is a lot better, it holds more water with any type of a litigation or criminal-type pursuit"*. Mr Kleve's reaction in the continuing discussion about committing Mr Lancksweert to signing an Agreement which would be used to try and recover the Car was to say, on 19 July 1999: *"Yeah, we got a win-win situation here"*. This all smacks of sharp practice which does not reflect well on either of them. As a consequence, I am not able to accept at face value what Mr Kleve is recorded as saying after the Settlement Agreement was concluded to FBI agent Kenneth Crook to the effect that he was only ever prepared to settle for U.S. $3 million and that he had not been paid any money by Mr Daniels.

128.    So far as the figure of U.S. $3 million is concerned, it is certainly true that Mr Kleve mentions this figure during the recorded telephone conversations with Mr Daniels, but this seems to be in the context of telling Mr Daniels that he had other prospective buyers for the Car in the United States prepared to pay that sort of money and he seems to have had a hope of pushing up the price by getting the Belgians to compete with these American buyers. This was wholly unrealistic, as Mr Daniels appears to have tried to explain to him. Mr Swaters had possession of the Car, he had good title as a matter of Belgian law and it was he who had incurred the expenditure restoring the Car. It is inconceivable that Mr Swaters and Mr Lancksweert, let alone some buyer in the United States, would have been prepared to pay anything like U.S. $3 million for Mr Kleve's interest in the Car. Whilst the fully restored car in his possession might have been worth that much, his interest in the Car which was not in his possession, or even in the United States, in circumstances where, for whatever reason, he could not even produce the VIN plate or the spare parts, was worth far less than that.

129.    I am also concerned that there may not have been complete disclosure by Ms Lawson and Mr Ford of all the transcripts of telephone conversations between Mr Kleve and Mr Daniels, but only of those which they consider assist their case. It seems to me extremely unlikely that Mr Daniels would have agreed the eventual settlement amount of U.S. $625,000 without having spoken to Mr Kleve about it, told him that this was the best settlement he was going to obtain and secured his agreement to settlement at that level. In those circumstances, I suspect that there were other conversations between them after Mr Kleve signed the Settlement Agreement in blank, the transcripts of which have not been disclosed or for which there are no transcripts, in which Mr Daniels persuaded Mr Kleve to accept settlement at U.S. $625,000. It may be that Mr Kleve did so in the hope that, as he and Mr Daniels had been discussing earlier, he could use the Settlement Agreement in some way in litigation to get the Car back to the United States and to obtain the U.S. $3 million he had been thinking of (or something close to it) and that may explain his subsequent conduct.

130.    Again, this question of Mr Kleve's knowledge that the Settlement Agreement had been executed and his dealings with Mr Daniels are areas where Ms Lawson could have been cross-examined if she had come to give evidence. I find that, in all probability, Mr Kleve did agree to settlement at U.S. $625,000 and did know that the Settlement Agreement had been concluded at that amount. However, even if he did not know and (as I have said is extremely unlikely) Mr Daniels concluded the settlement at that amount without informing Mr Kleve, Mr Daniels had clear actual authority to do so granted by Mr Kleve by the 18 August 1999 Power of Attorney.

131.    It does seem that, under the earlier Powers of Attorney, Mr Daniels was required to obtain the approval of Mr Kleve before concluding any settlement. Indeed this was recorded in the first recital to the Settlement Agreement itself. However, any discussion in the recorded telephone discussions about his authority being limited in that way predates the signature by Mr Kleve of the 18 August 1999 Power of Attorney which did not require his prior approval of a settlement and which Mr Daniels seems to have persuaded him to sign on the practical basis that there would be a problem if he were incapacitated or died. Thus the 18 August 1999 Power of Attorney is the latest in point of time and the one in force when the Settlement Agreement was concluded.

132.    Furthermore, since the 18 August 1999 Power of Attorney provided that it was to remain in force until cancelled in writing, Ms Lawson and Mr Ford would have to establish that there was some written communication causing a reasonable person in Mr Daniels' position to understand that the scope of his authority was more limited than set out in that Power of Attorney. That was Mr Kiernan's evidence as to the position in New York law, which I accept. Ms Lawson and Mr Ford cannot and do not point to any such written communication.

133.    In all the circumstances, the various challenges by Ms Lawson and Mr Ford to the validity and scope of the 18 August 1999 Power of Attorney are without merit. That Power of Attorney was valid and subsisting as at 2 September 1999 when the Settlement Agreement was concluded and, accordingly, Mr Daniels had actual authority to negotiate and agree the settlement amount and to conclude the Settlement Agreement on behalf of Mr Kleve.

Apparent authority

134.    In the circumstances, it is not strictly necessary to consider in detail Ms Swaters' alternative case that, even if Mr Daniels did not have actual authority to conclude the Settlement Agreement on behalf of Mr Kleve, he had apparent authority to do so. However, I will deal with the various matters relied upon by Ms Lawson and Mr Ford as putting a reasonable person in the position of Mr Lancksweert on notice that there was a problem with Mr Daniels' authority, since there is considerable overlap between those matters and the matters they rely upon in support of their assertion that the Settlement Agreement is not valid and binding.

135.    The relevant principles of New York law in relation to apparent authority are very similar to those of English law and can be stated shortly as follows:

         (1)    Where an agent acts without actual authority in respect of a transaction, he may nevertheless act with apparent authority where a third party reasonably believes, based on manifestations traceable to the principal, that the agent has authority to act on behalf of the principal;

         (2)    Where a principal signs a power of attorney, but separately communicates to the agent that the scope of his authority is narrower than that set out in the power of attorney, the agent will continue to have apparent authority to the full scope of the grant with respect to a third party who is aware of the power of attorney and reasonably relies on the scope of the authority granted therein, but who does not know about the separate limitation.

136.    That second principle of New York law was stated by the New York Supreme Court, Appellate Division in *Neildan Construction v Angona* 619 N.Y.S. 2d. 590 (1994), citing an earlier decision of the Appellate Division in *Grasso v Fiumara* 562 N.Y.S. 2d. 181 (1990) in these terms: *"the third party...was entitled to rely upon the facially valid power of attorney since the circumstances surrounding its presentation would not have put a reasonable person on notice that something was amiss."*

137.    In my judgment, there was nothing suspicious about the 18 August 1999 Power of Attorney, in particular about the fact that Mr Daniels did not produce the original, since he produced a notarised certified copy in relation to which the Florida notary public certified that it was a true copy of the original which she had seen, all of which confirmed that there was a valid Power of Attorney. I have already found that there is nothing in the point that Mr Kleve had signed the Settlement Agreement on 16 July 1999, whereas the Power of Attorney was given on 18 August 1999. The suggestion that any Power of Attorney had to be subsisting at the date Mr Kleve signed the Settlement Agreement is based on a complete misapprehension.  There was no contract made until 2 September 1999, when Mr Lancksweert signed the Settlement Agreement and he and Mr Daniels concluded the transaction. Provided that the 18 August 1999 Power of Attorney was valid and subsisting at the date the contract was concluded, which it was, it is irrelevant that the authority conferred by it was not granted until after Mr Kleve signed the Settlement Agreement.

138.    I have also already dealt with the point made by Mr Ford about the fact that Mr Lancksweert and SSFG asked for the affidavit from Mr Daniels effectively warranting his authority and agreeing to indemnify Mr Lancksweert in the event that there was a defect in that authority. In my judgment, asking for that affidavit does not mean that Mr Lancksweert and SSFG knew or were put on notice that there was something amiss with the Power of Attorney. It is inconceivable that, if SSFG had thought that there was anything amiss, they would not have advised Mr Lancksweert not to proceed without further evidence from Mr Kleve himself. All SSFG were doing was protecting their client's position in a particular eventuality, which is not the same thing as knowing or suspecting that eventuality will occur.

139.    Equally, there is nothing in the point upon which Mr Racki sought to place some reliance that there was something suspicious in the lapse of time of 44 days between the signature of the Settlement Agreement by Mr Kleve on 16 July 1999 and the closing meeting on 2 September 1999, which should have put Mr Lancksweert on enquiry. As Mr Daniels said in his fax of 11 August 1999 referred to at [94] above, there does seem to have been some delay in obtaining responses and information from Mr Kleve. Furthermore, Mr Lancksweert readily accepted in evidence that some delay had been caused because he was away on holiday in August. There is nothing remotely suspicious in the lapse of time.

140.    Much was made by Mr Ford of the fact that Mr Lancksweert was asked by Mr Daniels to make payment of two cheques, one to NSS and the other to Mr Kleve and Mr Daniels, in support of his and Ms Lawson's case that this should have alerted Mr Lancksweert to there being some defect in Mr Daniels' authority. There is nothing in this point. The Settlement Agreement signed by Mr Kleve itself provided in clause 2 that the settlement funds were to be released to Mr Daniels or his designated representative, so that Mr Kleve must have understood that the settlement amount in the first instance would be paid to Mr Daniels. Furthermore the provision in the

Power of Attorney that Mr Daniels had full complete authority and power to *"recover, collect and receive all such properties, interests, assets and demands whatsoever"* and *"to take lawful ways and means for the benefit, recovery and receipt thereof by legal process or any other act thereof to be executed"* was clearly wide enough to cover receipt by Mr Daniels of the settlement funds.

141.    In relation to the U.S. $225,000 paid to NSS, that represented 30% of the original settlement amount of U.S. $750,000 and it seems likely that amount of commission would have been due to him under the Contract of 23 August 1995 with Mr Kleve because Mr Daniels had procured agreement to that figure, which was only reduced to U.S. $625,000 because Mr Kleve did not produce the VIN plate or spare parts. The Settlement Agreement referred in terms in the recitals to NSS having an "encumbrance" for services rendered for the benefit of Mr Kleve, clearly a reference to the lien. The closing documents, as I have said, included the Lien Release together with the Certificate of Title stamped with "Lien Cancelled" by the Court clerk in Ohio. There was nothing remotely sinister in Mr Daniels requiring payment to NSS of the commission as a condition of his releasing the lien. Furthermore, Mr Lancksweert's evidence was that when Mr Daniels asked for the U.S. $225,000 to be paid to NSS, he checked with his New York lawyer, who was satisfied from the documents that Mr Daniels could give instructions to that effect, a point on which SSFG were right.

142.    One of the more extravagant allegations advanced by Ms Lawson and Mr Ford is that Mr Daniels stole the settlement funds. This allegation is unsupported by any evidence. I have already said that, as regards the U.S. $225,000 he was entitled to be paid 30% of any sum recovered pursuant to the Contract with Mr Kleve of 23 August 1995, up to a ceiling of U.S. $250,000, which was not exceeded. So far as the balance of the settlement funds, the U.S. $400,000, is concerned, I have already referred at [109] above to the fact that, the day after the Settlement Agreement was executed, Mr Daniels appears to have endorsed that cheque in favour of Mr Kleve, a strong indication that Mr Kleve did receive those funds. I set out in the next section of the judgment the other evidence which supports the conclusion that he did receive the funds. Whilst it is true that, in an affidavit sworn in the Ohio proceedings on 9 July 2010, Ms Lawson states that she went through her father's bank records after his death and there was no payment of U.S. $625,000 or $400,000, she has been neither produced the bank records in the present proceedings nor come to court to be cross-examined about her assertion that there was no trace of the payment.

143.    Even if Mr Kleve was not paid, that is a matter between him and Mr Daniels as his agent. It cannot either bring into question the authority of Mr Daniels under the 18 August 1999 Power of Attorney or render the Settlement Agreement invalid. During the course of the trial, Mr Ford advanced a new proposition of New York law (which was not pleaded) and in relation to which Mr Racki produced a Supplemental Report with the permission of the court, that, if an agent is to receive compensation direct from funds payable by the third party to the principal via the agent, there has to be a specific clause to that effect in the Power of Attorney given to the agent. In support of that proposition, Mr Racki relied upon § 5-1505 of the General Obligations Law of New York. However, as Mr Kiernan points out, that provision is in a section of the New York Code dealing with "Financial and Estate Planning" and is only applicable to Powers of Attorney granted in that context, for example in relation to a

testamentary disposition. It is not applicable to a power of attorney granted for commercial purposes, as in the present case.

144.    Once that proposition is shown to be a false one, there is nothing in the fact that some of the monies were paid to the agent direct to put Mr Lancksweert on enquiry that there was something suspicious going on. As Mr Kiernan put it, there is no obligation on the third party to determine the amount of any allocation between the principal and the agent. As a matter of New York law, as in English law, that is a matter for the principal and agent *inter se* and does not affect the contractual relationship between the principal and the third party.

145.    As set out at [14] above, various other points were pleaded by Mr Ford and Ms Lawson as somehow putting a reasonable person in the position of Mr Lancksweert on enquiry. The first is that the statement by Mr Daniels that the spare parts were stolen was something Mr Lancksweert knew or should have known was not true. As I said at [91] above, the apparent basis for this allegation was that there were photographs of parts on display at Mr Kleve's premises and an FBI report accompanying the photographs in SSFG's closing file. The obvious answer is that none of that dealt with whether the parts had been stolen since the photographs were taken and the FBI report was filed. Furthermore, Mr Lancksweert was not cross-examined about this point. In my judgment there is no basis for the suggestion that he knew or ought to have known that what Mr Daniels said about the spare parts having been stolen was not true.

146.    Next a point is taken that the draft agreements sent by Mr Daniels to SSFG by fax on 1 September 1999 had the signatures of Mr Kleve and Mr Daniels himself redacted. It is certainly correct that what was sent by fax did not include the signatures which Mr Kleve and Mr Daniels had put on the document in July 1999, but there may be an explanation for that and in any event, this is a non-point since Mr Daniels produced the Settlement Agreement, with their signatures on it, duly notarised, at the closing meeting the following day. The suggestion that Mr Lancksweert or SSFG having been presented with the signed notarised Agreement should have been in the slightest bit interested in what had been included in the fax the previous day, let alone been put on enquiry, is preposterous.

147.    Finally, there is the suggestion that Mr Daniels asked and Mr Lancksweert agreed, that the name of the escrow agent be omitted. This allegation, which was not put to Mr Lancksweert in cross-examination, is incoherent. The Settlement Agreement provided that the monies were to be paid into escrow and SSFG were to act as escrow agent, as was known and understood by Mr Daniels and Mr Lancksweert. In the event, as I have said, it appears that the escrow provisions did not need to be operated.

148.    In all the circumstances, in my judgment, there is nothing in any of the alleged irregularities identified by Ms Lawson and Mr Ford which would or should have put a reasonable person in the position of Mr Lancksweert on enquiry that there was something amiss with Mr Daniels' authority to agree the settlement amount and conclude the Settlement Agreement on behalf of Mr Kleve. Had I not concluded that Mr Daniels had actual authority, I would have concluded that he had apparent authority.

Subsequent events after the Settlement Agreement

149.    Before considering the question of whether the Settlement Agreement was a valid and binding contract against Mr Kleve and thus against Ms Lawson and Mr Ford as his successors, I should deal briefly with the subsequent events in so far as they are of any relevance.

150.    One issue upon which the evidence of subsequent events throws some light is the issue whether Mr Kleve received payment of the U.S. $400,000 settlement amount after the commission of U.S. $225,000 had gone to NSS. I have already referred to the evidence that, on 3 September 1999, Mr Daniels endorsed the U.S. $400,000 cheque in favour of Mr Kleve. Mr Lancksweert's unchallenged evidence was that, about two months after the closing meeting, he telephoned his bank to see if the two cheques had been paid and cleared. He was told that the cheques had cleared, a further strong indication, given the endorsement of the cheque for U.S. $400,000 in favour of Mr Kleve, that the monies were paid to Mr Kleve.

151.    One of the transcripts of telephone conversations relied upon by Ms Lawson and Mr Ford is between Mr Kleve and the FBI agent Mr Kenneth Crook on 5 June 2000, during the course of which Mr Kleve seems to be suggesting that the settlement he thought was going to be closed was for U.S. $3 million, that the other number (i.e. the U.S. $625,000) was news to him and that he had received none of the monies. Mr Crook says that his understanding from Mr Daniels was that documents went back and forth to get Mr Kleve's permission and they closed the settlement at what he thought was less than U.S. $600,000. He also refers to being told by Mr Daniels that there was a stipulation that Mr Kleve was to receive another car, a beautiful roadster. In relation to the monies, he said his understanding was there was "a bunch of money in the trust account" and a $340,000 car sitting in a warehouse. It was following that conversation that Mr Kleve apparently gave Mr Timothy Smith an unsigned copy of the Settlement Agreement with the settlement amount filled in on the first page as U.S. $3 million in what Mr Smith said was Mr Kleve's handwriting, for Mr Smith to send it by fax to Mr Crook.

152.    On the basis that the figure of U.S. $3 million was filled in by Mr Kleve, the question arises when that was filled in and why. As I have found, at the time that Mr Kleve signed the Settlement Agreement on 16 July 1999, in all probability the settlement amount was left blank. It seems likely that Mr Kleve filled in the figure of U.S. $3 million on a copy of the first page at some later stage. It was certainly not filled in on the original, given the evidence of the forensic document examiners that the amount of U.S. $625,000 had not been altered and that there is no indent of any other amount on the signature page. Given that Mr Smith said that he did not think he had this copy in his file until Mr Kleve gave it to him to send by fax to Mr Crook, it seems to me that it is most likely that Mr Kleve filled in that amount on that copy in June 2000 at the time of his conversation with Mr Crook.

153.    As to why he did so, I consider the most likely explanation is that Mr Kleve was trying to convince Mr Crook that he had only ever been prepared to settle for U.S. $3 million. However, as I held at [128] above, any settlement at U.S. $3 million was wholly unrealistic, as Mr Kleve's interest in the Car was worth considerably less than that. That must have been known to Mr Kleve since, as I have also held, it is inherently unlikely that Mr Daniels would have closed the settlement at U.S.

$625,000 without in practice informing Mr Kleve and obtaining his agreement, although the 18 August 1999 Power of Attorney did not require him to do so. The likelihood is that Mr Daniels told Mr Kleve that, without the spare parts and the VIN plate and in circumstances where Mr Swaters and not Mr Kleve had possession of the Car, the best settlement that he could achieve was the U.S. $625,000 being offered by Mr Lancksweert.

154.    The charitable explanation for what Mr Kleve told Mr Crook on 5 June 2000 and for his getting Mr Smith to send the fax of the Settlement Agreement with the figure of U.S. $3 million in it the following day is that he was an old man (by then he was 86 years old) and was confused. A more cynical view would be that, although he knew in September 1999 that there had in fact been a settlement at U.S. $625,000, he remained dissatisfied and convinced he could get more money, he wanted to create the impression that he had only been prepared to settle for U.S. $3 million and that the settlement at U.S. $625,000 was something he had not been prepared to agree. That explanation of what was going on is borne out by Mr Smith's assertion in his witness statement, that he ran into Mr Kleve on the street on about 6 June 2000 and Mr Kleve said he had heard a rumour that people thought he had sold his Ferrari but he had not, which Mr Smith claimed was consistent with what Mr Kleve had told Mr Smith earlier about not being willing to sell for U.S. $750,000 but that he could get U.S. $3 million if he could get the Car back to the United States.

155.    In that context, it is also striking that Ms Lawson exhibits to her 9 July 2010 affidavit in the Ohio proceedings another unsigned copy of the Settlement Agreement with the figure of U.S. $2,500,000 filled in as the settlement amount and with a manuscript alteration to clause 2 to provide that the funds were to be released to "Kleve" or designated representative, not Daniels or designated representative. The provenance of that copy is unclear. It was not in Mr Smith's "Ferrari file", in other words the papers he handed over to Mr Ford in 2010, but in cross-examination Mr Smith claimed to recall that Mr Kleve had told him first of all that he could get U.S. $2,500,000 for the Car, then he had told Mr Smith that the Belgians had offered U.S. $750,000 for the Car but he was going to turn it down, because he could get U.S. $3 million for the Car. I found that evidence implausible.

156.    In my judgment, that copy of the Settlement Agreement with the manuscript amendments, which were not in the original signed by Mr Kleve, was drawn up at some point long after the event to give the impression that Mr Kleve was only prepared to settle on those terms. It does not reflect what was actually agreed. I am fairly sceptical as to whether the conversations that Mr Smith claimed to have had with Mr Kleve did in fact take place, as I found Mr Smith an unreliable witness, but whether they did or not, I consider that, as I have said, Mr Kleve was aware, at the time that the Settlement Agreement was made, that the best settlement amount Mr Daniels could procure was U.S. $625,000 and that the Settlement Agreement had been concluded at that figure.

157.    I also consider that, in all probability, Mr Kleve was paid by Mr Daniels. Quite apart from the endorsement of the cheque and Mr Lancksweert's evidence that both cheques were cashed, at a later stage in February 2005 Mr Lancksweert spoke to Mr Daniels who confirmed that he paid Mr Kleve in part in cash when visiting the bank (which is borne out by the endorsement and the cheques having been cashed) and in

part by giving or selling him a Ferrari 250 for free, which tallies with what Mr Daniels told Mr Crook in 2000.

158.    Another reason why it is difficult to accept at face value what Mr Kleve told Mr Crook in June 2000, is that this whole story that Mr Kleve was never prepared to settle for less than U.S. $2.5 million or U.S. $3 million is thoroughly implausible. Quite apart from the fact that, as I have held, those sort of figures were unrealistic and the price being offered by Mr Lancksweert was a reasonable and fair one, Mr Kleve never once approached Mr Swaters or Mr Lancksweert subsequently in the period before his death four years later, to say that he had not agreed the settlement at U.S. $625,000 and therefore demanded that they hand over the Car. He did not complain to them that he had not been paid, nor is there any evidence that he ever made any sort of claim against Mr Daniels.

159.    In any event, even if Mr Kleve was not aware of the settlement amount at the time and did not specifically approve it, that is of no relevance where the 18 August 1999 Power of Attorney conferred actual authority on Mr Daniels to negotiate and agree the settlement amount and conclude the Settlement Agreement on Mr Kleve's behalf, irrespective of whether Mr Kleve had given his consent to the particular transaction. Equally, if, contrary to the conclusion I have reached, Mr Kleve was not in fact paid anything by Mr Daniels, that cannot provide Ms Lawson or Mr Ford with any sort of defence. The Settlement Agreement which Mr Kleve signed provided specifically in clause 2 that the funds were to be released to Mr Daniels or his designated representative. That is exactly what occurred, so that Mr Lancksweert provided the consideration as contemplated by the Settlement Agreement. Any issue Mr Kleve had as to non-payment by Mr Daniels was a matter between himself and Mr Daniels as his agent. It could not affect the validity of the Settlement Agreement.

160.    Mr Kleve died on 24 December 2003. Ms Lawson was appointed administrator of his estate, of which she and her two sisters were beneficiaries. She lodged with the Probate Court in Ohio an Amended Schedule of Assets of his estate in March 2005. That included at item 9: *"Automobiles and auto parts detailed on Exhibit D attached hereto $86,770"*. Exhibit D listed a number of cars Mr Kleve had owned and Item 31 of the Exhibit was "Miscellaneous Parts" valued at U.S. $25,000. At the end of the Exhibit was a statement signed by Ms Lawson as administrator: *"I certify the above information to be complete and accurate to the best of my knowledge. These values were determined after reviewing Old Cars Price Guide and Old Car Trader valuation guides"*.

161.    It is striking that this Amended Schedule of Assets of Mr Kleve's estate did not include the Car, an omission which is some significance not only in relation to Mr Racki's point, to which I refer below, that in some way the validity of the Settlement Agreement should be determined by Ohio probate law, pursuant to which any claim by Ms Swaters would now be time barred, but also in relation to the question whether the claim now advanced by Ms Lawson and Mr Ford that they have ownership in the Car, because Mr Kleve did and retained such ownership on the basis that the Settlement Agreement is invalid, is a bona fide claim. Again the omission of the Car from the Amended Schedule of Assets is an issue on which Ms Lawson would almost certainly have been cross-examined, had she given evidence.

162.    Later in 2005 Mr Swaters and Ms Swaters became aware that Ms Lawson was intending to auction items from her father's estate including the spare parts to the Car, at an auction held without reserve by auctioneers Kruse. The auction notice referred to *"Ferrari 375 parts"*. In August 2005, Mr Swaters' U.S. lawyers wrote to Ms Lawson explaining that the spare parts formed part of the Settlement and sought to collect them. No response was received. However, the auction of the spare parts did not proceed. In cross-examination, Mr Ford sought to suggest that the spare parts were never going to be auctioned at all and were removed from a subsequent auction notice. It was unclear why he was so anxious to deny that the spare parts were put up for auction, possibly it was because the auction was without reserve and that was inconsistent with his case that the spare parts were of considerable value. Whatever the reason for his evidence about this, I did not find it at all convincing.

163.    In December 2006, Ms Lawson sought to offer Mr Swaters title to the Car including the spare parts for U.S. $750,000. As Mr Eschwege rightly submits that offer is completely at odds with Ms Lawson's and Mr Ford's allegation in these proceedings that Mr Kleve's offer price was U.S. $3 million. Thereafter, Ms Lawson's failure to deliver up the spare parts prompted Mr Swaters and his daughter to commence the Ohio litigation to recover the spare parts which they contend were wrongfully retained by Mr Kleve.

The Settlement Agreement is a valid and binding contract

164.    In my judgment, given that Mr Daniels had actual, alternatively apparent, authority to conclude the Settlement Agreement on behalf of Mr Kleve and that the Settlement Agreement has not been fraudulently altered as Ms Lawson and Mr Ford originally contended, that Agreement was a valid and binding contract which bound Mr Kleve. It settled all the disputes as to ownership and passed title to the Car to Mr Swaters. I deal with the spare parts and the irrelevant points on Ohio law in the next section of the judgment. Ms Lawson, as the administrator of Mr Kleve's estate and as a beneficiary of that estate, can be in no better position than her father. Mr Ford, who only came on the scene when he purchased a majority share of her interest in February 2010, can only claim through her. None of the various points raised by Ms Lawson and Mr Ford in an effort to impugn the validity of the Settlement Agreement has any merit.

165.    I have already set out earlier in the judgment why, if, contrary to my principal conclusion, Mr Daniels did not have actual authority to conclude the Settlement Agreement, he had apparent authority to do so and why none of the points relied upon by Ms Lawson and Mr Ford would be such as to put a reasonable person in the position of Mr Lancksweert on enquiry. To the extent that the same points are relied upon in support of their case that the Settlement Agreement was not a valid and binding contract (for example the point about there being two cheques, one of them payable to the agent, which rendered the Agreement invalid as a matter of New York law) it is not necessary to repeat what I have already said above. Those points do not make the contract in any sense invalid, any more than they should have put Mr Lancksweert on enquiry as to Mr Daniels' authority.

166.    The point about the lapse of time of 44 days between 16 July 1999 when Mr Kleve signed the Settlement Agreement and 2 September 1999, when Mr Lancksweert signed it and it was concluded was also relied upon by Ms Lawson and Mr Ford as

demonstrating that the offer made by Mr Kleve was not accepted by Mr Lancksweert within a reasonable time as required by the New York Uniform Commercial Code, so that the offer is to be taken to have lapsed so that there was no contract. There are two principal reasons why this is a bad point.

167.  First, although Ms Lawson and Mr Ford refer to "Mr Kleve's 16 July offer" in their pleading, they do not specify what that offer was. Since, as I have found, in all probability the settlement amount on the first page was left blank when Mr Kleve signed it, it cannot have been an offer to settle at any particular amount. The negotiation about the amount of the settlement was between Mr Daniels as Mr Kleve's agent and Mr Lancksweert later in July and in August 1999. There was delay in finalising and closing the Settlement Agreement, in part due to Mr Kleve being slow to respond (as Mr Daniels said in his fax to SSFG of 11 August 1999) and in part because Mr Lancksweert was on holiday in August, but there is no question of the offer made by Mr Daniels on behalf of Mr Kleve not having been accepted within a reasonable time and thus lapsed. In any event, as a matter of New York law, as Mr Kiernan said in his report: *"Mr Daniels' execution of the Transfer Documents pursuant to the terms of the Settlement Agreement after Mr Lancksweert signed the agreement conclusively demonstrated that Mr Kleve's offer remained open under New York law when Mr Lancksweert accepted it by signing an agreement with all the blank terms filled in."* That analysis is clearly correct.

168.  Second, as Mr Kiernan says, the Uniform Commercial Code only applies to an agreement concerning a transaction in goods, which is determined by the agreement's predominant purpose. The predominant purpose of the Settlement Agreement was to settle Mr Kleve's claims to the Car. Accordingly, the Uniform Commercial Code does not apply to this transaction.

169.  Ms Lawson and Mr Ford also contend that there was a breach of clause 5 by Mr Lancksweert because he did not make full payment to Mr Daniels for the benefit of Kleve and Daniels but paid one of the cheques to NSS. This contention is misconceived. As Mr Kiernan explained in his evidence, New York law requires contracts to be read as a whole. Clause 5 must be read with clauses 1 and 2. Clause 2 provides that, upon release of Transfer Documents to Mr Lancksweert, *"the funds in the Account shall be released to Daniels, or designated representative"*. The payment procedures *'stipulated herein'* to which clause 5 refers thus expressly contemplated payment to Mr Daniels' designated representative, which NSS was and the payment was made at his request. In any event, the sum advanced to NSS was in the context of the settlement as a whole for the benefit of *"Kleve and Daniels"*, because without such payment, the lien would not have been released and Mr Kleve and Mr Daniels could not have given the warranties they did in clause 3.

170.  In what is something of an echo of Mr Kleve's apparent intention to use the Settlement Agreement as an admission of some kind by Mr Lancksweert, Mr Ford relies upon the statement in the preamble that: *"Kleve is the owner of the herein referenced automobile"* as some sort of admission by Mr Lancksweert that calls into question the veracity of his evidence that he and Mr Swaters had purchased and acquired good title to the chassis. There is nothing in this point. The recital is merely a statement of the historical position and not some form of admission by Mr Lancksweert and, in any event, the Amendment to the Settlement Agreement signed by Mr Lancksweert and by Mr Daniels on behalf of Mr Kleve, referred to at [90]

above, contains a contradictory statement to the effect that there is a *"current owner"* other than Mr Kleve (i.e. Mr Swaters), negativing any suggested admission. Furthermore, this point of Mr Ford's cannot affect the validity of the Settlement Agreement.

171.    Finally, Ms Lawson and Mr Ford contend that the Settlement Agreement was somehow void for want of consideration because Mr Kleve never received any of the settlement amount. This point is also a bad one for two reasons. First, as I have found, in all probability Mr Kleve did receive the U.S. $400,000. Second, as I pointed out in [159] above, clause 2 of the Settlement Agreement provided specifically in that the funds were to be released to Mr Daniels or his designated representative. This is exactly what occurred, so that Mr Lancksweert provided the consideration as contemplated by the Settlement Agreement which Mr Kleve had signed. Even if, contrary to the finding I have made, he did not receive the funds from Mr Daniels, that is a matter between him and his agent and cannot affect the validity and enforceability of the Settlement Agreement.

Spare parts

172.    As I said at [93] above, the case advanced by Mr Ford on behalf of himself and Ms Lawson was that because, when Mr Daniels indicated to Mr Lancksweert that the spare parts and VIN plate were lost and stolen, the price was reduced from U.S. $750,000 to U.S. $625,000, the spare parts were excluded from the settlement. Although Mr Lancksweert showed some inclination to accept that proposition, ultimately it is a question of construction of the Settlement Agreement whether the "subject automobile" included the spare parts or not. In considering that question, New York law, like English law, applies an objective approach, looking at the meaning of the language used.

173.    The starting point is that it was plainly the intention of the Settlement Agreement and related documents (such as the Bill of Sale) to transfer the ownership rights to the Car as a whole and resolve any disputes as to ownership. Mr Kleve and Mr Daniels warranted in clause 3 that Mr Lancksweert and any other person he should designate (which would encompass Mr Swaters) would have *"good and clear title to and hold all rights, title and interests in the subject automobile"*. The "subject automobile" (or "subject vehicle" in the Bill of Sale) was defined as "Ferrari 375 Plus serial number 0384AM", clearly a reference to the Car as a whole, not just to the chassis. It would have made no commercial sense for the Settlement Agreement to settle the rights in respect of some parts of the Car but not other parts and if it had been intended to reach such an uncommercial result, it seems to me that the Settlement Agreement would have carved out the spare parts to exclude them and defined the Car differently, either as "the chassis of the Ferrari 375 Plus serial number 0384AM" or as "the Ferrari 375 Plus serial number 0384AM excluding such parts as are retained by Kleve or have been lost and stolen".

174.    The moment one seeks to define how such a carve-out would have been expressed, it can be seen that the "subject automobile" or "subject vehicle" as defined: "Ferrari 375 Plus serial number 0384AM" must include whatever spare parts Mr Kleve had any rights to or interest in. As Mr Eschwege submitted, the chassis and the spare parts make up the Car as it was in 1999 (it being common ground that Mr Kleve did not own or possess the original engine at any time relevant to the present preliminary

issue and that Ms Swaters did not locate and purchase the original engine until 2009). Indeed, in their Amended Defence and Counterclaim, Ms Lawson and Mr Ford describe the spare parts as representing "the original DNA of the Car, which gave it its rarity, authenticity and value". This assertion that the spare parts represented the original DNA of the Car was repeated by Mr Ford in his witness statement. In cross-examination, Mr Eschwege put this assertion to Mr Ford and asked whether, without the spare parts, the Car was not really 0384AM, to which Mr Ford responded: *"Yes it is a replica"*. On that basis, it necessarily follows that, objectively, the transfer of title to the Car effected by the Settlement Agreement and the Bill of Sale included transfer of title to the spare parts.

175.    In my judgment, there is no ambiguity about this in the language of the documents, so that it is neither necessary nor permissible to have regard to the background and extrinsic evidence, but even if it were, this does not assist Ms Lawson and Mr Kleve. The evidence of both Mr Lancksweert and Ms Swaters in their witness statements was that as far as he and Mr Swaters were concerned, the Settlement Agreement was in respect of title in the Car as a whole. Ms Swaters recalls her father saying that the spare parts were part of the deal concluded in the Agreement.

176.    Contrary to Mr Ford's assertion, the reduction in price did not mean the spare parts were excluded from the Settlement Agreement. It simply reflected that since it was being represented that Mr Kleve could not transfer physical possession of them because they were lost or stolen (which was in fact a misrepresentation) the value of the interest he had to transfer was reduced. However, I consider that on the true construction of the Settlement Agreement, he was transferring title and any interest he had in the Car as a whole, so that in the event that the spare parts or VIN plate were located (which in the case at least of the spare parts they were because they had never in fact been lost or stolen) then ownership in them vested in Mr Swaters by virtue of the Settlement Agreement and Bill of Sale.

Irrelevance of Ohio law

177.    The case advanced by Ms Lawson and Mr Ford is that the Settlement Agreement was in some respect invalid or unenforceable as a matter of Ohio law, either because Ms Swaters did not make a claim against Mr Kleve's estate within the six month period following his death imposed by Ohio law, so that the claim is time barred, or because the requirements of the Ohio Certificate of Motor Vehicle Title Act were not complied with, so that there was not a valid conveyance of title to Mr Lancksweert and Mr Swaters. Even if Ohio law were relevant, these points are bad ones, for reasons I will elaborate shortly below.

178.    However, before any consideration of Ohio law could arise, Ms Lawson and Mr Ford face the obvious obstacle that the Settlement Agreement is expressly governed by the internal laws of the State of New York, without reference to New York conflict of laws principles. Mr Racki contends in his report that New York law would defer to Ohio law as regards a claim against the estate and title to the Car, but it is clear that his basis for this assertion (even if it were correct, which it is not for the reasons set out below) involves the application of New York choice of laws principles i.e. conflict of laws principles. His argument overlooks that the New York law clause in the Settlement Agreement expressly excludes the application of New York conflict of laws principles, so that his argument is fundamentally misconceived.

179.    Even if it were permissible to have regard to New York conflict of laws principles, the New York courts would give effect to the choice of law clause and apply New York law to the exclusion of Ohio law. The clear evidence of Mr Kiernan in his supplemental report was: *"New York law and the language of the Settlement Agreement would equally call for application of New York law, not Ohio law, to all issues relating to the effectiveness and validity of the Settlement Agreement"*. That proposition is undoubtedly correct and Mr Racki's contrary argument is absurd.

180.    His argument rested upon his analysis of two federal authorities. The decision of the District Court for the Southern District of New York (Edelstein DJ) in *John v Sotheby's Inc* 858 F. Supp. 1283 (1994) is a case where the plaintiff contracted with Sotheby's to sell a Rembrandt painting at auction, representing that she owned it. Before the auction a third party came forward claiming to own it and Sotheby's withdrew it from auction. The case concerned the rival claims to ownership. The court found that the plaintiff and her late ex-husband who were resident in Wisconsin purchased the painting in 1960. They were divorced in 1985 and an action was then commenced in Wisconsin for the division of their marital property, in which they entered a stipulation that her ex-husband would not sell the painting. Notwithstanding that stipulation, the ex-husband purported to sell the painting to the third party pursuant to a contract made in June 1985. In November 1989, the plaintiff and her ex-husband entered a Final Marital Settlement Agreement which was approved by the Wisconsin court and which provided that the painting and other paintings should be placed for auction with Sotheby's in New York and the sale proceeds divided equally between the parties.

181.    In his analysis set out in his Conclusions of Law, the learned judge, applying the federal diversity jurisdiction, said that he had to determine which law applied to the June 1985 contract between the ex-husband and the third party. It should be noted immediately that there was no express choice of law clause in that contract. Pursuant to the diversity jurisdiction, the federal court had to follow the conflict of laws rules in the place where it was sitting, there New York, under which as the judge found at [7]-[10]: *"the law of the jurisdiction having the greatest interest in the litigation will be applied and...the facts or contracts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict...The Court will apply the laws of the jurisdiction that has the greatest interest in, and is most intimately concerned with, the outcome of a given litigation."*

182.    At [11] the learned judge concluded that, although the painting was in New York, the third party was in California and the plaintiff and her ex-husband had been divorced in Nevada, Wisconsin had the greatest nexus to, and interest in, the contract dispute at the heart of the case. His reasons for reaching that conclusion were as follows. The orders issued by the Wisconsin court had a direct bearing on the interpretation of the June 1985 contract. The plaintiff and her ex-husband had resided in Wisconsin, including at the time that contract was made. Following the divorce, the division of the marital property, including the painting, occurred in Wisconsin. The decision of the District Court would impact the property rights of the plaintiff, a Wisconsin resident, and the estate of her ex-husband which was being administered in Wisconsin.

183.    Although in cross-examination Mr Racki obstinately insisted that the facts of that case were strikingly similar to those of the present case, in my judgment there is no real

similarity. The relevant contract in the present case was made in New York between a Belgian citizen and a resident of Ohio through an agent resident in Florida. The relevant property was located in Belgium at all material times (with the exception of the spare parts) and the chassis had not been physically in Ohio for more than ten years. In so far as there were probate proceedings in relation to Mr Kleve's estate those did not commence until after his death, in 2005, six years after the Settlement Agreement was concluded. The validity of that Agreement is to be assessed at the time it was concluded, not six years later and, on the basis that it was valid and binding on Mr Kleve at the time it was concluded, ownership of the Car (including the spare parts) had passed to Mr Swaters in 1999 and therefore could not have formed part of his estate. It is striking that Ms Lawson did not list the Ferrari 375 Plus in Schedule D.

184. Furthermore, there is a fundamental distinction as a matter of legal analysis between that case and the present. Here there is a choice of law clause providing that the Settlement Agreement is governed by the internal laws of the State of New York, without reference to its conflict of laws principles. It follows that any court, whether state or federal, considering which law applied to the question of the validity of the Settlement Agreement would apply New York law and would not consider its conflict of laws principles. In contrast the court in *John* was applying those conflict of laws principles, at least in part because there was no express choice of law. In my judgment, the reasoning in that case is of no application to the present case.

185. The other case relied upon by Mr Racki was the decision of the Court of Appeals of the Second Circuit in *Walter E Heller v Video Innovations* 730 F 2d 50 (1984). The plaintiff was a Delaware corporation which leased video equipment from the defendants, who were all resident in New York, pursuant to contracts governed by the law of Illinois, where the plaintiff had its principal place of business. However, before the District Court at first instance, both parties relied primarily on New York law and the judge decided the case on the basis of New York law. One of the issues on appeal was whether he had erred in doing so. In concluding that the judge had not erred, Van Graafeiland CJ giving the judgment of the Court of Appeals stated (omitting the citation of authority in the second paragraph quoted):

> "...both in the court below and in their original briefs in this Court, the parties relied primarily upon New York authorities to support their respective contentions. It is not clear whether the parties did so because they believed that New York law governed or because they believed that there was no material difference between the laws of the two States. Whatever their reasoning, we find no grounds for reversal in the reference to New York law.
>
> Because this is a diversity case, we must apply the choice of law rules of the forum State, in this instance, New York. Although New York courts generally accord deference to choice of law provisions in contracts...such provisions are not controlling and may be disregarded where the most significant contacts with the matter in dispute are in another State. Moreover, in the absence of a strong countervailing public

policy, the parties to litigation may consent by their conduct to
the law to be applied."

186.   Mr Racki relied upon this case as authority for the proposition that New York courts
       adopted the "substantial relationship" approach, which allowed them to disregard an
       express choice of law, even if the parties had a reasonable basis for it, if the most
       significant contacts were with another State. Mr Kiernan disagreed, considering that
       *Heller* was not a case where the court disregarded the parties' choice of law in favour
       of its own judgment as to with which State the transaction had its most significant
       connection, but was a case where the parties had chosen themselves to disregard their
       contractual choice of law and the court held they were entitled to do so. I agree with
       Mr Kiernan's analysis of *Heller* and consider it is not authority for the proposition for
       which Mr Racki contends.

187.   In the present case, there is no question of the parties choosing to disregard their
       choice of law. It is Ms Lawson and Mr Ford who wish, unilaterally, to disregard the
       express choice of the internal laws of the State of New York and to apply Ohio law
       through the application of New York conflict of laws principles which the contract
       says are not to be applicable. In my judgment, this is precisely the sort of situation in
       which New York courts would enforce the choice of law provision and apply New
       York law to the construction and validity of the Settlement Agreement.

188.   In any event, even if Mr Racki's proposition were correct, as Mr Kiernan says, Mr
       Racki has not: *"presented considerations of Ohio interest sufficient to warrant the
       extraordinary step of disregarding the parties' contractual choice of New York law to
       govern disputes relating to the transaction."* The Settlement Agreement was made in
       New York between a resident of Belgium and a resident of Ohio, the latter acting
       though a Florida agent. With the exception of the spare parts, the Car had not been in
       Ohio for more than ten years.  On no view could it be said that the contract or the
       underlying dispute it was settling had its most significant contacts with Ohio.

189.   It follows that in construing the Settlement Agreement and considering its validity, a
       New York court would and this court should, applying principles of New York law,
       disregard Ohio law which is of no relevance to those issues the court has to decide.
       Even if, contrary to that conclusion, Ohio law were of some relevance, the particular
       provisions of Ohio law relied upon by Ms Lawson and Mr Ford have no application in
       the present case.

190.   As I have held, the validity of the Settlement Agreement is to be assessed as at the
       date it was concluded by reference to its governing law, New York law.  Since the
       Settlement Agreement was, as I have also held, valid and binding on Mr Kleve from
       the moment it was concluded, 2 September 1999, and it and the Bill of Sale passed
       ownership to Mr Lancksweert and Mr Swaters with effect from that date, no part of
       the Car (including the spare parts) can have formed part of Mr Kleve's estate on his
       death in December 2003. Ms Lawson's statement as to the accuracy of Exhibit D to
       the Amended Schedule of her father's Assets forming part of his estate was incorrect.
       The spare parts did not form part of his estate. As Mr Lenox, Ms Swaters' Ohio law
       expert, (whose evidence I prefer to that of Ms Lawson and Mr Ford's Ohio law
       expert, Mr Graf) puts it in his report: *"In Ohio, an asset that is not rightfully owned
       by the decedent cannot be an asset of the estate."*

191.    As Mr Kiernan observes in his supplemental report, a Probate Court Order in Ohio purporting to approve the transfer of property of an estate cannot determine the ownership of the property if the property was not actually owned by the deceased at death. It follows that any Order of the Probate Court in Ohio Ms Lawson has obtained has no relevance to the question of ownership of the Car (including the spare parts), as such ownership was transferred to Mr Lancksweert and Mr Swaters by the Settlement Agreement and the Bill of Sale four years before Mr Kleve's death and the ownership rights created by those documents cannot be affected by such a court Order.

192.    In those circumstances, contrary to the assertion of Mr Graf, there was no requirement for Mr Swaters and Ms Swaters to present claims as creditors of the Kleve estate and the six month time limit for presentation of such claims is of no relevance. Mr Ford sought to argue in his submissions that the Complaint filed by Mr Swaters and Ms Swaters against Ms Lawson individually and in her capacity as a beneficiary of her father's estate in the Court of Common Pleas in Ohio on 12 February 2010 was such a claim against the Kleve estate. However, it is clear that the claim was being made on the basis that the Settlement Agreement and Bill of Sale had transferred ownership in the entire vehicle, including the spare parts to Mr Swaters through Mr Lancksweert.

193.    As a matter of Ohio law, the claim by Mr Swaters and Ms Swaters, as true owners of the spare parts pursuant to the Settlement Agreement and related documents, against Ms Lawson is not a claim as creditor of the estate so the time limit for such claims does not apply: see the decision of the Ohio Supreme Court in *Lewis v Steinreich* (1995) 73 Ohio St. 3d 299 at 301:

> "When property held by the decedent at the time of her death is actually owned by another from whom possession is wrongfully withheld, such property is not property belonging to the estate and the party claiming ownership is not a creditor of the estate."

194.    The other point taken by Mr Graf to the effect that there are defects in the Certificate of Title (which was in fact notarised by Ms Williams, the Notary Public in New York, at the closing meeting) such that, by application of the Ohio Certificate of Motor Vehicle Title Act, it did not transfer title from Mr Kleve to Mr Swaters, is an equally bad point. The Act concerns procedures for the registration of vehicles located in Ohio and only applies to vehicles which are in Ohio at the date of the relevant transaction. As Mr Lenox states, the mere fact that a person possesses an Ohio certificate of title does not, in and of itself, confer 'ownership' upon that person. He also states that Ohio and federal courts applying Ohio conflicts of laws principles have held that the law of the State where the motor vehicle is located at the time of the transfer determines the creation and transfer of interest in the vehicle: see the decision of the Ohio Supreme Court in *State ex rel. Hertz Corp v Rice* (1968) 14 Ohio St. 2d 34 applied most recently by the Court of Appeals for the Sixth Circuit in *McCaughey v Garlyn Shelton Inc* (2008) Case No. 05-3450.

195.    In the present case, at the time of the transfer of ownership from Mr Kleve to Mr Swaters in September 1999, the Car (apart from the spare parts) had not been in Ohio for more than ten years and was in Belgium. So far as the spare parts are concerned, they do not in themselves constitute a 'motor vehicle' within the meaning of the Ohio Act and the words of the Act make clear that where a motor vehicle is dismantled

such as to lose its character as a motor vehicle, the certificate of title must be surrendered and cancelled.

196.    In any event, even if there were defects in the Ohio certificate of title and even if the Ohio Act applied, which it does not, it does not follow that title did not pass to Mr Swaters as a matter of Ohio law. The case upon which Mr Graf relies, the decision of the Court of Appeals of Ohio in *Walther v Walther* (2005) Ohio App LEXIS 933 was a case where there was no evidence of any contractual or other legal obligation to transfer the vehicle. In those circumstances, the court held that a proper transfer of title under the Act was required to effect a transfer of interest in the vehicle. However, in the present case, Mr Kleve had legally obligated himself to transfer the vehicle by the Settlement Agreement. Neither he nor his daughter Ms Lawson could rely upon a certificate of title which they were not entitled to have, to contend that they still have title, because he had transferred his rights under the contract. Indeed if there was any defect in the certificate of title which impeded transfer of ownership as a matter of Ohio law, that would constitute a breach of warranty by Mr Kleve under clause 3 of the Settlement Agreement and Ms Lawson and Mr Ford cannot purport to set up rights which only arise because such a breach of contract has occurred.

197.    So far as the transfer of title in the spare parts is concerned, if, contrary to the conclusion I have reached, Ohio law is of any relevance, then I accept Mr Lenox's evidence that Ohio law would look to the Settlement Agreement to determine the question of ownership of the spare parts:

> "Ohio law would therefore look to the agreement of the parties to determine whether title to goods had passed from seller to buyer. The fact that Kleve, and subsequently Ms Lawson might have retained possession of certain Ferrari Spare Parts and after the 1999 Agreement was consummated is not dispositive of title under Ohio law. Instead, the question of ownership of the rights in the Spare Parts would be determined by the 1999 Agreement."

Conclusion

198.    Accordingly, for all the reasons set out in this judgment, the answer to the preliminary issue is as follows. As at 27 June 2014, before the auction of the Ferrari model 375 Plus Grand Prix Roadster, serial no. 0384AM (the "Car"), Ms Swaters had title to the Car including, for the avoidance of doubt, the spare parts.

**Kristi Lawson**

**From:**    <DavidC876@aol.com>
**To:**      <K-Lawson@cinci.RR.Com>
**Sent:**    Sunday, February 21, 2010 12:10 PM
**Subject:** Fwd: Kristine Lawson Next Move re; Fer #0384

From: fordlogic@gmail.com
To: Davidc876@aol.com
Sent: 2/20/2010 8:22:30 P.M. Pacific Standard Time
Subj: Kristine Lawson Next Move re; Fer #0384

Dave

Read up on the subject. Got pics of what arrived at Jacque Swaters place, and the new phony VIN plate.

Tactical errors have been made in the past, and may repeat without an aggressive, car savy gameplan with dispassionate decision makers in the driver's seat. Based on our talk today, and what I found in local papers, tactical errors are already at play for this very case.

The decision maker must be prepared to follow rational advice, and put this matter in the hands of talent, not friends,
not other car nuts, not bounty hunters, not sympathizers, but talent that can assess, synthesize, mobilize, and play.

The opponents have chosen the field, and put the first players on that field. They are well capitalized and well respected.

Let me repeat. They are well capitalized and well respected.

I do not think Ms. Lawson et. al. has a moment to waste in developing the legal approach, and THEN assembling the correct Ohio based legal talent for the Ohio portion.

The very first thing is to send me a copy of the recent court filing (complete), a copy of earlier court docs, prior
attorney names and contact info, investigator reports, police reports, police conclusions, etc.
Absolutely everything. Don't wait until all is gathered,
send a copy of what she has immediately. A 1/2" thick legal document can take days to truly and fully assess.

I would like to know what is left of 0384 (what docs, hist docs, parts, etc), who owns (name, address, teles, emails), and who
is the authorized decision maker for that entity. If there are several persons, then I need to have them sign off and appoint a single
one. If any have unrealistic expectations, or dilly dally with decisions, then it will harm and hobble the effort.

After receipt and review of files, I can make my suggestions about whether and how I propose to be involved.

Under no circumstance should Ms. Lawson not hire an Ohio attorney and anwser on time, even if as a request
for more time to answer. The best case is to have hired the right Ohio attorney after the above has


EXHIBIT
B.B.

occurred.

You may show this direct to Ms. Lawson as I want the purest path for communications.

Joe
Cell: 954.675.8445

_____ Information from ESET NOD32 Antivirus, version of virus signature database 4887 (20100222) _____

The message was checked by ESET NOD32 Antivirus.

http://www.eset.com

1

COURT OF COMMON PLEAS

HAMILTON COUNTY, OHIO


DAVID CLARK, et al.                    :

              Plaintiffs,      :

   vs.                                 :   Case No. A1605727

JOSEPH FORD, III, et al.           :

              Defendants.      :


DEPOSITION OF DEBORAH CLARK, a plaintiff herein,

taken by the defendant, Joseph Ford, III, as upon

examination pursuant to the Ohio Rules of Civil

Procedure and pursuant to agreement of counsel as

to the time and place and stipulations hereinafter

set forth, at the conference room at Litigation

Services, 655 West Broadway, Suite 880, San Diego,

California, at 12:20 p.m., December 20, 2017,

before Marc Volz, CSR No. 2863, RPR, CRR, CRC

EXHIBIT
E.E.

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

2

```
 1    APPEARANCES OF COUNSEL VIA VIDEOCONFERENCE:

 2    For Plaintiffs:

 3    ZACHARY GOTTESMAN

 4    GOTTESMAN & ASSOCIATES, LLC

 5    36 East 7th Street, Suite 1650

 6    Cincinnati, Ohio 45202-4453

 7    (513) 651-2121

 8    For Defendant, Joseph Ford, III:

 9    JACK S. GATLIN

10    GATLIN VOELKER, PLLC

11    2500 Chamber Center Drive, Suite 203

12    Fort Mitchell, Kentucky 41017

13    859-781-9100

14    For Defendants, Karyl Kleve and Katrina English:

15    THOMAS P. DOYLE

16    DOYLE & HASSMAN, LLC

17    526 York Street

18    Newport, Kentucky 41071

19    (859) 655-4430

20    For Defendants, Raymond Lawson and Kristine Lawson:

21    KENNETH G. HAWLEY

22    HAWLEY LAW CO., LPA

23    810 Sycamore Street, 5th Floor

24    Cincinnati, Ohio 45202

25
```

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

3

```
 1                       I N D E X

 2

 3   WITNESS:  DEBORAH CLARK

 4   EXAMINATION BY:                    PAGE

 5   Mr. Hawley                         4, 78

 6   Mr. Gatlin                         49, 88

 7   Mr. Doyle                          66, 91

 8

 9                     E X H I B I T S

10   DEFENSE      DESCRIPTION               PAGE

11   EXHIBIT 9   Skype partial transcript,  8
                 JF3000508
12
     EXHIBIT 10  Skype partial transcript,  22
13               JF3000126
14   EXHIBIT 11  Skype partial transcript   31
                 JF3000186
15
     EXHIBIT 12  Skype partial transcript   31
16               JF3000196
17   EXHIBIT 13  Email JF3000560            80
18   EXHIBIT 14  Affidavit of David Clark   81
19
20   QUESTIONS WITNESS REFUSES TO ANSWER    31, 86, 87
21
22
23
24
25
```

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

4

1                    DEBORAH CLARK,

2    plaintiff herein, having been sworn, testifies as

3    follows:

4                    -EXAMINATION-

5        BY MR. HAWLEY:

6        Q.  Good afternoon, Mrs. Clark.  My name is Ken

7    Hawley and I represent Kristine Lawson and -- who's been

8    named as Ray Lawson in this lawsuit.  I'm going to be

9    asking you some questions.  You just sat through your

10   husband's deposition so you know pretty well the way

11   things are going to go.  One thing that I would like to

12   ask you, though, is I know you have your phone right

13   there next to you.  I wonder if you could move that

14   away.  I don't want you to be distracted by calls or

15   texts while we're talking here.  That would be great.

16       Can you start just by telling us your name and

17   address.

18       A.  Deborah Clark and I live in San Diego.

19       Q.  You are married to David Clark?

20       A.  I am married to David Clark.

21       Q.  The two of you work together in his automobile

22   consulting business?

23       A.  No.

24       Q.  Do you do anything with respect to his

25   automobile consulting business?

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

5

1       A.   No.

2       Q.   Do you send emails and Skypes on his behalf

3   with respect to his automobile business?

4       A.   No.

5       Q.   Did you send Skypes in this case --

6       A.   No.

7       Q.   -- to Chris Gardner?

8       A.   No.

9       Q.   Did you send emails on Dave Clark's behalf?

10      A.   Yes.

11      Q.   Have you seen some of the emails that we've

12   spoken to today?

13      A.   Yes.

14      Q.   Or spoken about today?

15      A.   Yes.

16      Q.   Are you the one who actually sent those emails?

17      A.   Yes.

18      Q.   Did you have your husband's authority and

19   permission to send those emails?

20      MR. GOTTESMAN:  Objection.  Go ahead.

21      THE WITNESS:  For 47 years, yes.

22      MR. HAWLEY:

23      Q.   When you signed his name on the contract, did

24   you actually sign your husband's name on the contract

25   that's been marked as Exhibit 1?

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

6

1        A.   I have a POA.

2        Q.   My question is whether you signed his name on

3    the contract.

4        A.   Yes.

5        Q.   You had his -- you did that with his knowledge

6    and permission.  He knew about it and authorized you to

7    do that; is that right?

8        A.   Yes.  Yes.

9        Q.   All right.  Now, before you and your husband

10   filed this lawsuit you had provided some documentation

11   to Joe Ford that he requested for use in one or more of

12   the underlying lawsuits involving this Ferrari.  Do you

13   recall him asking you for any documentation that you had

14   that could help him?

15       MR. GOTTESMAN:  Objection.

16       THE WITNESS:  Yes.

17       MR. HAWLEY:

18       Q.   Did you send him transcripts of Skype

19   conversations that you had with people, including Chris

20   Gardner?

21       A.   Yes.

22       Q.   Are those transcripts of conversations that you

23   had with Chris Gardner?

24       A.   Yes.

25       MR. GOTTESMAN:  Objection.

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

7

1        MR. HAWLEY:

2        Q.  Now, if we can turn to what would be the second

3    third and fourth pages in that PDF of exhibits, the one

4    starting with JF300508 and then the next two pages.  If

5    you could do that and take a look at those for me,

6    please.

7        MR. HAWLEY:  We started out on this one in the very

8    beginning of Dave Clark's deposition, but we shortly

9    learned that he didn't have anything to do with these

10   Skypes.  He said his wife did them all, so we moved on

11   to that.  And I don't think they were actually marked.

12       MR. HAWLEY:

13       Q.  Are these transcripts of Skype conversations

14   that you had with Christopher Gardner?

15       A.  Yes.

16       MR. GOTTESMAN:  Hold on, Debbie, please.

17       Mr. Hawley, note my objection for the record that

18   JF300508 is apparently only the second of a two-page

19   transcript.  The JF3000126 is only the third of an

20   eight-page transcript, and JF3000119 is only the fourth

21   of an eight-page transcript.  And also I was going to

22   ask if you intended to mark this for identification as

23   an exhibit as it wasn't previously marked.

24       MR. HAWLEY:  I am going to -- if she will identify

25   it as partial transcripts of Skype conversations that

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

8

1    she had, I would like to have this one marked as the

2    next exhibit, which I think would be 10?  9.  If we

3    could mark that first page as Exhibit 9.

4         Q.  This appears to be a partial transcript of

5    conversation, Skype conversation you had with

6    Christopher Gardner; is that correct?

7         A.  Partial, yes.

8         Q.  The date of that is January 12, 2012.

9         A.  Yes.

10         Q.  At various times.  I'd like to ask you about

11    some of the things that are being discussed in this.

12    The second communication appears to come from you, and

13    it says, "Well, that is why it was important to let

14    Shelby know that we know about you, otherwise it would

15    look like we really don't know that much."  Who is

16    Shelby?

17         A.  He is an owner of R&M Auctions.

18         Q.  At that point was R&M Auctions under any sort

19    of contract to sell the Ferrari?

20         A.  No.

21         Q.  Were you or Chris Gardner or your husband

22    trying to present the Ferrari to RM Auctions for sale?

23         A.  No.

24         Q.  What was Shelby or RM Auctions' involvement

25    with this Ferrari at this period of time?

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

9

1        A.   They informed us that Christopher Gardner was
2    involved with this Ferrari.
3        Q.   What did they tell you about his involvement
4    with the Ferrari?
5        A.   They asked us did we know that Christopher
6    Gardner was involved, and we said no way, Christopher
7    Gardner couldn't be involved.  So we were made to look
8    like fools.
9        Q.   Who was negotiating or communicating with RM
10   Auctions at that point in time?
11       A.   No one at the time.  We went there initially
12   because they wanted to make contact between the owners
13   of both parties.  They wanted us to make contact with
14   both parties.  They had contact or could make contact
15   with Florence.  We had contact with the Kristi -- the
16   Lawsons.
17       Q.   This might be easier to understand.  I know
18   it's difficult to speak in this abnormal manner.  But
19   you said we went there.  Who is "we"?
20       A.   David and I.  David and I.
21       Q.   Did you actually go to RM Auctions?
22       A.   We went to their office in Los Angeles.
23       Q.   For what purpose did you go to RM Auctions'
24   office in Los Angeles?
25       A.   To talk about them wanting to purchase the

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

10

1    Ferrari 375.

2         Q.  And "them," meaning RM Auctions.

3         A.  Yes.  Or they had a client.  I don't know.  I

4    mean, that was their business.

5         Q.  Did RM Auctions contact you about the Ferrari,

6    or did you or your husband contact RM Auctions?

7         A.  A representative of RM Auctions contacted David

8    and asked us to come up and talk to Shelby.

9         Q.  What's Shelby's last name?

10        A.  I don't know.

11        Q.  Any idea whether Shelby is still with RM

12   Auctions?

13        A.  Yes.  His dad owns the place.  I think it's

14   Sotheby's now though.

15        Q.  If Sotheby's bought RM Auctions you think

16   Shelby went to work for them?

17        A.  They're still all involved as far as I know.

18        Q.  How was Chris Gardner involved?  How did you

19   find out that Chris Gardner was involved in that?  What

20   did you learn about his involvement?

21        A.  I had been talking about -- to Chris Gardner

22   since -- for years.  Christopher Gardner never mentioned

23   that he was involved with the 375.  And Joseph Ford had

24   not talked to us since January 2010, so we had no idea

25   that the two of them were involved together.

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

11

1       Q.   How did RM Auctions know to contact you and

2   your husband, you or your husband?

3       A.   Well, because in the small car world they knew

4   that we had a contract with the Kleves.

5       Q.   How did they know that you had a contract?

6       A.   Small world.

7       Q.   The contract you're referring to is what we've

8   marked as Exhibit 1?

9       A.   Yes.

10      Q.   What did RM Auctions want to do?  Why did they

11  contact you?  What did they want you to do?

12      A.   They wanted to purchase the Ferrari for one of

13  their clients.

14      Q.   Did they want to purchase it or did they want

15  to put it up for auction?

16      A.   No auction, purchase.  Why would they talk to

17  us about putting it in an auction?

18      MR. GOTTESMAN:  Debbie, if you would, please, just

19  answer his questions.  Don't ask Mr. Hawley or any of

20  the other counsel questions while we're doing this?

21      THE WITNESS:  Sorry.

22      MR. GOTTESMAN:  No problem.

23      MR. HAWLEY:

24      Q.   Was it your understanding that RM Auctions was

25  also contacting Florence Swaters or her representatives?

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

12

1        A.  They called her while we were in their office.

2        Q.  What was your understanding of why they were

3    calling Florence Swaters?

4        A.  To purchase the car.

5        Q.  What was your understanding of who held title

6    to the car at that point?

7        A.  Kristi Kleve.

8        Q.  Did you understand that Florence Swaters was

9    claiming also to own title to the car?

10       A.  I don't know that.  She had the car though.

11       Q.  That was going to be my next question.  What

12   was your understanding as to who had possession of the

13   car?  The bulk of the car, anyway.

14       A.  Florence Swaters.

15       Q.  Florence Swaters was over in Belgium?

16       A.  I don't know where she was at the time.

17       Q.  Tell us about -- you say they called Florence

18   Swaters while you were in the office.  Tell us about

19   that telephone call.

20       A.  I wasn't on either end of the call so I don't

21   know.

22       Q.  So they didn't actually call while you were in

23   the office?

24       A.  They called while we were in the office.  What

25   they said I don't know.

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

13

1      Q.  So you were in their building but not present

2   with anybody on the phone call; is that correct?

3      A.  Basically they got off the phone and asked us

4   if we knew that Christopher Gardner was involved.

5      Q.  Okay.  What did you say?

6      A.  No, he's not involved.  We were dumfounded.

7      Q.  Now, when Florence -- you were aware that

8   Florence Swaters has filed a lawsuit against Kristi

9   Gardner.

10     A.  That we knew.

11     Q.  Because of that lawsuit Kristi Gardner

12  contacted your husband for help?

13     MR. GOTTESMAN:  Counsel, you're saying Kristi

14  Gardner.  For the record it's Kristi Lawson.

15     MR. HAWLEY:  Kristi Lawson.

16     Q.  Kristi Lawson contacted your husband, saying

17  that she'd been sued by Florence Swaters and needed his

18  help.

19     A.  She did not call and ask for help per se.  She

20  called and told us that she had three days, four days to

21  answer a lawsuit.

22     Q.  What else did she tell you?

23     A.  That's all.

24     Q.  Did she ask you or your husband for any

25  assistance in responding to that lawsuit?

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

14

1       A.  I don't know.  That conversation was between
2  David and Kristi.
3       Q.  Now, someone told Kristi to contact Chris
4  Gardner.  Did you participate in that or was that your
5  husband?
6       A.  My husband said neither.  Neither did I.
7       Q.  So it's your understanding that you and your
8  husband, you or your husband are not the ones who put
9  Kristi Gardner -- or Kristi Lawson in touch with
10  Christopher Gardner.
11       A.  No, we did not.
12       Q.  Do you know how Kristi Lawson learned about
13  Chris Gardner?
14       A.  No, I do not.
15       Q.  Are you sure your husband didn't put him --
16       A.  I'm positive he didn't.
17       Q.  Why are you positive that he didn't?
18       A.  Because Chris Gardner was never involved as far
19  as we knew.
20       MR. GOTTESMAN:  Ken, if I can.  I don't want to
21  interrupt your examination, but I'm thinking -- and your
22  clients agree -- that the Clarks called Chris Gardner,
23  Gardner declined.  And then they talked to Ford.  And
24  then they told Kristi and Ford to talk.  So you've got a
25  link in there.  You can transpose that just to make it

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

15

1    move along and keep the record straight.

2        MR. HAWLEY:

3        Q.  Did you and your husband contact Chris Gardner

4    to see if he would be willing and able to assist Kristi

5    Lawson in defending against the Florence Swaters suit?

6        A.   Initially we called Chris Gardner for advice

7    because he'd been there and done that.

8        Q.  What was his advice?

9        A.  To call Joseph Ford.

10       Q.  And then did you call Joseph Ford?

11       A.  Yes.

12       Q.  Did you know Joseph Ford before that?

13       A.  No.

14       Q.  Who called Joseph Ford, you or your husband or

15   both of you?

16       A.  I don't recall.

17       Q.  Do you recall the substance of any

18   conversations you or your husband had with Joseph Ford

19   initially?

20       A.  Yes.

21       Q.  What is that substance?

22       A.  That we needed someone to put a financial team,

23   legal team together to help Kristi.

24       Q.  Did Mr. Ford agree to do that?

25       A.  Yes.

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

16

1      Q.  Why did you need to put -- why did you need to
2  someone to put a legal and financial team together to
3  help Kristi?
4      A.  Because somebody has to step in and do a legal
5  thing.  Who knew that she was going to get sued?
6      Q.  How about the financial part?  Why did Kristi
7  need financial help?
8      A.  She didn't have any money.  Why should she pay?
9  That's why we came in.
10      Q.  Why didn't you and your husband provide that
11  financial help?
12      A.  It wasn't supposed to be a legal case.
13      Q.  Are you saying that because Florence Swaters
14  filed a lawsuit it was no longer your responsibility
15  under the contract, your husband's responsibility under
16  the contract to pay expenses of recovering selling the
17  Ferrari?
18      A.  I did not say that.
19      Q.  Are you aware that there were multiple lawsuits
20  involved in their efforts to recover the loss of the
21  Ferrari?  When I say their, Kristi Lawson, Joe Ford
22  and --
23      A.  I'm aware of that.
24      Q.  Are you aware they never actually recovered the
25  Ferrari?

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

17

1      A.  Personally they did not recover the Ferrari,

2  no.

3      Q.  And your husband just testified that they tried

4  to get the engine, but the engine -- they were not

5  successful in getting the engine and that was shipped

6  over to Europe too?

7      A.  Could be.  I don't know.  I wasn't involved.

8      Q.  Were you aware that the court ordered Kristi

9  Lawson to ship the parts of the Ferrari that she still

10  had in her possession over to Europe under threat of

11  contempt of court?

12      A.  I know nothing about the court case.  I was not

13  informed.  We were not kept informed about anything.

14      Q.  Are you aware that it's your present attorney,

15  Mr. Gottesman, who filed the motion for contempt

16  against --

17      A.  Not aware.

18      Q.  -- Kristi Lawson and Joe Ford in an effort to

19  get them to ship -- require them to ship the parts to

20  Europe?

21      A.  I'm not really aware.

22      Q.  You're aware that Christopher Gardner sued

23  Kristi Lawson and Joe Ford.

24      A.  I'm aware of a court case.

25      Q.  Are you aware that your current attorney,

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

18

1    Mr. Gottesman, represented Christopher Gardner in that

2    lawsuit, aren't you?

3        A.  Yes.

4        Q.  In fact, that's how you came to know of

5    Mr. Gottesman; isn't that correct?

6        A.  No.

7        Q.  How did you learn of Mr. Gottesman?

8        A.  I never -- I didn't meet him until we

9    personally spoke to him.

10       Q.  Now I don't want to know anything about what

11   you ever spoke to Mr. Gottesman about, but I do want to

12   know what your fee agreement with Mr. Gottesman is.  How

13   are you compensating Mr. Gottesman in this case?  [QUES]

14       MR. GOTTESMAN:  Objection.  Don't answer that.

15       MR. HAWLEY:  You say don't answer that?

16       MR. GOTTESMAN:  That's right.

17       MR. HAWLEY:

18       Q.  Are you going to follow your attorney's

19   instructions not to answer that question?

20       A.  Yes.

21       MR. HAWLEY:  We're going to certify this.

22       Q.  So you learned at some point, though,

23   apparently through this conversation with RM Auctions in

24   2012, that Christopher Gardner was involved with the

25   Ferrari; is that correct?

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

19

1      A.  Yes.

2      Q.  When did you learn about his involvement?  Was

3  he claiming an ownership interest in the Ferrari to your

4  knowledge?

5      A.  I don't know.  Neither Gardner nor Joseph Ford

6  would admit to that, so...

7      Q.  Were you -- did you have discussions with

8  Christopher Gardner about getting a commission from him,

9  from his share of the proceeds of any sale that he came

10 into as a result of any sale of the Ferrari?

11     A.  No.

12     Q.  Did you say no --

13     A.  No.

14     Q.  -- you never discussed with him?

15     A.  No.

16     Q.  Did you have discussions with Chris Gardner

17 about having your husband play both sides of the table?

18 In other words, to act as if he's on Joe Ford and Kristi

19 Lawson's side of the ownership dispute and act like he's

20 on Florence Swaters' side of the lawsuit?

21     A.  No.

22     Q.  Do you have Exhibit 9 in front of you --

23     A.  Yes.

24     Q.  -- which is the JF3000508?

25     A.  Yes.

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

20

1        Q.   Did Chris Gardner suggest to you that your

2   husband Dave Clark should play both sides of the table?

3        A.   Yes.

4        Q.   And Chris Gardner said that "Dave has to play

5   Joey."  Joey is Joe Ford; is that right?

6        A.   I suppose.  I don't know.

7        Q.   By play him, that means deceive him, act like

8   he's on his side, when in fact he's working for Gardner

9   and Florence Swaters; is that correct?

10       A.   When who's working for Florence and Joe -- and

11  Swaters?

12       Q.   Your husband Dave Clark.  Your husband Dave

13  Clark.

14       A.   I'm going to answer that.  Up to that point we

15  had not talked to Joseph Ford in three years, so there's

16  no way we could play him.

17       Q.   Look at the fifth line down there.  Chris

18  Gardner is telling you, apparently, that -- that "Dave

19  has to play Joey also."  Do you see that?

20       A.   I understand.

21       Q.   And he's suggesting at that point that your

22  husband Dave has to play Joe -- Joe Ford.  Meaning lead

23  him on or deceive him in some way; is that correct?

24  That's what Chris Gardner is suggesting.

25       A.   That's what Chris Gardner is suggesting.

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

21

1       Q.  Did you ever tell Chris Gardner that no, you
2   and your husband were not going to double deal Joe Ford
3   like that?
4       A.  We weren't talking to Joe Ford then and had not
5   for three years.
6       Q.  You were talking to Chris Gardner right here in
7   this Skype conversation on January 12, 2012.  Did you
8   ever tell Chris Gardner that you and your husband would
9   never do that to Joe Ford?
10      A.  Does it say that I would tell him?
11      Q.  It doesn't say that you weren't going to do
12  that.
13      A.  Okay.  I never did.
14      Q.  Going down further, about the fourth entry from
15  the bottom, January 12, 2012 at 12:57 p.m., Chris is
16  suggesting that Dave is going to be playing both sides
17  of the table with Chris Gardner's hand in Dave's head,
18  and that it's going to be perfect.  Do you see that?
19      A.  Yeah.
20      Q.  Did you ever tell Chris Gardner that that was
21  wrong and that you and your husband were not going to
22  participate in any anything like that?
23      A.  No.  I just let the snake talk.
24      MR. HAWLEY:  The next page.  I'd like to have that
25  marked separately as Defense Exhibit 10.  And that's

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

22

1    JF3000126.

2        Q.  Is this another portion of a Skype transcript,

3    of a Skype conversation you had with Chris Gardner?

4        A.  Which one?

5        Q.  The one that we just marked as defendants' 10,

6    JF3000126.

7        A.  Yes.

8        Q.  In this Skype conversation with Chris Gardner

9    you're discussing coming to a settlement with Florence

10   Swaters over ownership of this Ferrari; isn't that

11   correct?

12       A.  Yes.

13       Q.  You're talking about negotiating a deal with

14   Florence Swaters where she will give up her interest for

15   $5 million.  And she had apparently been willing to pay

16   $4 million.  Or rather -- she wants to buy the Fords'

17   and Lawsons' interest at that point; isn't that correct?

18       A.  Yes.

19       Q.  Apparently she had offered $4 million but was

20   willing to come up to $5 million.  Or you were trying to

21   get her up to $5 million; is that right?

22       A.  You know, I can't say.  I don't know.

23       Q.  Did you ever tell Kristi Lawson that you were

24   negotiating with Chris Gardner behind her back with

25   Florence Swaters?

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

23

1        A.   I wasn't negotiating with Chris Gardner behind
2    Kristi's back with Florence.
3        Q.   Was Kristi Gardner -- Kristi Lawson -- I don't
4    know why I keep saying that, I apologize.  Was Kristi
5    Lawson aware that you were having these Skype
6    conversations with Chris Gardner at the time that you
7    were having these conversations?
8        MR. GOTTESMAN:   Objection.  Go ahead.
9        THE WITNESS:   I don't know.
10   MR. HAWLEY:
11       Q.   Did you ever tell Kristi Lawson that you were
12   doing that?
13       A.   I wasn't doing anything.
14       Q.   Well, you're negotiating with Chris Gardner.
15       A.   Negotiating, meaning what?
16       Q.   Well, let's see.  Look down at the 10:31:27
17   mark where Chris Gardner says:   "She," meaning Florence
18   Swaters, "will have to verbally say, okay.  Then we
19   start the settlement process."  And you say, "Ok.  I'll
20   have David verbally go back to them then with your
21   counter of 5 million."
22       A.   Okay.  So writing --
23       Q.   That's a negotiation.
24       A.   Writing and doing and acting are two different
25   things.

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

24

1      Q.  So what you're saying is that you and Chris
2  Gardner are not trying to negotiate a deal with Florence
3  Swaters at this point in this conversation?
4      A.  I'm saying Chris might be doing what he's
5  doing, but I'm not doing anything.
6      Q.  You're telling Chris that you'll have David go
7  back to them with a counter of $5 million.  And by them
8  that means Florence Swaters, right?
9      A.  Yes.
10      Q.  So you are telling Chris Gardner that you're
11  going to have your husband go to Florence Swaters with
12  an offer of $5 million.
13      A.  Yes.
14      Q.  That looks to me like you're sort of trying to
15  negotiate a deal with Florence Swaters.
16      A.  There has to be action.
17      Q.  I'm just saying, you're trying to negotiate a
18  deal with Florence Swaters.  Is that what you and
19  Mr. Gardner are trying to do here?
20      A.  No.  I'm playing with Gardner's head.
21      Q.  Now, did you tell Kristi Lawson that you were
22  playing this game with Chris Gardner at this time?
23      A.  Kristi Lawson and I weren't talking.  She
24  wouldn't return our calls.
25      Q.  Did you tell Joe Ford that you were having

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

25

1    these discussions?

2         A.  We weren't talking to Joe Ford in 2012.

3         Q.  So all of this was being done between you and

4    Chris Gardner without anyone's knowledge on Joe Ford's

5    or Kristi Lawson's part; is that right?

6         A.  Yes.

7         Q.  Now, down at the bottom of that, on February

8    28, 2012 at 10:48:36, you told Chris Gardner that you

9    wanted in writing from him that you could get 5 percent

10   of Chris Gardner's settlement.  Do you see that?

11        A.  Yeah.

12        Q.  Was this supposed to be on top of the

13   10 percent that you're now claiming in this lawsuit from

14   Joe Ford?

15        A.  I have no idea.  It's all make-believe.

16        Q.  Did you get 5 percent of Chris Gardner's share

17   of the sale proceeds?

18        A.  What sale?  This is hypothetical here.

19        Q.  You're suing my client, Kristi Lawson, for

20   10 percent of the sale price.  Did you sue Chris Gardner

21   for any -- 10 percent of his share of the sale?

22        A.  My contract -- our contract was with Kristi.

23        Q.  Did you ever get a contract with Chris Gardner

24   for 5 percent?

25        A.  No.

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

26

1      Q.  Did he ever tell you that he was going to cut

2  you into the deal?

3      A.  This deal is hypothetical.  This deal is

4  hypothetical.

5      Q.  Well, any deal at this point -- it was a

6  hypothetical deal when --

7      A.  No.

8      Q.  -- Kristi Lawson signed a contract for      10

9  percent back in 2007.

10     A.  No, because actions were taken on that.  This

11  is all just playing.  It's like playing Monopoly here.

12     Q.  So all these dealings with Chris Gardner and

13  Florence Swaters, both of whom ended up with substantial

14  sums of money from the sale of this, was just playing

15  with Monopoly money.  They got millions of dollars out

16  of this.  That's Monopoly money?

17     A.  The Skypes are hypothetical.  Okay?  Two

18  different things.

19     Q.  The next page, which appears to be a

20  continuation of that same Skype conversation, and so

21  this will be part of Defense Exhibit 10, Chris Gardner

22  is telling you that your 5 percent will be -- 5 percent

23  of the gross on the deal, not the net.  Do you see that

24  where he's telling you that?

25     A.  Yes.

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

27

1      Q.  Did he ever pay you that?

2      A.  What deal are we talking about?  There was no

3   deal.  Tell me what deal was going on then.

4      Q.  Actually you tell me what deal was going on.

5      A.  None.  No deal at the time.  2012 there was no

6   deal.

7      Q.  It didn't go through.  Did you have later

8   conversations with Chris Gardner about getting a

9   percentage of his share out of any sale of this car?

10     A.  I had no deal with Chris Gardner.

11     Q.  Go down to the middle of that page.  February

12  28, 2012 at 11:25:06 a.m.  This is something that you

13  said to Chris Gardner at that point.  It says:

14  "Initially --" you say to Chris Gardner:  "Initially we

15  contacted Joseph Ford after we were requesting to do so

16  by Florence's and made an agreement of 5 percent of the

17  total settlement amount, not the net after splits and

18  costs."  So you're telling him you made an agreement.

19  Who was that agreement with?

20     A.  I made no agreement.  It's all hypothetical.

21  Do you understand that?  This is all make-believe.

22     Q.  Actually I don't.  I've never --

23     A.  You'd have to know Chris Gardner to know that

24  he's playing with you, you play with him.

25     Q.  So your dealing with Chris Gardner and Florence

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

28

1   Swaters --

2        A.  I'm not dealing with Chris Gardner.  This has

3   nothing to do with the case.  This has nothing to do

4   with the case.

5        Q.  It all has to do with the sale of the Ferrari.

6        A.  No, it doesn't.

7        Q.  This doesn't have to do with this Ferrari?

8        A.  No, it doesn't.

9        Q.  And Florence Swaters doesn't have to do with

10  this Ferrari?

11       A.  No, it doesn't.  There was no action on any of

12  this.  It's just playing.

13       Q.  Are you saying that you are lying to Chris

14  Gardner?

15       A.  No.  I'm playing with him.

16       Q.  You're playing with him.  Does he know you're

17  playing with him?

18       A.  He's lying to me through his teeth.

19       Q.  He's lying to you and so you're playing with

20  him.

21       A.  I'm just playing with him.  It goes along with

22  everything that he writes.

23       Q.  Actually you're putting some things that he

24  didn't write which is that you want a deal of 5 percent

25  of his proceeds and you have some deal with someone else

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

29

1    for 5 percent of their proceeds.  Are you lying to him

2    about that in these emails, in these Skype

3    conversations?

4        A.  Yes.  I did not want that.  It's just play.

5        Q.  Now, at the time that you were just playing

6    here about Chris Gardner, if he had said, "Yeah, I'll

7    give you 5 percent of my share," were you expecting that

8    that was going to be on top of the 10 percent that you

9    were going to claim from Joe Ford and Kristi Lawson?

10       A.  I have no deal with Chris Gardner.  This has

11   nothing to do with any deal, any contract I had with

12   Kristi Lawson.

13       Q.  It has to do with the same Ferrari.  If Chris

14   Gardner had said yes to this deal, would you have been

15   getting that 5 percent on top of the 10 percent that

16   you're now suing Kristi Lawson and --

17       A.  Chris Gardner would never have said yes to this

18   deal, okay?

19       Q.  At some point did he tell you 3 percent?

20       A.  He would never have signed anything.  I know

21   that.  And anybody that knows Chris Gardner knows that.

22       Q.  Now, you're aware that a lot of people shared

23   in the proceeds from the sale of the Ferrari, aren't

24   you?

25       A.  Am I aware?  No, I don't know.

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

30

1      Q.   Are you aware that Florence Swaters got a big
2   chunk of the sale proceeds?
3      A.   Yes.  I suppose.
4      Q.   And that Kristi Lawson and Joe Ford never got a
5   penny of Florence Swaters' share?
6      A.   Why should they?
7      Q.   Well, why should you get a percentage of what
8   Florence Swaters gets?  Do you have a contract with her?
9      A.   Because it's the sale of the car.
10     Q.   Now, so you get 10 percent of the total sale of
11  the car no matter who sells it, is that it?
12     A.   Yes.
13     Q.   If Kristi Lawson and her sisters combined get
14  $600,000, they owe you a million six?
15     A.   Yes.
16     Q.   And if your present attorney's former client,
17  Chris Gardner, got millions out of this, you're entitled
18  to 10 percent of what Mr. Gottesman's former client,
19  Chris Gardner, got from Kristi and Joe Lawson?
20     MR. GOTTESMAN:  Objection.
21     MR. HAWLEY:  Kristi Lawson and Joe Ford.
22     MR. GOTTESMAN:  Objection.
23     MR. HAWLEY:
24     Q.   You get 10 percent of that money too?
25     A.   I don't know.  I don't think so.

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

31

1      Q.  Is your attorney on a contingent fee in this
2  case?  Are you paying him money or does he get a
3  percentage of what you --                    [QUES]
4      MR. GOTTESMAN:  Don't answer that, Debbie.  Don't
5  answer that.  My instruction.
6      MR. HAWLEY:
7      Q.  Are you going to follow your attorney's
8  instructions and not answer that question?
9      A.  Of course.
10     MR. HAWLEY:  We'll certify that one too.
11     MR. GOTTESMAN:  If you ask it again don't answer
12  it.
13     MR. HAWLEY:  Can you find in the stack of documents
14  there the next batch of Skype conversations.  They're
15  marked on the bottom JF3000186 and JF3000196.
16     MR. GOTTESMAN:  Counsel, are you going to mark
17  those?
18     MR. HAWLEY:  186, let's mark that as number 11,
19  Exhibit 11, and mark 196 as number 12.
20     Q.  Are these more transcripts, partial
21  transcripts, at least, of Skype conversations that you
22  had with Chris Gardner?
23     A.  Yes.
24     Q.  Turning to the first one marked as Exhibit 11,
25  right up at the top, you were communicating here with

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

32

1    Chris Gardner at that point, aren't you?

2         A.  Yes.

3         Q.  You are telling him that "We," meaning you and

4    your husband, "want to help you," meaning Chris Gardner,

5    "in any way we can."  Do you see that?

6         A.  Yes.

7         Q.  And, in fact, you were trying to help Chris

8    Gardner at that point, weren't you?

9         A.  Yes.

10        Q.  Part of the reason you were trying to help

11   Chris Gardner is because he was working a deal

12   separately with Florence Swaters and you had a deal with

13   Chris Gardner to get a percentage of his --

14        A.  No.

15        Q.  -- proceeds.

16        A.  No.

17        Q.  Why were you working and trying to help Chris

18   Gardner in any way you can at that point?

19        A.  Because we thought that Joseph Ford was the bad

20   guy.  We thought.  We thought.

21        Q.  Okay.  What you were trying to do is squeeze

22   Joe Ford out of the transaction altogether; isn't that

23   correct?

24        A.  No.

25        Q.  What were you going to do to help Chris Gardner

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

33

1   at that point?

2       A.  I have no idea.

3       Q.  Now, you're aware at that point that Chris

4   Gardner is suing Kristi Lawson and Joe Ford.

5       MR. GOTTESMAN:  Counsel, that's not true.

6       MR. HAWLEY:  That's not true?  Okay.

7       Q.  You're aware that Chris Gardner is in an

8   adversary position at that point with Joe Ford; is that

9   correct?

10      A.  We were not aware of anything that was going on

11  actually.

12      Q.  You say that "Dave and I have discussed the

13  idea of getting a legal opinion about our contract just

14  to make sure that it is perceived in our best interest."

15  What contract are you talking about?

16      A.  Exhibit Number 1.

17      Q.  Did you ever get that legal opinion?

18      A.  No.  Just talking again.

19      Q.  Down in the middle of the page when you and

20  Chris Gardner are talking about Joe Ford, Chris Gardner

21  tells you he could care less on him.  All Chris Gardner

22  wants to do is to take Joe Ford's share 100 percent

23  away.  You see that?

24      A.  Yes.

25      Q.  Were you trying to help Chris Gardner do that

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

34

1    at that point?

2        A.  No.

3        Q.  Is this again you're just leading -- playing

4    games with Chris Gardner at this point?

5        A.  Yes.

6        Q.  And so down in the middle of the page at the

7    1:11:31 p.m. where you say to Chris Gardner "which is

8    rightfully yours," you're talking about Joe Ford's share

9    of the proceeds is rightfully Chris Gardner's, you're

10   telling him; is that right?

11       A.  Yeah.

12       Q.  You're talking about that?  Down towards the

13   bottom of the page, August 2013, Chris is talking about

14   getting the police involved in Ohio.  Do you see that?

15       A.  Uh-huh.

16       Q.  He's talking about getting -- is he talking

17   about getting the police involved in Ohio in order to

18   get the Ferrari parts shipped over to Europe?

19       A.  I don't know.

20       MR. GOTTESMAN:  Objection.

21       MR. HAWLEY:

22       Q.  Where Chris is saying, Chris Gardner is saying

23   that Ford, meaning Joe Ford, is resisting the judge's

24   order, and he thinks RM is behind me.  Is that the order

25   for them to ship the parts over to Europe?

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

35

1       A.  Why you ask me?  I don't know.

2       Q.  You and Chris Gardner are having a discussion

3   about it at this point.  I'd like your understanding

4   about what you were discussing with Chris Gardner at

5   this point.

6       A.  The only discussions are right here.  If

7   nothing is explained then that's all I know.

8       Q.  Chris Gardner asked you down at 1:30:57 to find

9   out discretely if RM Auctions is involved; is that

10  correct?

11      A.  Yes.

12      Q.  He's asking you to find out discretely if RM

13  Auctions is involved in resisting the judge's order to

14  send the Ferrari parts over to Europe.  Does that

15  refresh your recollection as to what you're talking

16  about with Mr. Gardner at this point?

17      A.  No.

18      Q.  You're aware, though, that Kristi Lawson and

19  Joe Ford were ordered by the court under the threat of

20  being held in contempt to ship the parts to Florence

21  Swaters in Europe.

22      MR. GOTTESMAN:  Objection.  Asked and answered.

23      THE WITNESS:  No.

24      MR. HAWLEY:

25      Q.  You're not aware of that?

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

36

1          MR. GOTTESMAN:  Deborah, please recall my

2     instructions and make sure you allow me time to respond

3     if appropriate, okay?

4          THE WITNESS:  Yes.  Yes, Zachary.

5          MR. GOTTESMAN:  Thank you.

6          MR. HAWLEY:

7          Q.  Can you turn to Exhibit 12, please.  This is

8     another Skype -- partial transcript of a Skype

9     conversation you had with Chris Gardner.  Is that

10    correct?  Is this a transcript of your conversation?

11         A.  Yes.

12         Q.  Up near the top you tell Chris Gardner that

13    Kristi -- and that's Kristi Lawson -- called you that

14    day.  You see that?

15         A.  Yes.

16         Q.  Do you remember what that conversation was

17    about?

18         A.  No.

19         Q.  This conversation appears to be Chris Gardner

20    telling you that he's going to guide you in what you

21    should tell Kristi Lawson.  Is that a correct

22    understanding of what's being said in this conversation?

23         A.  I have no idea.

24         Q.  Down about 10 or 12 lines down Chris Gardner

25    remarks, "What a set up."  Who's being set up here?

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

37

1          MR. GOTTESMAN:  Objection.

2          THE WITNESS:  I have no idea.

3          MR. GOTTESMAN:  Objection.  Deborah, please allow

4     me time to respond appropriately.

5          MR. HAWLEY:

6          Q.  Almost midway down the page Chris Gardner tells

7     you that he's going to wipe out Ford and then introduce

8     you as his introduction to the deal.  Do you see that?

9          A.  Uh-huh.

10         Q.  Were you planning with Chris Gardner at that

11    point to squeeze Joe Ford out of the transaction and

12    then represent the people that Chris Gardner was

13    involved only because of you --

14         A.  Nope.

15         Q.  -- and your husband?

16         A.  No.

17         Q.  Isn't that what Chris Gardner is suggesting,

18    though, at this point?

19         A.  I don't know.

20         Q.  When you say "great," it sounds like you're

21    agreeing with what he's saying there.  Did you ever tell

22    him that you were not going to participate in any sort

23    of deal like that?

24         A.  Yes.

25         Q.  When did you tell him that?

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

38

 1        A.   When he asked for a deposition.

 2        Q.   When Chris Gardner asked for a deposition?

 3        A.   Yes.

 4        MR. GOTTESMAN:   For clarification, she means

 5   affidavit.

 6        MR. HAWLEY:

 7        Q.   You're referring to the affidavit from your

 8   husband?

 9        A.   Yes.

10        Q.   The affidavit he wanted, apparently he wanted

11   you and your husband to say that Joe Ford was acting as

12   an attorney and you and your husband said that wasn't

13   true; is that right?

14        A.   Correct.

15        Q.   Now a little bit below, midway through the

16   page, Chris Gardner tells you that he will make sure

17   that you get all you deserve.   Then it says "on side of

18   me."  And that he's already in, and that he's going to

19   pull you in.  Do you see that?

20        A.   Uh-huh.

21        MR. GOTTESMAN:   Deborah, I'm going to remind you.

22   Please use "yes" and "no" rather than "uh-huh" or

23   "huh-huh."

24        THE WITNESS:   Yes, I see that.

25        MR. HAWLEY:

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

39

1      Q.  Your response to Chris Gardner at that point is

2   you hope he takes into consideration when he figures out

3   your share that you and your husband, I assume, have

4   backed Chris Gardner at every step and will continue to

5   do so.  That's what you told Chris Gardner at that

6   point, isn't it?

7      A.  I don't know.  Where's that?

8      Q.  That's on August 27, 2013 at 3:19:26 p.m.  The

9   statement by you.

10     A.  Yes, it is.

11     Q.  At this point, Chris Gardner is the one who is

12  promising that you will get all that you deserve and

13  that he will bring you into the deal; isn't that

14  correct?

15     A.  No, it's not.

16     Q.  Well, let's see.  Look at that line at

17  3:17:52 p.m.  And I'm going to read this.  And tell me

18  if I read this correctly.  And this is Chris Gardner

19  speaking.  "I will make sure you get all you deserve, on

20  side of me.  I'm already in., Will pull you there."

21  Chris Gardner -- did I read that correctly?

22     A.  You read that correctly.

23     Q.  Chris Gardner at that point is saying that he

24  is going to make sure that you get paid out of this

25  deal.

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

40

1      A.   He is saying that he will -- that we will get
2  paid out of this deal?  I don't believe it.
3      Q.   He's saying that at this point.
4      A.   Yeah, he's saying that.  He's saying that.
5      Q.   And you are responding to him that you hope
6  that he takes into consideration when he figures out
7  your share all that you have done to back him up at
8  every step and that you would continue to do.  That's
9  how you responded to that; isn't that correct?
10     A.   That's how I responded.
11     Q.   And now down towards the bottom of the page,
12 about ten lines up at 8:21:52 a.m. on August 28, 2013,
13 Chris Gardner is telling you that he's in court ordering
14 Kristi to comply.  Do you see that?
15     A.   Uh-huh, yes.
16     Q.   And do you know whether that is -- he's
17 referring to the court date where he's seeking to have
18 Kristi and Joe Ford ship the Ferrari parts to Europe, to
19 Florence Swaters so that Florence Swaters can sell the
20 Ferrari?
21     A.   I have no knowledge of their case.
22     Q.   Now, by that time you apparently had a phone
23 conversation with Kristi Lawson and so you were
24 apparently in some communication with her at that point.
25 Did you ever tell her that you were working with Gardner

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

41

1    against --

2        A.  I don't recall the conversation.

3        Q.  Now, you did understand at the time that Kristi

4    Lawson and Joe Ford were trying to claim sole ownership

5    and rightful possession of the entire Ferrari.  You were

6    aware of that?

7        A.  Not aware of the case at all.

8        Q.  Not aware that Florence Swaters claimed

9    ownership and that Kristi Lawson claimed ownership?

10       A.  We were not kept abreast of the case at all.

11       Q.  I'm not asking about lawsuits.  I'm asking if

12    you were aware that Kristi Lawson and Florence Swaters

13    were each claiming to hold valid title and ownership of

14    the Ferrari.  You knew that, didn't you?

15       A.  Yes.

16       Q.  At that point, Chris Gardner in 2012 and 2013

17    is working with Florence Swaters to give her control and

18    ownership of the Ferrari, isn't he?

19       MR. GOTTESMAN:  Objection.

20       THE WITNESS:  I don't know.

21       MR. HAWLEY:

22       Q.  Well, when he's negotiating with Florence

23    Swaters behind Kristi Lawson's and Joe Ford's back and

24    promising to bring you into the deal, isn't that exactly

25    what he's doing at that point?

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

42

1      A.  He never made me that promise.  He lies.

2      Q.  You're saying that he's lying in these things.

3  You're not saying he didn't say these things, you're

4  saying that you don't think he was ever going to honor

5  them.

6      A.  I never took -- yes, I never took his word

7  for it.  I knew he was lying.

8      Q.  You're saying that you were lying right back at

9  him.

10     A.  Yes.

11     Q.  And you were playing him along, right?

12     A.  Yes.

13     Q.  But you're not denying that you and Chris

14  Gardner were having these conversations at the time

15  these things were going on.

16     A.  Exactly.

17     Q.  And you are also not denying that you were not

18  telling Kristi Lawson and Joe Ford that you were having

19  these conversations with Chris Gardner, were you?

20     A.  I never talked to Kristi and I never talked to

21  Joe up until then.  I did not have a conversation with

22  Kristi that I recall.

23     Q.  In your Skype here we just saw that you had

24  told Chris that you just talked to Kristi that day.

25     A.  I know.

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

43

1          Q.  That day did you tell her you were negotiating

2     and talking and telling all these lies back and forth

3     with Chris Gardner?

4          A.  There was no phone call.

5          Q.  But you lied to Chris Gardner about the phone

6     call to Kristi too.

7          A.  Yes.

8          MR. GOTTESMAN:  Objection.  Counsel, it may be a

9     misrepresentation.  Lies involve a lot of intent in

10    issues like that.  You can use language as you like.

11    She's indicated several times this was a farce all

12    along.

13         MR. HAWLEY:  When somebody says I talked to Kristi

14    today and then tells me under oath that that

15    conversation never happened that looks to me like that

16    would be a lie.

17         Q.  Now, in these Skype transcripts we see that

18    Chris Gardner was promising to bring you and your

19    husband in on his side of the deal; is that correct?

20         A.  I don't know that he ever promised.  I never

21    took it for serious.  I never took it serious.

22         Q.  But when the Ferrari actually sold and Chris

23    Gardner got a lot of money out of the sale, he never

24    brought you and your husband into that deal, did he?

25         A.  Never expected him to.  He's a liar.  He's a

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

44

1    cheat.

2         Q.  Did you ever consider filing a lawsuit against

3    him based on his promise to bring you into the deal?

4         A.  Our contract is with Kristi.

5         Q.  Are you saying that your contract with Kristi

6    prevented you from having another contract with someone

7    else?  Couldn't you have contracts with two people?

8         A.  Not with a liar and a cheat.

9         Q.  It seems to me that someone who promises you

10   something but lies about it and cheats you, it seems to

11   me that that would be the person that you would file a

12   lawsuit against.  Is there a reason why you haven't

13   filed a lawsuit against Chris Gardner for some

14   percentage of his proceeds from the sale of the Ferrari?

15        A.  We didn't have a contract with Chris Gardner,

16   we have one with Kristi Kleve.

17        Q.  So what you're doing, you're dealing with Chris

18   Gardner behind Kristi Kleve's back to have Chris Gardner

19   get in on this deal, but you want Kristi Lawson to pay

20   you 10 percent of what Chris Gardner got with your

21   assistance.  Is that what you're saying in this lawsuit?

22        A.  No.  Joseph Ford brought Chris Gardner in, we

23   didn't.

24        Q.  In these transactions you were working hand in

25   hand in telling Chris Gardner that you got his back at

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

45

1    every step of the way and that he's promising to bring

2    you in on the deal, but you're not telling Kristi Lawson

3    that.  But now you're suing Kristi Lawson for 10 percent

4    of the money that Chris Gardner got with your

5    assistance.  Is that what's going on here?

6         A.  Show me one instance where I had Christopher's

7    back.

8         Q.  Well, we see a lot of conversations that you're

9    having with Chris Gardner.

10        A.  That's nothing.

11        Q.  You negotiate deals with Bonhams and Florence

12   Swaters who sold the Ferrari.

13        A.  We don't appear anywhere there.  You can look

14   all you want.  You won't find any negotiations from us

15   between those, between Gardner and Florence and Bonhams.

16   You can read these stupid Skypes all you want.  There's

17   no significance to any of them because you have to find

18   the proof out there and there is none.

19        Q.  Now, these aren't all the Skype transcripts

20   that you've provided.  But would you agree that if we

21   have Skype transcripts that look like this, that have

22   your name and the time signatures and that you sent to

23   Joe Ford, that those are all real transcripts of your

24   conversations?

25        MR. GOTTESMAN:  Objection.  Go ahead.

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

46

 1      THE WITNESS:  You can have them.  I mean, Joe Ford
 2  already has them.  I sent them all to him when I helped
 3  him in his case.
 4      MR. HAWLEY:
 5      Q.  I guess what I'm asking is are all the Skype
 6  transcripts that you sent to Joe Ford actual transcripts
 7  of actual conversations that you had on Skype with
 8  various people -- mainly with Chris Gardner?
 9      A.  Only Chris Gardner is who I had Skype
10  conversations with.
11      Q.  All the transcripts that you sent to Joe Ford
12  are real transcripts of real Skype conversations you had
13  with Chris Gardner; is that correct?
14      A.  They were transcripts with Chris -- of
15  conversations I had with Chris.  But that they were real
16  I couldn't say because they were all made up.
17      Q.  I'm not saying that what you and Chris were
18  telling to each other was true.
19      A.  Okay.
20      Q.  But the conversations took place and the
21  transcripts are transcripts of those conversations.
22      A.  Right.  Right.  Joe Ford has a pile of them.
23  We helped him against Chris.
24      Q.  So I guess in conclusion, you're kind of
25  playing, you and your husband are playing all sides of

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

47

1    the table against each other and sort of trying to -- it

2    looks to me like you're sort of trying to jump onto the

3    easiest target at the end.

4         A.  You're funny, counselor.

5         MR. GOTTESMAN:  Hold on, Deborah.  Let him finish

6    his question.

7         MR. HAWLEY:

8         Q.  We've seen where you're telling Chris Gardner

9    you're helping him, and now you're telling me you're

10   helping Joe Ford.  Who are you really helping though?

11        MR. GOTTESMAN:  Objection.  Go ahead.

12        THE WITNESS:  First of all, we already established

13   I wasn't helping Chris Gardner, okay?  I only helped

14   Joseph Ford for Kristi.  We only care about Kristi.

15   Kristi is who we cared about.  That was it.  Now, the

16   fact that Joseph Ford and Chris Gardner both lied to us

17   which prevented us from actually, you know, knowing the

18   truth, that has a lot to do with it.  But don't look at

19   me as being the one that's playing all sides.

20        MR. HAWLEY:

21        Q.  Now, is there a reason why you didn't put your

22   name on the contract that's Exhibit 1?

23        A.  You'll have to ask Kristi and Dave that.

24        Q.  You agree that you're not a party to that

25   contract though, right?

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

48

1          A.  No, I'm not.  The only thing I'm responsible

2     for are these Skypes.

3          Q.  On the Skypes, were you having these Skype

4     conversations with -- did your husband know you were

5     having these conversations with Chris Gardner?

6          MR. GOTTESMAN:  Objection.

7          THE WITNESS:  No.

8          MR. HAWLEY:

9          Q.  You never told him you were having them?

10         A.  No.

11         Q.  Did you tell him that you were providing those

12    transcripts to Joe Ford?

13         A.  Yes.

14         Q.  When did your husband find out about those

15    transcripts?

16         A.  When Joe Ford asked us to help him and I told

17    David, "Look, David.  Look what I got."

18         Q.  Was your husband surprised that you had been

19    having all these communications with Chris Gardner?

20         MR. GOTTESMAN:  Objection.

21         THE WITNESS:  No.  No.

22         MR. HAWLEY:

23         Q.  Was your husband okay with it?

24         MR. GOTTESMAN:  Objection.

25         THE WITNESS:  Yes.

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

49

1          MR. HAWLEY:  I don't think I have any other

2     questions.

3          MR. GOTTESMAN:  Are you okay to keep going,

4     Deborah?

5          THE WITNESS:  Yes, Zachary.  Are you?

6          MR. GOTTESMAN:  Yes, I am.  We're going to switch

7     attorneys in the batter's box and you're going to go

8     through a little bit more so just bear with us, okay?

9          THE WITNESS:  Uh-huh.  As long as we're done with

10    the stupid Skypes.  I wish I'd never done them.

11         MR. GOTTESMAN:  We can hear you, Deborah.

12                         -EXAMINATION-

13    BY MR. GATLIN:

14         Q.  Mrs. Clark, my name is Jack Gatlin.  I'm here

15    on behalf of Joe Ford.  I'm going to try to make this as

16    organized and as concise as possible.  I think it would

17    be helpful if you had all of the exhibits in front of

18    you that have been marked Exhibits 1 through 12.  I'm

19    hoping they're just sitting there somewhere.  Should be

20    all in order 1 through 12.  I'm hoping they are.

21         Miss Clark, do you now have all 12 exhibits in

22    front of you?

23         A.  Yes.

24         Q.  Let's start with looking at Defendant's

25    Exhibit 1.  We've talked about this document a little

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

50

1    bit, but I want to make sure.  Is this the only contract

2    that exists as it relates to the Ferrari between you --

3    I'm sorry, between David Clark, the Lawsons, Kleve's and

4    English?

5        A.  I believe so.

6        Q.  Is Mr. Ford's name anywhere on this contract?

7        A.  No.

8        Q.  So you do not have any contract with Mr. Ford.

9        A.  No.

10       Q.  So everything you have with Mr. Ford as it

11   relates to Mr. Ford's obligations to you is what?

12       A.  The amendment that Kristi signed, including us

13   in the contract with Mr. Ford.  The agreement.  There's

14   an amendment to agreement between Kristi and Joe.

15       Q.  I understand.  Is either your name or David

16   Clark's name on that agreement?

17       A.  No.

18       Q.  So is there any documentation that has either

19   your signature, David Clark's signature or Joe Ford's

20   signature all on the same document?

21       A.  I don't think so.  I don't believe so.

22       Q.  This question has kind of been asked, but I'm

23   going to ask it in a little different way.  If you look

24   at the signature, I think that everyone has testified

25   to, that you signed David Clark's name here.

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

51

1       A.  Yes.  Yes.

2       Q.  You stated that you had power of attorney over

3   David Clark.

4       A.  Yeah.

5       Q.  Is there any reason you did not sign it as

6   Deborah Clark as power of attorney for David Clark?

7       A.  I didn't specifically start out signing it as

8   the POA.  I sign everything for David.  I sign checks.

9   I sign everything.  Everything.

10      Q.  So any time we see David Clark's signature

11  there's a high probability you signed it?

12      A.  Yes.

13      Q.  I think you kind of previously testified that

14  you guys have been married 47 years and you sort of have

15  this explicit, if not -- or implicit, maybe explicit

16  authority to sign his name.

17      A.  Yes.  Basically because he doesn't want to

18  bother.  I mean, that's his attitude.  "You sign it.  I

19  don't care," you know?

20      Q.  Now, did he review this contract prior to you

21  signing it or did you review the contract?

22      A.  He did.

23      Q.  Move on to Exhibit 4 which is the complaint.

24  On the very first page plaintiffs are David and Deborah

25  Clark, correct?

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

52

```
 1        A.  Yes.

 2        Q.  Let's look at Exhibit 4.  And on the very first

 3   page it says "David and Deborah Clark, Plaintiffs,"

 4   correct?

 5        A.  Yes.

 6        Q.  We've discussed that the contract is in the

 7   name of David Clark, correct?

 8        A.  Yes.

 9        Q.  So what legal claims does Deborah Clark have

10   against the defendants?

11        MR. GOTTESMAN:  Objection.  Go ahead.

12        THE WITNESS:  You'll have to ask my attorney.

13        MR. GATLIN:

14        Q.  Is it fair to say that your individual claims

15   as a plaintiff relate to that Exhibit 1 contract?

16        A.  I don't know how to answer that.

17        Q.  Do you understand that you are a plaintiff

18   yourself in this case?

19        A.  Yes.

20        Q.  Now, you testified that you had no

21   communication with Joseph Ford since 2010.

22        A.  Correct.

23        Q.  Did you ever call Joseph Ford after 2010?

24        A.  I don't recall.  I don't think so.

25        Q.  So if you were -- so you and your husband --
```

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

53

1    and it is -- it's just odd.  I don't mean it's odd that

2    you all work together, I don't mean it that way.  It's

3    odd because David Clark sends all the emails but it's

4    really you who's sending them.  So it's kind of like you

5    guys are one in the same in some of these transactions.

6        A.  David does most of the phone calls, I do the

7    emails.

8        Q.  I guess there has to be a lot of communication

9    between the two of you to keep everybody on the same

10   page.

11       A.  He calls me 10, 12 times a day.

12       Q.  So when you said you had no communication with

13   Joseph Ford since 2010 and you did not call Joseph Ford

14   did David have any communication?

15       A.  Not that I'm aware of.

16       Q.  Did you have any communication with Kristi

17   Lawson since 2010?

18       A.  I'm not specifically aware of any time, but I

19   know that we tried to call her several times and got no

20   response.

21       Q.  Is there any reason you did not call Joseph

22   Ford?

23       A.  You don't want to know.

24       Q.  I do.

25       A.  Because from day one when he signed that

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

54

1    contract with Kristi, he told Kristi, "Number one, don't

2    talk to David and Debbie anymore."  And he called us up

3    and said, "Your contract is null and void."  And we did

4    not talk to him again until he needed our help against

5    Christopher Gardner.

6        Q.  So when did Joseph Ford say that your contract

7    with Kristi was null and void?

8        A.  Around February 22nd 2010.

9        Q.  How did you respond to that?

10       A.  Well, after David found out what he'd done to

11   Kristi Kleve, he was so upset.  They said a if not

12   choice words to each other -- David and Joseph.

13       Q.  So there was some communication after 2010.

14       A.  Just on the day that that contract was signed

15   and Joseph Ford took 75 percent of Kristi's profits.  He

16   bought.  He bought the car for $75,000.  And that pissed

17   David off.

18       Q.  So is it fair to say at that point David broke

19   the contract with Kristi Lawson and Joe Ford?

20       A.  No.  No.  No, we did not.  Joe Ford claimed

21   that our contract was null and void.  We still had a

22   contract with Kristi.

23       Q.  So you made no further communication with Joe

24   and you made a few phone calls to Kristi?

25       A.  Yes.  She would not answer.  She was instructed

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

55

```
 1   not to talk to us.
 2        Q.  How many phone calls did you make to Kristi?
 3        A.  I don't know.
 4        Q.  So I don't want to talk specifically about the
 5   Skype but just the general concept.  Why did you
 6   continue to Skype with Christopher Gardner if it was all
 7   just make-believe?
 8        A.  Because it was fun.
 9        Q.  Okay.  Fun in what way?
10        A.  Oh, fun to read the lies and the bullshit.
11   Yeah.
12        Q.  So you just sort of enjoyed playing with him a
13   little bit.
14        A.  Yes.
15        Q.  Do you do that often?
16        A.  No.
17        Q.  In email communication or --
18        A.  No.  It just happened to be with him.
19        MR. GOTTESMAN:  Deborah, recall my instructions.
20   So you give me a time to interject if I need to.  Thank
21   you.
22        MR. GATLIN:
23        Q.  Now, had Chris Gardner paid you the 5 percent
24   would you have accepted it?
25        A.  It never came to our mind that he -- that was
```

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

56

1    all just -- just -- it was bullshit.

2         Q.   I understand.   But sometimes weird things

3    happen.

4         A.   No.   No.   No.   No.   No.   No.

5         Q.   You would not have accepted it?

6         A.   There was no way that there was anything there.

7    That's just BS.   Trust me.

8         Q.   Why were you so sure that it was BS?

9         A.   Because he's a con artist.

10        Q.   How long have you known Chris Gardner?

11        A.   I don't know.   We've sold cars to him over the

12   years.

13        Q.   Was he a con artist in those transactions?

14        A.   Well, no.   He was the buyer so we were in

15   control.

16        Q.   So he's paid you all commissions.

17        A.   No.   No.   We have sold him cars.

18        Q.   Have you ever -- has he ever been a client of

19   yours?

20        A.   Well, only in the sense that we have sold him

21   cars.   He's been a buyer in cars we have handled.

22        Q.   How many times has he been a buyer of cars

23   you've handled?

24        A.   Well, there were a couple times where we were

25   cheated by him.   One I know for sure.

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

57

1     Q.   When was the time you were cheated by him?

2     A.   Oh, during this -- during this time.

3     Q.   Not related to this car.

4     A.   No.  No.

5     Q.   How were you cheated by him?

6     A.   I sent him photos of the car and he said that

7   he wasn't interested in the car.  Sound familiar?  And

8   then he turned around and went to the buyer and

9   bought -- or seller and bought the car.

10    Q.   Did you have a contract with him?

11    A.   No.  This is just all behind the back thing.

12  Goes behind your back.

13    Q.   But you have sold him cars.

14    A.   We sold him a car, yes, from an estate.

15    Q.   When did you sell him?

16    A.   I don't remember the year.

17    Q.   Five years ago?  Ten years ago?  20 years ago?

18    A.   Five years ago.

19    Q.   So in this same period of time --

20    A.   Yes.

21    Q.   -- that you were dealing with him?

22    A.   I think so.  David would know better.

23    Q.   So you think you may have sold a car to Chris

24  Gardner after 2010?

25    A.   I think it might have been around 2010, yeah.

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

58

1    Around 2010, give or take a year.

2        Q.  Did you feel you owed him any kind of duty or

3    loyalty?

4        A.  No.  No.

5        Q.  Even as a former client?

6        A.  He was never our client.

7        Q.  He was just a connection you had that bought a

8    car.

9        A.  He bought a car from us at one point, yes.  But

10   Christopher has been in a lot of lawsuits involving cars

11   so we called him.

12       Q.  So explain.  Run that by me again.  He's been

13   involved in a lot of lawsuits so you called him to help

14   Kristi Lawson?

15       A.  To find out who -- which attorney to call.

16       Q.  But if this guy is such a big liar and a cheat

17   and a scoundrel and, in your words, a snake, why would

18   you involve him with a client of yours?

19       A.  Well, we didn't involve him, that's the thing.

20   We didn't even know he was involved.

21       Q.  You said you contacted him.

22       A.  We contacted him to get the name of an attorney

23   that can handle an international car case.

24       Q.  So you relied on his advice and expertise, you

25   just don't trust anything he says.

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

59

1        A.   Right.  Because he's won a few cases
2   internationally and we wanted to know who he used.  He
3   said Joseph Ford.
4        Q.   Now, at some point earlier today you said you
5   thought Joe Ford was the bad guy and that's why you were
6   talking with Chris Gardner.
7        A.   To us Joe Ford was the bad guy, yeah.  We felt
8   that he was cheating Kristi.
9        Q.   What knowledge did you have of that other than
10  a conversation or two?
11       A.   That Joe Ford told us that he took 75 percent
12  of the car.
13       Q.   But you don't really have any knowledge of the
14  time, effort and money that Joe Ford had involved in the
15  entire transaction, do you?
16       A.   No.  But from the on start, from the get-go to
17  take 75 percent of someone's car, that's not what we
18  expected.
19       Q.   You were so outraged by it you now have sued
20  Kristi Lawson for 10 percent of the entire proceeds,
21  including the amount that Joe received?
22       A.   Yes.
23       Q.   You like taking the moral high ground, don't
24  you.
25       MR. GOTTESMAN:  Don't respond to that, Debbie.

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

60

1          MR. GATLIN:

2          Q.  Why didn't you join Chris Gardner in this

3     lawsuit?

4          A.  What lawsuit?

5          Q.  The lawsuit you have filed against Joe Ford and

6     Kristi Lawson and the other heirs.

7          A.  Why didn't I what?

8          Q.  Why didn't you file a lawsuit against Chris

9     Gardner as well?  Why is he not also a defendant in this

10    lawsuit?

11         A.  Because I have a contract with Kristi.  One

12    thing at a time here.

13         Q.  You sued Joe Ford.  You don't have a contract

14    with Joe Ford.

15         A.  Kristi incorporated our contract with Joe Ford.

16         Q.  But your signature is not on that.

17         A.  But it's still -- it's incorporated.  That's

18    our contract.

19         Q.  Let's go back to Exhibit 1.  Did either you or

20    David Clark recover the Ferrari?

21         A.  We weren't able to.

22         Q.  What kept you from recovering the Ferrari?

23         A.  The contract here was breached.

24         Q.  Who breached the contract?

25         A.  Kristi.

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

61

1       Q.   How did Kristi breach the contract?

2       A.   By selling 75 percent of this car to Joseph

3   Ford.

4       Q.   So your position is that when Joe Ford took

5   over 75 percent of the car that that breached the

6   contract?

7       A.   How can we sell a car?  Number one, there was

8   no title on the car.  How could we sell the car?

9       Q.   Now, let's back up here for a minute.  There

10  were -- obviously the car ended up getting sold,

11  correct?

12      A.   Correct.

13      Q.   There was certainly litigation that came from

14  that, and there was what I would say a negotiated

15  resolution as to how those proceeds went, correct?

16  Between the various parties claiming an interest.

17      A.   I assume, yes.

18      Q.   And a significant portion of that interest went

19  to Florence Swaters, correct?

20      A.   I assume, yes.

21      MR. GOTTESMAN:  Excuse me, Jack.  I don't want you

22  to assume.  Answer what you know.  If you don't know,

23  say so.

24      THE WITNESS:  Okay.

25      MR. GOTTESMAN:  Don't just start agreeing to stuff

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

62

1    or assuming stuff, just tell him what you know.

2         THE WITNESS:  Okay.

3         MR. GATLIN:

4         Q.  So the fact that the Swaterses had possession

5    of the car did that not hinder your recovery of it?

6         A.  I don't know.

7         Q.  You're claiming that the hindrance to recovery

8    was the fact that another transaction occurred whereby

9    Kristi transferred a portion of her interest in the car

10   to Joseph Ford.  I'm still trying to understand:  How

11   did that stop you from recovering the vehicle?

12        A.  Joseph Ford wouldn't allow us.  He told us that

13   our contract was null and void, we were out of the deal.

14        Q.  But you continued to have email communications

15   with Joe, didn't you?

16        A.  No, never had communications with Joseph for

17   another three years.

18        Q.  But you did start to have communications again

19   in 2013 with Joe, correct?

20        A.  Three years had gone by.

21        Q.  So let's look at Exhibit 6.  I'm sorry, let's

22   first go to -- yeah, Exhibit 6.  Do you have that in

23   front of you?

24        A.  Uh-huh.

25        Q.  At this point, obviously Joe is providing you

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

63

1    an opportunity to sell this Ferrari, correct?

2         A.  I don't know how to answer that.

3         Q.  Did you receive this email?

4         A.  Yes.

5         Q.  What do you think this email says?

6         MR. GOTTESMAN:  Objection.  Go ahead.

7         THE WITNESS:  You know, now that I know better, I

8    know that Joseph Ford didn't have the ability to sell

9    the car.  So it really means nothing.  He couldn't sell

10   the car.  It wasn't theirs to sell.

11        MR. GATLIN:

12        Q.  Let's drill down on that.  Why couldn't Joe

13   Ford sell the car?

14        A.  Because legally it wasn't theirs to sell.

15        Q.  It wasn't whose?

16        A.  It wasn't Joe Ford's or Kristi's to sell.  It

17   was still legally in court.

18        Q.  So wasn't it really the court action that

19   hindered your recovery?

20        A.  I'm not sure.

21        Q.  But you testified that it was Joe Ford having a

22   75 percent share of Kristi's share that hindered your

23   ability to recover.  But obviously whether Joe had a

24   1 percent share or a hundred percent share, on February

25   17, 2014 he's still wanting David Clark to sell this

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

64

1    vehicle, isn't he?

2        A.  Yeah.  But how could he?

3        Q.  It was impossible for him to allow you all to

4    sell the vehicle?  Is that your testimony?

5        A.  I'm not sure.  I mean...

6        Q.  So take Joe Ford out of the equation.  If it

7    was just Kristi -- and I'm not sure why it has any legal

8    significance whether Kristi has assigned her share to

9    Ford or not, but let's just -- if Ford wasn't a part of

10   that equation would you have been able to sell and

11   recover the Ferrari?

12       A.  No, because they'd already breached our

13   contract with Bonhams.  As of this time Bonhams is

14   exclusively handling the car.

15       Q.  Who signed up Bonhams?

16       A.  I have no idea.  They signed it with Bonhams.

17       Q.  It was part of the litigation settlement more

18   or less, wasn't it?

19       A.  I have no idea.

20       Q.  So Bonhams is really what hindered your ability

21   to recover the vehicle?

22       A.  No.  They could have said, "Hey, Bonhams, we

23   have a contract with David Clark that says that he has

24   exclusive rights to sell the car."  They could have said

25   that.

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

65

1       Q.  But you did receive a letter from Bonhams,
2   right?  Defendant's Exhibit 7, the next one here.  You
3   remember receiving this email?
4       A.  Yes.
5       Q.  When you read this email from Anthony Maclean
6   what did the email mean to you?
7       A.  It meant that they were taking control.
8       Q.  Doesn't it also say in paragraph 4 if you do
9   have a client interested in buying the car to notify
10  them immediately?
11      A.  At which point we answered by sending them a
12  reply that we have the right to sell the car and not
13  them.
14      Q.  But you didn't provide them any potential
15  buyer.
16      A.  Would you turn over your client to Bonhams?
17      MR. GOTTESMAN:  Just answer the question, Deborah.
18  No questions in response, please.  He's entitled to
19  answer to --
20      THE WITNESS:  No.
21      MR. GATLIN:
22      Q.  Did you have a buyer as of January 25th 2014?
23      A.  I'm not sure.
24      Q.  You're not sure.  Meaning you don't think you
25  did or you don't recall or you don't know?

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

66

1        A.  I don't know.

2        MR. GOTTESMAN:  Mr. Doyle, do you want to jump in?

3        Deborah, take a break.

4        (Recess.)

5                        -EXAMINATION-

6        BY MR. DOYLE:

7        Q.  Hello, Deborah.  My name is Tom Doyle.

8        A.  Hi.

9        Q.  Hi.  I represent Karyl and Katrina.  Just

10   quickly, have you ever met Karyl Kleve or Katrina

11   English?

12       A.  Unfortunately, no.

13       Q.  Have you ever spoken with either of them in any

14   way?

15       A.  No.

16       Q.  Ever communicated with them in any way?

17       A.  No.

18       Q.  Do you have any personal knowledge about

19   anything that Karyl Kleve and Katrina English did in

20   regards to this Ferrari in this case?

21       A.  No.  Unfortunately not.

22       Q.  Thank you.  Do you work full time?

23       A.  No.

24       Q.  Do you work part-time?

25       A.  No.

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

67

1      Q.   In your 47 years of marriage did you ever have
2   another job outside the home?
3      A.   Yes.
4      Q.   What did you do?
5      A.   I worked at car dealerships.
6      Q.   When was the last time you worked at a car
7   dealership?
8      A.   2000.
9      Q.   What kind of car dealerships?
10      A.   Rolls Royce, Ferrari, Mercedes, Cadillac.
11      Q.   So you have experience in high-end cars.
12      A.   Yeah, sort of.
13      Q.   What did you do at the dealership?
14      A.   A little bit of everything.  I've done service.
15   I've done administrative in the sales department.
16      Q.   Since 2000 is the only income to your household
17   through Dave's work selling cars?
18      A.   Yes.
19      Q.   How many cars do you guys typically sell a
20   year?
21      A.   Two, three.
22      Q.   Two or three?
23      A.   Yeah.
24      Q.   What's the average commission you make on a
25   car?

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

68

1        A.  Don't know.  It varies.

2        Q.  Have you -- when I say you, you and/or Dave --

3    you said, and Dave testified, you guys have worked

4    together on this.  Have you guys ever made a commission

5    that was a higher dollar amount than what your client

6    made on a deal?

7        A.  Can you reword that question?  I'm not quite

8    sure what you mean there.

9        Q.  Sorry.  That was my fault.  The deals that you

10   and Dave have done on behalf of clients has there ever

11   been a deal where you and Dave made more money than your

12   client?

13       A.  No.

14       Q.  Did you do anything -- when I say you, now this

15   is just you, Debbie -- personally in an attempt to

16   recover and sell the Ferrari?

17       A.  Me personally?

18       Q.  Yes.

19       A.  Other than correspondence?  I'm not sure how to

20   answer this one either.

21       Q.  Sure.  Did you personally do anything to

22   assist in help --

23       A.  Yes.

24       Q.  -- and recover and sell?  You did.

25       A.  Yes.  Communication, you know?

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

69

1          Q.   Communication with who?

2          A.   In email.

3          Q.   Email?  So this is when you answered Dave's

4     emails and sent Dave's emails about the car?

5          A.   Yes.

6          Q.   Now, does anyone else besides you help Dave

7     sell cars?

8          A.   No.

9          Q.   So this communication that you talked about,

10    who did you communicate with?

11         A.   Whatever emails needed to be answered or sent.

12         Q.   Who sent the email that had to be answered?

13         A.   Well, Joseph Ford sent emails.

14         Q.   So you personally sent and received emails from

15    Joseph Ford about the Ferrari.

16         A.   Yes.

17         Q.   Is that correct?  Anyone else?

18         A.   Just David's clients.

19         Q.   About this Ferrari?

20         A.   Yes.  Such as Mr. Stu Carpenter for instance.

21         Q.   So you communicated with Mr. Stu Carpenter

22    about this --

23         A.   Not me personally.

24         Q.   That's what I'm asking.  I'm asking you.  What

25    did you personally do?

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

70

 1        A.   Nothing.

 2        Q.   Well, you said you communicated with Joe Ford

 3   about the Ferrari.

 4        A.   I did all the emails.  Now, if you call that

 5   communicating.

 6        Q.   I'm asking you.  Let's slow down here.  I'm not

 7   trying to trick you.  We're trying to figure out exactly

 8   what you personally did to help recover and sell this

 9   Ferrari.

10        A.   Nothing.

11        Q.   You did nothing.  Okay.

12        A.   I don't know how to answer that.

13        Q.   I want you just to tell me if you did anything.

14        A.   The emails.  I told you.  Emails.

15        Q.   Emails to Joe Ford.  Did you personally do any

16   other emails to anyone else about the Ferrari?

17        A.   I did lots of emails regarding this Ferrari.

18        Q.   Who did you send emails to?

19        A.   I can't.  That's privileged information.  I

20   can't give you those -- one of them I can talk about

21   because he ended up buying the car is Stu Carpenter's

22   client, Mr. Les Wexner.

23        Q.   So you sent other communications about this

24   Ferrari to other potential buyers.

25        A.   Yes.

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

71

1        Q.   How many?  I'm not asking the names.

2        A.   I don't know.  I don't know.

3        Q.   Was it more than five?

4        A.   I don't -- I don't know.  I really couldn't

5    answer that.

6        Q.   So you sent emails to Stu Carpenter, Joe Ford

7    and an unknown number of unknown people.

8        A.   Right.

9        Q.   Is that what you're testifying to?  Did you do

10   any other communications to anyone else that you can

11   discuss?

12       A.   No, I don't think so.  I can't think of anyone.

13       Q.   So besides these communications you did nothing

14   to assist in the recovery and sale of the Ferrari; is

15   that correct?

16       A.   Not that I recall.  I don't know.

17       Q.   Now, when Dave entered into the contract that's

18   marked as Exhibit 1 did you think that a lawsuit was

19   going to be filed about this Ferrari?

20       A.   No.

21       Q.   So that lawsuit was an unforeseen event that

22   you had no idea it was coming?

23       A.   No.  Who can tell the future?  No.

24       Q.   The Skype communication, we don't need to

25   graphically go back out under it.  I know you testified

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

72

1   about it was just playing.  Was that communication in
2   Kristi Lawson's best interests?
3        A.  You have to understand that Kristi had cut off
4   communications with us, so had Joseph Ford.  So seeing
5   as how we were -- what would you call -- removed from
6   them, it was just between Christopher and I.  I wasn't
7   involving anyone else.
8        Q.  So those conversations had nothing to do with
9   Kristi.
10       A.  No.  No.  Our best interests was always Kristi.
11   Kristi, Kristi, Kristi.  No.
12       Q.  That's what I'm asking.  Were those
13   conversations in Kristi's best interests?
14       A.  We were far removed from Kristi.  And my
15   conversations with Christopher Gardner, you'd have to
16   know the whole history of what transpired between him
17   and I for instance.  Him -- what do you call it?  Taping
18   phone conversations, all that stuff.  I just -- I was
19   just doing it to play with him really.  I knew what he
20   was like.  I knew what he was doing.
21       Q.  It's a pretty easy question.  I'm not trying to
22   ask you the same thing over and over, but you're also
23   not answering it.  Were those Skype conversations with
24   Christopher Gardner about the Ferrari were they in
25   Kristi Lawson's best interest?

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

73

```
 1        A.   Were they in her best interest?

 2        Q.   Or her interest at all?

 3        A.   They were not in her interest at all.

 4        Q.   That's all I need to know about that.  We've

 5   talked about how you are not on the contract that has

 6   been marked as Exhibit 1.  Are you normally on the

 7   contracts with the customers that Dave has to sell cars?

 8        A.   Never.  Never.

 9        Q.   You've never been on a contract.

10        A.   Never.

11        Q.   You said the Skype conversations with Chris

12   Gardner were hypotheticals.

13        A.   Yeah.  I don't know if that's the right word.

14   I was just fooling him.  I was just -- yeah.  Whatever

15   he said I would answer to what -- you know, wherever the

16   conversation was going.

17        Q.   How are we supposed to know when we read your

18   communications that you said on this case if they were

19   just hypotheticals or playing around or if they were

20   real?

21        A.   By my actions.  My actions are that David and I

22   flew to Cincinnati in November of 2013 and actually

23   testified for Joseph Ford and Kristi Kleve.  Okay?

24   Those are actions.  Those are what count.

25        Q.   So we can't trust any of the words that you
```

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

74

1   write in communications, we have to see what happened

2   afterwards to see if you were at that time playing

3   around or if you were serious?

4          MR. GOTTESMAN:  Objection.  It's argumentative.  Go

5   ahead.

6          MR. DOYLE:

7          Q.  Is that what you're saying?

8          A.  Well, depends on who I'm having the

9   communications with.

10          Q.  So you only play around with certain people and

11   then other people -- I don't understand what you're

12   saying.

13          A.  Well, there are good people in this world and

14   there are bad people in this world, and bad people might

15   have you think -- believe, believe certain things, okay?

16   So you're certainly not going to tell the truth to those

17   bad people, you just kind of play with them and tell

18   them what you feel should be written.

19          Q.  So if the person's bad you play around with

20   them and if the person is good you tell them the truth?

21          A.  Yes.

22          Q.  The determination of if a person is good or bad

23   is just something you do on your own?

24          A.  No, it's history.  You've got to look at a

25   person's history, what they've done bad, and this guy's

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

75

1    really bad.

2        Q.  Chris Gardner?

3        A.  Yes.  He's hurt a lot of people.  He's cheated

4    a lot of people.  And I guess you could say we just were

5    really pissed to find out that he was involved in the

6    case.

7        Q.  Do you plan on suing Chris Gardner over this

8    Ferrari?

9        A.  I can't answer that.

10       Q.  Have you discussed suing Chris Gardner with

11   your husband?

12       A.  I can't answer that.

13       Q.  What do you mean you can't answer that?  Is it

14   I don't know or...

15       A.  It's in my best interest not to answer you

16   that.

17       Q.  So you're refusing to answer whether or not

18   you've had discussion with your husband about suing

19   Chris Gardner?

20       A.  Yes.

21       Q.  What basis?

22       A.  That's none of your business.

23       MR. GOTTESMAN:  Deborah, look.  I understand why

24   you're reluctant to answer that question, but I think

25   it's a fair question for Tom to ask and I think you

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

76

1    should -- despite your desire not to answer I think you

2    ought to tell him whether you discussed it.

3         THE WITNESS:  All right.  David has discussed it

4    with me.  I have not discussed it with him because --

5    well, because we feel differently about this.

6         MR. DOYLE:

7         Q.  How do you feel about it?

8         A.  I honestly have mixed feelings.  I don't know.

9    Something that I need time on.

10        Q.  So your mind's not made up yet?

11        A.  Right.  Exactly.

12        Q.  What are David's thoughts on it?

13        MR. GOTTESMAN:  Objection.

14        THE WITNESS:  That's for you to ask David.

15        MR. DOYLE:

16        Q.  Do you know his thoughts on it?

17        A.  Yeah.

18        Q.  What are they?

19        A.  He would like to sue Gardner.

20        Q.  He would like to sue.  Why do you have mixed

21    feelings.

22        A.  I don't know.

23        Q.  Do you think -- is it because a lawsuit is a

24    tough thing to do and undertake?

25        A.  Yes.

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

77

1      Q.   And it creates a burden on that person?

2      A.   Pardon me?

3      Q.   And it creates a burden on that person?

4      A.   Yes.  Well, I don't care about that.  No, I

5    don't care about -- in this case, in this particular

6    case I feel bad, yes.

7      Q.   So is Karyl Kleve a bad person?

8      A.   No.

9      Q.   But you sued her.

10     A.   I know.

11     Q.   And you have mixed feelings about suing the

12   real bad guys, you said.

13     A.   No.  No.  It's just about the process.  I don't

14   have mixed feelings about suing a bad guy, it's just the

15   process.

16     Q.   What does that mean?

17     A.   The legal process.

18     Q.   I don't understand your answer.

19     A.   I don't want to go through a legal process of

20   another lawsuit.

21     MR. DOYLE:  Thank you very much for your time.  I

22   don't have any other questions.

23     THE WITNESS:  All right.

24     MR. GOTTESMAN:  Jack, are you reloading?

25     MR. GOTTESMAN:  I guess you're next in the

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

78

1    rotation.  Are you getting back up?

2         MR. HAWLEY:  I do have a couple.

3         MR. GOTTESMAN:  Deborah, maintain your position.

4    Be patient.  Mr. Hawley has some follow-up for you, and

5    I think it will be brief.  It's 5:30 here.  I think

6    everybody is running out of gas so just bear with us,

7    okay?

8         THE WITNESS:  Okay.

9         (Recess.)

10        MR. HAWLEY:  I wonder if it might make sense for us

11   to get a couple documents out before I start asking

12   questions just so things will start going more smoothly

13   when I do.

14        The first document I would like you to get would

15   be -- this is to the court reporter -- in the same PDF

16   that we've been working with -- the contract and the

17   Skype and the emails -- and there should be one

18   JF3000560.  The other one that I would like to have

19   ready would be the Affidavit of David Clark, which I

20   believe is in a separate PDF.  It should be there

21   somewhere.

22                    -FURTHER EXAMINATION-

23        BY MR. HAWLEY:

24        Q.  I want to make sure I understand the timing of

25   some things that happened that we've discussed today but

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

79

1  most of which we've discussed today.  You mentioned that

2  after you put Kristi in touch with Joe Ford you or your

3  husband got a call from Joe Ford and he said that your

4  deal with Kristi was terminated; is that correct?

5      A.  He said null and void.

6      Q.  Null and void.  Was that shortly after you put

7  Kristi in touch with Joe Ford?  Which was in 2010.

8      A.  It was right after he signed a contract with

9  Kristi and got control.

10     Q.  And the contract he signed with Kristi was in

11 2010.

12     A.  February 22nd, yes.

13     Q.  And so in 2010.  And then after that you didn't

14 have any other conversations with Kristi or Joe for a

15 couple years; is that correct?

16     A.  Correct.

17     Q.  Now, the next thing, Exhibit 10 was your Skype

18 conversations with Christopher Gardner from February of

19 2012.  And those were the conversations where -- and I

20 recognize you saying that you're just playing with

21 Gardner and you're not believing a word he's saying, but

22 the Skype conversation talks about him covering you and

23 your husband from his share and offering -- and you're

24 trying to get him to offer or he's offering 5 percent of

25 his proceeds from the sale.  I recognize that you're

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

80

1    saying that that was all hypothetical, imaginary in

2    jest.  I'm just trying to establish a timeline here

3    though.  You had this conversation with Chris Gardner

4    after Joe Ford told you that your contract with Kristi

5    was null and void; is that right?

6         A.   About two years after, yes.

7         Q.   Now, do you have the one that's JF3000560?

8    Which should be marked as Defendant's Exhibit 13.  Do

9    you have that in front of you?

10        A.   Yes.

11        Q.   Now, up at the top that's an email that appears

12   to come from your husband David Clark.  It's not clear

13   who that's sent to except there appears to be a reply

14   right down below that which is from Chris Gardner; is

15   that right?

16        A.   Yes.

17        Q.   It's backwards.  Chris Gardner is telling you

18   that you have an agreement with Kristi for her to pay

19   you at 8:17 in the morning, September 13th, right?

20        A.   That's what he's saying.

21        Q.   He's claiming he settled the deal with

22   Florence, and because of him the car will sell, and Ford

23   is going to go to the dumpster and Kristi is going to

24   pay you; is that right?

25        A.   That's right.  That's Christopher.

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

81

1        Q.   Then your husband or maybe you writing for your
2    husband asks if -- well, if Ford is out, how is this
3    going to influence and to who.  And is he wondering how
4    that might affect his ability to be paid?
5        A.   No.
6        Q.   Pretty clearly, though, at 8:17 that morning
7    Chris Gardner is telling you he's not paying you out of
8    his share, isn't he?
9        A.   I suppose that's what he's talking about.  I
10   mean, he's not saying he's not paying -- we're not
11   talking about him paying.
12       Q.   He's telling you you got to get your money from
13   Kristi, right?
14       A.   That's always been known.
15       Q.   Now, on your phone -- and eventually we'll
16   substitute the actual affidavit -- it's Affidavit of
17   David Clark, which is signed -- if you look on the last
18   page it looks like October 9th of 2013.  About a month
19   after Chris Gardner's telling you and your husband you
20   got to get your money from Kristi you're back supporting
21   Joe Ford and Kristi in the litigation by providing this
22   affidavit.  Is that a good timeline that I have
23   here?
24       A.   The timeline, yes.  It speaks for itself.
25       Q.   I think I have one last question which your

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

82

1    attorney, I believe, is going to instruct you not to

2    answer, but can you tell me when you first contacted

3    Zach Gottesman with the intention of retaining him to

4    file this lawsuit?

5        MR. GOTTESMAN:  I don't have a problem with you

6    giving him a date.  I don't want you to disclose any of

7    the substance of our conversations, Deborah.  Follow my

8    instruction.

9        THE WITNESS:  Ask the question, please.

10       MR. HAWLEY:

11       Q.  Can you tell me when you and/or your husband

12   first contacted Zachary Gottesman with the intention of

13   hiring him as your attorney in this lawsuit?

14       A.  The truth is it was actually someone that we

15   don't know in England that contacted Zachary to

16   represent us.

17       Q.  Who is that someone?

18       A.  Someone on FerrariChat.

19       Q.  What's that person's name?

20       A.  Kim.

21       Q.  I'm sorry, what?

22       A.  Kim.

23       Q.  Kim who?  Kim what?

24       A.  I don't know.  He works at Parliament in

25   London.  Kim something.

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

83

1        Q.  Kim directly contacted you and/or your husband
2    and told you to hire Zach Gottesman?
3        A.  No.  That all kind of fell out of the sky.  We
4    didn't contact Zach.
5        Q.  Tell me about Kim.  What happened on
6    FerrariChat?  Were you chatting on the FerrariChat?
7        A.  I told the truth in the story on FerrariChat
8    how we got cheated and people came to our aid.
9        Q.  So someone responded.  You put something on
10   FerrariChat and someone responded to that by telling you
11   to hire Zachary Gottesman.
12       A.  No.  They didn't tell me to hire Zachary
13   Gottesman.
14       Q.  Did they just tell you to file a lawsuit?
15       A.  No.  They just said that they were pretty sure
16   that Zachary would be willing to help us.
17       Q.  Do you know how this person knew Zachary
18   Gottesman?
19       A.  Yes, from the London case.
20       Q.  Was this person involved in the London case?
21       A.  No.  They were spectators.
22       Q.  Were they spectators present during any of
23   the --
24       A.  I believe they were at each and every hearing.
25       Q.  What was their role in attending each and every

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

84

1    hearing, just simply spectators?

2        A.  They own Ferraris.  They were interested.  The

3    whole world was interested in this case.

4        Q.  When you say "they" is it someone more than

5    this Kim person?

6        A.  Nobody that really stands out.

7        Q.  Do you recall any of their names --

8        A.  No.

9        Q.  -- you're referring to?

10       A.  No.  I wasn't on FerrariChat very much, so I

11   didn't really get a chance to know these people.

12       Q.  Now, did you attend any of those London

13   hearings?

14       A.  No.

15       Q.  How do you know that this Kim person was at

16   each and every one of the hearings?

17       A.  I don't know.  Read FerrariChat.  That's how I

18   know.  Those people talk about it.

19       Q.  Do you still have those FerrariChats?

20       A.  Well, they're online.  Just go to

21   FerrariChat.com.  They're all there.

22       Q.  Do you have them?

23       A.  Only where I am speaking, yes.

24       Q.  When you say only when are you speaking, do you

25   have things where people are responding to you?

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

85

1      A.   Yes.  Some of them very negative way.  A lot of
2  slander there against me.  Defamation of character, the
3  whole bit.  It's an interesting read.  You ought to read
4  it.
5      Q.   Who is defaming and slandering you on
6  FerrariChat?
7      A.   I have no idea.  I don't know those people.
8      Q.   Did you print those out or --
9      A.   Yes, they're printed out.  You can ask my
10  attorney for them.  They're printed out.  You'd be
11  shocked.
12      Q.   Do you know approximately when, what time
13  period that was that you got the suggestion from this
14  Kim person?  Is that Kim a first name or last name?
15      A.   I believe it's his first name.  That was about
16  September, October 2016.
17      Q.   Did you or your husband communicate with
18  Mr. Gottesman at any time in any of the prior litigation
19  proceedings?
20      A.   I don't believe so.  We did an arbitration for
21  Joseph Ford, but I don't think that Zachary ever talked
22  to us.  I think it was someone else.
23      Q.   Did you ever speak to him on the telephone at
24  the time?
25      A.   When?

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

86

1          Q.   In the prior litigations or at any time?

2          A.   Prior to when?

3          Q.   In any of the prior litigation.

4          A.   From the other court cases, no.  I don't think

5     so.

6          Q.   Any email correspondence with him?

7          A.   No.

8          Q.   After you heard from Mr. Kim did you contact

9     Mr. Gottesman?

10         A.   No.

11         Q.   Did your husband?

12         A.   No.

13         Q.   Did Mr. Gottesman contact you?

14         A.   Yes.

15         Q.   Do you know whether Mr. Gottesman was paid a

16    portion of Chris Gardner's proceeds?          [QUES]

17         MR. GOTTESMAN:  You said you would only know that

18    through attorney-client communications.  I would

19    instruct you not to answer.

20         MR. HAWLEY:

21         Q.   Let me ask you.  Let me give you something

22    hypothetical here.  Let's say that Chris Gardner got a

23    lot of money out of the sale of the Ferrari, like a

24    couple million dollars, and Mr. Gottesman got a

25    percentage of Chris Gardner's funds, and Mr. Gottesman

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

87

1    is now representing you trying to get 10 percent of the

2    total sale price from Kristi Lawson, which would include

3    money that Mr. Gottesman has already earned.  Do you

4    think that's fair?

5        A.  I couldn't answer that.

6        Q.  As a person bringing this lawsuit seeking that

7    result do you think that you are acting fairly?

8        A.  I couldn't answer that.

9        Q.  I think my next question would be whether you

10   have agreed to pay Mr. Gottesman a percentage of what

11   you get in this lawsuit.                    [QUES]

12       MR. HAWLEY:  Are you going to allow her to answer

13   that because I'm going to ask her that.  Fee agreements

14   are not privileged, you understand.

15       MR. GOTTESMAN:  I take the position that they are

16   if they include evaluation of the merits of the case.

17   And I'm instructing her not to answer about our fee

18   agreement.

19       Follow my instructions, Deborah.

20       MR. HAWLEY:

21       Q.  Just so the record is clear, you are not going

22   to answer that question.

23       A.  I'm not going to answer that question.

24       Q.  Would you agree that if Mr. Gottesman was on a

25   contingent fee with Chris Gardner and is on a contingent

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

88

1    fee with you that he would be getting a percentage under

2    two separate fee agreements on the same money from two

3    separate clients, Chris Gardner and you, if he wins in

4    this case?

5        A.   I have no idea.

6        MR. HAWLEY:  I have no further questions.

7        MR. GATLIN:  Miss Clark, I have just a few

8    follow-ups.

9                  -FURTHER EXAMINATION-

10       BY MR. GATLIN:

11       Q.   You said several times tonight, today that "we

12   got cheated.  We got cheated."  What do you mean by "we

13   got cheated"?

14       A.   I mean that there's two parties there besides

15   Kristi that did not -- that withheld things from us

16   totally.  We didn't know about Christopher and we didn't

17   know about Ford.  We didn't know they were working

18   together.  The whole thing we got blindsided.

19       Q.   How did any of that blindsiding affect your

20   ability to recover the Ferrari?

21       A.   Well, that was made impossible by all kinds of

22   other things such as the agreement that they all signed:

23   Kristi, Joe, Christopher, Florence and Bonhams, you

24   know?  That's just the beginning.

25       Q.   Is it your position that once litigation was

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

89

1    filed that it was impossible to recover the Ferrari?

2        A.  No, not really.  We still worked on it.  We

3    still did everything we could.

4        Q.  So what efforts did you undertake after 2010?

5    Did you use Skype?  Go ahead.

6        A.  No.  We helped in the recovery.

7        Q.  How?

8        A.  By helping Joe, by helping Chris.  Only we

9    didn't know at the beginning that, you know, that was

10    all phony, that they were working together.  There was

11    just a lot of things that they weren't honest about.  So

12    we were out there trying to sell this car and there was

13    no truth to anything.  First of all, they didn't even

14    have a title.  They didn't have court permission.

15        Q.  So this was when the contract was signed in

16    2007 they did not have title is your position.

17        A.  In 2007 there was no lawsuit.  It was after the

18    lawsuit.

19        Q.  When you said it was all phony, was it phony

20    like the Skype conversations you had with Chris Gardner?

21        A.  Exactly.

22        Q.  Now, why did you testify, or why did David and

23    you testify and/or have an affidavit to assist Joe Ford?

24        A.  You know, it wouldn't -- it doesn't have to be

25    the name Joseph Ford.  It was a matter of having an

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

90

1    affidavit that told the truth.

2         Q.  So what was the purpose of you having an

3    affidavit that told the truth?  Specifically Exhibit 14,

4    what's the purpose of that document?

5         A.  Which is what?

6         Q.  Exhibit 14 is --

7         MR. GOTTESMAN:  Look on your phone, Deborah.

8         THE WITNESS:  Yeah, I will.

9         MR. GATLIN:

10        Q.  It's the affidavit of David Clark.

11        A.  Which one, 14?  Which paragraph?

12        MR. GOTTESMAN:  He's not referring to a specific

13   paragraph.

14        MR. GATLIN:

15        Q.  I'm just saying what was the purpose of this

16   affidavit of David Clark?

17        A.  Because Joseph Ford and Christopher Gardner

18   were in court, and Joseph Ford needed the truth told,

19   Christopher Gardner needed the truth told.  They both

20   wanted the truth told.  So we told the truth.  Now, it

21   happened to be in Joe's favor.  It could have been in

22   Gardner favor, depending on what the truth was, but this

23   is the truth.

24        Q.  Have you had a chance to review the affidavit

25   of David Clark?

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

91

1        A.  Have I had a chance?  I typed it up.

2        Q.  You typed up the affidavit?

3        A.  I typed up the affidavit.

4        Q.  Is it your position that this is the truth?

5        A.  As far as I know, sure.  I was there.

6        Q.  Whose signature is it on page 3 of this

7   affidavit?

8        A.  If you can see that's under notary.  That's

9   David's signature because you can tell it's different

10  than my signature.

11       Q.  You still stand by this affidavit as being the

12  truth?

13       A.  Yes.  As far as I know.

14       Q.  There's nothing in this affidavit that you

15  would dispute?

16       A.  As far as I know.

17       MR. GATLIN:  Nothing further.

18       THE WITNESS:  Can't we get this over with?

19       MR. DOYLE:  Thank you for that reaction.  It's good

20  to see you too.  We're in the home stretch.  We're

21  really close.

22       THE WITNESS:  Okay.

23                    -FURTHER EXAMINATION-

24  BY MR. DOYLE:

25       Q.  So earlier you testified about you helped Dave

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

92

1   by communicating with mystery buyers, and you wouldn't
2   tell me the number or who they were.  Do you remember
3   the years?
4        A.  No.  It's so hard -- you know how many years
5   have gone by here?  It's really hard to remember.
6        Q.  Let's try to narrow it down because you talked
7   about Joe Ford's contract that was signed with Kristi in
8   February 2010, right?
9        A.  Right.
10       Q.  How many potential buyers did you communicate
11  with before February 2010?
12       A.  Oh, no.  We were trying to make things right
13  with Florence then.
14       Q.  So the answer is zero?
15       A.  Right.  We were supposed to get the car and the
16  parts together so they could be sold remember as one
17  car, remember?  Yeah.
18       Q.  So all this communication, which we will
19  request and hopefully we can work out a way through
20  redaction or something that we need to get this
21  communication.  All the communication with these mystery
22  buyers happened after 2010, correct?
23       A.  Uh-huh.
24       Q.  Was it after 2014 when Joe Ford reached out to
25  you again after not hearing from them for three years?

5273afd7-a782-46cf-9f5d-8df2432e1978

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

93

1      A.  Again, that was the end of 2013 when he reached

2  out to us.

3      Q.  So all the communication with these potential

4  buyers happened after he reached back out to you.

5      A.  Right, uh-huh.

6      Q.  So before that there were no communications

7  with potential buyers; is that correct?

8      A.  No.

9      Q.  That is a correct statement though?

10      A.  Right.  Right.

11      Q.  Was Joe Ford essential to the eventual sale of

12  this car?

13      A.  Was he essential?

14      Q.  Yes.

15      A.  I think he hindered it by breaking the

16  agreement.

17      Q.  By breaking what agreement?

18      A.  That agreement that they all had with Bonhams

19  and Swaters and -- what is it called?

20      Q.  Heads of agreement?

21      A.  Yes, that one.

22      MR. DOYLE:  I do not have any other questions.

23      MR. GOTTESMAN:  Jack?

24      Court reporter, my name is Zach Gottesman and I'm

25  speaking on behalf of plaintiff.  My client, Deborah

Deborah Clark, 12/20/2017
(via LSS Affiliate Reporting Firm)

94

1    Clark, asserts her right to review the transcript and

2    sign it if it is ordered.  Deborah, you're done.  Get

3    up, grab Dave, get out of there.

4         THE WITNESS:  Thanks.  Goodbye.

5         (The proceedings concluded at 3:14 p.m.)

6                         ***

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 95

1   STATE OF CALIFORNIA ) ss

2

3       I, Marc Volz, CSR 2863, RPR, CRR, CRC, do hereby

4   declare:

5       That, prior to being examined, the witness named in

6   the foregoing deposition was by me duly sworn pursuant

7   to Section 2093(b) and 2094 of the Code of Civil

8   Procedure;

9       That said deposition was taken down by me in

10  shorthand at the time and place therein named and

11  thereafter reduced to text under my direction.

12      I further declare that I have no interest in the

13  event of the action.

14      I declare under penalty of perjury under the laws

15  of the State of California that the foregoing is true

16  and correct.

17

18      WITNESS my hand this 8th day of

19  January, 2018.

20

21  _____

22  MARC VOLZ, CSR NO. 2863, RPR, CRR, CRC

23

24

25

EXHIBIT 14
REPORTER Jn. Lolz
WITNESS Deborah Clark
DATE 12-20-17

### Affidavit of David Clark

After being duly sworn, affiant hereby states under oath that:

1. My name is David Clark. I live at 3547 Riviere Drive, San Diego, California, 92109. I am sixty-five years of age. I am married to Deborah Clark. I represent sellers and buyers as an agent. I mostly work with Estate Sales, to sell their classic cars. I have been doing so since approximately 1979.

2. On or about July 18, 2007 I agreed to recover and sell a 1954 Ferrari 375 Plus 0384AM ("Ferrari") that had been stolen from Karl Kleve. Some parts had not been stolen and remained in Ohio, which I will call the Ohio Parts ("Ohio Parts"). Kleve had passed away so his heirs signed the contract. A true and correct copy of that agreement with Kleve's heirs ("Heirs") is attached as Exhibit A.

3. In my effort to perform my contract, I traveled from my home in San Diego, California to Cincinnati, Ohio. I also made contact with the European ("Swaters") who was believed to be in possession of the Ferrari.

4. I traveled to Cincinnati, Ohio on more than one occasion and also met with Kristi and her husband on the West coast to discuss and go over all related materials with Kristie Lawson. I studied all related documents and viewed all the parts that were still in the possession of the Kleve Heirs. Kristi Kleve, my wife and I also traveled to another state to look at the motor and speak to the then current owner of the original correct motor. We discussed the possibility of holding the motor until such a time that the motor could be reunited with the rest of the car. I then contacted the Swater's family and spoke to Florence Swaters in regards to working out a mutual compromise to reunite the car with the original parts in Ohio. Ms. Swaters was not aware of the facts and that we presumed the car in Belgium had been stolen from Mr. Kleve. She then agreed to meet with Kristi Kleve sometime in early January, a date had been discussed. Florence Swaters called Kristi and talked to her about meeting in Ohio, this meeting never took place. Because on or about February 17, 2010, Swaters filed suit in Cincinnati, Ohio as Case A1001370, claiming that he owned the 100% of the Ferrari and its Ohio Parts because his agent had settled those claims with Kleve in 1999.

5. In February of 2010 needing to find someone very quick, as Kristi had to reply to the lawsuit within a short period of time I called, Gardner of Switzerland ("Gardner"). Having had numerous conversations with Gardner about cars in the past I knew that Gardner had been involved in lawsuits involving classic cars and I figured he may be able to suggest who I could call. Gardner described how his Bugatti and Gullwing had recently been released by French authorities as a result of a year's long legal battle with the French Comite au family. In reply I mentioned the Ferrari lawsuit that had just been filed. I explained how we wanted to help Kristi Kleve that she didn't deserve to be put through this. How sweet she was and that they had no financial means to retain legal

EXHIBIT
tabbies®
F.F.

advice. I asked Gardner if he knew of someone we could get to help in the legal case, maybe take the case on a contingency. Gardner said that he could not get involved because he was still very ill and suggested we contact Joseph Ford. He explained to us that Joe Ford had helped him in the past and had been his friend for a longtime. Gardner explained that Ford was very good at organizing and searching out for information and putting this all together for Gardner. Joe Ford was an ex-car dealer/exporter with a law degree and prior, inactive law license had helped Gardner and Gardner's attorneys in the Cointreau battle.

6. At no time did the Heirs decide to sell the parts, at no time did I offer the parts for sale to Gardner. The Kieve Heirs were being sued over the parts and title; it would not be feasible to offer the parts for purchase. My conversation at the time was whether Ford (not Gardner) could help Lawson. If my wife and I thought Ford could help, we would then refer Ford to Lawson.

7. My wife and I contacted Ford. We interviewed Ford for about an hour on Skype. Ford explained his former experience as an Architect with Ford's master's degree in Architecture, Ford's Law Degree, Ford's inactive Louisiana law license, the fact that Ford did not practice law. Gardner had stated, Ford helped Gardner and Gardner's attorneys in the Cointreau affair in Europe. After the interview with Ford, my wife and I agreed that because of Ford's unique skill set and experience, Ford might be able to help Lawson. At no time did we think Ford neither was to act as a lawyer nor did Ford offer to act as a lawyer, for us or for anyone else. At no time did Ford claim to have acted as Gardner's lawyer. Ford explained he would put together a legal team in Ohio to represent Kristi Kieve Lawson and Heirs.

Shortly after interviewing and approving of Ford, I gave Ford's name and contact information to Kristine A. Lawson. I suggested to Lawson that she contact Ford.

8. Within ten days or less, I learned from Kristi that Ford and Lawson entered into a contract and that Ford was helping Lawson. I first learned of Gardner's involvement around November or December of 2011, after being asked by an Auction House if Gardner was involved in the case, my wife and I both said "No way". Gardner never once mentioned he was involved with the case. Shortly thereafter my wife Skype's Gardner and asked him outright if he was involved with the case on the 375 plus. My wife actually said to Gardner, "why did you keep this information from us when we brought this case to your attention from the very beginning".

9. In the recent weeks, Gardner asked me to provide an affidavit saying that I offered the Ohio Parts to Gardner and that Gardner agreed to buy them using Ford as his agent. Gardner also asked me to state that Ford represented himself to be an actively licensed and practicing Lawyer. I refused to provide any such affidavit because that would not be the truth.

Further affiant sayeth naught.

Affiant Signature

State of California
County of _____

Subscribed and sworn to (or affirmed) before me on this ____
day of _____ 20__ by _____

_____
proved to me on the basis of satisfactory evidence to be the
person(s) who appeared before me.

(Seal)                    Signature _____